# In the
# United States Court of Appeals
# for the Ninth Circuit

◆

ROGER PALMER, et al.,

*Plaintiffs–Appellants,*

v.

STEVE SISOLAK, et al.,

*Defendants–Appellees.*

◆

On Appeal from the United States District Court
for the District of Nevada
Case No. 3:21-cv-00268-MMD-CSD
The Honorable Miranda M. Du

◆

**APPELLANTS' OPENING BRIEF**

◆

DAVID C. O'MARA
THE O'MARA LAW FIRM, P.C.
311 East Liberty Street
Reno, NV 89501
(775) 323-1321
david@omaralaw.net

RAYMOND M. DIGUISEPPE
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
(910) 713-8804
law.rmd@gmail.com

*Counsel for Appellants*

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellants submit this corporate disclosure and financial interest statement pursuant to Federal Rule of Appellate Procedure 26.1.

Firearms Policy Coalition, Inc., has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

/s/ *Raymond M. DiGuiseppe*
*Counsel for Appellants*

# TABLE OF CONTENTS

Page

INTRODUCTION..................................................................1

JURISDICTIONAL STATEMENT..............................................2

PERTINENT AUTHORITIES...................................................3

ISSUE PRESENTED.............................................................3

STATEMENT OF THE CASE....................................................4

I. Nevada Enacts AB 286 and Categorically Bans the Possession, Receipt, Manufacturing, and Sales of Common, Lawfully Possessed Firearms and Firearm Parts. ................................................................4

II. The Impact on the Plaintiffs and All Other Similarly Situated Individuals Whom They Represent. ............11

A. Facts Relating to Plaintiff Roger Palmer...........11

B. Facts Relating to Plaintiff Chad Moxley.............15

C. Facts Relating to Plaintiff FPC.........................20

III. Procedural History....................................................23

A. Plaintiffs' Motion for a Preliminary Injunction..23

B. Defendants' Motion to Dismiss..........................25

SUMMARY OF THE ARGUMENT..............................................28

STANDARD OF REVIEW........................................................29

ARGUMENT........................................................................30

I. Bruen Repudiated the Means-End Interest Balancing Test that the District Court Applied to Dismiss the Complaint...............................................................30

**Page**

**ARGUMENT**

II.  **The Plain Text of the Second Amendment Covers the Conduct Which is Subject to the Ban.** ........................32

III. **Defendants Bear the Burden of Showing that the Ban is Consistent With This Nation's Historical Tradition of Firearms Regulation.** ...............................................35

IV.  **In Light of the Historical Inquiry Established in *Heller* and Made Explicit in *Bruen*, Plaintiffs Necessarily Prevail on Their Second Amendment Claims.** ............39

V.   **The District Court Wrongly Decided Plaintiffs' Takings Clause Claim.** ...........................................................48

   A.  **No "Police Power" or "Public Safety" Exception Exists.** ...........................................................50

   B.  **The Illusory Disposal Options Also Do Not Excuse the Obligation to Provide Fair Compensation.** ...52

**CONCLUSION**

**TABLE OF CITED AUTHORITIES**

*Cases*

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)......................................29, 30

*Association for Los Angeles Deputy Sheriffs v. County of Los Angeles*, 648 F.3d 986, 990 (9th Cir. 2011)........................................29

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)..............................29

*Butcher v. City of Marysville*, 398 F.Supp.3d 715 (E.D. Cal. 2019).........30

*Caetano v. Massachusetts*, 136 S.Ct. 1027 (2016)..........................35, 38

*Cases*

*Cedar Point Nursery v. Hassid*, ___ U.S. ___, 141 S.Ct. 2063 (2021) 48, 52

*Cousins v. Lockyer*, 568 F.3d 1063 (9th Cir. 2009)...............................29

*District of Columbia v. Heller*, 554 U.S. 570, 554 (2008)................*passim*

*Dore v. U.S.*, 97 F.Supp. 239 (Ct. Cl. 1951).......................................54

*Dougherty v. City of Covina*, 654 F.3d 892 (9th Cir. 2011)....................29

*Drummond v. Robinson Township*, 9 F.4th 217 (3d Cir. 2021)..............33

*Ezell v. City of Chicago*, 651 F.3d 684 (9th Cir. 2011).........................34

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015)..........35

*Frein v. Penn. State Police*, 47 F.4th 247 (3d Cir. 2022)........................38

*Jackson v. City and County of San Francisco*,
746 F.3d 953 (9th Cir. 2014)............................................................33

*Lingle v. Chevron, U.S.A. Inc.*, 544 U.S. 528 (2005)............................48

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)......48, 51

*Luis v. United States*, 578 U.S. 5 (2016)............................................33

*McDonald v. Chicago*, 561 U. S. 742 (2010)............................30, 31, 32

*McDougal v. County of Imperial*, 942 F.2d 668 (9th Cir. 1991)..............30

*New York State Rifle & Pistol Assn., Inc. v. Bruen*,
142 S. Ct. 2111 (2022)...........................................................*passim*

*Olson v. United States*, 980 F.3d 1334 (9th Cir. 2020).........................29

*Pa. Coal Co. v. Mahon*, 260 U.S. 393 (1922)......................................50

*Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978)..........54

*Rhode v. Becerra*, 445 F. Supp. 3d 902 (S.D. Cal. 2020)..................35, 47

*Rigby v. Jennings*, __ F.Supp.3d __, 2022 WL 4448220 (D. Del. 2022)....34

## TABLE OF CITED AUTHORITIES (continued)

*Cases*

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017)................33


***United States Constitution***

First Amendment...................................................................33

Second Amendment.............................................................*passim*

Fourth Amendment................................................................33

Fourteenth Amendment......................................................23, 32


***Federal Statutes***

18 U.S.C. § 921....................................................................53

18 U.S.C. § 922..............................................................46, 53

28 U.S.C. § 1291....................................................................3

28 U.S.C. § 1331....................................................................2

28 U.S.C. § 1343....................................................................2

28 U.S.C. § 2201....................................................................3

28 U.S.C. § 2202....................................................................3

42 U.S.C. § 1983....................................................................3

42 U.S.C. § 1988....................................................................3

27 C.F.R. § 478.92..........................................................10, 53


***State Statutes***

Cal. Penal Code § 29180..........................................................47

Conn. Pub. Act No. 19-6 (2019)..............................................47

# TABLE OF CITED AUTHORITIES (continued)

### *State Statutes*

D.C. Code § 7-2502.02.................................................................47

2019 Hi. HB 2744 (2020)............................................................47

N.J. Stat. § 2C:39-9 (2018).........................................................47

N.Y. Legislation S.13A/A.2666A, S.14A/A.613A (2021)........................47

2020 R.I. HB 7102 (2020)............................................................47


### *Court Rules*

Fed. R. Civ. P. 12.......................................................................25

Fed. R. App. P. 4(a)(1)(A).............................................................3


### *Publications*

1 Charles Winthrop Sawyer, Firearms in American History 145 (1910).................................................................................42

3 Federal and State Constitutions: Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America 1834–35 (Francis Thorpe ed., 1909).........41

5 American Archives, Fourth Series, 1418 (Peter Force ed., 1844).........43

7 Federal and State Constitutions: Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America 3787–88 (Francis Thorpe ed., 1909).........41

7 The Writings Of Thomas Jefferson 325 (Paul Ford ed., 1904).............44

*Publications*

8 Documents and Records Relating to the State of New-Hampshire During the Period of the American Revolution, From 1776 to 1783.......43

Harold L. Peterson, Arms and Armor in Colonial America 178 (1956)...41

James Whisker, The Gunsmith's Trade 145–63 (1992).......................42

Journal of the Maryland Convention July 26 – August 14, 1775, at 64–65 (William Hand Browne ed., 1892)...................................................43

M. L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492-1792, at 149 (1980).........................................42, 45

## INTRODUCTION

In its landmark decision in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the United States Supreme Court unequivocally rejected the sort of means-end, interest-balancing inquiry which formed the basis for the district court's erroneous judgment dismissing the complaint in this case. In *Bruen*, the Supreme Court ruled, "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." 142 S. Ct. at 2126. In spite of the plain text of the Second Amendment, the State of Nevada, through Assembly Bill No. 286 ("AB 286" or the "Ban"), banned the possession and self-manufacture of common, lawfully possessed firearms and firearms parts. However, Nevada unquestionably cannot meet its burden under *Bruen* to show that the Ban is consistent with this Nation's historical tradition of firearm regulation. Indeed, citizens of the United States and their predecessor colonies have been free to manufacture, possess, and sell self-made firearms since well before the Founding such that no *relatively similar* analogue exists.

Here, the district court not only reached the wrong conclusion under an interest-balancing framework, but that framework is now plainly inconsistent with the binding precedent set in *Bruen*. Notably, most if not all recent decisions like this one have been vacated and remanded for further proceedings consistent with *Bruen*. Based on the findings that have already been made in this case, the Defendants-Appellees (hereinafter, "Defendants")[1] cannot possibly prevail, and all that remains to be done is for final judgment to be entered in favor of Plaintiffs-Appellants (hereinafter, "Plaintiffs").

Plaintiffs invoke their right of appeal, seeking that the judgment of the district court be vacated and the case remanded for further proceedings consistent with the United States Constitution and *Bruen*.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 in that this action arises under the Constitution and laws

---

[1] "Defendants" or "Appellees" refers to Defendants Stephen Sisolak, Aaron D. Ford, George Togliatti, and Mindy McKay, who are the only defendants now involved. Joseph Lombardo, Steven Wolfson, Daniel Coverley, and Mark Jackson, law enforcement officials in the counties where Plaintiffs Palmer and Moxley reside, were initially named as defendants but later voluntarily dismissed from the case. ER-33-36.

of the United States, specifically the Second Amendment to the United States Constitution, and relief is sought under 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. §§ 1983 and 1988. The district court granted Defendants' motion to dismiss on March 29, 2022, dismissing Plaintiffs' Complaint with prejudice, which was a final appealable order disposing of all the parties' claims. ER-17-32. The lower court entered final judgment the following day. ER-26. Plaintiffs timely filed a notice of appeal on April 28, 2022. ER-12-13; Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction over this appeal under 28 U.S.C. § 1291, in that Plaintiffs are appealing a final judgment of the district court below.

## PERTINENT AUTHORITIES

The constitutional authority pertinent to this appeal is the Second Amendment to the United States Constitution, which provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

## ISSUE PRESENTED

In light of *Bruen*, did the district court err in holding that Plaintiffs' Complaint fails to plead any set of facts that would entitle them to relief on their Second Amendment claim, such that the complaint could

properly be dismissed for failure to state a claim on which relief may be granted?

## STATEMENT OF THE CASE

**I.**     **Nevada Enacts AB 286 and Categorically Bans the Possession, Receipt, Manufacturing, and Sales of Common, Lawfully Possessed Firearms and Firearm Parts.**

On June 7, 2021, Nevada's Governor Stephen Sisolak signed AB 286 into law. ER-233 [Compl. ¶2].[2] AB 286 amended Chapter 202 of the Nevada Revised Statutes in order to ban the possession, receipt, manufacturing, and sale of Non-Firearm Objects ("NFOs"), and to further ban both the possession of previously self-manufactured firearms as well as, prospectively, any further self-manufacturing of firearms. ER-233 [Compl. ¶3].

The litigation underlying this appeal focuses on portions of amended Chapter 202 which:

  a.     Completely prohibit a person from possessing purchasing, transporting, or receiving NFOs used to machine, print, or otherwise self-manufacture firearms (Sec. 3);

_____

[2]     "Compl." refers to the Complaint, the specific paragraphs of which are cited in parallel with the ER citations for better ease of reference.

b. Completely prohibit a person from selling, offering to sell, or transferring NFOs (Sec. 3.5);

c. Completely prohibit a person from manufacturing, causing to be manufactured, assembling, or causing to be assembled a firearm that is not imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law (Sec. 4);

d. Completely prohibit a person from possessing, selling, offering to sell, transferring, purchasing, transporting, or receiving a firearm that is not imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law (Sec. 5); and,

e. Establish an expansive, inherently vague definition of an "[un]finished frame or receiver," encompassing virtually all conceivable forms and types of NFOs and non-firearm predecessor materials.

ER-233 [Compl. ¶4].

Pursuant to Section 3 of AB 286, effective as of January 1, 2022, it became a crime for anyone in Nevada to "possess, purchase, transport or

receive an unfinished frame or receiver," unless "[t]he person is a firearms importer or manufacturer" or "[t]he unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by a firearms importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number." AB 286, § 3(1)(a)-(b). ER-247 [Compl. ¶61]. Consequently, all ordinary law-abiding citizens (*i.e.*, everyone except firearms importers and manufacturers) were required to dispossess themselves of all "unfinished" frames, receivers, and other NFOs not serialized as "required by federal law" by no later than January 1, 2022. ER-248 [Compl. ¶65]. Further, as of January 1, 2022, no ordinary law-abiding Nevadan may ever again lawfully possess, purchase, transport, or receive any such frames, receivers, or NFOs, effectively barring them from ever lawfully self-building any firearm for any purpose unless and until (1) federal law or regulations require serialization of such component parts and (2) the components are in fact serialized and then transferred in accordance with those laws or regulations before being incorporated into any firearm self-built by the ordinary person. ER-248 [Compl. ¶66].

Pursuant to Section 3.5 of AB 286, which became effective immediately when Governor Sisolak signed it into law, it is a crime for anyone in Nevada to "sell, offer to sell or transfer an unfinished frame or receiver," unless (1) the person is (a) a firearms importer or manufacturer and (b) "the recipient of the unfinished frame or receiver is a firearms importer or manufacturer," or (2) "[t]he unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by an importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number"—subject to the limited exception for sales under section 5.5. AB 286, § 3.5(1)(a)-(b); *id.* at §10(1). ER-249 [Compl. ¶67]. Thus, this section shuts the door on any sale or transfer of any "unfinished frame or receiver," not serialized as "required by federal law," to or by any ordinary law-abiding Nevadan, by immediately criminalizing all such sales or transfers, except for sales that were conducted for purposes of complying with the mandatory dispossession of frames, receivers, and other NFOs by the dispossession deadline of January 1, 2022. ER-249 [Compl. ¶68].

Pursuant to Section 4 of AB 286, which became effective immediately when Governor Sisolak signed it into law, it is a crime for

anyone in Nevada to "manufacture or cause to be manufactured or assemble or cause to be assembled a firearm that is not imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law and any regulations adopted thereunder," unless the firearm "[h]as been rendered permanently inoperable," "[i]s an antique firearm," or "[h]as been determined to be a collector's item pursuant to 26 U.S.C. Chapter 53 or a curio or relic pursuant to 18 U.S.C. Chapter 44." AB 286, § 4(1)(a)-(c). ER-249 [Compl. ¶67]. Because the serialization requirement of this manufacturing prohibition mandates that the firearm's serial number be "issued by a firearms importer or manufacturer," the prohibition effectively bans all self-manufacturing by ordinary law-abiding citizens. ER-249 [Compl. ¶67].

Notably, only licensed manufacturers and importers are required by federal law to imprint serial numbers and then only on completed firearms or finished frames or receivers. ER-58. In other words, unless and until a serialization requirement for unfinished frames or receivers is established under federal law, the Ban literally mandates that, to be lawfully made or possessed, any homebuilt firearm must start, at a minimum, with a finished frame or receiver, and thus it completely

extinguishes any right to self-manufacturing for the ordinary person, because obviously one cannot self-manufacture a firearm that has already been manufactured. *Id.*

Pursuant to Section 5 of AB 286, effective as of January 1, 2022, it is a crime for anyone in Nevada to "possess, sell, offer to sell, transfer, purchase, transport or receive a firearm that is not imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law and any regulations adopted thereunder," unless (1) the person is a law enforcement agency or a firearms importer or manufacturer, or (2) the firearm has been rendered permanently inoperable, was manufactured before 1969, is an antique firearm, or has been determined to be a collector's item pursuant to 26 U.S.C. Chapter 53 or a curio or relic pursuant to 18 U.S.C. Chapter 44. AB 286, § 5(1)(b)-(b). ER-250 [Compl. ¶71]. This section targets existing firearms of ordinary law-abiding Nevadans, who lawfully built them before the Ban, prohibiting as of January 1, 2022, the possession, sale, transfer, transport, or receipt of all such modern and operable firearms manufactured after 1969. ER-250 [Compl. ¶72]. As with the existing NFOs lawfully acquired before the Ban, obtaining serialization after the

fact is no option, because federal law requires that any necessary serialization occur before a completed firearm ever reaches the consumer. *See* 27 C.F.R. § 478.92(a)(1) & (a)(2). ER-250 [Compl. ¶72].

In net effect then, AB 286 (i) imposes a blanket prohibition against all self-built modern operable firearms of any type (all handguns and all long guns) in addition to component parts integral to their manufacture that are not already—and could not be—imprinted with a serial number as required by federal law; (ii) mandated that all ordinary law-abiding citizens dispossess themselves of all such arms and parts on or before January 1, 2022 (or render them useless); (iii) totally bans all such individuals from possessing or using any of the same on and after that date; (iv) immediately banned sales or transfers to these individuals of any "unfinished frames or receivers" that lack the required but unobtainable form of serialization; and (v) immediately banned them from self-manufacturing any firearms that lack the required but unobtainable form of serialization. ER-58-59. Indeed, it is clear that the Nevada lawmakers fully anticipated and intended dispossession as the sole means of compliance. *See* Notes of Assemblywoman Jauregui (AB

286's sponsor) to the amendments of AB 286 on May 11, 2021. ER-248 [Compl. ¶64]. State Defendants readily concede this as well. ER-172.

The Ban generally took effect immediately when Governor Sisolak signed AB 286 into law, and Sections 3 and 5 of the Ban became effective on January 1, 2022, leaving thousands of individuals and countless local businesses mere months to dispossess themselves of all lawfully owned property in the State of Nevada affected by the Ban and putting all residents at risk of enforcement and prosecution for proscribed conduct on and after January 1. ER-234 [Compl. ¶6].

## II. The Impact on the Plaintiffs and All Other Similarly Situated Individuals Whom They Represent.

### A. Facts Relating to Plaintiff Roger Palmer

Plaintiff Roger Palmer ("Palmer") is a resident of Clark County, Nevada, and is a responsible, peaceable citizen not disqualified from exercising his Second Amendment right to possess arms and ammunition. ER-251 [Compl. ¶¶75-76]. Palmer holds a Nevada Concealed Carry Permit and is a retired law enforcement officer who has also served as a firearms instructor, concealed carry instructor, and a state security guard instructor. ER-251 [Compl. ¶¶77-78]. Palmer is now

a full-time private investigator and a member of Plaintiff Firearms Policy Coalition, Inc. ("FPC"). ER-251 [Compl. ¶¶79, 81].

Palmer is not a licensed firearms, manufacturer, importer, or dealer. ER-251 [Compl. ¶80]. Palmer owns and possessed before the Ban multiple unserialized firearms, both handguns and rifles, that he previously self-manufactured lawfully with unserialized component parts, including Polymer80[3] NFOs, one or more of which fall within the new definition of and prohibition against unserialized "unfinished frames or receivers" under Nevada's Ban. ER-251 [Compl. ¶82]. Because these firearms were self-manufactured, the completed firearms themselves necessarily lack "a serial number issued by a firearms importer or manufacturer," thus falling within the Ban's prohibition against all modern, operable unserialized firearms under Section 5 of AB 286. *Id.*

---

[3] "About Polymer80," online at https://www.polymer80.com/about-us: "Polymer80, Inc. designs and develops innovative firearms and aftermarket accessories that provide ways for our customer to participate in the build process, while expressing their right to bear arms. This provides a fun learning experience and a greater sense of pride in their completed firearm, strengthening our brand loyalty. We summarize this with our motto of 'Engage Your Freedom.'" (last accessed October 5, 2022). Polymer80, Inc., is presently located in Dayton, Nevada.

Palmer also owns and possessed multiple uncompleted NFOs and firearm building kits, which he lawfully acquired before enactment of the Ban. ER-252 [Compl. ¶83]. One or more of these components fall within the new definition of and prohibition against unserialized "unfinished frames or receivers" under Nevada's Ban, which mandated dispossession of such firearm components by January 1, 2022, thereafter outlawed possession of any such components and any unserialized firearms assembled with such components under Sections 3 and 5, and immediately banned any further self-manufacturing of such firearms under Section 4 of AB 286. *Id.*

Palmer's lawfully self-manufactured, unserialized firearms are of a type commonly possessed by law-abiding citizens for lawful purposes today; specifically, handguns manufactured with Polymer80 kits and AR-15 rifles manufactured with precursor NFOs. ER-252 [Compl. ¶84]. Indeed, handguns are recognized as "the most popular weapon chosen by Americans for self-defense in the home." *District of Columbia v. Heller*, 554 U.S. 570, 554 (2008). Unserialized NFOs like those owned by Palmer are also commonly possessed by law-abiding citizens in the exercise of

their right to self-manufacture such firearms for self-defense and other lawful purposes. ER-252 [Compl. ¶84].

Nonetheless, Palmer was mandated to dispossess himself of the unserialized NFOs, and to dispossess himself of the unserialized firearms he self-built (or render them "permanently inoperable") by January 1, 2022, lest he face criminal prosecution under Sections 3 and 5 of AB 286. ER-253 [Compl. ¶85]. Palmer desires to continue to own and possess his lawfully self-manufactured unserialized firearms and NFOs for self-defense and other lawful purposes. He does not desire to sell or otherwise dispose of them. *Id.* Further, he reasonably fears criminal sanction in light of the statutorily mandated dispossession established under Nevada's Ban. ER-252 [Compl. ¶84].

Palmer also desires to acquire additional NFOs commonly used in the self-manufacturing of firearms for self-defense and other lawful purposes, including those that fall within the definition of "unfinished frames or receivers" under Nevada's Ban, and he desires to self-manufacture additional operable firearms for self-defense and other lawful purposes. ER-253 [Compl. ¶87]. However, he is currently prohibited from purchasing or otherwise acquiring any such NFOs under

the Ban, he is currently prohibited from self-manufacturing any operable unserialized firearms under Section 4, and he is prohibited from ever again possessing, purchasing, transporting, or receiving any such firearms or NFOs effective January 1, 2022. *Id.*

Based on the threat of criminal prosecution by and through Nevada's Ban that Defendants are actively enforcing and will continue to enforce, Palmer is and has been prevented from acquiring, possessing, transporting, or receiving NFOs, and from self-manufacturing any additional operable firearms from NFOs, for self-defense and other lawful purposes. ER-253 [Compl. ¶87].

## B.    Facts Relating to Plaintiff Chad Moxley

Plaintiff Chad Moxley ("Moxley") is a resident of Douglas County, Nevada, and is a responsible, peaceable citizen not disqualified from exercising his Second Amendment right to possess firearms and ammunition. ER-254 [Compl. ¶¶91-92]. Moxley is a retired firefighter and a member of FPC. ER-254 [Compl. ¶¶93-94]. Moxley currently holds a valid Federal Firearms License ("FFL") and a Nevada Concealed Carry Permit. ER-254 [Compl. ¶95].

Moxley conducts sales of firearms and constituent firearm parts at local gun shows through his sole proprietorship, Strategic Supplies, in compliance with all applicable state and federal laws and regulations. ER-254 [Compl. ¶96]. On average, Moxley attended two gun shows per month before the Ban and sold between five and forty unfinished receiver kits that now fall within the new definition of and prohibition against the sale of unserialized "unfinished receivers" under Sections 3 and 3.5 of Nevada's Ban. ER-254 [Compl. ¶97]. Before the enactment of Nevada's Ban, Moxley had already planned and made arrangements to attend at least six more gun shows before the end of 2021, at which he would have otherwise made available for sale and sold firearm components now prohibited from commercial sale under the Ban. ER-254 [Compl. ¶98].

Moxley desires to continue making available for sale and would make available for sale to ordinary law-abiding citizens the unserialized firearms, component parts, and other NFOs targeted by Nevada's Ban, but he is now prohibited from doing so under Section 3.5's ban against any such sales or transfers. ER-254 [Compl. ¶99]. Based on this threat of criminal prosecution by and through the Nevada Ban that Defendants are actively enforcing, Moxley is now abstaining from and must continue

to abstain from any attempt to sell or transfer any "unfinished frames or receivers" (and all other NFOs that fall within this broad definition) to any ordinary, law-abiding citizen. ER-255 [Compl. ¶100]. Consequently, he is forced to suffer lost sales, revenue, and goodwill in his business, and his would-be consumers, who include individuals just like the other individual plaintiffs in this case, are concomitantly denied the ability to acquire from him such constituent firearms components in the exercise of their right to self-manufacture firearms for self-defense and other lawful purposes. *Id.*

Further, Moxley lawfully owns and possessed multiple firearms, both handguns and rifles, that he previously self-manufactured lawfully with unserialized component parts, including Polymer80 kits, precursor AR-15 lower receivers, and/or other NFOs, one or more of which fall within the new definition of and prohibition against unserialized "unfinished frames or receivers" under Section 3 of Nevada's Ban. ER-255 [Compl. ¶101]. Because these firearms were self-manufactured, the completed firearms themselves lack necessarily lack "a serial number issued by a firearms importer or manufacturer," thus falling within the Ban's

prohibition against all modern, operable unserialized firearms under Section 5 of AB 286. *Id.*

Moxley's lawfully self-manufactured unserialized firearms are of a type commonly possessed by law-abiding citizens for self-defense and other lawful purposes today. ER-255 [Compl. ¶102]. As with Palmer, these self-manufactured firearms include handguns, "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629. ER-255 [Compl. ¶102].

Nonetheless, Moxley was mandated to dispossess himself of all unserialized firearms he has self-built (or render them "permanently inoperable") by January 1, 2022, or face criminal prosecution under Sections 3 and 5 of AB 286. ER-255-56 [Compl. ¶103]. Moxley desires to continue to own and possess his lawfully self-manufactured unserialized firearm for self-defense and other lawful purposes, and not sell or otherwise dispose of them, but he reasonably fears criminal sanction in light of the statutorily mandated dispossession established under Section 5 of Nevada's Ban. ER-256 [Compl. ¶104].

Moxley also desires to self-manufacture additional operable firearms for self-defense and other lawful purposes. ER-256 [Compl. ¶105].

However, he is currently prohibited from self-manufacturing any operable unserialized firearms under Section 4, and he is prohibited from ever again possessing, purchasing, transporting, or receiving any such firearms under Section 5 since January 1, 2022. *Id.* Based on this threat of criminal prosecution by and through Nevada's Ban that Defendants are actively enforcing and will continue to enforce, Moxley is and has been prevented from acquiring, possessing, transporting, or receiving NFOs, and from self-manufacturing any additional operable firearms from NFOs, for personal self-defense and other lawful purposes. ER-256 [Compl. ¶106].

Individual Plaintiffs Palmer and Moxley brought the action underlying the instant appeal on behalf of themselves, and as representatives of the class of similarly situated Nevada resident FPC members who have been forced to dispossess themselves of the firearms and constituent firearm parts prohibited by the Nevada Ban, who are banned from lawfully possessing or using any other such firearms and constituent parts, and who are banned from self-manufacturing any such firearms. ER-256 [Compl. ¶107]. Further, as a seller of now-banned NFOs, Moxley is bringing this action on behalf of his customers who seek

to purchase NFOs for lawful purposes and whose Second Amendment rights are being violated by the Ban. *Id.*

## C.  Facts Relating to Plaintiff FPC

The purposes of FPC include defending and promoting the People's rights—especially the fundamental, individual Second Amendment right to keep and bear arms—advancing individual liberty and restoring freedom. ER-257 [Compl. ¶110]. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. ER-257 [Compl. ¶111]. FPC's members reside both within and outside Nevada. ER-257 [Compl. ¶112].

FPC represents its Nevada resident members—who include gun owners, prospective gun owners and self-manufacturers, retailers of NFOs, parts, and firearms, and others—and brought the action underlying the instant appeal on behalf of its Nevada resident members, including the named individual Plaintiffs herein. ER-257 [Compl. ¶113]. FPC's Nevada resident members, including the individual Plaintiffs in this case, have been and will continue to be adversely and directly harmed by Defendants' administration, implementation, and

enforcement of the laws, and related regulations, policies, practices, and customs challenged herein and will otherwise remain so adversely and directly affected under the Nevada Ban. ER-257 [Compl. ¶114].

Many of FPC's Nevada resident members lawfully acquired unserialized firearm components that are commonly possessed by law-abiding citizens in the exercise of their right to self-manufacture such firearms for self-defense and other lawful purposes. ER-257-58 [Compl. ¶115]. However, those Nevada resident members were mandated to dispossess themselves of the unserialized firearm components by January 1, 2022, or face criminal prosecution under Section 3 of Nevada's Ban. ER-258 [Compl. ¶116]. Further, many of FPC's Nevada resident members desire to continue to own and possess their firearm components for lawful purposes, and to not sell or otherwise dispose of them, but they reasonably fear criminal sanction in light of the statutorily mandated dispossession established under Section 3 of Nevada's Ban. ER-258 [Compl. ¶117].

Additionally, many of FPC's Nevada resident members also desire to acquire additional NFOs otherwise commonly available for purchase and commonly used in the self-manufacturing of firearms for self-defense and

other lawful purposes, including those that fall within the definition of "unfinished frames or receivers" under Nevada's Ban, and further desire to self-manufacture additional operable firearms for self-defense or other lawful purposes. ER-258 [Compl. ¶118]. However, they are currently prohibited from purchasing or otherwise acquiring any such unfinished receivers or frames under Section 3.5 of the Ban, currently prohibited from self-manufacturing any operable unserialized firearms under Section 4, and prohibited from ever again possessing, purchasing, transporting, or receiving any such firearms or NFOs parts under Sections 3 and 5 since January 1, 2022. *Id.* Based on this threat of criminal prosecution by and through the Nevada Ban that Defendants are actively enforcing, FPC's Nevada resident members have been prevented from acquiring, possessing, transporting, or receiving NFOs, and from self-manufacturing any additional operable firearms from NFOs, for self-defense and other lawful purposes. ER-258 [Compl. ¶119].

FPC reasonably fears the prosecution of its Nevada resident members by and through Defendants' administration, implementation, and enforcement of the laws, regulations, policies, practices, and customs challenged herein. ER-258 [Compl. ¶120]. As to all claims made in a

representative capacity in the litigation underlying this appeal and in this appeal itself, there are common questions of law and fact that substantially affect the rights, duties, and liabilities of numerous FPC Nevada resident members who knowingly or unknowingly are subject to the Nevada Ban. ER-258-59 [Compl. ¶121]. The relief sought herein is declaratory and injunctive in nature and is a matter of substantial public interest. *Id.*

## III. Procedural History

Plaintiffs initiated this action against Defendants on June 10, 2021, by the filing of the Complaint. ER-232-269. The Complaint challenged the Ban as unconstitutional under the Second, Fifth, and Fourteenth Amendments to the United States Constitution.

### A. Plaintiffs' Motion for a Preliminary Injunction

Plaintiffs moved for an order preliminarily enjoining the Ban on June 18, 2021. ER-209-229. The district court denied the motion for a preliminary injunction on July 26, 2021. ER-81-95. The district court first held, in the context of a two-step framework of the sort since expressly rejected in the Second Amendment context by the Supreme Court in *Bruen*, that "A.B. 286 does not severely burden Second Amendment

protected conduct, but merely regulates it. Intermediate scrutiny rather than strict scrutiny is therefore appropriate for the Court's analysis of A.B. 286." ER-86-87. Applying the aforementioned interest-balancing inquiry, the district court reasoned that "Defendants have sufficiently shown that the government's objectives in enacting A.B. 286 are substantial and important, thus satisfying the first prong of intermediate scrutiny." ER-88.

The district court further held that "A.B. 286 is a reasonable fit for achieving the government's objectives of decreasing the threat that unserialized firearms pose to public safety and preserving law enforcement's ability to trace firearms related to violent crimes," and thus "Defendants ha[d] met their burden under the second prong and A.B. 286 satisfies intermediate scrutiny." ER-89. Therefore, the court opined that Plaintiffs had "not met their burden to show a likelihood of success on the merits of their Second Amendment claim to warrant a preliminary injunction." ER-90.

## B.     Defendants' Motion to Dismiss

On July 6, 2021, Defendants filed a motion to dismiss the Complaint

pursuant to Fed. R. Civ. P. 12(b)(6) (the "Motion to Dismiss"). ER-167-

177. In the Motion, Defendants argued:

> To succeed on their Second Amendment claim, Plaintiffs
> must meet a two-part test. First, they must show that AB
> 286 burdens conduct protected by the Second Amendment.
> If it does not, this Court must affirm it without further
> analysis. If Plaintiffs can show that AB 286 does burden
> Second Amendment-protected conduct, then they move
> onto the second step. They must show that AB 286 fails the
> applicable level of means-end scrutiny.

ER-172 (internal quotations and citations omitted). Defendants

contended that "if the challenged gun control measure is a longstanding,

presumptively lawful regulation, the challenge fails at step one," and that

the "requirement [that functioning firearms be serialized] is a

longstanding, presumptively lawful regulation." ER-173-74. The Motion

to Dismiss further argued that Plaintiffs did not meet their burden to

show that AB 286 failed the purportedly applicable level of means-end

scrutiny, asserting: "Intermediate scrutiny is the default level of scrutiny

for Second Amendment cases. Strict scrutiny applies only in the rare case

where a measure implicates the core of the Second Amendment right and

severely burdens that right." ER-175 (internal citations and quotations omitted).

Plaintiffs filed their opposition to the Motion to Dismiss on August 9, 2021. ER-55-79. They argued, *inter alia*, that AB 286 plainly targets arms that are in common use throughout the country for lawful purposes and thus protected by the Second Amendment, citing Supreme Court precedent and a clear historical record. ER-61-62. Plaintiffs further argued that the right guaranteed by the Second Amendment necessarily includes the right to own, possess, and use NFOs and other precursor parts necessary for the construction and thus the exercise of the right to self-manufacture arms in common use for lawful purposes. ER-62-63.

The district court issued its order granting Defendants' Motion to Dismiss on March 29, 2022. ER-17-32. The district court found, "Under the statutory scheme, Plaintiffs are not entirely stripped of the opportunity to self-manufacture and assemble firearms, they are only prohibited from doing so with unserialized firearms.... Accordingly, the Court finds A.B. 286 does not severely burden Second Amendment protected conduct, but merely regulates it." ER-22. Applying a means-end test under intermediate scrutiny, the district court determined that,

"the government's objectives in enacting A.B. 286 are undeniably substantial and important, thus satisfying the first prong of intermediate scrutiny." ER-26. With respect to its analysis of the second prong under intermediate scrutiny, the district court held, "Plaintiffs have…failed to plead that A.B. 286 is not a reasonable fit for the state's important interest of ensuring public safety. As such, Plaintiffs have failed to state a Second Amendment claim upon which relief can be granted." ER-27.

With respect to Plaintiffs' claims under the Takings Clause of the Fifth Amendment, the district court first concluded that no taking had occurred, stating "A.B. 286 does not deny all economically beneficial or productive use of unserialized firearms and component parts, nor is it clear based on the Complaint and the record the extent or certainty of the economic impact on Plaintiffs." ER-29. The district court further concluded, "Even if the Court were to find there is a taking, regulatory or physical, Plaintiffs' claim fails because A.B. 286 is an appropriate exercise of the government's police power." *Id.* The district court agreed with the Defendants that "the government does not need to compensate Plaintiffs when A.B. 286 prohibits a type of personal property via a valid law." *Id.* (internal quotations omitted).

On March 30, 2022, the clerk of the district court entered the final judgment on the docket dismissing Plaintiffs' Complaint. ER-16. Plaintiffs timely filed their notice of this appeal on April 28, 2022. ER-12-13.

## SUMMARY OF THE ARGUMENT

The district court erred in concluding that Plaintiffs have failed to sufficiently state a plausible claim for which relief may be granted, because the allegations in the Complaint strongly support the asserted constitutional violations inflicted by the Ban. Further, the district court's dismissal of the Complaint was based upon the Ninth Circuit's pre-*Bruen* precedents concerning interest-balancing inquiries under intermediate scrutiny in the Second Amendment context, which the Supreme Court has now expressly and unequivocally rejected. This compels that the judgment of the district court be vacated and the matter remanded. In fact, Defendants have not and cannot meet their burden under *Bruen*, as the plain text of the Second Amendment covers the conduct and bearable arms which are subject to the Ban, there is no analogous history supporting Nevada's Ban, and the arms regulated by the Ban are unquestionably not dangerous and unusual today.

# STANDARD OF REVIEW

This Court applies a *de novo* standard of review to a district court's grant of a defendant's motion to dismiss for failure to state a claim under Rule 12(b)(6), *Dougherty v. City of Covina*, 654 F.3d 892, 897 (9th Cir. 2011), as well as to the district court's underlying "[c]onclusions of law and the application of the law to the facts," *Olson v. United States*, 980 F.3d 1334, 1337 (9th Cir. 2020). In deciding such motions, "we accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to Plaintiffs, and "draw[] all reasonable inferences in their favor." *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles*, 648 F.3d 986, 990 (9th Cir. 2011). The complaint "need not contain detailed factual allegations; rather, it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Cousins v. Lockyer*, 568 F.3d 1063, 1067–68 (9th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And the complaint does that so long as it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "It is axiomatic that the motion to dismiss for failure to state a claim is viewed

with disfavor and is rarely granted." *McDougal v. County of Imperial*, 942 F.2d 668, 676 n.7 (9th Cir. 1991); *Butcher v. City of Marysville*, 398 F.Supp.3d 715, 722 (E.D. Cal. 2019) (quoting *Ashcroft* at 678) ("Rule 12(b)(6)'s plausibility standard 'is not akin to a probability requirement, but asks for more than a sheer possibility that a defendant has acted unlawfully.'").

## ARGUMENT

### I. *Bruen* Repudiated the Means-End Interest Balancing Test that the District Court Applied to Dismiss the Complaint.

In *Bruen*, the Supreme Court expressly and unequivocally rejected all manner of means-end, interest-balancing inquiry in the Second Amendment context, including the Ninth Circuit's "two-step" approach. With respect to the Second Amendment, the nation's courts are not to engage in any "'judge-empowering interest-balancing inquiry that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Bruen*, 142 S. Ct. at 2129 (quoting *Heller*, 554 U.S. at 634) (internal quotation marks omitted). Indeed, as the *Bruen* Court noted, such two-step interest balancing had previously been "expressly rejected" by *Heller* and *McDonald v. Chicago*, 561 U. S.

742 (2010). *Id.* Rather than creating a new test, the *Bruen* Court merely applied the test established in *Heller*. "The test that we set forth in *Heller* *and apply today* requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131 (emphasis added).

Concerning the two-step approach applied in the Ninth Circuit and elsewhere, the *Bruen* Court more pointedly stated: "Despite the popularity of this two-step approach, it is one step too many…. Instead, the government must *affirmatively prove* that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127 (emphasis added). Clarifying its prior holdings in *Heller*, *McDonald*, and other cases, the Court further stated: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* at 2129-30 (internal quotations omitted).

## II. The Plain Text of the Second Amendment Covers the Conduct Which is Subject to the Ban.

The plain text of the Second Amendment unquestionably covers the conduct which is now subject to and outlawed by the Ban, as the Plaintiffs wish to engage in a course of conduct to keep and bear common types of arms and their constituent parts which Nevada has banned. ER-253, 254, 256, 258. Preliminarily, the Second Amendment declares in no uncertain terms: "the right of the people to keep and bear Arms, *shall not be infringed*." U.S. Const. amend. II (emphasis added). Incorporated against the states through the Fourteenth Amendment, *McDonald*, 561 U.S. at 767, the Second Amendment confers "an individual right to keep and bear arms," *Heller*, 554 U.S. at 595. It is a fundamental constitutional right guaranteed to the people, which is key to "our scheme of ordered liberty." *McDonald*, at 767–68.

The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, at 592. And it "elevates above all" governmental interests in restricting the right, "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. at 635. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the

power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 634 (emphasis original).

Moreover, "[j]ust as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to *all instruments that constitute bearable arms*, even those that were not in existence at the time of the founding." *Bruen*, 142 S. Ct. at 2132 (citing *Heller*, 554 U.S. at 582) (emphasis added). Further, the Ninth Circuit "and other federal courts of appeals have held that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017); *Luis v. United States*, 578 U.S. 5, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring) (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)) ("Constitutional rights thus implicitly protect those closely related acts necessary to their exercise.... The right to keep and bear arms, for example 'implies a corresponding right to obtain the bullets necessary to use them.'"); *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) (the right 'implies a corresponding right to acquire and maintain proficiency'

with common weapons") (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (9th Cir. 2011)).

Much as the right to keep and bear arms "wouldn't mean much without the training and practice that make it effective," *Ezell*, 651 F.3d at 704, the right to self-manufacture arms "wouldn't mean much" without the right to own, possess, and use the constituent parts necessary to engage in such activity—and, of course, the firearm itself as the end product of this protected activity—for lawful purposes. *See Rigby v. Jennings*, __ F.Supp.3d __, 2022 WL 4448220, *7 (D. Del. 2022) ("[T]he right to keep and bear arms implies a corresponding right to manufacture arms. Indeed, the right to keep and bear arms would be meaningless if no individual or entity could manufacture a firearm. Thus, if possessing untraceable firearms is protected by the Second Amendment, then so too is manufacturing them."). The firearms and firearm components subject to the Ban are unquestionably instruments that constitute bearable arms and are therefore covered by the plain text of the Second Amendment.

**III. Defendants Bear the Burden of Showing that the Ban is Consistent With This Nation's Historical Tradition of Firearms Regulation.**

Under *Heller* and in accordance with the historical tradition outlined in *Bruen*, the government may only ban weapons that are dangerous *and* unusual, *i.e.*, weapons that are *not* in common use. *Heller*, 554 U.S. at 627; *see also Caetano v. Massachusetts*, 136 S.Ct. 1027, 1031 (2016) (Alito, J., concurring) ("A weapon may not be banned unless it is *both* dangerous *and* unusual.") (emphasis in original); *Rhode v. Becerra*, 445 F. Supp. 3d 902, 930 (S.D. Cal. 2020) ("*Heller* asks whether the law bans the types of firearms commonly used for a lawful purpose. It is a hardware test. *Heller* draws a distinction between firearms commonly owned for lawful purposes and firearms specially adapted to unlawful uses and not commonly owned."). "[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Caetano* at 1031. An arm is not "unusual" so as to fall outside the ambit of this protection so long as it is "commonly possessed by law-abiding citizens for lawful purposes *today*." *Id*. at 1032 (Alito, J., concurring) (emphasis in original); *see also Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) (If "the banned weapons are

commonly owned . . . then they are not unusual."); *Bruen*, 142 S. Ct. at 2128 (noting that in *Heller*, "we found it fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons that the Second Amendment protects the possession and use of weapons that are in common use at the time"). Accordingly, the burden is on Defendants to show that the bearable arms and components thereof subject to the Ban are dangerous *and* unusual, and Defendants have not and cannot do so.

Plaintiffs' previously self-manufactured arms, and those they wish to self-manufacture in the future, are common, constitutionally protected categories of arms. The arms at issue are common in all material respects:

1) They are common categorically, as they are all functionally semiautomatic in their operation;

2) They are common characteristically, as they are all popular configurations of arms (*e.g.*, rifles, shotgun, and handguns) with varying barrel lengths and common characteristics such as pistol grips and the like; and

3) They are common jurisdictionally, as they are lawful to possess and use in the vast majority of states now and throughout relevant history for a wide variety of lawful purposes, including self-defense, proficiency training, competition, recreation, hunting, and collecting.

Moreover, there is no constitutionally relevant difference, in light of *Heller*'s "hardware test," between a semiautomatic handgun, shotgun, and rifle, which all function in essentially the same manner. While some exterior physical attributes may differ (*e.g.*, wood vs. metal stocks and furniture, the number and/or location of grips, having a bare muzzle vs. featuring muzzle devices, varying barrel lengths), they are the same in all relevant respects.

The right to keep and bear, for example, a self-manufactured Glock-style pistol or AR-15 rifle is no more limited than the right to keep and bear a Glock pistol or an AR-15 rifle purchased from a store. Notions of whether a particular firearm is necessary or can be procured in a similar form from a commercial manufacturer are wholly immaterial. Because the arms subject to Nevada's Ban are types which are in common use

today, they are not and cannot be both dangerous *and* unusual. *See Caetano*, 136 S. Ct. at 1031; *Bruen*, 142 S. Ct. at 2128.

It is axiomatic that the government cannot defend a restriction on the exercise of constitutional rights by pointing to the existence of *other* channels through which the same rights might be exercised. Rather, the government must *justify* cutting off the channel it has foreclosed. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *Bruen*, 142 S.Ct. at 2130. The same is true with the right to keep and bear arms, to which the Supreme Court has "repeatedly compared" the right to free speech. *Id.* Just as "[w]e would never say the police may seize and keep printing presses so long as newspapers may replace them, or that they may seize and keep synagogues so long as worshippers may pray elsewhere," *Frein v. Penn. State Police*, 47 F.4th 247, 254 (3d Cir. 2022), we would never say that "seizures do not burden Second Amendment rights as long as citizens can 'retain[ ] or acquir[e] other firearms,'" *id.* at 256. And, just the same, we would not we say that a State can outlaw self-manufactured arms so long as they may be acquired from a commercial manufacturer or retailer.

## IV. In Light of the Historical Inquiry Established in *Heller* and Made Explicit in *Bruen*, Plaintiffs Necessarily Prevail on Their Second Amendment Claims.

The arms and constituent parts subject to the Ban are unquestionably in common use today and not both dangerous *and* unusual, and the constitutional inquiry is therefore complete because the Defendants cannot show that the Ban comports with this Nation's historical tradition of firearm regulation. Indeed, any historical evidence that the Defendants could conceivably present (*e.g.*, any bans of similar types of arms in the past) would be entirely irrelevant given that the banned arms are in common use for lawful purposes *today*, and *Heller* establishes that as the controlling question here. The *Bruen* Court was also crystal clear on this point in discussing alleged Colonial-era bans on carrying handguns, observing that the historical record in the United States and their predecessor colonies supports only restrictions on "dangerous and unusual weapons" rather than those in common use at the time:

> Even if respondents' reading of these colonial statutes were correct, it would still do little to support restrictions on the public carry of handguns today. At most, respondents can show that colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons'—a fact we already acknowledged in *Heller*. Drawing from this historical tradition, we explained there that the Second Amendment protects only the carrying of weapons that are

those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.' Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today. . . . Thus, even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

142 S. Ct. at 2143 (citations omitted). Against this backdrop in which *Heller* established that history is used to determine the scope of Second Amendment rights, Defendants cannot possibly carry their burden.

Not only is there no evidence at all of any historical tradition of firearm regulation in the United States or their predecessor colonies that could support Nevada's Ban, but the historical evidence supports only Plaintiffs' challenges to the Ban. Indeed, throughout American history, rich with traditions of citizens robustly exercising the cherished right to keep and bear arms, people have been free to personally manufacture, construct, and/or assemble arms for lawful purposes, including but not limited to self-defense in the home.

The colonists in the first permanent English settlements had the express right to import arms and the items and materials necessary to make them. Binding his "Heirs and Successors," King James I in 1606

40

granted the "Southern Colony" (Virginia) the right to import from Great Britain "the Goods, Chattels, Armour, Munition, and Furniture, needful to be used by them, for their said Apparel, Food, Defence or otherwise." 7 FEDERAL AND STATE CONSTITUTIONS: COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3787–88 (Francis Thorpe ed., 1909). ER-242 [Compl. ¶43]. Along the same lines, the 1620 Charter of New England granted colonists the right "to take, load, carry, and transport in . . . Shipping, Armour, Weapons, Ordinances, Munition, Powder, Shott, Victuals, and all Manner of Cloathing, Implements, Furniture, Beasts, Cattle, Horses, Mares, and all other Things necessary for the said Plantation, and for their Use and Defense, and for Trade with the People there." 3 FEDERAL AND STATE CONSTITUTIONS: COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 1834–35 (Francis Thorpe ed., 1909). ER-242 [Compl. ¶43].

Moreover, "[f]rom the earliest periods American gunsmiths had made and repaired military firearms." HAROLD L. PETERSON, ARMS AND ARMOR IN COLONIAL AMERICA 178 (1956). ER-242 [Compl. ¶43]. "The influence of

the gunsmith and the production of firearms on nearly every aspect of colonial endeavor in North America cannot be overstated, and that pervasive influence continuously escalated following the colonial era." M. L. BROWN, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792, at 149 (1980). ER-243 [Compl. ¶44].

As historian Charles Winthrop Sawyer explained, "in the smaller shops which formed the great majority—mere cabins on the outskirts of the wilderness—one man with or without an apprentice did every part of the work." 1 CHARLES WINTHROP SAWYER, FIREARMS IN AMERICAN HISTORY 145 (1910). ER-243 [Compl. ¶45]. As well, many gunsmiths worked primarily in other trades and built or repaired firearms as a hobby. *See* JAMES WHISKER, THE GUNSMITH'S TRADE 145–63 (1992). ER-243 [Compl. ¶45]. During the Revolutionary War, many colonies relied on and incentivized people outside of the firearms industry to produce firearms. ER-243 [Compl. ¶46]. For example, on August 2, 1775, a Committee appointed by Maryland's Provincial Convention "to enquire into the practicability of establishing a manufactory of Arms within this Province" determined that "Arms may be furnished sooner, and at less expense by engaging immediately all Gun Smiths, *and others concerned*

*in carrying on that business.*" Journal of the Maryland Convention July 26 – August 14, 1775, at 64–65 (William Hand Browne ed., 1892) (emphasis added). ER-243 [Compl. ¶46].

In January 1776, the New Hampshire House of Representatives passed a resolution to pay each person who "made" a firearm to certain specifications. ER-244 [Compl. ¶47]. "[E]very good firearm Manufactured in this Colony" was rewarded with "three pounds for each." 8 Documents and Records Relating to the State of New-Hampshire During the Period of the American Revolution, From 1776 to 1783, at 15–16 (Nathaniel Bouton ed., 1874). ER-244 [Compl. ¶47]. In March 1776, a committee of New York's Provincial Congress published notice "in all the publick Newspapers in this Colony" that "this Committee are ready to receive proposals from & treat with any Person or Persons who are willing to engage in manufacturing good Muskets, or the Locks, Barrels, or any necessary parts thereof." 5 American Archives, Fourth Series, 1418 (Peter Force ed., 1844). ER-244 [Compl. ¶48]. The Provincial Congress offered rewards for the manufacturers who could produce the greatest number of arms for the colony but excluded "any person with whom the Congress or Committee of Safety have already contracted"—

thus incentivizing those capable of manufacturing arms but not necessarily in the firearms business. *Id.*

A month later, the North Carolina Provincial Congress called for "all Gunsmiths, and other mechanicks, who have been accustomed to make, or assist in making Muskets" to be recruited to manufacture arms for the colony. 5 AMERICAN ARCHIVES, FOURTH SERIES, 1338 (Peter Force ed. 1844). ER-244 [Compl. ¶49]. And further, "that they be furnished, at the expense of this Colony, with tools, implements and utensils, and materials for carrying on the said work." *Id.* Certainly, the ratifiers of the Bill of Rights remembered that the young country depended on the manufacture of firearms by those outside of the firearms industry for survival and intended to protect such activity through the Second Amendment. ER-244 [Compl. ¶50].

Indeed, manufacturing of firearms was entirely unregulated during the colonial and founding eras in America, and there were no restrictions on who could be a gunsmith or make guns. *See, e.g.*, Letter from Sec'y of State Thomas Jefferson to George Hammond, British Ambassador to the U.S., (May 15, 1793), in 7 THE WRITINGS OF THOMAS JEFFERSON 325, 326 (Paul Ford ed., 1904) ("Our citizens have always been free to make, vend,

and export arms. It is the constant occupation and livelihood of some of them."); *see also* M. L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792, at 149 (1980) ("The influence of the gunsmith and the production of firearms on nearly every aspect of colonial endeavor in North America cannot be overstated, and that pervasive influence continuously escalated following the colonial era."). ER-243, 244 [Compl. ¶¶44, 51].

No history or precedent exists for extinguishing law-abiding citizens' commonplace ability to self-manufacture firearms in common use at the time for self-defense or other lawful purposes, or for prohibiting law-abiding citizens from possessing NFOs. The Second Amendment's text as informed by its history and tradition reflects the right to self-manufacture firearms and, quite obviously, their component parts.

Today, consistent with these traditions and history, federal laws permit the manufacture of a firearm for personal use. *See What is ATF doing in regards to people making their own firearms*, Bureau of Alcohol, Tobacco, Firearms and Explosives (June 16, 2021), https://www.atf.gov/firearms/qa/what-atf-doing-regards-people-making-their-own-firearms ("An individual may generally make a

firearm for personal use.");[4] William J. Krouse, *Gun Control: 3D-Printed AR-15 Lower Receivers*, Cong. Res. Serv. Insight, 2 (Aug. 22, 2018), https://fas.org/sgp/crs/misc/IN10957.pdf ("In short, unfinished receivers and the components needed to build fully functional AR-15s and other firearms are legally available on the U.S. civilian gun market and can be purchased without a background check under federal law."); *see also, e.g.*, 18 U.S.C. § 922(a)(1)(a).

In short, Americans have *always* had the right to self-manufacture the common arms of their time, and that right has never been contingent on whether the same arms could also be purchased at a shop—whether it be an early colonial or frontier gunsmith or a national sporting goods chain. While a handful of states aside from Nevada have enacted anomalous

---

[4] In April 2022, the Bureau of Alcohol, Tobacco, Firearms and Explosives published a Final Rule that altered the definition of "firearm" and "firearm frame or receiver" to impose serialization, background check, and record-keeping requirements on certain unfinished firearm kits. Notably, the Final Rule exempts self-manufactured arms/NFOs for personal use from these requirements. Final Rule, Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (April 26, 2022) (effective August 24, 2022).

laws concerning the self-manufacture of firearms, they date back only as early as 2016[5] and are plainly not indicative of any historical tradition.

In the approximately 400-year history of the colonies and later the United States, no regulations at all like the Ban appeared until this most recent decade, meaning that a regulatory scheme somewhat like the Ban has been on the books in only a few states during approximately the most recent 1.5% of the time since the first colonies were established and approximately the most recent 2.4% of the time since the colonies declared their independence in 1776. That is hardly an historical tradition of such regulations. In light of all of the foregoing, Plaintiffs not only state a plausible case for relief, but they necessarily must prevail on their claim that the Ban is an unconstitutional infringement upon the protected Second Amendment rights of the Plaintiffs and similarly situated citizens of Nevada which must be enjoined.

---

[5] California – Cal. Penal Code § 29180(b) (2016); Connecticut – Conn. Pub. Act No. 19-6 (2019); Hawaii – 2019 Hi. HB 2744 (2020); New Jersey – N.J. Stat. § 2C:39-9 (2018); New York – N.Y. Legislation S.13A/A.2666A, S.14A/A.613A (2021); Rhode Island – 2020 R.I. HB 7102 (2020); and the District of Columbia – D.C. Code § 7-2502.02(a)(8) (2020). Notably, California and Connecticut do not prohibit unserialized self-manufactured firearms but instead require individuals to obtain serial numbers for their self-manufactured firearms from state authorities.

## V. The District Court Wrongly Decided Plaintiffs' Takings Clause Claim.

The settled law is clear: the government must provide just compensation for any "physical invasion" of private property interests. *Cedar Point Nursery v. Hassid*, ___ U.S. ___, 141 S.Ct. 2063, 2074 (2021) ("government-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation"). This is true whether the invasion involves a classic exercise of eminent domain powers, an occupation or possession (even temporarily or intermittently), or "a regulation [that] results in a physical appropriation of property." *Id.* at 2071–2072. A regulation has this impact when it effectively deprives the owner of "all economically beneficial us[e]' of [their] property." *Lingle v. Chevron, U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992)). A "regulatory" taking having such effect is no different than a "physical" taking, as it requires compensation *per se*. *Cedar Point* at 2072 (the "regulatory taking" label "can mislead" in this context because the more lenient *Penn Central* test for less invasive regulations "has no place").

Here, the Ban requires all law-abiding Nevada citizens to destroy or dispossess themselves of "unfinished frames and receivers" and other NFOs lacking serial numbers, as well as common, operable firearms manufactured using such parts, but provides no compensation in connection with that mandate. The private property targeted by the Ban was previously owned, possessed, used, and manufactured for self-defense and other lawful purposes, and the total loss of the substantial economic value of these items frustrates the legitimate investment-backed expectations of law-abiding Nevada citizens. For the very reason of these investment-backed expectations, borne out of Nevada's own prior law under which all these individuals were permitted to acquire and use these arms and parts, this property has substantial value to all those now being forced to comply with the Ban, including Plaintiffs and all similarly situated Nevada resident FPC members who have come to rely on their existing self-built arms for lawful purposes and on their ability to self-manufacture additional such arms with constituent parts that they currently possess or may later acquire. ER-264, 267 [Comp. ¶¶144, 156].

Yet, the Ban has completely deprived Plaintiffs and similarly affected Nevada property owners of all economically beneficial use of

their property and caused them to suffer a permanent physical invasion of their interests in that property. This taking demands compensation in accordance with the fundamental right to due process of law.

## A. No "Police Power" or "Public Safety" Exception Exists.

As noted above in Procedural History Section III.B, the district court dismissed Plaintiffs' Takings Clause claim under the Fifth Amendment of the United States Constitution in large part because AB 286 was deemed a legitimate exercise of the State of Nevada's "police power" and because "the government does not need to compensate Plaintiffs when A.B. 286 prohibits a type of personal property via a valid law." ER-29. However, as described in greater detail above, AB 286 is neither a "valid law" nor a legitimate exercise of the State's "police power"—rather, it is a plainly unconstitutional violation of the Second Amendment. Moreover, the district court preliminarily concluded that AB 286 did not result in a "taking" at all, ER-27, but a government regulation is plainly "onerous" and "goes too far"[6] when it impermissibly infringes on protected constitutional rights—in this case, the Second Amendment.

---

[6] *See Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415-16 (1922).

Defendants have not even attempted to claim, much less show, the homemade firearms and components at issue are either "dangerous" or "unusual"—let alone both—so as to be stripped of constitutional protection. That the State provides no viable means of making the existing property "safe" in the way the State says it must be—i.e., having it serialized so as to remove the supposed nuisance—illustrates that the problem is not with the property itself, but with the restrictive regulatory regime that literally makes it impossible to comply with the stated aims of the law. This is no basis for invoking a "public safety" exception to the Takings Clause. It is equivalent to forbidding a homeowner from installing noise abatement technology on his or her vehicle and then claiming that the noisy car is now a nuisance.

Private property interests cannot be taken without compensation on "nuisance" grounds unless the property or its intended use was clearly established as a nuisance *before* the taking. "[R]egulations that prohibit all economically beneficial use" of property "cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *See Lucas*, 505 U.S. at

1029. That is, nuisance takings are proper only when the property or its intended use has *historically* been understood as prohibited, because only then can it be fairly said the property owner lacks investment-backed expectations. *Id.* at 1030; *Cedar Point*, 141 S.Ct. at 2079 (italics added) ("For example, the government owes a landowner no compensation for requiring him to abate a nuisance on his property, because *he never had a right to engage in the nuisance in the first place.*"). The property interests at stake here—common-use firearms and their constituent parts owned, possessed, used, and self-manufactured for lawful purposes—have never been *until now* deemed a "nuisance" injurious to the public in Nevada, nor could they ever be properly classified as such.

### B. The Illusory Disposal Options Also Do Not Excuse the Obligation to Provide Fair Compensation.

It is no answer to say these law-abiding Nevadans could "sell or dispose" of the banned precursor parts before the dispossession mandate took effect. A sale of these firearms or their constituent parts is no realistic option in Nevada, particularly since such items are now banned from the hands of all ordinary law-abiding citizens throughout the State. Presumably, many licensed firearms dealers would refuse to purchase or otherwise accept for sale any such products given the potential risks and

uncertainties in dealing with legally banned firearms and firearms products, particularly when these arms and parts cannot be brought into compliance with the Ban's impossible-to-satisfy serialization requirement. ER-264 [Compl. ¶145]. Such practical and economic realities would extend to any market that may otherwise exist for sales across state lines. While these precursor parts do not constitute "firearms" under federal law, the federal government's vast firearms regulatory web would inevitably raise concerns that engaging in any such transfers could spur criminal investigations or accusations of regulatory violations, naturally deterring many Nevadans from even attempting to sell these parts out of state and likewise deterring many dealers from purchasing or accepting them in such transactions. *See* 18 U.S.C. § 922(a)(5) (federal law regulates all "firearm" sales to anyone out of state, generally prohibiting any such sales by any unlicensed person); 18 U.S.C. § 921(a)(3)(*i*) and 27 C.F.R. § 478.92(a)(1) & (a)(2) (federal law requires serialization of "completed" firearms or "finished" frames or receivers before the point of sale); https://www.atf.gov/firearms/qa/can-individual-now-manufacture-these-firearms-and-sell-them (ATF's regulations

require everyone "engaged *in the business*" of manufacturing firearms to obtain a license).

Whatever limited market may exist for the sale of such outlawed items, anyone forced to sell under such legal compulsion surely would not garner the fair market value of these otherwise valuable and popular firearms and constituent components. ER-265 [Compl. ¶146]. "A 'sale' implies willing consent to the bargain. A transaction in the form of a sale but under compulsion or duress, is not a sale." *Dore v. U.S.*, 97 F.Supp. 239, 224 (Ct. Cl. 1951). The Ban has destroyed or significantly diminished the value of the property to any would-be purchasers and has thus destroyed the very market to which it has relegated the affected citizens.

For all the same reasons, even assuming this situation does not rise to the level of a taking *per se*, it is still one requiring compensation under the *Penn Central* factors, because the economic impact on this valuable constitutionally protected property is substantial, the extent of interference is great, and the character of the governmental action is in the general nature of a government-imposed invasion of property interests so as to compel compensation consistent with the spirit and purpose of the Takings Clause. *See Penn Central Transp. Co. v. New York*

*City*, 438 U.S. 104, 124 (1978). An unconstitutional taking occurred, and Plaintiffs must also prevail on their Takings Clause claims arising under the Fifth Amendment.

## CONCLUSION

Under the legal standards established by the Supreme Court in *Heller* and its progeny, especially as further elucidated in *Bruen*, Plaintiffs necessarily prevail on their claims in these proceedings. The Ban put into effect by AB 286 is plainly unconstitutional. The judgment of the district court should be vacated with directions that Plaintiffs may proceed on their claims or, in the alternative, with directions that the district court reconsider the motion for injunctive relief under *Bruen*.

Respectfully submitted,

/s/ *Raymond M. DiGuiseppe*
RAYMOND M. DIGUISEPPE
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
(910) 713-8804
law.rmd@gmail.com

## STATEMENT OF RELATED CASES

The matter of *Fahr v. City of San Diego, et al.*, S.D. Cal. Case No. 21-CV-1676-BAS-BGS, concerns a similar challenge under the Second Amendment to a similar ordinance of San Diego City, the final disposition of which remains pending before the district court.

# CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party.

This brief contains 10,632 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** *Raymond M. DiGuiseppe*          **Date:** October 7, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that on October 7, 2022, I served the foregoing brief via the CM/ECF system for the United States Court of Appeals for the Ninth Circuit, which will distribute the brief to all attorneys of record in this case. No privacy redactions were necessary.

Dated this 7th day of October 2022.

/s/ *Raymond M. DiGuiseppe*
*Counsel for Appellants*