No. 22-15645

# In the
# United States Court of Appeals
# for the Ninth Circuit

◆

ROGER PALMER, et al.,

*Plaintiffs–Appellants,*

v.

STEPHEN SISOLAK, et al.,

*Defendants–Appellees.*

Appeal from the United States District Court
for the District of Nevada
The Honorable Miranda M. Du
Case No. 3:21-cv-00268

◆

## APPELLANTS' EXCERPTS OF RECORD

◆

DAVID C. O'MARA
THE O'MARA LAW FIRM, P.C.
311 East Liberty Street
Reno, NV 89501
(775) 323-1321
david@omaralaw.net

RAYMOND M. DIGUISEPPE
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
(910) 713-8804
law.rmd@gmail.com

*Counsel for Appellants*

Under Federal Rules of Appellate Procedure for the Ninth Circuit, Rule 30-1, Plaintiffs-Appellants ROGER PALMER, CHAD MOXLEY, and FIREARMS POLICY COALIATION, INC., by and through their attorney of record, hereby submit Appellants' Excerpts of Record.

Date: October 7, 2022

/s/ *Raymond M. DiGuiseppe*
*Counsel for Appellants*

# INDEX TO APPELLANTS' EXCERPTS OF RECORD

| Dkt. # | Date | Description | Page |
|--------|------|-------------|------|
| 70 | 6/3/22 | Designation of Transcript on Appeal | 6 |
| 68 | 4/28/22 | Representation Statement | 8 |
| 67 | 4/28/22 | Notice of Appeal | 12 |
| 66 | 3/30/22 | Judgment | 16 |
| 65 | 3/29/22 | Order Granting Motion to Dismiss | 17 |
| 63 | 8/27/21 | Stipulation and Order for Dismissal of Clark County and Douglas County Defendants | 33 |
| 57 | 8/23/21 | Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion to Dismiss | 37 |
| 53-1 | 8/9/21 | Copy of Order Granting Preliminary Injunction in *Polymer80, Inc. v. Sisolak et al.*, Third Judicial District Court of Nevada, Case No. 21-CV-00690, in Support of Opposition to Motion to Dismiss (Exhibit 1) | 49 |
| 53 | 8/9/21 | Plaintiffs' Opposition to Motion to Dismiss | 55 |
| 51 | 7/26/21 | Order Denying Plaintiffs' MPI | 81 |
| 71 | 7/16/21 | Transcript of Oral Proceedings on MPI | 96 |
| 40-2 | 7/9/21 | Declaration of Joseph Ostini in Support of Plaintiffs' Reply in Support of MPI (Exhibit 2) | 121 |
| 40-1 | 7/9/21 | Declaration of Joseph Greenlee in Support of Plaintiffs' Reply in Support of MPI (Exhibit 1) | 132 |
| 40 | 7/9/21 | Plaintiffs' Reply in Support of MPI | 152 |

| 34 | 7/6/21 | Motion to Dismiss by Defendants Stephen Sisolak, Aaron D. Ford, George Togliatti, and Mindy McKay | 167 |
|---|---|---|---|
| 31 | 7/2/21 | Response of Defendants Stephen Sisolak, Aaron D. Ford, George Togliatti, and Mindy McKay to Motion for Preliminary Injunction | 178 |
| 7 | 6/18/21 | Motion for Expedited Briefing on MPI | 193 |
| 6-3 | 6/18/21 | Declaration of Roger Palmer in support of Motion for Preliminary Injunction (Exhibit 3) | 197 |
| 6-2 | 6/18/21 | Declaration of Chad Moxley in support of Motion for Preliminary Injunction (Exhibit 2) | 201 |
| 6-1 | 6/18/21 | Declaration of Brandon Combs for FPC in support of Motion for Preliminary Injunction (Exhibit 1) | 205 |
| 6 | 6/18/21 | Plaintiffs' Motion for Preliminary Injunction | 209 |
| 1 | 6/10/21 | Complaint for Declaratory and Injunctive Relief | 232 |
| | | District Court Docket Sheet | 270 |

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2022, an electronic PDF of Appellants' Excerpts of Record was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

Dated this 7th day of October 2022.

/s/ *Raymond M. DiGuiseppe*
*Counsel for Appellants*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

## DESIGNATION OF TRANSCRIPTS
## TO BE USED IN RECORD ON APPEAL

District Court Case Number: ___3:21-cv-00268_____

Court of Appeals Case Number: __22-15645_____

Case Caption: __Roger Palmer, et al. v. Stephen Sisolak, et al._____

_____ Transcripts are **NOT** required for this appeal.

The undersigned hereby designates the following transcripts to be used in the record on appeal
for the above listed case and appeal:

| Date of Hearing | Docket Number | Proceeding | Recorder/ Reporter | Transcript Filed Yes/No |
|---|---|---|---|---|
| 7.16.21 | 6 | Motion for Preliminary Injunction | Kathy French | No |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Date: __June 3, 2022_____          __/s/ David C. O'Mara_____
                                        Signature

                                        __David C. O'Mara, Esq._____
                                        Print Name

                                        __Roger Palmer_____
                                        Appellant/Appellee

ER-6

| AO 435 (NVD Rev. 04/2021) *Read Instructions attached:* | United States District Court, District of Nevada TRANSCRIPT ORDER | | FOR COURT USE ONLY DUE DATE: |
|---|---|---|---|

| 1. NAME Raymond M. DiGuiseppe | 2. PHONE NUMBER 910-713-8804 | 3. DATE 5/31/2022 |
|---|---|---|

**4. FIRM NAME**
The DiGuiseppe Law Firm, P.C.

| 5. MAILING ADDRESS 4320 Southport-Supply Road, Suite 300 | 6. CITY Southport | 7. STATE NC | 8. ZIP CODE 28461 |
|---|---|---|---|

| 9. CASE NUMBER 3:21-cv-00268 (9th Cir. No. 22-15645) | 10. JUDGE Hon. Miranda Du | DATES OF PROCEEDINGS | |
|---|---|---|---|
| | | 11. FROM July 16, 2021 | 12. TO July 16, 2021 |

| 13. CASE NAME Palmer, et al. v. Sisolka, et al. | LOCATION OF PROCEEDINGS | |
|---|---|---|
| | 14. CITY Reno | 15. STATE NV |

**16. ORDER FOR**
☑ APPEAL ☐ CRIMINAL ☐ BANKRUPTCY ☐ OTHER *(Specify)*
☐ NON-APPEAL ☐ CIVIL ☐ IN FORMA PAUPERIS

**17. TRANSCRIPT REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested):**

| | PORTIONS | DATE(S) | | PORTION(S) | DATE(S) |
|---|---|---|---|---|---|
| ☐ | VOIR DIRE | | ☐ | TESTIMONY (Specify witness) | |
| ☐ | OPENING STATEMENT (Plaintiff) | | | | |
| ☐ | OPENING STATEMENT (Defendant) | | | | |
| ☐ | CLOSING ARGUMENT (Plaintiff) | | ☑ | PRE-TRIAL PROCEEDING | July 16, 2021 |
| ☐ | CLOSING ARGUMENT (Defendant) | | | Hearing on PI Motion | |
| ☐ | OPINION OF COURT | | | | |
| ☐ | JURY INSTRUCTIONS | | ☐ | OTHER (Specify) | |
| ☐ | SENTENCING | | | | |
| ☐ | DETENTION HEARING | | | | |

**18. ORDER**

| CATEGORY | ORIGINAL (Includes Certified Copy to Clerk for Records of the Court) | FIRST COPY | ADDITIONAL COPIES | DELIVERY INSTRUCTIONS (check all that apply) | ESTIMATED COSTS |
|---|---|---|---|---|---|
| ORDINARY (30-DAY) | ☒ | | | PAPER COPY ☐ | |
| 14-DAY | | | | E-MAIL ☑ | |
| EXPEDITED (7-DAY) | | | | DISK ☐ | |
| 3-DAY | | | | | |
| DAILY | | | | PDF FORMAT ☐ | |
| HOURLY | | | | ASCII FORMAT ☐ | |
| REALTIME/ ROUGH | | | | KEYWORD INDEX ☐ | |

| CERTIFICATION (19. & 20.) By signing below, I certify that I will pay all charges (deposit plus additional). | E-MAIL ADDRESS |
|---|---|
| 19. SIGNATURE *Raymond M. DiGuiseppe* | law.rmd@gmail.com |
| 20. DATE 5/31/2022 | NOTE: IF ORDERING BOTH PAPER AND ELECTRONIC COPIES, THERE WILL BE AN ADDITIONAL CHARGE. |

| TRANSCRIPT TO BE PREPARED BY Kathy French | ESTIMATE TOTAL | 0.00 |
|---|---|---|

| | DATE | BY | PROCESSED BY | PHONE NUMBER |
|---|---|---|---|---|
| ORDER RECEIVED | | | | |
| DEPOSIT PAID | | | DEPOSIT PAID | |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES | 0.00 |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT | 0.00 |
| ORDERING PARTY NOTIFIED TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | 0.00 |

THE O'MARA LAW FIRM, P.C.
DAVID C. OMARA
(Nevada Bar No. 8599)
311 East Liberty Street
Reno, NV 89501
P: (775) 323-1321
F: (775) 323-4082
E: david@omaralaw.net

FIREARMS POLICY COALITION
ADAM KRAUT*
WILLIAM SACK*
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 596-3492
E: akraut@fpclaw.org
E: wsack@fpclaw.org

THE DiGUISEPPE LAW FIRM, P.C.
RAYMOND M. DiGUISEPPE*          *Admitted Pro Hac Vice
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ROGER PALMER; CHAD MOXLEY; and, FIREARMS POLICY COALITION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> STEPHEN SISOLAK, Governor of Nevada; AARON FORD, Attorney General of Nevada; GEORGE TOGLIATTI, Director of the Nevada Department of Public Safety; and MINDY MCKAY, Administrator of the Records, Communications, and Compliance, Division of the Nevada, Department of Public Safety, <br><br> Defendants. | Case No. 3:21-cv-00268 |

1

1
2   ## <u>REPRESENTATION STATEMENT</u>

3
4        The following identifies the parties and their respective counsel:

5   ### <u>PLAINTIFFS:</u>

6
7        ROGER PALMER, CHAD MOXLEY, and FIREARMS POLICY

8   COALIATION, INC.

9   ### <u>PLAINTIFFS' COUNSEL:</u>

10
11  **David C. O'Mara**            **Adam Kraut***
    The O'Mara Law Firm, P.C.     **William Sack***
12  (Nevada Bar No. 8599)         Firearms Policy Coalition, Inc.
13  311 East Liberty Street        1215 K Street, 17th Floor
    Reno, NV 89501                 Sacramento, CA 95814
14  P: (775) 323-1321              P: (916) 596-3492
15  F: (775) 323-4082              E: akraut@fpclaw.org
     E: david@omaralaw.net          E: wsack@fpclaw.org
16

17  **Raymond M. DiGuiseppe***        *Admitted Pro Hac Vice*
18  The DiGuiseppe Law Firm, P.C.
    4320 Southport-Supply Road, Suite 300
19  Southport, NC 28461
20  P: 910-713-8804
    E: law.rmd@gmail.com
21

22
23  ### <u>DEFENDANTS</u>

24  STEPHEN SISOLAK, Governor of Nevada; AARON FORD, Attorney General of

25  Nevada; GEORGE TOGLIATTI, Director of the Nevada Department of Public
26
27  Safety; and MINDY MCKAY, Administrator of the Records, Communications,

28  and Compliance, Division of the Nevada, Department of Public Safety.

---

2

1

**DEFENDANTS' COUNSEL**

2

3 **Steve Shevorski** (Bar No. 8256)
Chief Litigation Counsel
4 Nevada Attorney General's Office

5 **Jeffrey M. Conner** (Bar No. 11543)
6 Deputy Solicitor General
Nevada Attorney General's Office
7

8 **Kiel B. Ireland** (Bar No. 15368C)
Deputy Attorney General
9 Nevada Attorney General's Office

10
Nevada Office of the Attorney General
11 555 E. Washington Ave, Ste. 3900
12 Las Vegas, NV 89101
(702) 486-3420 (phone)
13 (702) 486-3773 (fax)
sshevorski@ag.nv.gov
14 jconner@ag.nv.gov
15 kireland@ag.nv.gov

16

17 Dated: April 28, 2022

18

19 　　　　　　　　　　　　　　　/s/ *David C. O'Mara*
　　　　　　　　　　　　　　　David C. O'Mara
20

21 　　　　　　　　　　　　　　　Attorney for Plaintiffs

22

23

24

25

26

27

28

3

1

## **CERTIFICATE OF SERVICE**

2

3       I, David C. O'Mara, hereby certify that I served a copy of the *Notice of*

4    *Appeal* and *Representation Statement* through the Court's ECF system to all

5    registered users.

6    Dated: April 28, 2022

7

8                                                                By:

9                                                                /s/ *David C. O'Mara*

10                                                               David C. O'Mara
                                                                 The O'Mara Law Firm, P.C.
11                                                               311 East Liberty Street
12                                                               Reno, NV 89501

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  THE O'MARA LAW FIRM, P.C.          FIREARMS POLICY COALITION
2  DAVID C. OMARA                     ADAM KRAUT*
   (Nevada Bar No. 8599)              WILLIAM SACK*
3  311 East Liberty Street            1215 K Street, 17th Floor
4  Reno, NV 89501                     Sacramento, CA 95814
   P: (775) 323-1321                  P: (916) 596-3492
5  F: (775) 323-4082                  E: akraut@fpclaw.org
6   E: david@omaralaw.net             E: wsack@fpclaw.org

7
8  THE DiGUISEPPE LAW FIRM, P.C.
   RAYMOND M. DiGUISEPPE*             *Admitted Pro Hac Vice
9  4320 Southport-Supply Road, Suite 300
   Southport, NC 28461
10 P: 910-713-8804
11 E: law.rmd@gmail.com

12 Attorneys for Plaintiffs

13                    **UNITED STATES DISTRICT COURT**

14                        **DISTRICT OF NEVADA**
15

16 ROGER PALMER; CHAD MOXLEY;
   and, FIREARMS POLICY
17 COALITION, INC.,
18                     Plaintiffs,

19      v.

20 STEVE SISOLAK, Governor of Nevada;      Case No. 3:21-cv-00268
   AARON FORD, Attorney General of
21 Nevada; GEORGE TOGLIATTI,
22 Director of the Nevada Department of
   Public Safety; and MINDY MCKAY,
23 Administrator of the Records,
   Communications, and Compliance,
24 Division of the Nevada, Department of
25 Public Safety,
26
                       Defendants.
27

28

                                    1

1
2

## **NOTICE OF APPEAL**

3
4     PLEASE TAKE NOTICE that the above-named Plaintiffs hereby appeal to

5
6   the United States Court of Appeals for the Ninth Circuit from the Court's Order

7   entered on March 29, 2022 (ECF Doc. 65) and the related Judgment entered on

8   March 30, 2022 (ECF Doc. 66). A copy of the Order and Judgment are attached as

9
10  Exhibits 1 and 2 respectively.

11  Dated: April 28, 2022

12
13                                   /s/ *David C. O'Mara*
                                     David C. O'Mara
14
15                                   Attorney for Plaintiffs

16
17
18
19
20
21
22
23
24
25
26
27
28

1
2 **CERTIFICATE OF SERVICE**
3
4     I, David C. O'Mara, hereby certify that I served a copy of the *Notice of*
5 *Appeal* and *Representation Statement* through the Court's ECF system to all
6 registered users.
7
8 Dated: April 28, 2022
9
10                                                By:
11                                                /s/ *David C. O'Mara*
12                                                David C. O'Mara
13                                              The O'Mara Law Firm, P.C.
14                                              311 East Liberty Street
15                                              Reno, NV 89501
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## INDEX OF EXHIBITS

2

| Exh No | Description | Pages |
|--------|-------------|-------|
| 1 | Order; ECF No. 65 | 16 |
| 2 | Judgment; ECF No. 66 | 1 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF APPEAL

ER-15

AO 450 (Rev. 5/85) Judgment in a Civil Case ⊕

# UNITED STATES DISTRICT COURT

_____*****_____DISTRICT OF____NEVADA_____

ROGER PALMER, *et al.*,

        Plaintiff,

   V.

STEPHEN SISOLAK, *et al.*,

        Defendants.

JUDGMENT IN A CIVIL CASE

CASE NUMBER: 3:21-cv-00268-MMD-CSD

_____ **Jury Verdict.** This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

_____ **Decision by Court.** This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

_XX_ **Decision by Court.** This action came to be considered before the Court.  The issues have been considered and a decision has been rendered.

   IT IS ORDERED AND ADJUDGED

Defendants' motion to dismiss the complaint is granted.

_____March 30, 2022_____

_DEBRA K. KEMPI_
Clerk

/s/ Lia Griffin
Deputy Clerk

1

2

3                     UNITED STATES DISTRICT COURT

4                          DISTRICT OF NEVADA

5                                 * * *

6    ROGER PALMER, *et al.*,                    Case No. 3:21-cv-00268-MMD-CSD

7                              Plaintiffs,                  ORDER

         v.

8    STEPHEN SISOLAK, *et al.*,

9

                               Defendants.

10

11   **I.      SUMMARY**

12           On June 10, 2021, Plaintiffs[1] initiated this action challenging sections of Nevada

13   Assembly Bill 286 ("A.B. 286"), which prohibits certain actions relating to firearms

14   commonly referred to as "ghost guns," as violating the Second Amendment and the

15   Fifth Amendment's Takings Clause. (ECF No. 1 ("Complaint").) Shortly after initiating

16   this action, Plaintiffs filed a motion for preliminary injunction to enjoin Defendants[2] from

17   enforcing A.B. 286. (ECF No. 6.) The Court held a hearing on that motion ("the

18   Hearing") and ultimately declined to enjoin Defendants because Plaintiffs had failed to

19   demonstrate a likelihood of success on the merits of their claims. (ECF Nos. 48, 51

20   ("Order").)

21           Defendants now move to dismiss this action under Rule 12(b)(6) for failure to

22   state a claim. (ECF No. 34 ("Motion")[3].) Because the Court agrees with Defendants for

23

24

         _____

25           [1]Roger Palmer, Chad Moxley, and the Firearms Policy Coalition, Inc. ("FPC")
         (collectively, "Plaintiffs").

26           [2]Remaining Defendants are Nevada Governor Steven Sisolak; Attorney General
         Aaron Ford; Director of Public Safety George Togliatti; Division Administrator for
27       Department of Public Safety's Records, Communications and Compliance Division
         Mindy McKay (collectively, "Defendants").
28
             [3]Plaintiffs oppose dismissal and Defendants filed a reply. (ECF Nos. 53, 57.)

1   the reasons articulated in the Court's Order, and as further explained below, the Court

2   grants Defendants' Motion.

3   **II.   BACKGROUND**

4          The following facts are adapted from the Complaint. (ECF No. 1.) Plaintiffs Roger

5   Palmer and Chad Moxley, both citizens of Nevada, own and possess multiple

6   unserialized firearms and previously self-manufactured unserialized component parts.[4]

7   (*Id.* at 5, 20-21, 24.) Moxley and Palmer are both members of the Firearms Policy

8   Coalition, Inc. ("FPC"). (*Id.* at 20, 23.) FPC's stated purpose is to defend and promote

9   Second Amendment rights to keep and bear arms. (*Id.* at 26.) Palmer owns and

10  possesses multiple uncompleted non-firearm objects and firearm building kits. (*Id.* at

11  21.) Moxley sells firearms and component firearm parts at local gun shows and seeks to

12  continue selling unserialized firearms, their component parts, and other non-firearm

13  objects. (*Id.* at 23-24.) Moxley made arrangements prior to the enactment of A.B. 286 to

14  attend six or more gun shows before the end of 2021. (*Id.* at 23.)

15         On June 7, 2021, Nevada's Governor Stephen Sisolak signed A.B. 286 into law.

16  (*Id.* at 2.) At a May 11, 2021, pre-enactment hearing, Assemblywoman Sandra

17  Jauregui—a sponsor of A.B. 286—made public statements about the law's purpose. (*Id.*

18  at 17, 20, 33, 35.) With its enactment, A.B. 286 amended Chapter 202 of the Nevada

19  Revised Statutes to prohibit "a person from engaging in certain acts relating to firearms

20  which are not imprinted with a serial number under certain circumstances[.]" A.B. 286,

21  2021 Leg., 81st Sess. (Nev. 2021).

22         This litigation centers on certain sections A.B. 286 added to Chapter 202, which

23  are as follows:

24         *Section 3* states in part that a person "shall not possess, purchase, transport or

25  receive an unfinished frame or receiver[.]" *Id.* at § 3(1).

26

27  _____

28  [4]Plaintiffs use both "constituent" and "component" parts interchangeably in the
    Complaint. For consistency purposes, the Court will use component parts throughout
    this order.

2

# ER-18

1    *Section 3.5* states in part that a person "shall not sell, offer to sell or transfer an

2    unfinished frame or receiver[.]" *Id.* at § 3.5(1).

3    *Section 4* states in part that a person "shall not manufacture or cause to be

4    manufactured or assemble or cause to be assembled a firearm that is not imprinted with

5    a serial number" unless the firearm is: (a) rendered permanently inoperable, (b) an

6    antique firearm, or (c) determined to be a collector's item. *Id.* at §§ 4(1); 4(1)(a)-(c).

7    *Section 5* states in part that a person "shall not possess, sell, offer to sell,

8    transfer, purchase, transport or receive a firearm that is not imprinted with a serial

9    number" unless the person is a (a) law enforcement agency, (b) firearms importer or

10   manufacturer; or the firearm is: (a) rendered permanently inoperable, (b) manufactured

11   before 1969, (c) an antique firearm, or (d) determined to be a collector's item. *Id.* at §§

12   5(1); 5(1)(a)-(b).

13   *Section 5.5* further provides: "Nothing in the provisions of sections 3 to 5,

14   inclusive, of this act shall be deemed to prohibit the sale of an unfinished frame or

15   receiver or firearm that is not imprinted with a serial number to a firearms importer or

16   manufacturer or a license dealer before January 1, 2022." *Id.* at § 5.5.

17   A person in violation of any part of §§ 3-5 is guilty of a gross misdemeanor for a

18   first offense and a category D felony for a second or any subsequent offense. *Id.* at §§

19   3-5. Sections 3 and 5 become effective on January 1, 2022. *Id.* § 10(2).

20   **III.   LEGAL STANDARD**

21   A court may dismiss a plaintiff's complaint for "failure to state a claim upon which

22   relief can be granted." Fed. R. Civ. P. 12(b)(6). A properly pleaded complaint must

23   provide "a short and plain statement of the claim showing that the pleader is entitled to

24   relief." Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

25   While Rule 8 does not require detailed factual allegations, it demands more than "labels

26   and conclusions" or a "formulaic recitation of the elements of a cause of action."

27   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). "Factual

28   allegations must be enough to rise above the speculative level." *Twombly*, 550 U.S. at

3

ER-19

555. Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

## IV.   DISCUSSION

Defendants argue that dismissal is warranted because A.B. 286 does not violate the Second Amendment, nor does the Fifth Amendment's Takings Clause restrict the government's power to regulate and prohibit "dangerous private property." (ECF No. 34.) The Court will first address the Second Amendment, followed by the Takings Clause of the Fifth Amendment. Because the Court finds that Plaintiffs have failed to state a claim upon which relief can be granted, the Court will grant Defendants' Motion.

### A.   Second Amendment

The Second Amendment expressly states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In 2008, the Supreme Court held in *District of Columbia v. Heller* that the Second Amendment protects the "individual right to keep and bear arms." 554 U.S. 570, 622. The "central component" of that right to bear arms is for self-defense, particularly defense of the home. *Id.* at 599, 628-29. However, the Court also cautioned that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and historically speaking "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.[5] The Court later held that the Second Amendment is also fully applicable to states and municipalities through the Fourteenth Amendment. *See McDonald v. City of Chi.*, 561 U.S. 742, 790-91 (2010).

The Ninth Circuit has adopted a two-step framework to evaluate Second Amendment claims after *Heller* and *McDonald*. *See Young v. Hawaii*, 992 F.3d 765,

---

[5]In *Heller*, the Supreme Court indicated that determining the scope of the Second Amendment's protection requires a historical and textual analysis of the Amendment, *see id.* at 576-605, but the Court declined to undertake an exhaustive historical analysis of the full scope of the Amendment, *see id.* 626-27.

783-84 (2021) (en banc).[6] The two-step inquiry requires courts to ask (1) whether the challenged law burdens conduct protected by the Second Amendment and (2) if the law burdens protected Second Amendment conduct, then the second step requires determining the appropriate level of scrutiny and applying it to the challenged law. *See id.*, 992 F.3d at 783-84.

"The level of scrutiny depends upon (1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right." *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 963 (9th Cir. 2014) (internal quotes and citation omitted). Courts must look at the "historical understanding of the scope of the right." *Young*, 992 F.3d at 783 (quoting *Heller*, 554 U.S. at 625). A law that imposes a severe restriction on a core right, which destroys the protection of the Second Amendment, is "unconstitutional under any level of scrutiny." *Jackson*, 746 F.3d at 961 (citing *Heller*, 554 U.S. at 629). "[I]f a challenged law does not implicate a core Second Amendment right, or does not place a substantial burden on the Second Amendment right, [courts] may apply intermediate scrutiny." *Id.* "[A]ll forms of the [intermediate scrutiny] standard require (1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." *Id.* at 965 (quoting *Chovan*, 735 F.3d at 1129).

### 1.    Burden on Protected Conduct

Defendants argue that Plaintiffs cannot meet the required two-step inquiry for their claim. (ECF No. 34 at 7-10.) More specifically, Defendants argue that Plaintiffs cannot show A.B. 286 burdens constitutionally protected Second Amendment conduct, and thus the inquiry ends there. (*Id.* at 7-8.) Plaintiffs counter that they have asserted a "strong, ultimately meritorious" Second Amendment claim as A.B. 286 is a law that

---

[6]*See also Silvester v. Harris*, 843 F.3d 816, 820-21 (9th Cir. 2016); *Peruta v. Cnty. of San Diego*, 824 F.3d. 919, 939 (9th Cir. 2016); *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 960-61 (9th Cir. 2014); *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013).

1  targets firearms in common use for lawful purposes, and the law targets the right to self-

2  manufacture firearms. (ECF No. 53 at 5-9.) The Court agrees with Defendants.

3         The focus of the analysis as stated in *Heller* requires the Court to determine

4  whether A.B. 286 burdens the "central component" of the right to bear arms for self-

5  defense in the home. *See* 554 U.S. at 599, 628-29. As it stands, A.B. 286 regulates

6  firearms not imprinted with serial numbers—the law therefore "does not interfere with

7  the right to 'defense of hearth and home'" because Plaintiffs' ability to use any and all

8  serialized firearms to defend their homes remains unchanged. (ECF No. 34 at 8

9  (quoting *Heller*, 554 U.S. at 635).) *Cf. Jackson*, 746 F.3d at 968 ("A ban on the sale of

10  certain types of ammunition does not prevent the use of handguns or other weapons in

11  self-defense. The regulation . . . limits only the manner in which a person may exercise

12  Second Amendment rights by making it more difficult to purchase certain types of

13  ammunition."). Notably, Plaintiffs admitted at the Hearing that a person could still

14  acquire a serialized firearm from a licensed seller for defense of self and home under

15  A.B. 286. (ECF No. 48.) Thus, A.B. 286 does not target firearms in common use for

16  lawful purposes.

17         Moreover, A.B. 286 does not target the right to self-manufacture firearms.

18  Rather, it prohibits self-manufacturing of *unserialized* firearms. A.B. 286 § 4(1) ("a

19  person shall not manufacture . . . a firearm that is not imprinted with a serial number").

20  Under the statutory scheme, Plaintiffs are not entirely stripped of the opportunity to self-

21  manufacture and assemble firearms, they are only prohibited from doing so with

22  unserialized firearms. *See* § 4(1). A.B. 286 additionally provides that individuals can

23  self-manufacture and assemble unserialized firearms so long as the firearms fall within

24  an exception. *See* § 4(1)(a)-(c). Accordingly, the Court finds A.B. 286 does not severely

25  burden Second Amendment protected conduct, but merely regulates it. Intermediate

26  scrutiny rather than strict scrutiny is therefore appropriate for the Court's analysis of

27  ///

28  ///

1    A.B. 286.[7] *See Young*, 992 F.3d at 784 (stating that intermediate scrutiny applies in

2    cases where Second Amendment rights are "affected in some lesser way"); *see also*

3    *Teter v. Connors*, 460 F. Supp. 3d 989, 1003 (D. Haw. 2020) (citation omitted,

4    emphasis in original) (stating that "[m]ost post-*Heller* decisions have landed on some

5    form of intermediate scrutiny" and the court is unaware of any Ninth Circuit cases

6    applying strict scrutiny in the Second Amendment context).

**2.    Stated Objective and Reasonable Fit**

8        Defendants argue that "the ability of law enforcement to conduct serial number

9    tracing" is "a substantial or important interest" of the State of Nevada. (ECF No. 34 at 9-

10   10 (quoting *Pena v. Lindley*, 898 F.3d 969, 982 (9th Cir. 2018)).) Additionally, A.B. 286

11   is a "reasonable fit" to that important interest as it does not prevent individuals who are

12   legally permitted to obtain a firearm from purchasing a serialized firearm or receiver for

13   home defense. (*Id*.) Plaintiffs appear to counter that the State's important interest must

14   be "narrowly tailored" to achieve its interest. (ECF No. 53 at 11-12.) Moreover, Plaintiffs

15   assert the State's claimed interest is "disingenuous," "pretextual," and an "attempt to

16   justify the law as being something other than what it is." (*Id*. at 13.) The Court disagrees

17   with both of Plaintiffs' arguments and finds they have failed to plausibly plead A.B. 286

18   is not a reasonable fit for an important government interest.

19       As a preliminary matter, the Court rejects Plaintiffs' apparent application of the

20   strict scrutiny, rather than intermediate scrutiny standard. At the Hearing, Plaintiffs

21   argued A.B. 286 must be "narrowly tailored" to the government's objective. (ECF No.

22   48.) But Plaintiffs appeared then—as they do now—to apply strict scrutiny, which the

23   Court has previously determined is improper. (*See* ECF No. 51 at 8, n.8.) The Court

24   reiterates that while courts have used various terminology to describe the intermediate-

25

26       [7]Defendants also argue that A.B. 286 would still pass constitutional muster under
strict scrutiny review. (ECF No. 34 at 9-10.) Plaintiffs on the other hand, citing to
27   *Jackson*, 746 F.3d at 961, together with *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct.
2373 (2021), argue the Court should apply "exacting scrutiny" as the appropriate
28   standard. (ECF No. 53 at 11, 13.) The Court declines to address these arguments as it
has determined that intermediate scrutiny is the appropriate level of scrutiny.

1  scrutiny standard, as mentioned above, the government must show "a *reasonable fit*
2  between the challenged regulation and asserted objective" under intermediate scrutiny.
3  *Jackson*, 746 F.3d at 965 (quotes omitted, emphasis added); *see Teter*, 460 F. Supp.
4  3d at 1003 (stating that most decisions post-*Heller* "have landed on some form of
5  intermediate scrutiny."). Intermediate scrutiny is not a strict test, and the Ninth Circuit
6  has expressed that the standard "does not require the least restrictive means of
7  furthering a given end." *Silvester*, 843 F.3d at 827 (quoting *Jackson*, 746 F.3d at 966);
8  *see also Altman v. Cnty. of Santa Clara*, 464 F. Supp. 3d 1106, 1129 (N.D. Cal. 2020)
9  ("The Ninth Circuit . . . does not require narrow tailoring for firearm regulations subject to
10  intermediate scrutiny."). As such, and despite Plaintiffs repeated contention, A.B. 286
11  need not be narrowly tailored to the government's important objective.

12       The Court now turns to whether Plaintiffs plausibly assert that A.B. 286 fails to
13  pass intermediate scrutiny. In analyzing the first prong of intermediate scrutiny review,
14  the Court must determine whether the government's stated objective is significant,
15  substantial, or important. *See Jackson*, 746 F.3d at 965. Defendants cite to a
16  congressional report that concludes unserialized firearms are a present and increasing
17  threat to public safety because they present a "homeland security challenge" and they
18  "hamstring[ ] law enforcement's ability to investigate crimes committed with untraceable
19  weapons." (ECF No. 34 at 5 (quoting H.R. Rep. No. 116-88, pt. 1, at 2 (2019).)
20  Defendants further note that law enforcement agencies recovered nearly 24,000
21  privately made firearms, without serial numbers on the frame or receiver, from crime
22  scenes between 2016 and 2020. (*Id.* (citing Definition of "Frame or Receiver" and
23  Identification of Firearms, 86 Fed. Reg. 27720,27722 (May 21, 2021) (to be codified at
24  27 C.F.R. pts. 447, 478, 479)). The Court, in considering the government's stated
25  objectives, will not impose "an unnecessarily rigid burden of proof . . . so long as
26  whatever evidence the [government] relies upon is reasonably believed to be relevant to
27  ///
28  ///

8

ER-24

1  the problem that the [government] addresses." *Jackson*, 746 F.3d at 965 (quoting

2  *Renton v. Playtime Theatres*, 475 U.S. 41, 50-52 (1986)).[8]

3       Here, A.B. 286 prohibits "a person from engaging in certain acts relating to

4  firearms which are not imprinted with a serial number." A.B. 286, 2021 Leg., 81st Sess.

5  (Nev. 2021). When the Nevada Legislature considered A.B. 286, Assemblywoman

6  Sandra Jauregui—a sponsor of the Bill—echoed Congress' concerns when she stated

7  that unserialized firearms are a threat to public safety because they circumvent

8  background checks, and they are untraceable if used in a crime. (ECF No. 34 at 6

9  (citing *Prohibits Certain Acts Relating to Firearms: Hearing on A.B. 286 Before Senate*

10 *Comm. on Judiciary*, 81st Session (May 11, 2021) (statement of Sandra Jauregui,

11 Assemblywoman)). Moreover, Assemblywoman Jauregui "explained that ghost guns are

12 an especially acute threat to Nevada because one of the largest unfinished receiver kit

13 companies in the nation, Polymer80, Inc. is based [in Nevada]." (*Id.*)

14      Plaintiffs do not contest the government's interest is important or substantial. Nor

15 can they. It is "self-evident" that preventing gun violence and maintaining public safety is

16 a long-acknowledge and undeniably important government interest. *Chovan*, 735 F.3d

17 at 1139; *see also Jackson*, 746 F.3d at 965; *United States v. Salerno*, 481 U.S. 739,

18 748 (1977) ("[T]he Government's regulatory interest in community safety can, in

19 appropriate circumstances, outweigh an individual's liberty interest."). Additionally, the

20 government's objective in preserving law enforcement's ability to investigate crimes

21 committed with untraceable weapons is also a substantial and important government

22 interest. *See Pena v. Lindley*, 898 F.3d 969, 981-82 (9th Cir. 2018) (holding that a

23 California law requiring new models of semiautomatic pistols to be imprinted with

24 characters, including a serial number, passed constitutional muster under intermediate

25 scrutiny because "preserving the ability of law enforcement to conduct serial number

26

27      [8]Plaintiffs seek to raise doubt regarding the justification behind A.B. 286 (*see* ECF No. 53 at 17-20), but the Court declines to address these issues as the Court makes clear here that it does not need to impose an unnecessary burden of proof so

28 long as the government's stated objective is reasonably believed to be relevant to the problem. *See Jackson*, 746 F.3d at 965.

1    tracing—effectuated by limiting the availability of untraceable firearms—constitutes a
2    substantial or important interest."). As such, the government's objectives in enacting
3    A.B. 286 are undeniably substantial and important, thus satisfying the first prong of
4    intermediate scrutiny.

5         The second prong of intermediate scrutiny requires a determination that A.B.
6    286's regulations be a "reasonable fit" with the government's asserted objectives.
7    *Jackson*, 746 F.3d at 965. Defendants articulate that A.B. 286 "addresses the threat
8    posed by unserialized firearms and firearm components." (ECF No. 34 at 6.) A plain text
9    reading of A.B. 286 affirms that it does so by prohibiting the possession and sale of
10   firearms and component parts that lack serial numbers. §§ 3(1), 3.5(1). It also prohibits
11   a person from manufacturing or assembling an unserialized firearm unless it falls within
12   a categorical exception, *see* A.B. 286 § 4(1)(a)-(c). Moreover, A.B. 286 prohibits the
13   possession of unserialized firearms unless an exception applies, *see* § 5(1)(a)-(b).

14        A.B. 286 focuses only on unserialized firearms that (1) are not within a
15   categorical exception, (2) bypass background checks by virtue of self-manufacturing
16   and assembly, and (3) are untraceable without a serial number. Plaintiffs do not directly
17   challenge that A.B. 286 is not a "reasonable fit" for the state's substantial or important
18   interest in promoting public safety or conducting serial number tracing. Instead, Plaintiffs
19   contend the government's objectives are "disingenuous." (ECF No. 53 at 12-17.)
20   According to Plaintiffs, if the purpose of A.B. 286 is to require firearms be serialized,
21   then the State would have established a mechanism permitting individuals to pass a
22   background check and obtain a state-issued serial number like California and
23   Connecticut. (*Id*.) But Plaintiffs misstate the purpose of A.B. 286. While the law requires
24   firearms be serialized, *see* A.B. 286 §§ 4, 5, the purpose itself is not to serialize
25   firearms. Rather, as Defendants clearly state, the purpose is to maintain public safety
26   and to preserve the ability of law enforcement to investigate crimes committed with
27   untraceable weapons. Plaintiffs' repeated assertion that Defendants are required to
28   create a mechanism to obtain serialization appears to be an effort to mask another

1    effort to argue A.B. 286 must be "narrowly tailored" to the government's stated

2    objective.[9] However, as the Court has made clear, intermediate scrutiny rather than

3    strict scrutiny is appropriate in analyzing A.B. 286. Moreover, merely because California

4    and Connecticut have chosen a different avenue to regulate unserialized firearms does

5    not require Nevada to follow identically in tow. Because Defendants are not required to

6    narrowly tailor their regulation, Plaintiffs' argument is inapposite. Plaintiffs have thus

7    failed to plead that A.B. 286 is not a reasonable fit for the state's important interest of

8    ensuring public safety. As such, Plaintiffs have failed to state a Second Amendment

9    claim upon which relief can be granted.

10            **B.      Fifth Amendment's Takings Clause**

11           Plaintiffs allege that the enactment of A.B. 286 resulted in a "taking" of their

12   unserialized firearms and component parts. (ECF No. 1 at 33-36.) The Takings Clause

13   of the Fifth Amendment provides: "[N]or shall private property be taken for public use,

14   without just compensation." U.S. Const. amend. V. The Clause is made applicable to

15   states through the Fourteenth Amendment. *See Chi., B. & Q.R. Co. v. Chicago*, 166

16   U.S. 226, 239 (1897). A physical taking of property occurs "[w]hen the government

17   physically takes possession of an interest in the property for some public purpose."

18   *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002).

19   When a government regulation of private property becomes so onerous and thus "goes

20   too far[,] it will be recognized as a taking." *See Pa. Coal Co. v. Mahon*, 260 U.S. 393,

21   415-16 (1922).

22           Although it is somewhat unclear from the Complaint and Plaintiffs' opposition to

23   the Motion, Plaintiffs appear to argue that A.B. 286 resulted in a regulatory taking and a

24   nuisance taking.[10] Defendants argue that Plaintiffs have failed to demonstrate a taking

25

26           [9]To support this argument, Plaintiffs cite and discuss a state court action before
     the Third District Court of Nevada pertaining to A.B. 286. (ECF No. 53 at 13-17.) *See*
27   *Polymer80, Inc. v. Sisolak*, Case No. 21-CV-00690 (Nev. 3rd. Jud. Dist. Ct. July 16,
     2021). The Court notes that the state court action has no binding authority on this Court.

28           [10]In its previous Order, the Court notably addressed the issue of physical taking
     because Plaintiffs' motion for a preliminary injunction argued that the government had a

1    has occurred. The Court will first address the parties' arguments as they related to

2    regulatory taking, then discuss the government's police power, and finally conclude by

3    addressing Defendants' nuisance taking argument.

### 1.    Regulatory Taking

5    Defendants argue that A.B. 286 is not a "physical appropriation" of property in

6    violation of the Fifth Amendment's Takings Clause because the State is not taking title

7    to unserialized firearms or component parts. (ECF No. 34 at 11.) Nor does the law

8    violate the Takings Clause since the government is not required to compensate an

9    owner when it prohibits a type of personal property through a "valid law." (*Id.* at 10-11.)

10   Plaintiffs counter that unserialized firearms and component parts are subject to

11   dispossession because A.B. 286 destroys or diminishes their value. (ECF No. 53 at 23.)

12   A.B. 286 is thus a *per se* taking because it deprives all economically beneficial use of

13   the property. (*Id.* at 23-14.) The Court disagrees with Plaintiffs.

14   The Supreme Court has articulated two guidelines for determining whether a

15   government regulation is "onerous." *See Murr v. Wisconsin*, 137 S. Ct. 1933, 1942-43

16   (2017). The first pertains to whether a regulation "denies all economically beneficial or

17   productive use of" the property. *Id.* The second applies when a regulation does not so

18   deny. In that case, "a taking still may be found based on *a complex of factors*, including

19   (1) the economic impact of the regulation on the claimant; (2) the extent to which the

20   regulation has interfered with distinct investment-backed expectations; and (3) the

21   character of the governmental action." *Id.* (emphasis added and quotation marks

22   omitted) (citing *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)

23   ("*Penn Central*")).

24

25   _____

26   duty to provide "just compensation" since A.B. 286 required the property at issue be
     sold or transferred. (ECF No. 51 at 14-15.) In their response to the motion to dismiss,
27   Plaintiffs do not oppose Defendants' argument that they are not taking title to the
     property at issue, nor does Plaintiffs raise concern that the alleged taking is not for a
28   public purpose. (*See* ECF No. 53 at 20-24.) Because Plaintiffs' arguments pertain to the
     diminished value and economic benefit of unserialized firearms and component parts,
     the Court finds only a regulatory takings analysis is warranted.

1    Plaintiffs do not explicitly argue in their response that the *Penn Central* complex

2  factors test has been met for there to be a regulatory taking. (*See* ECF No. 53 at 20-24.)

3  Plaintiffs nevertheless conclude that the economic impact on the property at issue is

4  "substantial" and the character of the government's action is an "invasion of property

5  interests" that requires compensation in accordance with the Takings Clause. (*Id.* at 24.)

6  But as the Court found in its previous Order, A.B. 286 does not deny all economically

7  beneficial or productive use of unserialized firearms and component parts, nor is it clear

8  based on the Complaint and the record the extent or certainty of the economic impact

9  on Plaintiffs. (ECF No. 51 at 11-12.) Without more, and because Plaintiffs fail to argue

10  the *Penn Central* complex factors test weigh in their favor, the Court declines to engage

11  further analysis. The Court therefore finds that Plaintiffs have not sufficiently pled a

12  regulatory taking claim.

13                    **2.    Police Power**

14    Even if the Court were to find there is a taking, regulatory or physical, Plaintiffs'

15  claim fails because A.B. 286 is an appropriate exercise of the government's police

16  power. In their Motion, Defendants argue the government does not need to compensate

17  Plaintiffs when A.B. 286 prohibits "a type of personal property" via a "valid law." (ECF

18  No. 34 at 10.) That is because, according to Defendants, the Takings Clause does not

19  restrict the government's traditional power to regulate and prohibit "dangerous private

20  property." (*Id.* at 2.) Although not explicit, inherent in Defendants' argument is that A.B.

21  286 is an appropriate exercise of the government's police power. Plaintiffs appears to

22  counter that Defendants have not demonstrated unserialized firearms and component

23  parts are either "dangerous," "unusual," or "both." (ECF No. 53 at 21.) The Court agrees

24  with Defendants.

25    The police power exception to the Takings Clause provides that "[a] prohibition

26  simply upon the use of property for purposes that are declared, by valid legislation, to

27  be injurious to the health, morals, or safety of the community, cannot, in any just sense,

28  be deemed a taking." *Mugler v. Kansas*, 123 U.S. 623, 668 (1887). "If [an] ordinance is

13

ER-29

1   otherwise a valid exercise of the [government's] police powers, the fact that it deprives
2   the property of its most beneficial uses does not render it unconstitutional." *Goldblatt v.*
3   *Hempstead,* 369 U.S. 590, 592 (1962) (collecting cases).

4          The Court is unaware of—and the parties have not pointed to—any binding Ninth
5   Circuit case explicitly discussing police power exception to the Takings Clause in the
6   context of firearms regulations.[11] However, several other courts have applied this
7   principle in finding that firearm regulations do not constitute a taking. *See Adkins v.*
8   *United States*, 82 Fed. Cl. 619, 623-24 (2008) (holding that prohibition on the sale of
9   machine guns to anyone other than law enforcement agencies did not constitute a
10  physical or regulatory taking); *Fesjian v. Jefferson*, 399 A.2d 861 (D.C. 1979) (holding
11  that a statue requiring machine guns denied registration be sold, surrendered, or
12  disposed, was a valid exercise of police power thereby not a taking); *Rupp v. Becerra*,
13  Case No. 8:17-cv-00746-JLS-JDE, 2018 WL 2138451, *8-*9 (C.D. Cal. May 9, 2018)
14  (dismissing a Takings claim on the grounds that a California prohibition on certain
15  weapons represented an exercise of police power and not a taking). The Court finds this
16  authority persuasive and concludes that firearm regulations may fall within the police
17  power exception.

18         While Plaintiffs contend Defendants have not demonstrated that the property at
19  issue are "dangerous" or "unusual," Defendants—and the Nevada Legislature—have in
20  fact adequately demonstrated that unserialized firearms and component parts are
21  properly considered "dangerous private property." As discussed above, public safety
22  and the importance of firearm tracing necessitates the prohibition of unserialized
23  firearms and component parts. It is not clear what further showing Plaintiffs demand.
24  Nevertheless, the Court finds that Defendants have properly invoke the police power
25  exception, thus A.B. 286 is not a taking.

26  _____

27         [11]The Court notes in an unpublished opinion, *Duncan v. Becerra*, 742 F. App'x
    218 (9th Cir. 2018), the Ninth Circuit was presented with a similar Takings Clause claim.
    But there, the Ninth Circuit affirmed the district court's findings on a deferential abuse of
28  discretion standard. The Court finds the guidance from *Duncan* inconclusive as applied
    to the facts of this case.

14

ER-30

### 3.   Nuisance Taking

In their opposition to the Motion, Plaintiffs also seek to characterize A.B. 286 as a "nuisance taking." (ECF No. 53 at 21-22.) Citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029 (1992), Plaintiffs argue that A.B. 286 can only be proper if the property or its intended use has historically been prohibited. (*Id.* at 22.) Plaintiffs' reliance on *Lucas*, however, is misplaced.

In *Lucas*, the Supreme Court stated that, "when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." 505 U.S. at 1019. Therefore, "[w]here a regulation 'denies all economically beneficial or productive use of land,' the multi-factor analysis established in *Penn Central* is not applied, and a compensable taking has occurred unless 'the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with.'" *Esplanade Props., Ltd. Liab. Co. v. City of Seattle*, 307 F.3d 978, 984 (9th Cir. 2002) (quoting *Lucas*, 505 U.S. at 1027). But as the Court discussed above, A.B. 286 does not deny all economically beneficial or productive use of the property to be a *per se* taking. Even if the Court found differently, the *Lucas* decision articulated that compensation "must be accorded" to "regulations that prohibit all economically beneficial use of *land*[.]" 505 U.S. at 1029 (emphasis added). A.B. 286, however, does not regulate land nor real property. Plaintiffs' nuisance taking argument is therefore legally infirm.

Defendants have thus shown that as a matter of law, A.B. 286 cannot constitute a regulatory taking. The Court will thus dismiss Plaintiff's Fifth Amendment's Takings Clause claim.

### V.   LEAVE TO AMEND

Plaintiffs request the Court grant them leave to amend their Complaint, but Plaintiffs do not explain how their Complaint can be cured by amendment. (ECF No. 53 at 2.) The Court has discretion to grant leave to amend and should freely do so "when

15

1   justice so requires." *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990)

2   (*quoting* Fed. R. Civ. P. 15(a)). Because Plaintiffs do not challenge that public safety is

3   a substantial or important government interest, nor do they argue that A.B. 286 is not a

4   reasonable fit to the government's stated objective, the Court finds the deficiencies in

5   the allegations regarding their Second Amendment claim do not appear to be curable.

6   Moreover, the police power exception applies to the Fifth Amendment takings claim,

7   and thus leave to amend that claim would be futile. Accordingly, Plaintiffs' request for

8   leave to amend their Complaint is denied.

9   **VI.    CONCLUSION**

10   The Court notes that the parties made several arguments and cited to several

11   cases not discussed above. The Court has reviewed these arguments and cases and

12   determines that they do not warrant discussion as they do not affect the outcome of the

13   Motion and the issues before the Court.

14   It is therefore ordered that Defendants' motion to dismiss the complaint (ECF No.

15   34) is granted.

16   The Clerk of Court is directed to enter judgment accordingly and close this case.

17   DATED THIS 29th Day of March 2022.

18

19

20

21   MIRANDA M. DU
     CHIEF UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

16

ER-32

**Marquis Aurbach Coffing**
Nick D. Crosby, Esq.
Nevada Bar No. 8996
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 382-5816
ncrosby@maclaw.com
*Attorneys for Defendant,*
*Joseph Lombardo and*
*Steven Wolfson*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ROGER PALMER; CHAD MOXLEY; and, FIREARMS POLICY COALITION, INC., | Case Number: 3:21-cv-00268-MMD-WGC |
| Plaintiffs, | **STIPULATION AND ORDER FOR DISMISSAL WITH PREJUDICE** |
| vs. | |
| STEPHEN SISOLAK, Governor of Nevada; AARON FORD, Attorney General of Nevada; GEORGE TOGLIATTI, Director of the Nevada Department of Public Safety; MINDY MCKAY, Administrator of the Records, Communications and Compliance Division of the Nevada Department of Public Safety; JOSEPH LOMBARDO, Sheriff of Clark County, Nevada; STEVEN WOLFSON, District Attorney of Clark County, Nevada; DANIEL COVERLEY, Sheriff of Douglas County, Nevada; and MARK JACKSON, District Attorney of Douglas County, Nevada, | |
| Defendants. | |

Defendant Joseph Lombardo, Sheriff of Clark County, Nevada ("Lombardo"), and

Defendant Steven Wolfson, District Attorney of Clark County ("Wolfson") (collectively "Clark

County Defendants"), by and through their attorneys of record, Nick D. Crosby, Esq., with the law

firm of Marquis Aurbach Coffing; Daniel Coverley, Sheriff of Douglas County, Nevada

("Coverley"), and Mark Jackson, District Attorney of Douglas County, Nevada ("Jackson")

(collectively "Douglas County Defendants"), by and through their counsel of record, Zachary J.

Wadle, Esq., with the Douglas County District Attorney's Office; and Plaintiffs Roger Palmer,

MAC:14687-369 4454004_2 8/27/2021 11:30 AM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1  Chad Moxley and Firearms Policy Coalition, Inc. (collectively "Plaintiffs"), by and through their

2  attorneys of record, David C. Omara, Esq., of The O'Mara Law Firm, P.C., Raymond M.

3  DiGuiseppe, Esq, of The DiGuiseppe Law Firm, P.C., and Adam Kraut and William Sack, of the

4  Firearms Policy Coalition, hereby stipulate and agree as follows:

5  1.  All claims asserted by Plaintiffs against the Clark County Defendants and the

6  Douglas County Defendants in the above-entitled action shall be dismissed with

7  prejudice as to the Clark County Defendants and Douglas County Defendants.

8  2.  The Plaintiffs, Clark County Defendants and Douglas County Defendants shall

9  each bear their own attorney's fees and costs and shall not be subject to any award

10  of attorney's fees, costs or damages arising from the above-entitled action.

11  3.  The Clark County Defendants and the Douglas County Defendants will be subject

12  to and shall abide by any injunction, declaratory relief granted or order of the United

13  States District Court for the District of Nevada regarding the constitutionality or

14  enforceability of Nevada Assembly Bill 286 (2021 Session) issued in the above-

15  entitled action, provided, however, these Defendants shall not be liable for any

16  damages ordered in any such decree, order, or judgment, including any award of

17  attorney's fees or costs.

18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Page 2 of 4

MAC:14687-369 4454004_2 8/27/2021 11:30 AM

4.     Plaintiffs, through their counsel of record, shall immediately, or as soon as reasonably possible, notify the Clark County Defendants and the Douglas County Defendants of any order, injunction or decree or modification of any such order, injunction or decree regarding the constitutionality or enforceability of Nevada Assembly Bill 286 (2021 Session) issued in the above-entitled action.

Dated this 27th day of August, 2021.

**MARQUIS AURBACH COFFING**


By: */s/ Nick D. Crosby, Esq.*
    Nick D. Crosby, Esq.
    Nevada Bar No. 8998
    10001 Park Run Drive
    Las Vegas, Nevada 89145
    *Attorneys for Defendant,*
    *Joseph Lombardo, Sheriff of Clark*
    *County, Nevada and Steven Wolfson,*
    *Clark County District Attorney*

Dated this 27th day of August, 2021.

**THE O'MARA LAW FIRM, P.C.**


By: */s/ David O'Mara, Esq.*
    David C. Omara, Esq
    Nevada Bar No. 8599
    311 East Liberty Street
    Reno, Nevada 89501
    *Attorneys for Plaintiffs*


**THE DIGUISEPPE LAW FIRM, P.C.**


By: */s/ Raymond M. DiGuiseppe, Esq.*
    Raymond M. DiGuiseppe, Esq
    *Admitted PHV**
    4320 Southport-Supply Road, # 300
    Southport, NC 28461
    *Attorneys for Plaintiffs*

Dated this 27th day of August, 2021.

**DOUGLAS     COUNTY     DISTRICT ATTORNEY**


By: */s/ Zachary J. Wadle, Esq.*
    Zachary J. Wadle, Esq. (Deputy D.A.)
    Nevada Bar No. 8711
    1038 Buckeye Road
    P.O. Box 218
    Minden, Nevada 89423
    *Attorneys     for     Douglas     County*
    *Defendants, Daniel Coverley, Sheriff of*
    *Douglas County, Nevada and Mark*
    *Jackson, District Attorney of Douglas*
    *County, Nevada.*

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14687-369 4454004_2 8/27/2021 11:30 AM

1

## **ORDER**

2     IT IS HEREBY ORDERED.

3     Dated this 27th day of _____August_____, 2021.

4

5

6                                      _____
                                       DISTRICT COURT JUDGE

7     Submitted by:

8     MARQUIS AURBACH COFFING

9

10    By: */s/ Nick D. Crosby, Esq.*_____
          Nick D. Crosby, Esq.
11        Nevada Bar No. 8998
          10001 Park Run Drive
12        Las Vegas, Nevada 89145
          *Attorneys for Defendant,*
13        *Joseph Lombardo, Sheriff of Clark*
          *County, Nevada and Steven Wolfson,*
14        *Clark County District Attorney*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Page 4 of 4

MAC:14687-369 4454004_2 8/27/2021 11:30 AM

AARON D. FORD
  Attorney General
Steve Shevorski (Bar No. 8256)
  Chief Litigation Counsel
Jeffrey M. Conner (Bar No. 11543)
  Deputy Solicitor General
Kiel B. Ireland (Bar No. 15368C)
  Deputy Attorney General
Office of the Attorney General
555 E. Washington Ave, Ste. 3900
Las Vegas, NV 89101
(702) 486-3420 (phone)
(702) 486-3773 (fax)
cnewby@ag.nv.gov
sshevorski@ag.nv.gov
kireland@ag.nv.gov

*Attorneys for State Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ROGER PALMER; CHAD MOXLEY; and FIREARMS POLICY COALITION,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>STEPHEN SISOLAK, Governor of Nevada; AARON FORD, Attorney General of Nevada; GEORGE TOGLIATTI, Director of the Nevada Department of Public Safety; MINDY MCKAY, Administrator of the Records, Communications, and Compliance, Division of the Nevada, Department of Public Safety; JOSEPH LOMBARDO, Sheriff of Clark County, Nevada; STEVEN WOLFSON, District Attorney of Clark County, Nevada; DANIEL COVERLEY, Sheriff of Douglas County, Nevada; and, MARK JACKSON, District Attorney of Douglas County, Nevada,<br><br>                    Defendants. | Case No.  3:21-cv-00268-MMD-WGC<br><br><br>**STATE DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS' MOTION TO DISMISS** |

Defendants Stephen Sisolak, Aaron D. Ford, George Togliatti and Mindy McKay (collectively, the "State Defendants"), by and through counsel, file this reply supporting their motion to dismiss the complaint, ECF No. 34.

///

## I.   Introduction

This Court should dismiss the complaint with prejudice.  Its order denying Plaintiffs' motion for a preliminary injunction already determined the legal questions necessary to grant the motion to dismiss.  This Court ruled that Assembly Bill 286 ("AB 286") passed intermediate scrutiny because it constitutes a reasonable fit with the important government objective of preventing and prosecuting gun crime.  ECF No. 51, at 7.  And it concluded that AB 286 did not effect a regulatory taking or a physical taking.  *Id.* at 11, 14.

Those were purely legal determinations based on the same authorities at issue in the current motion – AB 286's text, its legislative history and official federal government reports on ghost guns.  Plaintiffs point to no allegations in the complaint that would demand a different result from the one on their motion for a preliminary injunction.  Nor do they even attempt to rebut this Court's conclusions or the caselaw that it relied on.

Instead, they ask this Court to take the role of the Nevada Legislature and replace AB 286 with California and Connecticut's ghost-gun regulatory scheme instead.  Nothing in the Constitution requires Nevada to copy California or Connecticut's chosen means for regulating untraceable firearms.  Plaintiffs' request is as baseless as their other already-rejected arguments.  Dismissal is proper.[1]

## II.   Relevant background

### A.   Plaintiffs' brief shows how narrow AB 286's effect is

Plaintiffs describe the "net effect" of AB 286 as "a blanket prohibition against all self-built modern operable firearms."  ECF No. 53, at 5.  That shows just how narrow AB 286 is.

AB 286 does not affect the tens of thousands of serialized firearms sold in Nevada each year.  *See* FBI, *NICS Firearm Checks: Year by State/Type* 3-5 (2021), https://bit.ly/3z3Ev6T (showing that, on average, over 120,000 background checks were

---

[1] All the authorities cited by the State Defendants are matters of public record that may be considered in ruling on the motion to dismiss.  *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1006, 1016 n.9 (9th Cir. 2012).

1 | performed in connection with retail firearms sales in 2018 through 2020).[2]  It does not

2 | affect self-built antique firearms or collector's items, curios and relics. AB 286, § 4(1)(b)-

3 | (c). And it does not affect inoperable firearms (for example, inoperable firearms assembled

4 | for pleasure by a hobbyist). *Id.* § 4(1)(a).

5 |      But even Plaintiffs' narrow conception of AB 286 overstates its reach. AB 286 does

6 | not bar "all self-built modern operable firearms." Nevadans are free to assemble modern,

7 | operable guns, so long as they start from a serialized receiver and the resulting gun has a

8 | serial number. *See* AB 286, § 4.

9 |      Plaintiffs claim in their brief that self-assembly kits cannot be serialized under

10 | federal law. ECF No. 53, at 10, 15. But as long as the receiver is sufficiently finished, it

11 | can and must be serialized. *See* Definition of "Frame or Receiver" and Identification of

12 | Firearms, 86 Fed. Reg. 27720, 27726 & n.42 (proposed May 21, 2021) (to be codified at CFR

13 | pts. 447, 478-79).[3]  A person interested in assembling his own gun can start with that

14 | serialized receiver and go from there.

15 |     **B.**   **Neither the complaint nor Plaintiffs' brief points to a single benefit**

16 |          **that ghost guns offer for home defense**

17 |      *Heller v. District of Columbia*, 554 U.S. 570 (2008), identified the core Second

18 | Amendment right as "the right of law-abiding, responsible citizens to use arms in defense

19 | of hearth and home." *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013) (quoting

20 | *Heller*, 554 U.S. at 635). Yet Plaintiffs never cite any benefit ghost guns have for exercising

21 | that core right. On the contrary, both the complaint and their brief indicate that handguns

22 | and AR-15-style rifles assembled from ghost gun kits are indistinguishable from

23 | professionally manufactured versions for home-defense purposes. *See* ECF No. 1, ¶ 84;

24 | ECF No. 53, at 6-7. In other words, the serialized firearms available across Nevada are

25 | just as effective for home defense as the ghost guns targeted by AB 286.

---

[2] This figure was calculated by adding together the yellow "handgun," "long gun," "*other" and "**multiple" columns for each year, and then averaging the three years.

[3] Generally, a receiver that is more than 80% finished is considered to need a serial number, while a so-called "80% receiver" does not need a serial number. *See* Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. at 27726 n.42.

C.   **This Court denied Plaintiffs' motion for a preliminary injunction based on the same considerations present here**

Plaintiffs filed a motion for a preliminary injunction premised on their Second Amendment and takings claims. ECF No. 6, at 3. This Court denied the motion. *Id.* at 1.

This Court first concluded that AB 286 passes intermediate scrutiny. ECF No. 51, at 7. Relying on a report from the U.S. House Committee on Homeland Security and a Bureau of Alcohol, Tobacco, Firearms, Explosives (the "ATF") notice of proposed rulemaking, it determined that AB 286 represented a reasonable fit with an important government objective. ECF No. 51, at 7-10. It explained that those federal authorities and AB 286's legislative history were a sufficient basis for showing that the law was constitutional and "more specific evidence" on the effectiveness of AB 286 was not necessary. *Id.* at 10.

This Court also concluded that AB 286 does not violate the Takings Clause. Based on AB 286's text and prior precedent, it determined that AB 286 does not amount to a regulatory taking. ECF No. 51, at 11-13. It further determined that the plain language of AB 286 showed that it did not authorize a "physical taking" of Plaintiffs' property. *Id.* at 14-15.

III.   **Restated legal standard**

A complaint can survive a motion to dismiss only if it contains sufficient factual allegations to make out a "plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009). While factual allegations must be assumed to be true at this stage, this Court need not accept the complaint's legal conclusions. *Id.* at 678.

Plaintiffs argue for a more "[l]enient" standard under which their complaint would survive "unless it appears beyond doubt that [they] can prove no set of facts in support of [their] claim." ECF No. 53, at 1-2. But that argument relies on *Conley v. Gibson*, 355 U.S. 41 (1957), and its progeny. *See id.* Those cases are no longer good law. *Henry v. Adventist Health Castle Med. Ctr.*, 970 F.3d 1126, 1132 (9th Cir. 2020), *cert. pet. docketed* No. 20-869 (U.S. filed Dec. 30, 2020). To proceed past the motion to dismiss stage, Plaintiffs must

/ / /

1  satisfy the "more stringent" plausibility standard.  *Swingless Golf Club Corp. v. Taylor*, 679

2  F. Supp. 2d 1060, 1066 (N.D. Cal. 2009).

3  **IV.    Argument**

4      **A.    AB 286 is consistent with the Second Amendment**

5      Plaintiffs once again largely ignore, *see, e.g.*, ECF No. 54, at 8-9, the two-step

6  framework we are bound to apply to Second Amendment claims, *see* ECF No. 51, at 4-5

7  (collecting cases). If the challenged law does not "burden conduct protected by the Second

8  Amendment," then the inquiry ends. *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016).

9  If it does, then the law is evaluated under the appropriate level of scrutiny. *Id.* AB 286 is

10  constitutional either way: it does not burden protected conduct and it passes intermediate

11  scrutiny.

12          **1.    AB 286 does not burden protected conduct because it does not
                interfere with Nevadans' ability to protect their home**

13

14      AB 286 does not burden protected conduct, so there is no need to proceed to step two

15  of the Second Amendment inquiry. *See Silvester*, 843 F.3d at 821. As noted above, the

16  Second Amendment's core right is the use of firearms to protect the home. *United States*

17  *v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013); *accord* ECF No. 51, at 4 ("The 'central

18  component' of th[e] right to bear arms is for self-defense, particularly defense of the home.").

19  AB 286 does not burden that protected conduct. Nothing in the complaint indicates that

20  Plaintiffs or anyone else legally entitled to purchase firearms will have difficulty obtaining

21  and using them for home defense in the wake of AB 286. And according to Plaintiffs, AR-

22  15s and handguns – which are still freely available in serialized form – are effective for

23  home defense. ECF No. 53, at 6.

24      Plaintiffs try to paper over this fatal defect in their claim by asserting a "right to

25  self-manufacture firearms." ECF No. 53, at 8. They do not cite a single case recognizing

26  such a right. *See id.* at 8-9. Contrary to their argument, self-assembling unserialized guns

27  is not "necessary to the realization of" the Second Amendment's core right. *See id.* Again,

28  serialized firearms remain available in stores across the State to allow Nevadans to

1  exercise the core right to use firearms for home defense. And, in any event, AB 286 does
2  not ban self-assembling a gun, as long as the underlying receiver is serialized.

3  **2.   If this Court reaches step two, AB 286 passes intermediate scrutiny**

4

5  **a.   AB 286 presents a reasonable fit with the important objective of preventing and prosecuting gun crime**

6

7  If the analysis proceeds to step two, this Court has already determined that
8  intermediate scrutiny is the correct level of scrutiny. ECF No. 51, at 6-7. In the firearms
9  context, a regulation passes intermediate scrutiny if the government's objective is
10  "significant, substantial, or important" and there is a "'reasonable fit' between the
11  challenged regulation and the asserted objective." *Silvester*, 843 F.3d at 821-22. "The test
12  is not a strict one." *Id.* at 827.

13  There can be no dispute that preventing and prosecuting gun crime is an important
14  government objective. ECF No. 51, at 8 (collecting cases). AB 286 constitutes a reasonable
15  fit with that important objective because it bans only unserialized guns and their
16  components. Congress, the ATF and experts testifying to the Nevada Legislature in
17  support of AB 286 all recognized that ghost guns and ghost gun kits undermine the
18  government's ability to prevent and prosecute gun crime. ECF No. 35, at 5-6; *see* ECF No.
19  51, at 7-8. They undermine prevention because they do not require background checks.
20  And they undermine prosecution because ghost guns are virtually untraceable. That is
21  why this Court concluded – based on the same authorities cited in the motion to dismiss –
22  that AB 286 passes intermediate scrutiny. ECF No. 51, at 9-10.

23  **b.   Plaintiffs' contention that AB 286 is not a reasonable fit with its goals fails as a matter of law**

24

25  Plaintiffs' primary argument in response is that AB 286 is "pretextual." The
26  complaint doesn't allege that the Nevada Legislature had a secret motive for passing
27  AB 286. Instead, reading the complaint and Plaintiffs' brief together, it is apparent that
28  Plaintiffs' argument is merely that AB 286 is not a reasonable fit for its goal. ECF No. 53,

1    at 13. That is a question of law, *see Eldred v. Reno*, 239 F.3d 372, 374 (D.C. Cir. 2001), and

2    this Court has already decided it against Plaintiffs, ECF No. 51, at 7. Nothing in Plaintiffs'

3    argument suggests that there is some factual issue that warrants proceeding past the

4    motion to dismiss stage.

5        Plaintiffs put much emphasis on the fact that California and Connecticut have

6    adopted different measures to regulate ghost guns. ECF No. 53, at 13. But intermediate

7    scrutiny does not require Nevada to adopt Plaintiffs' preferred regulatory scheme. *See*

8    *Pena v. Lindley*, 898 F.3d 969, 980 (9th Cir. 2018) ("[W]e must allow the government to

9    select among reasonable alternatives in its policy decisions."), *cert. denied sub nom. Pena*

10   *v. Horan*, 141 S. Ct. 108 (2020). The fact that other states have used other constitutional

11   means to regulate ghost guns does not change the fact that AB 286 is a reasonable fit with

12   its important objective.

13       Plaintiffs' argument that AB 286 fails intermediate scrutiny because it lacks the

14   "required tailoring – much less *any* tailoring at all," ECF No. 53, at 17, contradicts the plain

15   text of AB 286. The law is tailored to the problem of ghost guns: it "targets only unserialized

16   firearms that are not within a categorical exception, that bypass background checks by

17   virtue of self-assembly, and that are untraceable without a serial number." ECF No. 51, at

18   9. It does not affect the tens of thousands of serialized firearms sold on a yearly basis in

19   Nevada. Even if there were a less-restrictive means of regulating ghost guns, intermediate

20   scrutiny does not demand the use of the least-restrictive means. *Silvester*, 843 F.3d at 827.

21             **c.    Ghost guns present a real threat that is alleviated by**
22                     **AB 286**

23       Plaintiffs rely on cases from outside the firearms context to argue that the State

24   Defendants must also show that "the recited harms are real" and that AB 286 "will in fact

25   alleviate these harms." ECF No. 53, at 17 (quoting *Doe v. Harris*, 772 F.3d 563, 577 (9th

26   Cir. 2014)). The Ninth Circuit does not require that showing. *Pena*, 898 F.3d at 979-80.

27       But even if it did, the State Defendants *have* shown that the threat posed by ghost

28   guns is real and that AB 286 alleviates it. The federal government has recognized that

1   ghost guns present a real threat.  ECF No. 51, at 7 (citing H.R. Rep. No. 116-88, pt. 1, at 2
2   (2019); Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. at
3   27722).  The Nevada Legislature heard expert testimony about specific shootings using
4   ghost guns made by a Nevada-based company.  *Minutes of Senate Committee on Judiciary*,
5   81 Sess., at 6-7 (May 11, 2021), https://bit.ly/3md2nBk [hereinafter "*Senate Judiciary*
6   *Minutes*"]; *see* Robert Jablon, *LA Deputies Shot in Ambush Sue Nevada "Ghost Gun" Kit*
7   *Maker*, L.V. Rev. J. (Aug. 10, 2021), https://bit.ly/3yVGbit.  And the Third Circuit has
8   recognized that the prevalence of unserialized firearms "makes it more difficult for law
9   enforcement to gather information on firearms recovered in crimes."  *United States v.*
10  *Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010).

11      As this Court explained, it is "common sense" that prohibiting a significant and
12  growing source of untraceable firearms will help alleviate that threat.  ECF No. 51, at 9-
13  10.  The Nevada Legislature heard and considered testimony on that specific issue in
14  passing AB 286.  *Senate Judiciary Minutes, supra*, at 3, 5.  Nothing more was required.
15  *See Pena*, 898 F.3d at 984.

16      **B.    Plaintiffs' takings claim fails because no compensation is due when**
17      **the government requires dispossession of personal property**

18          **1.    AB 286 does not appropriate Plaintiffs' property**

19      The parties agree that where a government establishes "a regulation [that] results
20  in a physical appropriation of property," it has effected a taking requiring compensation.
21  ECF No. 53, at 22 (alteration in original).  But that principle is inapplicable here because
22  AB 286 does not appropriate Plaintiffs' property.  It is therefore distinguishable from *Cedar*
23  *Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021), where California had compelled private
24  property owners to allow third parties to enter the property for public policy reasons.  *Id.*
25  at 2072.  And from *Horne v. Department of Agriculture*, 576 U.S. 350 (2015), where the
26  United States had outright appropriated a portion of the raisin crop each year.  *Id.* at 354-
27  55.

28  / / /

1    Courts regularly find that laws that require dispossession of personal property – but
2  not appropriation by the state – are not compensatory takings.  The U.S. Supreme Court
3  in *Hamilton v. Kentucky Distilleries & Warehouse Co.*, 251 U.S. 146 (1919), held that there
4  was no taking when distillers and jobbers were required to dispose of their alcohol.  *Id.* at
5  157-58.  The D.C. Court of Appeals held that a law that required that certain machine guns
6  be sold, surrendered or disposed of was not a taking.  *Fesjian v. Jefferson*, 399 A.2d 861
7  (D.C. 1979); *see also* ECF No. 51, at 13 (citing and describing *Fesjian*).

8    As this Court has recognized, requiring dispossession is distinguishable from
9  appropriation because requiring dispossession is not a "taking of private property for public
10 use."  ECF No. 51, at 14 (cleaned up) (quoting U.S. Const. amend. V).  There is no *use* by
11 the Nevada public when a ghost gun is rendered inoperable, destroyed or transferred to
12 another state.  AB 286, like other measures mandating dispossession, is therefore outside
13 the text of the Takings Clause.  *See id.*

14   Contrary to Plaintiffs' argument, ECF No. 53, at 21-22, the fact that the property
15 was previously legal is irrelevant.  Alcohol was legal prior to *Hamilton*, but the Supreme
16 Court held that there was no taking there.  *See* 251 U.S. at 157-58.  More recently, myriad
17 federal courts have concluded that the ATF did not effect a taking when it banned bump-
18 stocks, a firearm component that had been legal until that point.  *Guedes v. ATF*, __ F.
19 Supp. 3d __, 2021 WL 663183, at *2, 10 (D.D.C. Feb. 19, 2021) (collecting cases).  That is so
20 even though the bump-stock ban – unlike AB 286 – did not allow owners to sell their bump-
21 stocks or move them to another state.  *Id.* at *2.  Owners were instead required to surrender
22 or destroy their bump-stocks within three months.  *Id.*; *see* Bump-Stock-Type Devices, 83
23 Fed. Reg. 66514, 66514 (Dec. 26, 2018) (codified at CFR pts. 447-49).

24   **2.    AB 286 is not a per se taking**

25   The government commits a per se taking where (a) it invades a property owner's
26 land or (b) denies all economically beneficial use of the land.  Plaintiffs argue that both
27 types of per se takings occurred here.  ECF No. 53, at 21-22.  Wrong and wrong.
28 / / /

1

### a.   AB 286 does not physically invade an interest in land

2   A physical invasion is recognized as a per se taking when the government physically

3   invades *real* property (land, airspace and water).  *See Lucas v. S.C. Coastal Council*, 505

4   U.S. 1003, 1015 (1992) (citing installation of "cable facilities," invasion of airspace and

5   imposition of a navigational servitude as examples of physical invasions).  Plaintiffs cite no

6   cases extrapolating this concept to personal property, and it is not clear how requiring

7   dispossession of ghost guns represents Nevada's "inva[ding]" their property.

8

### b.   AB 286 does not deny all economically beneficial use of land

9

10   Likewise, the denial of all economically beneficial use of property is a per se taking

11   only when the property in question is land.  Plaintiffs misleadingly quote the *Lucas* Court

12   as stating that "'[r]egulations that prohibit all economically beneficial use' *of property*

13   'cannot be newly legislated or decreed (without compensation).'"   ECF No. 53, at 21

14   (emphasis added).  But the *Lucas* Court did not say "of property"; it defined this type of per

15   se taking as "regulations that prohibit all economically beneficial use of *land*."  505 U.S. at

16   1029 (emphasis added).  AB 286 does not deny anyone all economically beneficial use of

17   *land. See Md. Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 365-66 (4th Cir. 2020) (rejecting an

18   attempt to extend this form of categorical takings to a firearms regulation), *cert. denied*,

19   No. 20-855, __ S. Ct. __, 2021 WL 1725174 (2021).

20   What's more, the complaint does not allege facts showing that Plaintiffs have been

21   deprived of "*all* economically beneficial uses." *See Lucas*, 505 U.S. at 1019.  Plaintiffs allege

22   only that "many" licensed firearms dealers will decline to buy unserialized firearms now,

23   and that they will therefore "not garner the *fair* market value." ECF No. 34, ¶¶ 145-46.

24   All means all.  At best, Plaintiffs have attempted to allege a diminution in the value of the

25   property, not that they were denied "all" economically beneficial use of it.[4]

26   / / /

27

28   [4] Plaintiffs also fail to acknowledge that their unserialized firearms would maintain their value if they removed them from Nevada. *See Fesjian*, 399 A.2d at 865-66 (finding no taking where owners could remove their firearms from the jurisdiction).

### 3. AB 286 is not a *Penn Central* taking

Plaintiffs argue in passing at the end of their brief that AB 286 constitutes a regulatory taking under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). ECF No. 53, at 24. They do not even try to explain how their claim meets *Penn Central*'s multifarious test. *See id.*

This Court has already concluded that AB 286 is not a regulatory taking under the *Penn Central* factors. ECF No. 51, at 11-13. And the takings claim fails for the independent reason that the complaint's vague allegation that "many" dealers will resist buying ghost guns, ECF No. 1, ¶ 145, does not show a sufficient diminution in value to support a regulatory takings claim, *see MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127-28 (9th Cir. 2013) (holding that an 81% diminution in value was "insufficient to demonstrate a taking").

### C. Plaintiffs' request to amend their complaint is improper and should be denied

In a last-ditch effort to save this case, Plaintiffs ask that this Court grant them leave to amend their complaint. ECF No. 53, at 2. But in this District a request to amend the complaint must be accompanied by the "proposed amended pleading." LR 15-1. Plaintiffs did not attach any proposed amended pleading, so it is impossible to tell how the hypothetical new complaint could address the operative complaint's fatal defects.

It could not. For the reasons explained above, AB 286 does not violate the Second Amendment or the Takings Clause and any amendment would be futile.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## V.     Conclusion

Banning unserialized, virtually untraceable firearms advances important public-safety interests without impacting the Second Amendment's core protection of the right of home defense.  And no compensation is due when the government mandates dispossession of personal property.  Those are purely legal conclusions that are ripe for determination on a motion to dismiss.  This Court should dismiss the complaint with prejudice.

DATED this 23rd day of August, 2021.

<div align="center">

AARON D. FORD
Attorney General

By:_/s/ *Kiel B. Ireland*_____
　　Steve Shevorski (Bar No. 8256)
　　Chief Litigation Counsel
　　Jeffrey M. Conner (Bar No. 11543)
　　Deputy Solicitor General
　　Kiel B. Ireland (Bar No. 15368C)
　　Deputy Attorney General

*Attorneys for State Defendants*

</div>

# EXHIBIT 1

# EXHIBIT 1

FILED

1  Case No. 21-CV-00690

2  Dept. No. I

2021 JUL 16  PM 2: 41

3  The undersigned affirms that this document
   does not contain the social security number
4  of any individual.


Andrea Andersen

5

6  **IN THE THIRD JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**

7  **IN AND FOR THE COUNTY OF LYON**

8  POLYMER80, INC.,

9
       Plaintiff,
10

11     vs.

12  STEPHEN SISOLAK, Governor of Nevada, AARON
    FORD, Attorney General of Nevada, GEORGE
13  TOGLIATTI, Director of the Nevada Department
14  of Public Safety, MINDY MCKAY, Administrator
    of the Records, Communications, and Compliance
15  Division of the Nevada Department of Public
    Safety,
16

17        Defendants.
                                              /
18

19  **ORDER GRANTING PRELIMINARY INJUNCTION**

20      This Court, having reviewed and considered Plaintiff Polymer80, Inc.'s (i) *Verified*

21  *Complaint,* (ii) Plaintiff Polymer80, Inc.'s *Motion for Temporary Restraining Order and Preliminary*

22  *Injunction,* (iii) *Defendants' Opposition to Application for Temporary Restraining Order,* and (iv) the

23  *Reply Memorandum of Points and Authorities of Polymer80, Inc. in Further Support of Its Motion*

24  *for Temporary Restraining Order,* and having considered the exhibits thereto and the arguments

25  therein, and having conducted a hearing on July 14, 2021 on Plaintiff Polymer80, Inc.'s *Motion for*

26  *Temporary Restraining Order and Preliminary Injunction* and having heard oral argument from

27  counsel for Plaintiff Polymer80, Inc. and Defendants, and good cause appearing,

28

Page 1 of 5

1       IT IS HEREBY ORDERED that Plaintiff Polymer80, Inc.'s *Motion for Temporary Restraining*

2   *Order and Preliminary Injunction* is GRANTED in PART and DENIED in PART for the reasons set forth

3   herein.   Specifically, Plaintiff Polymer80, Inc.'s *Motion for Temporary Restraining Order and*

4   *Preliminary Injunction* is GRANTED as to Section 3.5 of AB 286, and for the reasons stated herein,

5   the State of Nevada and Defendants STEPHEN SISOLAK, Governor of Nevada, AARON FORD,

6   Attorney General of Nevada, GEORGE TOGLIATTI, Director of the Nevada Department of Public

7   Safety, MINDY MCKAY, Administrator of the Records, Communications, and Compliance Division of

8   the Nevada Department of Public Safety, are hereby preliminarily enjoined from enforcing Section

9   3.5 of AB 286 during the pendency of this lawsuit and a ruling on Polymer80, Inc.'s claims for relief.

10      A preliminary injunction is proper when a party can show a reasonable likelihood of success

11  on the merits of its claims and that irreparable harm will occur, for which compensatory damages

12  is an inadequate remedy, in the absence of preliminary injunctive relief.   *See, e.g., Dangberg*

13  *Holdings Nevada, LLC v. Douglas County*, 115 Nev. 129, 142 (1999). Here, Plaintiff Polymer80, Inc.

14  has met this burden.   Additionally, the public interests at stake and a balancing of hardships

15  between the parties warrants preliminary injunctive relief. *See Clark Co. School Dist. v. Buchanan,*

16  112 Nev. 1146, 1150 (1996) (court may weigh the public interest and relative hardships of the

17  parties in determining whether a preliminary injunction should be granted).

18      Turning first to whether Polymer80, Inc. has demonstrated a likelihood of success on the

19  merits of its claims, the Court finds that it has.   Polymer80, Inc. ultimately seeks a declaratory

20  judgment from this Court, declaring that AB 286 violates the Nevada Constitution's Due Process

21  Clause because the statute is unconstitutionally vague, and a permanent injunction, permanently

22  enjoining the Defendants from enforcing AB 286.   At this stage of these proceedings and based on

23  the record before this Court, Polymer80, Inc. has demonstrated a likelihood of succeeding on these

24  claims because AB 286 – a criminal statute that under Nevada law requires a heightened level of

25  scrutiny – and particularly AB 286's definition of "Unfinished Frame or Receiver" is impermissibly

26  vague.

27      "A criminal statute can be invalidated for vagueness (1) if it fails to provide a person of

28  ordinary intelligence fair notice of what is prohibited; or (2) if it is so standardless that it authorizes

1   or encouraged seriously discriminatory conduct." *Scott v. First Jud. Dist. Ct.*, 131 Nev. 1015, 1021

2   (2015) (quotations omitted).  Here, the Court finds, at this juncture, that AB 286 fails to provide a

3   person of ordinary intelligence fair notice of what AB 286 criminalizes and encourages

4   discriminatory, criminal enforcement because the definition of "Unfinished Frame or Receiver" in

5   Section 6.9 of AB 286 is inherently vague due to the use of undefined terms, such as "blank",

6   "casting", and "machined body", and amorphous words and phrases – that are similarly not defined

7   such as "additional machining" and "machined to the point at which most of the major machining

8   operations have been completed."  In fact, it is unclear, on the current record, as to what the

9   Nevada Legislature meant by the words "blank", "casting", and "machined body", as those words

10  are used in AB 286.  Moreover, Defendants, at the hearing on Polymer80, Inc.'s motion, made

11  reference to a manufacturing continuum on which a "blank", "casting", or "machined body" is

12  turned into a frame or lower receiver of a firearm, but, at the hearing, Defendants could not

13  identify where on that continuum AB 286 comes into play (i.e., at what point during the machining

14  process an item, such as a blank, becomes unlawful and subject to criminal prosecution).

15  Therefore, Polymer80, Inc. has demonstrated a reasonable likelihood of success on its claim that

16  AB 286 is unconstitutionally vague due to the ambiguities that permeate AB 286's definition of

17  "Unfinished Frame or Receiver."

18       The Court also finds that Nevada Legislature only adopted limited definitions from Federal

19  Law when it adopted AB 286.  The Nevada Legislature presumably did so purposely, creating

20  additional ambiguity in AB 286.  Thus, this Court declines the Defendants' invitation to fill holes in

21  AB 286 by looking to Federal Law when the Nevada Legislature only incorporated Federal Law into

22  AB 286 in specific limited instances.

23       Turning to the issue of irreparable harm, the Court first notes that Section 3.5 of AB 286

24  criminalizes the sale or transfer of an "unfinished frame or receiver" and this portion of AB 286 is

25  currently in effect.  Polymer80, Inc. has sufficiently demonstrated to this Court that it has standing

26  to facially challenge AB 286 and will suffer irreparable harm in the absence of preliminary injunctive

27  relief because Section 3.5 of AB 286 renders Polymer80, Inc. unable to conduct its business without

28  the threat of criminal prosecution.  The inability of a company like Polymer80, Inc. to conduct its

1   business without the threat of unreasonable interference or the destruction of the business is the
2   type of irreparable harm that warrants preliminary injunctive relief. *See Sobol v. Capital Mgmt.*
3   *Consultants, Inc.*, 102 Nev. 444, 446 (1986); *see also Finkel v. Cashman Prof'l, Inc.*, 128 Nev. 68, 73
4   (2012). The Court also notes that the harm Polymer80, Inc. would suffer due to its inability to
5   conduct its business in the face of AB 286 is immeasurable, underscoring the Court's finding that
6   Polymer80, Inc. has sufficiently demonstrated irreparable harm to warrant a preliminary
7   injunction.

8      Defendants maintain that Polymer80, Inc. can simply serialize its products to avoid the
9   harm it claims it will suffer as a result of the enactment of AB 286. The Court finds this argument
10  unconvincing initially because the Nevada Legislature did not include any such language or
11  provision in AB 286. Moreover, the argument is belied by the plain language that the Nevada
12  Legislature did include in AB 286. Section 3.5 of AB 286 criminalizes the sale of an "unfinished
13  frame or receiver unless … [t]he unfinished frame or receiver *is required by federal law* to be
14  imprinted with a serial number." (emphasis added). Thus, unless Federal Law requires the
15  unfinished frame or receiver (whatever that may be) to be imprinted with a serial number,
16  Polymer80, Inc. can find no safe haven under AB 286 by simply placing a serial number on its
17  products that Federal Law does not require.

18     Finally, the Court finds that public interests weigh in favor of issuing a preliminary injunction
19  pending the trial in this matter due to the ambiguity in AB 286, which is, once again, a criminal
20  statute. Additionally, the balance of hardships weighs decidedly in favor of Polymer80, Inc.
21  because the Defendants will only be preliminary enjoined from enforcing Section 3.5 of AB 286
22  during the pendency of this matter and until this matter proceeds to verdict, during which time
23  Polymer80, Inc., as explained above, will face irreparable harm in the absence of a preliminary
24  injunction.

25     Based on the foregoing and good cause appearing, IT IS HEREBY ORDERED that Plaintiff
26  Polymer80, Inc.'s *Motion for Temporary Restraining Order and Preliminary Injunction* is GRANTED
27  in PART and DENIED in PART.

28

1      IT IS HEREBY FURTHER ORDERED that the State of Nevada and Defendants STEPHEN

2  SISOLAK, Governor of Nevada, AARON FORD, Attorney General of Nevada, GEORGE TOGLIATTI,

3  Director of the Nevada Department of Public Safety, MINDY MCKAY, Administrator of the Records,

4  Communications, and Compliance Division of the Nevada Department of Public Safety, and their

5  respective officers, agents, servants, and employees and anyone acting in concert with them,

6  individually or collectively, are hereby preliminarily enjoined from enforcing Section 3.5 of AB 286

7  during the pendency of this lawsuit.

8      The Court declines to enter a preliminary injunction with respect to the enforcement of

9  Section 3 of AB 286 because that portion of AB 286 does not take effect until January 1, 2022.

10  However, to the extent this matter does not proceed to trial as scheduled before January 1, 2022,

11  Polymer80, Inc. may renew its request for a preliminary injunction with respect to the enforcement

12  of Section 3 of AB 286.

13      IT IS HEREBY FURTHER ORDERED that this Order only applies to the enforcement of Section

14  3.5 of AB 286 and shall not preclude or prohibit the enforcement of other sections of AB 286 that

15  are now in effect or may take effect in the future.

16      IT IS HEREBY FURTHER ORDERED, pursuant to NRCP 65(c), that Plaintiff Polymer80, Inc. shall

17  post security with the Court in the amount of $20,000.00 (Twenty Thousand Dollars) on or before

18  July 16, 2021, and that this Order shall only take effect upon the posting of this security.  The Court

19  finds that security in the amount of $20,000.00 (Twenty Thousand Dollars) is sufficient to pay the

20  costs and damages that may be sustained, if any, by the Defendants if it is ultimately determined

21  they have been wrongfully enjoined pending trial.

22

23      DATED this  11th  day of July, 2021.

24

25                                                JOHN P. SCHLEGELMILCH

26                                                DISTRICT JUDGE

27

28

Page 5 of 5

ER-54

1  THE O'MARA LAW FIRM, P.C.
   DAVID C. OMARA
2  (Nevada Bar No. 8599)
   311 East Liberty Street
3  Reno, NV 89501
   P: (775) 323-1321
4  F: (775) 323-4082
   E: david@omaralaw.net
5
   THE DIGUISEPPE LAW FIRM, P.C.
6  RAYMOND M. DIGUISEPPE*
   4320 Southport-Supply Road, Suite 300
7  Southport, NC 28461
   P: 910-713-8804
8  E: law.rmd@gmail.com

9  *Attorneys for Plaintiffs*

FIREARMS POLICY COALITION
ADAM KRAUT*
WILLIAM SACK*
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 596-3492
E: akraut@fpclaw.org
E: wsack@fpclaw.org

*Admitted PHV*

10        UNITED STATES DISTRICT COURT
                DISTRICT OF NEVADA
11

12  ROGER PALMER, *et al.*,                    Case No.: 3:21-cv-00268

                        Plaintiffs,       **PLAINTIFFS' OPPOSITION
13        v.                              TO STATE DEFENDANTS'
                                          MOTION    TO    DISMISS**
14  STEPHEN SISOLAK, in his official      **PURSUANT TO FRCP 12(B)(6)**
    capacity as Governor of Nevada, *et al.*,
15                                        **Judge: Hon. Miranda Du**
                        Defendants.       **Date:  TBD**
16                                        **Time:  TBD**

17                    **I. Introduction**

18        State Defendants' Motion to Dismiss ("MTD") the Complaint pursuant to Rule 12(b)(6) of

19  the Federal Rules of Civil Procedure ("Rule 12(b)(6)") must be denied. The Complaint states strong,

20  indeed meritorious, constitutional challenges to Assembly Bill No. 286 ("AB 286" or the "Ban")

21  which easily survive the lenient standards of review on any motion to dismiss under Rule 12(b)(6).

22              **II. The Lenient Standards of Review**

23        In any challenge to the Complaint as failing to sufficiently state claims for relief under Rule

24  12(b)(6), "we accept all factual allegations in the complaint as true and construe the pleadings in the

25  light most favorable" to Plaintiffs and "draw[] all reasonable inferences in their favor." *Association*

26  *for Los Angeles Deputy Sheriffs v. County of Los Angeles*, 648 F.3d 986, 990 (9th Cir. 2011). The

27  Complaint "need not contain detailed factual allegations; rather, it must plead 'enough facts to state a

28  claim to relief that is plausible on its face.'" *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir.

1 | 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And the Complaint does that

2 | so long as it "pleads factual content that allows the court to draw the reasonable inference that the

3 | defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

4 |     In ruling on such motions, "it must be borne in mind that in many a suit such a motion cannot

5 | take the place of submission of evidence and of findings of fact and conclusions of law." *Rennie &*

6 | *Laughlin, Inc. v. Chrysler Corp.*, 242 F.2d 208, 213 (9th Cir. 1957) (internal quotations omitted).

7 | "The salvaged minutes that may accrue from circumventing these procedures can turn to wasted

8 | hours if the appellate court feels constrained to reverse the dismissal of an action." *Id.* Thus, it is

9 | settled that "a motion to dismiss is viewed with disfavor in the federal courts," *id.*, and a complaint

10 | should not be dismissed on this ground "unless it appears beyond doubt that the plaintiff[s] can

11 | prove no set of facts in support of [their] claim which would entitle [them] to relief," *Geraci v.*

12 | *Homestreet Bank*, 347 F.3d 749, 751 (9th Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46

13 | (1957)); *accord Nichols v. Mayflower Transit, LLC*, 368 F.Supp.2d 1104, 1106 (D. Nev. 2003).

14 |     Generally, this inquiry is based on the face of the complaint and any attachments to the

15 | complaint. *Patel v. American National Property and Casualty Company*, 367 F.Supp.3d 1186, 1191

16 | (9th Cir. 2019) ("Generally, a district court may not consider any material beyond the pleadings in

17 | ruling on a Rule 12(b)(6) motion .... However, material which is properly submitted as part of the

18 | complaint may be considered on a motion to dismiss."). "Similarly, 'documents whose contents are

19 | alleged in a complaint and whose authenticity no party questions, but which are not physically

20 | attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.'" *Id.*

21 | (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)). Additionally, the court may consider

22 | matters that are proper subjects for judicial notice under Federal Rule of Evidence 201. *Id.*

23 |     In the unlikely event that a court grants a motion to dismiss on the basis of failure to state a

24 | claim, "[t]he court should 'freely give' leave to amend" absent any "undue prejudice to the opposing

25 | party." *Farmer v. Las Vegas Metropolitan Police Department*, 423 F.Supp.3d 1008, 1013 (D. Nev.

26 | 2019) (quoting Fed. R. Civ. P. 15(a)). Generally, such "leave to amend is only denied when it is

27 | clear that the deficiencies of the complaint cannot be cured by amendment." *Id.*

28 |         **III.  The Undisputed Effects of Nevada's Ban Under AB 286**

1        The Complaint details the extraordinary impacts of the prohibitions imposed by AB 286's

2   Ban, the full extent of which State Defendants essentially concede in their motion (*see* MTD at 6):

3        **Section 3.**        Effective January 1, 2022, it is a crime for anyone in Nevada to "possess,

4   purchase, transport or receive an unfinished frame or receiver," unless "[t]he person is a firearms

5   importer or manufacturer" or "[t]he unfinished frame or receiver is required by federal law to be

6   imprinted with a serial number issued by a firearms importer or manufacturer and the unfinished

7   frame or receiver has been imprinted with the serial number." Comp. ¶ 61; AB 286, § 3(1)(a)-(b).

8   Consequently, all ordinary law-abiding citizens (i.e., everyone except firearms importers and

9   manufacturers) must dispossess themselves of all "unfinished" frames, receivers, and other non-

10  firearm objects ("NFOs") not serialized as "required by federal law" by no later than January 1,

11  2022. Compl. ¶ 63. Further, no ordinary law-abiding citizen may ever again lawfully possess,

12  purchase, transport, or receive any such frames, receivers, or NFOs on or after January 1, 2022,

13  effectively barring them from ever lawfully self-building any firearm for any purpose unless and

14  until (1) federal law or regulations *require* serialization of such component parts and (2) the

15  components are in fact serialized and then transferred in accordance with those laws or regulations

16  before being incorporated into any firearm self-built by the ordinary person. Compl. ¶ 66.

17       **Section 3.5.**       Effective immediately, it is a crime for anyone in Nevada to "sell, offer to sell

18  or transfer an unfinished frame or receiver," unless (1) the person is (a) a firearms importer or

19  manufacturer and (b) "the recipient of the unfinished frame or receiver is a firearms importer or

20  manufacturer," or (2) "[t]he unfinished frame or receiver is required by federal law to be imprinted

21  with a serial number issued by an importer or manufacturer and the unfinished frame or receiver has

22  been imprinted with the serial number"—subject to the limited exception for sales under section 5.5.

23  AB 286, § 3.5(1)(a)-(b); *id.* at §10(1). Compl. ¶ 67. Thus, this section shuts the door on any future

24  sale or transfer of any "unfinished frame or receiver," not serialized as "required by federal law," to

25  or by any ordinary law-abiding citizen, by immediately criminalizing all such sales or transfers,

26  except for sales conducted for purposes of complying with the mandatory dispossession of frames,

27  receivers, and other NFOs by the dispossession deadline of January 1, 2022. Compl. ¶ 67.

28       **Section 4.**        Effective immediately, it is a crime for anyone in Nevada to "manufacture or

1   cause to be manufactured or assemble or cause to be assembled a firearm that is not imprinted with a

2   serial number issued by a firearms importer or manufacturer in accordance with federal law and any

3   regulations adopted thereunder," unless the firearm "[h]as been rendered permanently inoperable,"

4   "[i]s an antique firearm," or "[h]as been determined to be a collector's item pursuant to 26 U.S.C.

5   Chapter 53 or a curio or relic pursuant to 18 U.S.C. Chapter 44." AB 286, § 4(1)(a)-(c). Compl. ¶ 69.

6   Because the serialization requirement of this manufacturing prohibition mandates that the firearm's

7   serial number be "*issued by* a firearms importer or manufacturer," the prohibition effectively bans all

8   self-manufacturing by ordinary law-abiding citizens. Only licensed manufacturers and importers are

9   *required* to imprint serial numbers and then only on *completed* firearms or *finished frames or*

10  *receivers*. In other words, unless and until a serialization *requirement* for *unfinished* frames or

11  receivers is established under federal law, the Ban literally mandates that, to be lawfully made or

12  possessed, any homebuilt firearm must *start*, at a minimum, with a *finished* frame or receiver, and

13  thus it completely extinguishes any right to self-manufacturing for the ordinary person, because

14  obviously one cannot *self*-manufacture a firearm that has *already* been manufactured. Compl. ¶ 70.

15       **Section 5.**      Effective January 1, 2022, it is a crime for anyone in Nevada to "possess, sell,

16  offer to sell, transfer, purchase, transport or receive a firearm that is not imprinted with a serial

17  number issued by a firearms importer or manufacturer in accordance with federal law and any

18  regulations adopted thereunder," unless (1) the person is a law enforcement agency or a firearms

19  importer or manufacturer, or (2) the firearm has been rendered permanently inoperable, was

20  manufactured before 1969, is an antique firearm, or has been determined to be a collector's item

21  pursuant to 26 U.S.C. Chapter 53 or a curio or relic pursuant to 18 U.S.C. Chapter 44. AB 286, §

22  5(1)(b)-(b). Compl. ¶ 71. This section targets existing firearms of ordinary law-abiding Nevadans,

23  who *lawfully* built them *before* the Ban, prohibiting as of January 1, 2022, the possession, sale,

24  transfer, transport, or receipt of all such modern and operable firearms manufactured after 1969. As

25  with the existing NFOs *lawfully* acquired *before* the Ban, obtaining serialization after the fact is no

26  option, because federal law requires that any necessary serialization occur *before* a completed

27  firearm ever reaches the consumer. *See* 27 C.F.R. § 478.92(a)(1) & (a)(2). Compl. ¶¶ 63, 71.

28       In net effect then, AB 286 imposes a blanket prohibition against all self-built modern

1   operable firearms of any type (all handguns and all long guns) *in addition* to component parts

2   integral to their manufacture that are not already—and *could not* be—imprinted with a serial number

3   as *required* by federal law, it mandates that all ordinary law-abiding citizens *dispossess* themselves

4   of all such arms and parts on or before January 1, 2022 (or render them useless), it totally bans all

5   such individuals from possessing or using any of the same on and after that date, it *immediately* bans

6   sales or transfers to these individuals of any "unfinished frames or receivers" that lack the required

7   but unobtainable form of serialization, and it *immediately* bans them from self-manufacturing any

8   firearms that lack the required but unobtainable form of serialization. Compl. ¶¶ 64, 71, 127. Indeed,

9   it is clear that the Nevada lawmakers fully anticipate and intend dispossession as the sole means of

10  compliance. *See* Notes of Assemblywoman Jauregui (AB 286's sponsor) to the amendments of AB

11  286 on May 11, 2021. Compl. ¶ 64. State Defendants readily concede this as well. MTD at 6.

12      **IV.   The Complaint States a Strong, Ultimately Meritorious Second Amendment Claim**

13              No basis exists to dismiss the Second Amendment claim, especially under the lenient

14  standards of Rule 12(b)(6). Rather, it is a strong, indeed meritorious claim that must proceed.

15  **A.   The Ban's Undisputed Targeting of Arms in Common Use for Lawful Purposes**

16              The Complaint is replete with assertions, grounded in Supreme Court precedent, that the

17  arms targeted for prohibition and dispossession by the Ban are arms in common use for lawful

18  purposes and are thus protected by the Second Amendment. As the Complaint expounds, the

19  Supreme Court "has held that 'the Second Amendment extends, *prima facie*, to all instruments that

20  constitute bearable arms, even those that were not in existence at the time of the founding.'" *Caetano*

21  *v. Massachusetts*, 577 U.S. 411, 416 (2016) (Alito, J., concurring) (quoting *District of Columbia v.*

22  *Heller*, 554 U.S. 570, 582 (2008)). Compl. ¶ 1. Thus, the Second Amendment "guarantees the right

23  to carry weapons '*typically possessed* by law-abiding citizens for lawful purposes,'" *id.* (quoting

24  *Heller* at 625) (italics added), and its protection extends to all firearms currently in common use that

25  are not both "dangerous per se" and "unusual," *id.* at 417 ("A weapon may not be banned unless it is

26  both dangerous *and* unusual."). Compl. ¶ 34; *see also Miller v. Bonta*, __ F.Supp.3d__, 2021 WL

27  2284132, *45 (S.D. Cal. 2021) ("Fortunately, no legislature has the constitutional authority to dictate

28  to a good citizen that he or she may not acquire a modern and popular gun for self-defense.").

1   "Dangerous *per se*" does not mean the mere inherent propensity of a firearm to cause injury.

2   *Caetano*, 577 U.S. at 418 ("firearms cannot be categorically prohibited just because they are

3   dangerous"). In fact, "the relative dangerousness of a weapon is irrelevant when the weapon belongs

4   to a class of arms commonly used for lawful purposes." *Id.* "*Heller* defined the 'Arms' *covered by*

5   the Second Amendment to include " 'any thing that a man wears for his defence, or takes into his

6   hands, or useth in wrath to cast at or strike another.' " *Id.* (quoting *Heller*, 554 U.S. at 581) (quoting

7   1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)). Compl. ¶ 35. And an arm is

8   not "unusual" so as to fall outside the ambit of this protection so long as it is "commonly possessed

9   by law-abiding citizens for lawful purposes *today*." *Caetano* at 420 (italics original). Compl. ¶ 36.

10   As the Complaint further details—also based on sources not subject to reasonable dispute—

11   both handguns and AR-15 rifles are in common use and neither class of arms is "dangerous" *or*

12   "unusual" in this sense. Handguns have been recognized, by the Supreme Court itself, as "the

13   quintessential self-defense weapon" "overwhelmingly chosen by American society" for lawful self-

14   defense. *Heller*, 554 U.S. at 628-29. Compl. ¶ 36. Similarly, over 25 years ago, the Supreme Court

15   recognized the AR-15 as a common firearm possessed by *ordinary people*, finding, "The AR-15 is

16   the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon."

17   *Staples v. United States*, 511 U.S. 600, 603 (1994). Compl. ¶¶ 138-140; *see also Miller v. Bonta*, __

18   F.Supp.3d __, 2021 WL 2284132, *6 (finding such rifles are "commonly owned by law-abiding

19   citizens" and "the overwhelming majority of citizens who own and keep the popular AR-15 rifle and

20   its many variants do so for lawful purposes, including self-defense at home").

21   State Defendants do not contest that such arms are in common use for lawful purposes

22   throughout the country. Nor do they claim either class of arms is "dangerous" *or* "unusual"—much

23   less "dangerous *and* unusual" as would be necessary to strip them of constitutional protection. State

24   Defendants use the term "dangerous" in connection with the arms at issue only once, and then only

25   in context of their (fallacious) claim that the dispossession mandate of AB 286 does not constitute a

26   compensable "taking." MTD at 2 ("The Fifth Amendment's takings clause also does not hamstring

27   state government's traditional power to regulate, and indeed prohibit, dangerous private property.").

28   They say nothing to even suggest that handguns or AR-15 rifles are anything but arms in common

1    use for lawful purposes within the purview of the Second Amendment's protection.

2        This is significant because, as the Complaint sets out, both the individual Plaintiffs, Roger

3    Palmer and Chad Moxley, own and possess multiple self-built handguns and AR-15 rifles "of a type

4    commonly possessed by law-abiding citizens for lawful purposes today," as well as NFOs used in

5    the construction of such arms, which they lawfully acquired before the Ban and which they have

6    only ever used for lawful purposes, but which are now subject to prohibitions of the Ban. Compl. ¶¶

7    81-85, 101-103. Moreover, both rightfully desire to continue to own, possess, acquire, use, and self-

8    build such arms along with their constituent parts for self-defense and other lawful purposes. Both

9    would do so, but for the Ban's prohibitions which prohibit all such activity and property interests

10   without providing any pathway for ordinary law-abiding citizens to *lawfully* engage in the

11   manufacturing or assembly of arms in common use for lawful purposes. Compl. ¶¶ 86-87, 104-105.

12       Further, before the enactment of AB 286, Plaintiff Moxley, who holds a valid Federal

13   Firearms License ("FFL") and a Nevada Concealed Carry Permit, regularly engaged in lawful sales

14   of firearms and constituent NFOs to law-abiding gunowners for lawful purposes, and he had made

15   arrangements to attend at least six more gun shows before the end of the year at which he would

16   have otherwise made available for sale and sold firearm components now prohibited from

17   commercial sale under the Ban. Compl. ¶¶ 95-98. Plaintiff Moxley desires to continue, and would

18   continue, doing so but for the Ban's prohibition of such commercial sales. Compl. ¶¶ 99-100.

19       On this basis, and in an assertion of standing which has never been challenged by anyone,

20   Plaintiffs Palmer and Moxley are bringing this action on behalf of themselves and as representatives

21   of the class of numerous similarly situated Nevada resident FPC members impacted by the Ban,

22   which leaves them all no pathway for compliance with the new law except through total

23   dispossession of their existing self-built arms (or rendering them inoperable and thus useless for self-

24   defense or any other lawful purpose), dispossession of NFOs lawfully acquired under the prior law,

25   and a total cessation of any further manufacturing of any arms in common use for lawful purposes.

26   Compl. ¶¶ 88, 106, 113-118, 135-137. Further, as a seller of the now-banned precursor parts,

27   Plaintiff Moxley has further asserted—in another entirely unchallenged claim to standing—that he is

28   bringing this action on behalf of his customers who seek to purchase NFOs for lawful purposes and

1 | whose Second Amendment rights are being violated by the Ban. Compl. ¶ 107.

2 |     As to all the common questions of law and fact that substantially affect the rights, duties, and

3 | liabilities of Plaintiffs Palmer and Moxley, and the numerous similarly situated FPC Nevada resident

4 | members included within this unchallenged representative class, Plaintiffs have individually and

5 | collectively asserted that, absent the requested judicial relief, they and all such Nevadans have been

6 | and will continue to be adversely and directly harmed by Defendants' actual and threatened

7 | administration, implementation, and enforcement of the Ban. Compl. ¶¶ 114, 119-121.

8 |     Thus, the Complaint has firmly established that the Ban targets arms protected under the

9 | Second Amendment, and any lingering doubt on that point must resolved in Plaintiffs' favor because

10 | their allegations must be taken as true and construed in the light most favorable to them. *Association*

11 | *for Los Angeles Deputy Sheriffs v. County of Los Angeles*, 648 F.3d at 990.

12 | **B. The Undisputed Right to Self-Manufacture Firearms in Common Use**

13 |     The Complaint also sets forth a solid, unrefuted case that the Second Amendment secures the

14 | closely related, historically recognized right to self-manufacture firearms in common use for lawful

15 | purposes. Compl. ¶ 40. Like the other foundational pillars of the Complaint, this is drawn from

16 | Supreme Court authority and a clear historical record. The *Heller* court itself emphasized that the

17 | contours of the Second Amendment's protection must be defined by its founding-era origins,

18 | because "[c]onstitutional rights are enshrined with the scope they were understood to have when the

19 | people adopted them, whether or not future legislatures or (yes) even future judges think that scope

20 | too broad." *Heller*, 554 U.S. at 634-35; Compl. ¶ 132; *see also Young v. Hawaii*, 992 F.3d 765, 783

21 | (9th Cir. 2021) (quoting *Heller* at 625) ("Courts must look at the "historical understanding of the

22 | scope of the right."). Compl. ¶¶ 10, 42-51 (detailing the historical pedigree of self-manufacturing).

23 |     This right necessarily includes the right to own, possess, and use NFOs and other precursor

24 | parts necessary for the construction and thus the exercise of the right to self-manufacture arms in

25 | common use for lawful purposes. The Ninth Circuit "and other federal courts of appeals have held

26 | that the Second Amendment protects ancillary rights necessary to the realization of the core right to

27 | possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir.

28 | 2017); Compl. ¶ 133; *Luis v. United States*, __ U.S. __, 136 S.Ct. 1083, 1097 (2016) (Thomas, J.,

1   concurring) (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir.

2   2014)) ("Constitutional rights thus implicitly protect those closely related acts necessary to their

3   exercise ... The right to keep and bear arms, for example 'implies a corresponding right to obtain the

4   bullets necessary to use them.'"). Much as the right to keep and bear arms "wouldn't mean much

5   without the training and practice that make it effective," *Ezell v. City of Chicago*, 651 F.3d 684, 704

6   (9th Cir. 2011), the right to self-manufacture arms "wouldn't mean much" without the right to own,

7   possess, and use the constituent parts necessary to engage in such activity—and, of course, the

8   firearm itself as end product of this protected activity—for lawful purposes. Compl. ¶ 134.

9         While this self-manufacturing right is clear, and State Defendants offer no evidence to the

10  contrary, any question that may exist here must be resolved in favor of sustaining the Complaint.

11  **C.   The Ban's Categorical Prohibitions Render It Categorically Unconstitutional, and At**
     **the Least Subject It to the Strictest Form of Scrutiny**
12

13        It is clear that a flat ban on the exercise of conduct guaranteed to law-abiding citizens under

14  the Second Amendment is flatly unconstitutional—full stop. The *Heller* court itself expressly

15  rejected any use of "rational basis" scrutiny for restraints on Second Amendment rights and

16  emphasized that any "judge-empowering interest-balancing inquiry" is inappropriate because the

17  Second Amendment is "the very *product* of an interest balancing by the people" already solidified at

18  the time of the founding, which is not subject to second-guessing based on "future judges'

19  assessments of its usefulness." *Heller*, 554 U.S. at 628, n. 27, 634. And the Ninth Circuit itself has

20  said, at least twice now, "If a regulation 'amounts to a destruction of the Second Amendment right,'

21  it is unconstitutional under any level of scrutiny." *Young v. Hawaii*, 992 F.3d at 784 (quoting

22  *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)). It is equally clear that any *severe* burden on

23  such conduct is subject to the strictest form of scrutiny. *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir.

24  2018) (quoting *Silvester* at 821) (holding that strict scrutiny must be applied to any "'law that

25  implicates the core of the Second Amendment right and severely burdens that right'").

26        The Ban here unquestionably *destroys* fundamental guarantees of the Second Amendment for

27  all ordinary law-abiding Nevadans otherwise fully entitled to exercise this bundle of constitutional

28  rights. It declares unlawful, on pain of criminal penalty and a mandate of property dispossession, an
     entire spectrum of protected conduct along with the full gamut of the related protected property

1  interests: the acquisition, possession, and use of firearm precursor parts that lack the required

2  serialization, which means *all of them* because the form of serialization required by the Ban is

3  unobtainable; the manufacturing or assembly of any modern operable firearms with any such

4  precursor parts; and the ownership, possession, or use of any such firearms which are manufactured

5  or assembled through such a self-building process—i.e., all those arms that lack the required

6  serialization, which, again, means *all of them* because the required serialization is unobtainable.

7  State Defendants offer only two meager retorts in addressing the obvious concerns about the

8  breadth of the Ban, both of which ignore or distort the truth about its sweeping reach. First, they say

9  Plaintiffs and the rest of the countless law-abiding Nevadans being treated like criminals can just

10  purchase a *completed* firearm that already contains a serial number imprinted by the manufacturer.

11  MTD at 9. This, of course, ignores the entire point that they have a constitutional right to *self-*

12  manufacture arms in common use for lawful purposes and the Ban *destroys* that right. Second, State

13  Defendants say all these individuals can alleviate their woes by just purchasing NFOs imprinted with

14  the required serial numbers and use those to assemble firearms. MTD at 9. This ignores the reality

15  that such parts are only lawful to acquire, own, possess, or use at all under the Ban if they are

16  serialized as *required by federal law*, illustrating again how the whole statutory scheme is tied to a

17  *non-existent* federal regulatory regime. By its very design, the scheme cuts off all opportunity for

18  ordinary, law-abiding citizens to *lawfully* self-build any firearms unless and until—*if ever*—the

19  federal regulatory scheme is formally modified to require serialization of such precursor parts.

20  Moreover, underlying both of State Defendants' feeble attempts to mask what's really going

21  on here by pointing to other purported alternatives is their refusal to recognize the fundamental

22  precept solidified in *Heller*: the existence of some other option to the banned activity, even if true,

23  does not and cannot excuse the destruction of the rights being eliminated under the Ban. *Heller*, 554

24  U.S. at 629 (flatly rejecting the District of Columbia's attempt to justify its handgun ban with the

25  argument that the District had not *also* banned residents from possessing long guns as "no answer").

26  Whether such individuals may have access to some *other* arms is simply irrelevant.

27  Thus, under binding Supreme Court and Ninth Circuit precedent, the Ban's *destruction* of

28  core Second Amendment guarantees "is unconstitutional under any level of scrutiny," *Young*, 992

1  F.3d at 784, and at the very least must be seen as *severely* burdening these guarantees so as to require

2  the strictest form of scrutiny, *Pena*, 898 F.3d at 977. This is especially true in an arena where all the

3  supporting allegations must be construed in the light most favorable to the claim being raised.

4  **D. The Ban Flatly Fails Any Form of Heightened Scrutiny**

5      Because, at the least, it must be said that the Ban severely burdens the fundamental

6  constitutional rights at stake, at the least the State bears the burden of demonstrating that the law "is

7  narrowly tailored to serve compelling state interests" so as to survive strict scrutiny. *In re National*

8  *Security Letter*, 863 F.3d 1110, 1121 (9th Cir. 2017). But, even applying the least stringent forms of

9  heightened scrutiny that *could* be applied to a restraint on core Second Amendment rights, *see Teter*

10  *v. Connors*, 460 F.Supp.3d 989, 1001 (D. Haw. 2020) (*Heller* makes clear that "rational basis is not

11  appropriate" and "some degree of heightened scrutiny applies" to such restraints), the Complaint

12  makes a rock solid case for a clear violation of the Second Amendment.

13      **1.   The Proper Standards of Constitutional Scrutiny**

14      As the Ninth Circuit has explained, we are "guided by First Amendment principles" in

15  analyzing the constitutionality of burdens imposed on the Second Amendment. *Jackson*, 746 F.3d at

16  961. The First Amendment jurisprudence has established at least two forms of heightened scrutiny

17  for restraints on free speech rights that do not trigger strict scrutiny—"exacting scrutiny" and

18  "intermediate scrutiny." "Exacting scrutiny" requires the government to demonstrate a "sufficiently

19  important" governmental interest, and a "substantial relation" between the restraint and that interest

20  "is necessary but not sufficient." *Americans for Prosperity Foundation v. Bonta*, __ U.S. __, 141

21  S.Ct. 2373, 2384 (2021). Rather, "the challenged requirement must be narrowly tailored to the

22  interest it promotes, even if it is not the least restrictive means of achieving that end." *Id.*

23      Similarly, for "intermediate scrutiny," while the law need not be the *least* restrictive means of

24  advancing a "significant" or "important" governmental interest, it must be "narrowly tailored" to

25  achieve that interest. The Supreme Court has repeatedly said this. *See e.g.*, *Packingham v. North*

26  *Carolina*, 137 S. Ct. 1730, 1736 (2017) (the government must show that the law is "narrowly

27  tailored to serve a significant governmental interest" under intermediate scrutiny); *Ward v. Rock*

28  *Against Racism*, 491 U.S. 781, 791 (1989) (Content-neutral restrictions on protected speech survive

1 intermediate scrutiny if "they are narrowly tailored to serve a significant governmental interest, and

2 ... leave open ample alternative channels for communication of the information."). So has the Ninth

3 Circuit. *See e.g., Doe v. Harris*, 772 F.3d 563, 576-77 (9th Cir. 2014) (quoting the *Ward* opinion in

4 articulating this standard); *Vivid Entertainment, LLC v. Fielding*, 774 F.3d 566, 580 (9th Cir. 2014)

5 ("A statute will survive intermediate scrutiny if it: (1) is designed to serve a substantial government

6 interest; (2) is narrowly tailored to serve that interest; and (3) does not unreasonably limit alternative

7 avenues of communication."); *Minority Television Project, Inc. v. F.C.C.*, 736 F.3d 1192, 1204 (9th

8 Cir. 2013) (quoting *F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 380 ("With this

9 substantial interest in mind, the next question in our intermediate scrutiny analysis is whether the law

10 is "'narrowly tailored to further [that] substantial government interest."'").

11       The focus of this "narrowly tailored" requirement is ensuring the restraint does not burden

12 "substantially more" protected conduct "than necessary" to further the interest. *Pacific Coast*

13 *Horeshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068 (9th Cir. 2020) (quoting *Turner*

14 *Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997)) (we review legislation under "intermediate

15 scrutiny" to see whether it "'advances important governmental interests unrelated to the suppression

16 of free speech and does not burden substantially more speech than necessary to further those

17 interests'"); *Doe v. Harris*, 772 F.3d at 577 (quoting *Ward*, 491 U.S. at 799) (the test is whether "the

18 means chosen ... 'burden[s] substantially more speech than is necessary to further the government's

19 legitimate interests' "). Further, the government must "'demonstrate that the recited harms are real ...

20 and that the regulation will in fact alleviate these harms in a direct and material way.'" *Id.* (quoting

21 *Turner* at 664). To do this, the government must "identify the interests served by the restriction" and

22 "provide evidence" that the targeted conduct "endangers those interests." *United Broth. of*

23 *Carpenters and Joiners of America Local 586 v. N.L.R.B.*, 540 F.3d 957, 967 (9th Cir. 2008).

24 "Speculation as to what might happen if the proposed activity was allowed is insufficient." *Id.* And,

25 ultimately, the State must prove "each activity targeted within the proscription's scope is an

26 appropriately targeted evil," *Ward* at 799–800, in demonstrating a "reasonable fit," *Board of*

27 *Trustees of the University of New York v. Fox*, 492 U.S. 469, 480 (1989).

28       **2. The Claimed Interest is a Pretextual Justification Resting on a False Narrative**

1    Given the severity of the burden imposed by the Ban—in truth, a *destruction* of core Second
2    Amendment rights—if strict scrutiny is not applied, then "exacting scrutiny," as the next highest
3    form of scrutiny, should be applied. But, even viewing the Ban through the lens of intermediate
4    scrutiny, it cannot stand. First, however "important," "substantial," or "significant" the State's
5    claimed interest may be, it cannot suffice in any event because the slightest inspection reveals it is a
6    disingenuous, indeed pretextual, attempt to justify the law as being something other than what it is.
7    In articulating the State's purported interest in AB 286, State Defendants fundamentally
8    mischaracterize the purpose and function of the law, declaring "AB 286's basic requirement is that
9    functioning firearms be serialized." MTD at 8. They claim that this "basic requirement" serves the
10   interest of addressing the problem of "ghost guns," which "circumvent background checks" and "are
11   virtually impossible to trace if used in a crime," and thus pose "a present and increasing threat to
12   public safety." MTD at 5-6. Thus, they assert, AB 286 is both necessary and effective in ensuring
13   that the State's law enforcement agencies can conduct "background checks" on those who seek to
14   acquire firearms and can "trace" firearms used to perpetrate crimes. MTD at 2, 4-6.

15   If the true purpose and function of AB 286 were to require firearms in the State "be
16   serialized," the State could and would have actually *required* serialization of both the existing self-
17   manufactured firearms and those that would have otherwise been self-manufactured had the Ban not
18   been imposed, instead of *outlawing* all existing self-manufactured firearms and *outlawing* any future
19   self-manufacturing of firearms. Indeed, California and Connecticut are among the small handful of
20   states that regulate self-manufacturing of firearms at all, and they have established mechanisms that
21   permit their citizens to engage in this activity so long as they pass a background check and apply for
22   and obtain a state-issued serial number. Cal. Penal Code §§ 29180(b)(1), 29182(b)(1); C.G.S.A. §§
23   29-36a, 29-36b. These regulatory regimes clearly illustrate the reality that *if* the regulatory purpose is
24   truly intended to require serialization in order to ensure those who manufacture their own firearms
25   are subjected to background checks and that their firearms are subject to "tracing," the State would
26   create a create a mechanism for doing so and then require use of that mechanism as a condition to
27   engaging in lawful self-manufacturing of firearms. In a telling irony for Nevada, a *lawfully* self-
28   manufactured gun in California that *does* bear a State-issued serial number obtained *after* an

1  applicant has completed and passed a State-provided background check is *still* illegal to possess

2  under Nevada's Ban, even though, as a marked gun, it is not any kind of "ghost."[1]

3          Nevada has not only *not* established any sort of mechanism through which its citizens could

4  submit to a background check or obtain a serial number as a condition to lawfully retaining their

5  existing self-built arms or manufacturing any firearms in the future, but it has designed the entire

6  statutory scheme of AB 286 to affirmatively *bar* any opportunity for its citizens to demonstrate they

7  are not "prohibited" persons or to obtain serial numbers to facilitate "tracing" of their self-built

8  firearms. As previously detailed, Nevada has tied the whole scheme to a unobtainable serialization

9  requirement, by outlawing any and all firearm precursor parts, any and all modern operable firearms

10 built with such parts, and any and all manufacturing of such firearms with precursor parts *unless* the

11 proscribed parts or firearms are "required by federal law" to be serialized *and* are in fact so

12 serialized. Nothing in the current federal regulatory scheme *requires* serialization of NFOs that fall

13 within AB 286's sweepingly broad definition of "unfinished frames or receivers." As State

14 Defendants themselves explain, there is, at most, a *proposal* to *change* the regulatory definitions of

15 the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") to require serialization of such

16 "unfinished frames or receivers," because no such requirement exists. MTD at 5. Thus, it is

17 *impossible* to satisfy the statute's own serialization requirement and, for the same reason, the scheme

18 *cannot* achieve the aims that State Defendants claim it is intended to achieve.

19          Just recently, on July 16, 2021, a court in Lyon County, Nevada spotlighted this impossibility

20 of statutory compliance and this impossibility of achieving the claimed statutory aims. In that case,

21 the court issued a preliminary injunction in favor of the Plaintiff who challenged AB 286 as

22 unconstitutional on vagueness grounds, temporarily enjoining the sales prohibition under section 3.5

23 on the basis that the Ban's definition of "unfinished frame or receiver" is unconstitutionally vague.

24 *Polymer80, Inc. v. Sisolak*, 21-CV-00690, Third District Court of Nevada, Order Granting

25

26

27 [1]     Because this case is about the right to self-manufacture firearms, and not about the
   constitutionality of serialization or other firearm marking requirements, the handgun

28 microstamping requirement at issue in the *Pena* case is beside the point. *See* MTD at 9.

1 Preliminary Injunction ("Polymer80 MPI Order").[2] Along the way, the court addressed State

2 Defendants' claim that "Polymer80, Inc. can simply serialize its products to avoid the harm it will

3 suffer as a result of the enactment of AB 286." *Id.* at 4. The court rejected this argument as

4 "unconvincing" and "belied" by the Ban's language creating an impossible compliance standard:

5       Section 3.5 of AB 286 criminalizes the sale of an 'unfinished frame or receiver
        unless … [t]he unfinished frame or receiver *is required by federal law* to be
6       imprinted with a serial number.' (emphasis added). Thus, unless Federal Law
        requires the unfinished frame or receiver (whatever that may be) to be imprinted with
7       a serial number, Polymer80, Inc. can find no safe haven under AB 286 by simply
8       placing a serial number on its products that Federal Law does not require.

9 *Id.* at 4. The same is true of the other sections of AB 286, as each ties compliance to this impossible

10 standard.

11       Moreover, who knows if or when the *proposal* to change ATF's regulations to expand the

12 definition of "firearm" to include firearm precursor parts, through its own proposed definition of

13 "unfinished frame or receiver,"[3] will ever be formally adopted? In fact, the portions of the Federal

14 Register on which State Defendants rely as support for their position show that ATF has recognized

15 *since at least the 1970s* that "unfinished" frames or receivers have been excluded from the federal

16 regulatory regime, and that for the last several years (since at least 2016) ATF has been monitoring

17 the cases in which courts have strictly interpreted the existing regulations so as to exclude

18 "unfinished" frames or receivers, 86 Fed. Reg. at 27721 & n. 9, 27722. Yet, nothing has changed,

19 indicating a lack of political support or will to actually alter the regulatory scheme as proposed.

20       Notably too, *even if* the proposed rule were adopted, that would not remove the impossibility

21 bar the State has imposed. The federal regime would *continue* to permit self-manufacturing of

22 firearms for personal use. What State Defendants portray as a "loophole" in the federal law has been

23 the status quo for more than 50 years now—prior to that, there were no such regulations at all—and

24 the proposed new ATF rule continues to preserve an express exception for the building of homemade

25 firearms for personal use. The language of the proposed rule expressly declares that "nothing in this

26 _____

27 [2]       This order is attached as Exhibit A.

28 [3]       The state court found that Nevada chose not to adopt the federal definition and that it
"presumably did so purposely." Polymer80 MPI Order at 3.

1   rule would restrict persons not otherwise prohibited from possessing firearms from making their own

2   firearms at home *without markings* solely for personal use (not for sale or distribution)." 86 Fed.

3   Reg. at 27725, 22732 (italics added). That is, people would retain the means to lawfully own,

4   possess, use, manufacture, and/or assemble firearms for personal use, regardless of serialization. In

5   fact, because the federal regulatory regime would *purposefully* continue to permit self-building for

6   personal use, all the barriers that Nevada has erected against the exercise of this right through AB

7   286 would remain fixed in place because serialization would still not be "*required* by federal law."

8           For all these reasons, State Defendants cannot deal with the Ban by characterizing it as "a

9   longstanding, presumptively lawful regulation" insulated from judicial review. MTD at 7-8 (citing

10  *Heller*, 554 U.S. at 626-27). Indeed, what they claim is "presumptively lawful" is "a *serialization*

11  requirement." MTD at 8 (italics added). But again, the Ban affirmatively *precludes* people from

12  obtaining serialization (or even a background investigation) as means to lawfully self-build. The

13  refusal to provide any mechanism to comply with the very procedure the State claims is essential to

14  protect the public safety certainly can have *no historic pedigree at all*. A mandate without available

15  means of compliance is not and cannot be presumptively lawful—it is presumptively *un*lawful and a

16  disingenuous means of banning the underlying activity in toto. Any such regulation is necessarily

17  stripped at the outset of any "presumptive" lawfulness it might otherwise hold. *See Pena*, 898 F.3d at

18  1009-1010 (quoting *Heller II*, 670 F.3d 1244, 1253 (D.C. Cir. 2011)) (observing that, like all legal

19  presumptions, this presumption is rebutted upon a showing that "'the regulation does have more than

20  a de minimis effect on [plaintiff's] right'"). Additionally, governmental restraints on the exercise of

21  the right to self-manufacture firearms simply are not "longstanding" at all. They are instead of very

22  recent advent among the small handful of states that do impose such restrictions.[4]

23          Because it rests on a false and misleading narrative about the Ban's purpose and effect, State

24

25  ─────────────────────
    [4]    According to Plaintiffs' research, only six other jurisdictions regulate self-
26  manufacturing of firearms, and they began doing so only within the last few years: California
    (Stats. 2016, c. 60 (A.B.857), § 4, eff. Jan. 1, 2017); Connecticut (2019, P.A. 19-6, § 2, eff.
27  Oct. 1, 2019); New Jersey (L.2019, c. 165, § 3, eff. July 16, 2019); Hawaii (2019 HI H.B.
    2744); Rhode Island (2020 R.I. HB 7102); and the District of Columbia (Apr. 27, 2021, D.C.
28  Law 23-274, § 201(b), 68 DCR 1034).

1  Defendants' claimed interest in the Ban simply cannot be deemed an "important," "substantial," or

2  "significant" state interest and thus the Ban necessarily fails any form of heightened scrutiny.

3         **3.  The Ban's Destructive Sweep is Far Broader Than Could Ever Be Tolerated**

4         Even assuming State Defendants have carried their initial burden of articulating a legitimate

5  governmental interest behind the Ban, their Ban still necessarily fails any form of heightened

6  scrutiny for a clear absence of the required tailoring—much less *any* tailoring at all. Even continuing

7  to apply the most lenient form of heightened scrutiny, to carry their tailoring burden under

8  intermediate scrutiny, State Defendants must show (1) the Ban does not burden "substantially more"

9  protected conduct "than necessary" to further the claimed interest, *Kirchmeyer*, 961 F.3d at 1068, (2)

10  "the recited harms are real," *Doe*, 772 F.3d at 577, and (3) "the regulation will in fact alleviate these

11  harms in a direct and material way," *id.* State Defendants torpedo their own case on the first

12  requirement with their disingenuous claim that AB 286 is all about ensuring serialization of self-

13  manufactured firearms, while at the same time making it *impossible* for any ordinary law-abiding

14  Nevadan to obtain the serialization required to comply with the law and advance its supposed

15  purposes. Any such scheme pushed forward on the basis of this claimed interest necessarily burdens

16  "substantially more" protected conduct "than necessary"—a reality underscored by the regulatory

17  schemes in California and Connecticut, which actually establish mechanisms for background checks

18  and serialization in providing a realistic pathway to the lawful self-manufacturing of firearms.

19         State Defendants have also failed to carry their burden of showing "the recited harms are

20  real." At the outset, it must be borne in mind that the mere propensity for or existence of some

21  misuse of a protected arm cannot suffice as a reason to ban or severely restrict its availability for

22  lawful purposes. Were it otherwise, the handgun ban in *Heller* and stun gun ban in *Caetano* could

23  have been upheld. They had to fall *despite* the propensity for misuse of these arms for the simple, yet

24  fundamental reason that they are in common use for lawful purposes and are not "dangerous" or

25  "unusual" in the *constitutional* sense. *See Heller*, 554 U.S. at 682 (Souter, J., dissenting) (Justice

26  Souter advocated *for* the ban by emphasizing that handguns are "specially linked to urban gun deaths

27  and injuries," and "are the overwhelmingly favorite weapon of armed criminals"); *id.* at 628 (the

28  majority still struck down the ban because what mattered was that this weapon is "overwhelmingly

1  chosen by American society" for lawful self-defense purposes). The same is true here: the mere fact

2  that *some* people may seek to misuse self-manufactured arms, "circumvent" background checks, or

3  avoid law enforcement detection with "ghost guns" simply cannot serve as a justification to ban the

4  whole class of arms and the full spectrum of protected self-manufacturing activities.

5        Further, the only actual data State Defendants cite in support of their claim that AB 286

6  combats a "present and increasing threat to public safety" consists of references to two pages of the

7  Federal Register where the ATF has compiled information about this supposed "ghost gun"

8  phenomenon. State Defendants portray this "evidence" as establishing that "[l]aw enforcement

9  agencies recovered nearly 24,000 ghost guns at crime scenes between 2016 and 2020," and "that

10  number has been increasing every year." MTD at 5 (citing 86 Fed. Reg. at 27722-23). But, as the

11  ATF's own reference list shows, this information was drawn solely from newspaper and media

12  publications, like the Baltimore Sun, the Wall Street Journal, NPR, and CBS News, which

13  supposedly documented instances of crime involving "ghost guns" in a handful of other states, based

14  on unknown and unidentified sources. 86 Fed. Reg. 27722 n. 17. Such hearsay information is clearly

15  not a proper subject of judicial notice. *U.S. v. Ritchie*, 342 F.3d 903, 908-09 (9th Cir. 2003) ("Courts

16  may only take judicial notice of adjudicative facts that are 'not subject to reasonable dispute.'

17  Fed.R.Evid. 201(b). Facts are indisputable, and thus subject to judicial notice, only if they are either

18  'generally known' under Rule 201(b)(1) or 'capable of accurate and ready determination by resort to

19  sources whose accuracy cannot be reasonably questioned' under Rule 201(b)(2).").

20        While State Defendants portray ATF's statements here as declarations about the number of

21  "ghost guns" found at *actual* crime scenes, ATF itself only described the scenes as "*potential* crime

22  scenes," acknowledging that "*ATF does not know if the firearm being traced by the law enforcement*

23  *agency was found at a crime scene as opposed to one recovered by them that was stolen or*

24  *otherwise not from at the scene of a crime.*" 86 Fed. Reg. 27722 n. 18 (italics added). Thus, the

25  24,000 "ghost guns" purportedly "recovered" represent nothing more than additional evidence of the

26  growing popularity of the self-built arms.  Moreover, while State Defendants cite reports of the

27  Department of Homeland Security concerning its intention to conduct annual threat assessments of

28  "ghost guns" in connection with acts of domestic terrorism, MTD at 5, they overlook the unfavorable

1   aspects of it. A supplemental report published by other members of the same committee argued that

2   "[a]vailability is not the issue" when it comes to "ghost guns," because what matters is "the intent

3   and actual usage of the devices," and the decision to conduct annual threat assessments concerning

4   such devices "ignores the lack of evidence that ghost guns are being used in terrorist acts." H.R. Rep.

5   No. 116-88, Part 2, at 2. Further, the "overly broad definitions in this bill will unfairly associate the

6   legal acts of lawful gun owners, hobbyists, and gunsmiths with acts of terrorism." *Id.*

7            Whatever limited evidentiary value this information might have, *none* of it concerns the

8   situation within *Nevada*. And this goes to the third tailoring requirement—that "the regulation will in

9   fact alleviate [the claimed] harms in a direct and material way." *Doe*, 772 F.3d at 577. State

10  Defendants cannot carry this aspect of the burden either because the evidence of the public safety

11  threat on which they rely as the supposed aim of the Ban is simply too attenuated from those actually

12  impacted by the Ban. The State has not even attempted to show any of the numerous law-abiding

13  citizens directly targeted by this law has ever misused, much less committed any crime of violence

14  with, any self-built firearm or firearm component, so as to somehow justify dispossessing them of all

15  such firearms and firearm parts and prohibiting them from exercising their fundamental right to

16  possess, use, and self-manufacture protected arms. To the contrary, the strong opposition in the

17  legislative history of AB 286 starkly illustrates that the Ban impacts "tens of thousands" of law-

18  abiding gun owners in Nevada who have only ever exercised and only ever intend to exercise the

19  self-manufacturing    right    for    self-defense    and    other    lawful    purposes.    *See    e.g.*,

20  https://www.leg.state.nv.us/App/NELIS/REL/81st2021/ExhibitDocument/OpenExhibitDocument?ex

21  hibitId=53373&fileDownloadName=AB%20286_Opposition%20Statement_Randi%20Thompson_

22  Nevada%20Firearms%20Coallition%20PAC.pdf  (Statement of Nevada Firearms Coalition);

23  https://www.leg.state.nv.us/App/NELIS/REL/81st2021/ExhibitDocument/OpenExhibitDocument?ex

24  hibitId=53350&fileDownloadName=AB%20286_Opposition%20Statement_Raymond%20Sherwoo

25  d_Big%20Daddys%20Fireams%20Training.pdf (Statement of Raymond Sherwood).

26           Nevada *already* regulates the entire gamut of *prohibited* persons with its existing laws that

27  criminalize possession by every class of individual whose use or possession of a firearm could

28  conceivably pose a danger to themselves or others. Nev. Rev. Stat. Ann. §§ 202.300, 202.360. State

1   Defendants have not, and cannot, show the Ban is *at all* necessary to alleviate the public safety

2   concerns it claims to be addressing about self-built firearms in the hands of would-be wrongdoers,

3   much less that it will *in fact* alleviate those harms in a *direct and material way*. And, to whatever

4   extent the Ban may operate to deter such conduct, the fact is, it unquestionably sweeps in

5   "substantially more" protected conduct "than necessary" to further the claimed interest. Again, State

6   Defendants must prove with *evidence* that "each activity targeted within the proscription's scope is

7   an appropriately targeted evil." *Ward*, 491 U.S. at 799–800. They have not even come close in

8   pressing their disingenuous defense of the Ban with their false narrative about its purpose and effect.

9   Citing to the non-binding opinion of the Third Circuit in *United States v. Marzzarella*, 614 F.3d 85

10  (3d Cir. 2010), *see* MTD at 9-10, is of no help to State Defendants. *Marzzarella* involved a challenge

11  to the federal prohibition of possessing firearms with *defaced* serial numbers, under 18 U.S.C. §

12  922(k). That is a world removed from a ban on the full spectrum of constitutionally protected

13  conduct and property interests involved in self-manufacturing firearms for lawful purposes under a

14  scheme that makes it *impossible* to comply with the statute's own serialization requirement.

15          For all these reasons, Plaintiffs' claim that the Ban violates the Second Amendment is

16  strong—indeed meritorious. Surely then, it survives the lenient standard of review which permits

17  dismissal under Rule 12(b)(6) *only* if "it appears beyond doubt that the plaintiff[s] can prove no set

18  of facts in support of [their] claim which would entitle [them] to relief." *Geraci*, 347 F.3d at 75.

19          **V.  Any Taking of This Valuable Protected Property Compels Just Compensation**

20          The Takings claim also stands on solid ground against any attempt to dismiss it.

21  **A.  The Complaint States a Strong Case of an Actionable Takings Claim**

22          At the outset, State Defendants cannot just sweep all this under a rug by trying to relegate the

23  entire class of affected individuals to state court inverse condemnation proceedings. MTD at 10.

24  Fundamentally, the cases on which State Defendants rely here do not involve a taking of property

25  interests protected under separately enumerated *federal* constitutional rights; they concern property

26  rights created and protected under state law alone. *Knick v. Township of Scott*, 139 S. Ct. 2162, 2168

27  (2019) (concerning real property in Pennsylvania); *McCarran Int'l Airport v. Sisolak*, 137 P.3d

28  1110, 1114 (Nev. 2006) (concerning air space above real property in Nevada). Indeed, even though

1    the property at issue in the *Knick* was not separately protected under an enumerated federal

2    constitutional right, unlike the property rights at stake here, the Supreme Court still applied the

3    fundamental due process principle that "[a] property owner has an actionable Fifth Amendment

4    takings claim when the government takes his property without paying for it." *Knick* at 2167.

5       This fundamental right to due process of law takes center stage here with the Ban's mandate

6    that all ordinary law-abiding Nevadans dispossess themselves of all "unfinished frames or receivers"

7    (and the many other NFOs that fall within the Ban's sweepingly broad definition of this term) that

8    lack the required but unobtainable serialization requirement, as well as all modern operable firearms

9    manufactured with such parts (or render them useless), without any compensation.

10      Beyond this, the essential thesis of State Defendants' claim that no compensation at all is

11   required for the forced dispossession of the countless homemade firearms and components targeted

12   by the Ban rests on the notion that the State can treat all such objects as "dangerous private property"

13   subject to complete destruction under the government's "police powers." MTD at 10 (citing *Guedes*

14   *v. ATF*, __ F.Supp.3d __ (D.C. Cir. 2021), 2021 WL 663183). Yet, this in stark contrast to their

15   position concerning the Second Amendment claim, in which context they have not even attempted to

16   claim, much less show, the homemade firearms and components at issue are either "dangerous" or

17   "unusual"—let alone both—so as to be stripped of constitutional protection. That the State provides

18   no viable means of making the existing property "safe" in the way the State says it must be—i.e.,

19   having it serialized so as to remove the supposed nuisance—illustrates that the problem is not with

20   the property itself, but with the restrictive regulatory regime that literally makes it impossible to

21   comply with the stated aims of the law. This is no basis for invoking a public safety exception to the

22   Takings Clause. It is equivalent to forbidding a homeowner from installing noise abatement

23   technology on his or her vehicle and then claiming that the noisy car is now a nuisance.

24      Moreover, it is axiomatic that private property interests cannot be taken without

25   compensation on "nuisance" grounds unless the property or its intended use was clearly established

26   as a nuisance *before* the taking. "[R]egulations that prohibit all economically beneficial use" of

27   property "cannot be newly legislated or decreed (without compensation), but must inhere in the title

28   itself, in the restrictions that background principles of the State's law of property and nuisance

1   already place upon land ownership." *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003,

2   1029 (1992). That is, nuisance takings are proper only when the property or its intended use has

3   *historically* been understood as prohibited, because only then can it be fairly said the property owner

4   lacks investment-backed expectations. *Id.* at 1030; *Cedar Point*, 141 S.Ct. at 2079 (italics added)

5   ("For example, the government owes a landowner no compensation for requiring him to abate a

6   nuisance on his property, because *he never had a right to engage in the nuisance in the first place.*").

7   The property interests at stake here—common-use firearms and their constituent parts owned,

8   possessed, used, and self-manufactured for lawful purposes—have never been *until now* deemed a

9   "nuisance" injurious to the public in Nevada, nor could they ever be properly classified as such.

10  **B.   Due Process Compels Just Compensation for This Taking**

11      The settled law is clear: the government must provide just compensation for any "physical

12  invasion" of private property interests. *Cedar Point Nursery v. Hassid*, ___ U.S. ___, 141 S.Ct.

13  2063, 2074 (2021) ("government-authorized invasions of property—whether by plane, boat, cable,

14  or beachcomber—are physical takings requiring just compensation"). This is true whether the

15  invasion involves a classic exercise of eminent domain powers, an occupation or possession (even

16  temporarily or intermittently), or "a regulation [that] results in a physical appropriation of property."

17  *Id.* at 2071–2072. A regulation has this effect when it effectively deprives the owner of "all

18  economically beneficial us[e]' of [their] property." *Lingle v. Chevron, U.S.A. Inc.*, 544 U.S. 528, 538

19  (2005) (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992)). A

20  "regulatory" taking having such effect is no different than a "physical" taking, as it requires

21  compensation *per se. Cedar Point* at 2072 (the "regulatory taking" label "can mislead" in this

22  context because the more lenient *Penn Central* test for less invasive regulations "has no place").

23      As asserted in the Complaint, the numerous modern operable firearms, and the unfinished

24  frames, receivers, and NFOs possessed as constituent parts of the same, targeted by the Ban were

25  previously owned, possessed, used, and manufactured for self-defense and other lawful purposes, but

26  are now subject to dispossession or permanently disabling by no later than January 1, 2022. Compl.

27  ¶ 144. Yet, for the very reason of these investment-backed expectations, borne out of Nevada's own

28  prior law under which all these individuals were permitted to acquire and use these arms and parts,

1  this property has substantial value to all those now being forced to comply with the Ban, including

2  Plaintiffs and all similarly situated Nevada resident FPC members who have come to rely on their

3  existing self-built arms for lawful purposes and on their ability to self-manufacture additional such

4  arms with constituent parts that they currently possess or may later acquire. Compl. ¶ 144, 156.

5        Indeed, while Nevada has suspended the criminal sanctions for selling such firearms and

6  "unfinished frames or receivers" until January 1, 2022, so that ordinary law-abiding citizens can

7  "sell or dispose of them" before that date, a sale of these firearms or their constituent parts is no

8  realistic option in Nevada, particularly since such items are now banned from the hands of all

9  ordinary law-abiding citizens throughout the State. Presumably, many licensed firearms dealers will

10  refuse to purchase or otherwise accept for sale any such products given the potential risks and

11  uncertainties in dealing with legally banned firearms and firearms products, particularly when these

12  arms and parts cannot be brought into compliance with the Ban's impossible-to-satisfy serialization

13  requirement. Compl. ¶ 145. Further, whatever limited market may exist for the sale of such outlawed

14  items, anyone forced to sell under such a legal compulsion surely will not garner the fair market

15  value of these otherwise valuable and popular firearms and constituent components. Compl. ¶ 146.

16  "A 'sale' implies willing consent to the bargain. A transaction although in the form of a sale, but

17  under compulsion or duress, is not a sale." *Dore v. U.S.*, 97 F.Supp. 239, 224 (Ct. Cl. 1951). The

18  Ban has destroyed or significantly diminished the value of the property to any would-be purchasers

19  and has thus destroyed the very market to which it has relegated the affected citizens.

20        Selling out of state is not a reliable alternative either given the restraints on sales under

21  *federal* law. First, while the federal scheme does not require serialization of "unfinished" frames or

22  receivers, it *does* require serialization of *completed* firearms or *finished* frames or receivers before

23  the point of sale. 18 U.S.C. § 921(a)(3)(*i*); 27 C.F.R. § 478.92(a)(1) & (a)(2). Anyone attempting to

24  sell such arms or parts lacking serial numbers, including licensed dealers like Plaintiff Moxley, thus

25  bears the risk of running afoul or being accused of running afoul of this basic requirement for

26  commercial sales. Second, in addition to the serialization problem, any unlicensed person engaging

27  in the sale of self-built arms runs the risk of violating, or being accused of violating, the ATF

28  regulations requiring everyone "engaged *in the business*" of manufacturing firearms to obtain a

1  license. https://www.atf.gov/firearms/qa/can-individual-now-manufacture-these-firearms-and-sell-

2  them. Third, federal law also regulates all firearm sales to anyone out of state, generally prohibiting

3  any such sales by any unlicensed person. 18 U.S.C. § 922(a)(5) (it is generally unlawful for anyone

4  (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) "to

5  transfer, sell, trade, give, transport, or deliver any firearm to any person" (other than a licensed

6  importer, licensed manufacturer, licensed dealer, or licensed collector) "who the transferor knows or

7  has reasonable cause to believe does not reside in … the State in which the transferor resides.").

8       Consequently, the Ban completely deprives the affected property owners of "all

9  economically beneficial us[e]' of [their] property," and causes them to "suffer a permanent physical

10  invasion of their property interests," effecting a taking *per se*. *Lingle*, 544 U.S. at 538.

11       For all the same reasons, even assuming this situation does not rise to the level of a taking

12  *per se*, it is still one requiring compensation under the *Penn Central* factors, because the economic

13  impact on this valuable constitutionally protected property is substantial, the extent of interference is

14  great, and the character of the governmental action is in the general nature of a government-imposed

15  invasion of property interests so as to compel compensation consistent with the spirit and purpose of

16  the Takings Clause. *See Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978).

17  Dated: August 9, 2021             Dated: August 9, 2021

18  THE O'MARA LAW FIRM, P.C.       THE DIGUISEPPE LAW FIRM, P.C.

19           /s/ David C. O'Mara           /s/ Raymond M. DiGuiseppe

20       DAVID C. O'MARA, ESQ.        RAYMOND M. DIGUISEPPE
    311 E. Liberty Street          4320 Southport-Supply Road, Ste 300

21  Reno, NV 89501              Southport, NC 28461
    Tel: 775.323.1321            910.713.8804

22  david@omaralaw.net          Law.rmd@gmail.com

23  FIREARMS POLICY COALITION     FIREARMS POLICY COALITION

24           /s/ Adam Kraut            /s/ William Sack

25        ADAM KRAUT, ESQ.         WILLIAM SACK, ESQ
    1215 K Street 17th Floor

26  Sacramento, CA 95814
    916.596.3492

27  akraut@fpclaw.org

28                   **CERTIFICATE OF SERVICE**

1        I hereby certify that I am an employee of The O'Mara Law Firm, P.C. and on this date, the

2   foregoing document was filed electronically *via* the Court's ECF system which provided notification

3   of such filing to counsel of record for all parties.

4   Dated: August 9, 2021                          _____/s/ Bryan Snyder_____
                                                                   BRYAN SNYDER
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INDEX OF EXHIBITS**

| Exh No. | Description | Pages |
|---------|-------------|-------|
| 1 | *Polymer80, Inc. v. Sisolak*, 21-CV-00690,<br>Third District Court of Nevada<br>Order Granting Preliminary Injunction | 5 |

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

ROGER PALMER, *et al.*,

                    Plaintiffs,

    v.

STEPHEN SISOLAK, *et al.*,

                    Defendants.

Case No. 3:21-cv-00268-MMD-WGC

ORDER

## I.   SUMMARY

Plaintiffs[1] challenge sections of the recently enacted Nevada Assembly Bill 286 ("A.B. 286") that prohibits certain acts relating to firearms not imprinted with serial numbers—commonly referred to as "ghost guns"—alleging that these sections violate the Second Amendment and the Fifth Amendment's Takings Clause. (ECF No. 1.) Before the Court is Plaintiffs' motion for a preliminary injunction (ECF No. 6 ("Motion")),[2] seeking to enjoin Defendants[3] from enforcing A.B. 286. Because Plaintiffs have not shown a likelihood of success on the merits of their claims—and as further explained below—Plaintiffs are not entitled to the extraordinary remedy of preliminary injunction. The Court will therefore deny Plaintiffs' Motion.

///

---

[1]Plaintiffs are Roger Palmer, Chad Moxley (together, "Individual Plaintiffs"), and the Firearms Policy Coalition, Inc. (collectively, "Plaintiffs").

[2]The Court has additionally reviewed the parties' corresponding responses and replies. (ECF Nos. 25, 28, 31, 32, 40.) The Court also heard arguments on the Motion on July 16, 2021 ("the Hearing"). (ECF No. 48.)

[3]Defendants are Nevada Governor Steven Sisolak; Attorney General Aaron Ford; Director of Public Safety George Togliatti; Division Administrator for Department of Public Safety's Records, Communications and Compliance Division Mindy McKay (together, "State Defendants"); Clark County Sheriff Joseph Lombardo; Clark County District Attorney Steven Wolfson; Douglas County Sheriff Daniel Coverley; and Douglas County District Attorney Mark Jackson (collectively, "Defendants").

ER-81

## II.   BACKGROUND

Plaintiffs Roger Palmer and Chad Moxley, both citizens of Nevada, own and possess multiple unserialized firearms and previously self-manufactured unserialized constituent parts. (ECF No. 1 at 5, 20-21, 24.) Palmer owns and possesses multiple uncompleted non-firearm objects and firearm building kits. (*Id.* at 21.) Moxley sells firearms and constituent firearm parts at local gun shows and seeks to continue selling unserialized firearms constituent parts and other non-firearm objects. (*Id.* at 23-24.) Moxley made arrangements prior to the enactment of A.B. 286 to attend six or more gun shows before the end of the year. (*Id.* at 23.) Palmer and Moxley are both members of the Firearms Policy Coalition, Inc. ("FPC"). (*Id.* at 20, 23.) FPC's stated purpose is to defend and promote Second Amendment rights to keep and bear arms. (*Id.* at 26.)

On June 7, 2021, Nevada's Governor Stephen Sisolak signed A.B. 286 into law. (*Id.* at 1.) At a May 11, 2021, pre-enactment hearing, Assemblywoman Sandra Jauregui—a sponsor of A.B. 286—made public statements about the law's purpose. (*Id.* at 17, 20, 33, 35.) With its enactment, A.B. 286 amended Chapter 202 of the Nevada Revised Statutes to prohibit "a person from engaging in certain acts relating to firearms which are not imprinted with a serial number under certain circumstances[.]" A.B. 286, 2021 Leg., 81st Sess. (Nev. 2021).

This litigation centers on certain sections A.B. 286 added to Chapter 202, which are as follows:

*Section 3* states in part that a person "shall not possess, purchase, transport or receive an unfinished frame or receiver[.]" *Id.* at § 3(1).

*Section 3.5* states in part that a person "shall not sell, offer to sell or transfer an unfinished frame or receiver[.]" *Id.* at § 3.5(1).

*Section 4* states in part that a person "shall not manufacture or cause to be manufactured or assemble or cause to be assembled a firearm that is not imprinted with a serial number" unless the firearm is: (a) rendered permanently inoperable, (b) an antique firearm, or (c) determined to be a collector's item. *Id.* at §§ 4(1); 4(1)(a)-(c).

1          *Section 5* states in part that a person "shall not possess, sell, offer to sell,
2    transfer, purchase, transport or receive a firearm that is not imprinted with a serial
3    number" unless the person is a (a) law enforcement agency, (b) firearms importer or
4    manufacturer; or the firearm is: (a) rendered permanently inoperable, (b) manufactured
5    before 1969, (c) an antique firearm, or (d) determined to be a collector's item. *Id.* at §§
6    5(1); 5(1)(a)-(b).

7          *Section 5.5* further provides: "Nothing in the provisions of sections 3 to 5,
8    inclusive, of this act shall be deemed to prohibit the sale of an unfinished frame or
9    receiver or firearm that is not imprinted with a serial number to a firearms importer or
10   manufacturer or a license dealer before January 1, 2022." *Id.* at § 5.5.

11         A person in violation of any part of §§ 3-5 is guilty of a gross misdemeanor for a
12   first offense and a category D felony for a second or any subsequent offense. *Id.* at §§
13   3-5. Sections 3 and 5 become effective on January 1, 2022. *Id.* § 10(2).

14         Plaintiffs seek a preliminary injunction to enjoin enforcement of A.B. 286 pending
15   a decision on the merits.

16   **III.   LEGAL STANDARD**

17         "'An injunction is a matter of equitable discretion' and is 'an extraordinary remedy
18   that may only be awarded upon a clear showing that the plaintiff is entitled to such
19   relief.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter v.*
20   *Nat. Res. Def. Council*, 555 U.S. 7, 22, 32 (2008)). To qualify for a preliminary
21   injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a
22   likelihood of irreparable harm; (3) that the balance of equities favors the plaintiff; and (4)
23   that the injunction is in the public interest. *Winter*, 555 U.S. at 20. "When the
24   government is a party, the last two factors (equities and public interest) merge." *E. Bay*
25   *Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) (parentheses in original).
26   A plaintiff may also satisfy the first and third prongs under a "sliding scale" approach by
27   showing serious questions going to the merits of the case and that a balancing of
28   hardships tips sharply in plaintiff's favor. *All. for the Wild Rockies v. Cottrell*, 632 F.3d

1   1127, 1134-35 (9th Cir. 2011) (holding that the Ninth Circuit's "sliding scale" approach

2   remains valid following the *Winter* decision).

3   **IV.   DISCUSSION**

4        Plaintiffs contend A.B. 286 violates their rights under the Second Amendment

5   and the Fifth Amendment's Takings Clause. The Court will first address Plaintiffs'

6   Second Amendment arguments, then will address their Takings Clause arguments.

7   Because the Court finds that Plaintiffs have failed to demonstrate a likelihood of

8   success on the merits on either claim, the Court will deny the Motion.[4]

9        **A.   Second Amendment Claim**

10        The Second Amendment expressly states: "A well regulated Militia, being

11   necessary to the security of a free State, the right of the people to keep and bear Arms,

12   shall not be infringed." U.S. Const. amend. II. In 2008, the United States Supreme Court

13   held in *District of Columbia v. Heller* that the Second Amendment protects the

14   "individual right to keep and bear arms." 554. U.S. 570, 622. The "central component" of

15   that right to bear arms is for self-defense, particularly defense of the home. *Id.* at 599,

16   628-29. However, the Court also cautioned that, "[l]ike most rights, the right secured by

17   the Second Amendment is not unlimited" and historically speaking "the right was not a

18   right to keep and carry any weapon whatsoever in any manner whatsoever and for

19   whatever purpose." *Id.* at 626.[5] The Court later held that the Second Amendment is also

20   fully applicable to states and municipalities through the Fourteenth Amendment. *See*

21   *McDonald v. City of Chicago*, 561 U.S. 742, 790-91 (2010).

22        The Ninth Circuit has adopted a two-step framework to evaluate Second

23   Amendment claims after *Heller* and *McDonald*, as exemplified in its recent decision in

24

25       [4]The Court notes that the equities and public interest considerations of the

26   *Winters* factors weigh heavily in favor of State Defendants in light of their articulated objective of promoting public safety.

27       [5]In *Heller*, the Supreme Court indicated that determining the scope of the Second Amendment's protection requires a historical and textual analysis of the Amendment,

28   *see id.* at 576-605, but the Court also declined to undertake an exhaustive historical analysis of the full scope of the Amendment, *see id.* 626-27.

4

ER-84

1   *Young v. Hawaii*, 992 F.3d 765, 783-84 (2021) (en banc).[6] The two-step inquiry requires

2   courts to ask (1) whether the challenged law burdens conduct protected by the Second

3   Amendment and (2) if the law burdens protected Second Amendment conduct, then the

4   second step requires determining the appropriate level of scrutiny and applying it to the

5   challenged law. *See Young*, 992 F.3d at 783-84.

6   "The level of scrutiny depends upon (1) how close the law comes to the core of

7   the Second Amendment right, and (2) the severity of the law's burden on the right."

8   *Jackson*, 746 F.3d at 963 (internal quotes and citation omitted). Courts must look at the

9   "historical understanding of the scope of the right." *Young*, 992 F.3d at 783 (quoting

10  *Heller*, 554 U.S. at 625). A law that imposes a severe restriction on a core right, which

11  destroys the protection of the Second Amendment, is "unconstitutional under any level

12  of scrutiny." *Jackson*, 746 F.3d at 961 (citing *Heller*, 554 U.S. at 629). "[I]f a challenged

13  law does not implicate a core Second Amendment right, or does not place a substantial

14  burden on the Second Amendment right, [courts] may apply intermediate scrutiny." *Id.*

15  "[A]ll forms of the [intermediate scrutiny] standard require (1) the government's stated

16  objective to be significant, substantial, or important; and (2) a *reasonable fit* between the

17  challenged regulation and the asserted objective." *Id.* at 965 (emphasis added) (quoting

18  *Chovan*, 735 F.3d at 1129).

19  **1.   Burden on Protected Conduct**

20  Plaintiffs argue that the Court should evaluate the constitutionality of A.B. 286

21  with strict scrutiny because the rights guaranteed under the Second Amendment to bear

22  arms has always included "the right to self-manufacture such arms." (ECF No. 6 at 10-

23  12.) Because A.B. 286 infringes on that "core" right, Plaintiffs insist it is unconstitutional

24  under any level of scrutiny. (*Id.* at 13-16.) State Defendants counter that A.B. 286 does

25  not burden Second Amendment rights because it does not interfere with the right to self-

26  defense in the home, nor does it strip persons from access to serialized firearms for

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯

28  [6]*See also Silvester v. Harris*, 843 F.3d 816, 820-21 (9th Cir. 2016); *Peruta v. Cnty. of San Diego*, 824 F.3d. 919, 939 (9th Cir. 2016); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 960-61 (9th Cir. 2014); *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013).

5

1  defense of their homes.[7] (ECF No. 31 at 11.) Therefore, State Defendants assert that

2  intermediate scrutiny should apply to A.B. 286. (*Id.*) The Court agrees with State

3  Defendants.

4          The focus of the analysis as stated in *Heller* requires the Court to determine

5  whether A.B. 286 burdens the "central component" of the right to bear arms for self-

6  defense in the home. *See* 554. U.S. at 599, 628-29. As it stands, A.B. 286 regulates

7  firearms that are not imprinted with serial numbers—the law therefore "does not

8  interfere with the right to 'defense of hearth and home'" because Individual Plaintiffs'

9  ability to use any and all serialized firearms to defend their homes remains unchanged.

10 (ECF No. 31 at 11 (quoting *Heller*, 554 U.S. at 635).) *Cf. Jackson*, 746 F.3d at 968 ("A

11 ban on the sale of certain types of ammunition does not prevent the use of handguns or

12 other weapons in self-defense. The regulation . . . limits only the manner in which a

13 person may exercise Second Amendment rights by making it more difficult to purchase

14 certain types of ammunition.").

15         Moreover, A.B. 286 does not completely prohibit, as Plaintiffs suggest, the right

16 to self-manufacture firearms but rather prohibits self-manufacturing of *unserialized*

17 firearms. A.B. 286 § 4(1) ("a person shall not manufacture . . . a firearm that is not

18 imprinted with a serial number"); *see also* § 4(1)(a)-(c), (exceptions). Under A.B. 286,

19 Individual Plaintiffs are not stripped of an opportunity to self-manufacture and assemble

20 firearms and constituent parts so long as they are serialized or fall within § 4(1)(a)-(c)

21 exceptions. Plaintiffs affirmed this point at the Hearing when they stated that a person

22 could still acquire a serialized firearm from a licensed seller under A.B. 286 for defense

23 of self and home. (ECF No. 48.) Accordingly, the Court finds that A.B. 286 does not

24 severely burden Second Amendment protected conduct, but merely regulates it.

25 Intermediate scrutiny rather than strict scrutiny is therefore appropriate for the Court's

26          [7]State Defendants dispute that A.B. 286 burdens Second Amendment protected
    conduct because the requirement that firearms be serialized is a "longstanding,
27  presumptively lawful regulation." (ECF No. 31 at 10-11.) In light of the Supreme Court's
    decision in *Heller* to not undertake an exhaustive historical analysis of the full scope of
28  the Second Amendment, and in consideration of the limited historical facts presented,
    this Court declines to consider this argument at this early phase of the litigation.

6

1  analysis of A.B. 286. *See Young*, 992 F.3d at 784 (stating that intermediate scrutiny

2  applies in cases where Second Amendment rights are "affected in some lesser way").

3  <div align="center">**2.     Stated Objective and Reasonable Fit**</div>

4  Plaintiffs argue that, even if the Court applies intermediate scrutiny, A.B. 286 is

5  unconstitutional because the restraint must be reasonably proportional and closely

6  drawn to the government's interests. (ECF No. 6 at 15.) As such, Plaintiffs assert that

7  A.B. 286 does not meet this requirement because it is a blanket ban on unserialized

8  firearms and constituent parts. (*Id*. at 15-16.) State Defendants counter that A.B. 286

9  survives intermediate scrutiny because the law is a "reasonable fit" for the important

10  government goal of preserving the ability of law enforcement to conduct firearm tracing

11  by limiting the availability of non-traceable firearms. (ECF No. 31 at 12.) The Court

12  again agrees with State Defendants.

13  In analyzing the first prong of intermediate scrutiny review, the Court must

14  determine whether the government's stated objective is significant, substantial, or

15  important. *See Jackson*, 746 F.3d at 965. State Defendants cite to a congressional

16  report that concludes unserialized firearms are a present and increasing threat to public

17  safety because they present a "homeland security challenge" and they "hamstring[ ] law

18  enforcement's ability to investigate crimes committed with untraceable weapons." (ECF

19  No. 31 at 7 (quoting H.R. Rep. No. 116-88, pt. 1, at 2 (2019).) State Defendants further

20  note that law enforcement agencies recovered nearly 24,000 privately made firearms,

21  without serial numbers on the frame or receiver, from crime scenes between 2016 and

22  2020. (*Id*. (citing Definition of "Frame or Receiver" and Identification of Firearms, 86

23  Fed. Reg. 27720,27722 (May 21, 2021) (to be codified at 27 C.F.R. pts. 447, 478, 479)).

24  The Court in considering the government's stated objectives will not impose "an

25  unnecessarily rigid burden of proof . . . so long as whatever evidence the [government]

26  relies upon is reasonably believed to be relevant to the problem that the [government]

27  addresses." *Jackson*, 746 F.3d at 965 (quoting *Renton v. Playtime Theatres*, 475 U.S.

28  41, 50-52 (1986)).

1    Here, A.B. 286 prohibits "a person from engaging in certain acts relating to

2   firearms which are not imprinted with a serial number." A.B. 286, 2021 Leg., 81st Sess.

3   (Nev. 2021). When the Nevada Legislature considered A.B. 286, Assemblywoman

4   Sandra Jauregui—a sponsor of the Bill—echoed Congress' concerns when she stated

5   that unserialized firearms are a threat to public safety because they circumvented

6   background checks and they are untraceable if used in a crime. (ECF No. 31 at 7 (citing

7   *Prohibits Certain Acts Relating to Firearms: Hearing on A.B. 286 Before Senate Comm.*

8   *on Judiciary*, 81st Session (May 11, 2021) (statement of Sandra Jauregui,

9   Assemblywoman)). Moreover, Assemblywoman Jauregui "explained that ghost guns are

10   an especially acute threat to Nevada because one of the largest unfinished receiver kit

11   companies in the nation, Polymer80, Inc. is based [in Nevada]." (*Id.*)

12    The Court finds that public safety is an important government interest, and "it is

13   self-evident." *Chovan*, 735 F.3d at 1139; *see also Jackson*, 746 F.3d at 965. Moreover,

14   the government's interest in preserving law enforcement's ability to investigate crimes

15   committed with untraceable weapons is also a substantial and important government

16   interest. *See Pena v. Lindley*, 898 F.3d 969, 981-82 (9th Cir. 2018) (holding that a

17   California law requiring new models of semiautomatic pistols to be imprinted with

18   characters, including a serial number, passed constitutional muster under intermediate

19   scrutiny because "preserving the ability of law enforcement to conduct serial number

20   tracing—effectuated by limiting the availability of untraceable firearms—constitutes a

21   substantial or important interest."). As such, State Defendants have sufficiently shown

22   that the government's objectives in enacting A.B. 286 are substantial and important,

23   thus satisfying the first prong of intermediate scrutiny.

24    The second prong of intermediate scrutiny requires a determination that A.B.

25   286's regulations be a "reasonable fit" with the government's asserted objectives.[8]

26

27    [8]At the Hearing, Plaintiffs argue that A.B. 286 must be "narrowly tailored" to the
government's stated interest. But Plaintiffs appear to apply strict scrutiny. While courts
have used various terminology to describe the intermediate-scrutiny standard, as

28   discuss above, the government must show "a *reasonable fit* between the challenged
regulation and asserted objective" under intermediate scrutiny. *Jackson*, 746 F.3d at

1    *Jackson*, 746 F.3d at 965. States Defendants articulate that A.B. 286 "addresses the

2    threat posed by unserialized firearms and firearm components." (ECF No. 31 at 7-8.) A

3    plain text reading of A.B. 286 affirms that it does so by prohibiting the possession

4    and sale of firearms and constituent parts that lack serial numbers. It also prohibits a

5    person from manufacturing or assembling an unserialized firearm unless it falls within a

6    categorical exception, *see* § 4(1)(a)-(c). Moreover, A.B. 286 prohibits the possession of

7    unserialized firearm unless an exception applies, *see* § 5(1)(a)-(b).

8        Because A.B. 286 targets only unserialized firearms that are not within a

9    categorical exception, that bypass background checks by virtue of self-assembly, and

10    that are untraceable without a serial number, the Court finds that A.B. 286 is a

11    reasonable fit for achieving the government's objectives of decreasing the threat that

12    unserialized firearms pose to public safety and preserving law enforcement's ability to

13    trace firearms related to violent crimes. Accordingly, State Defendants have met their

14    burden under the second prong and A.B. 286 satisfies intermediate scrutiny.

15        Plaintiffs challenged State Defendants' asserted objectives, contending that State

16    Defendants offered no evidence that tracing firearms reduces crimes or increases public

17    safety. (ECF No. 40 at 9.) Similar to the Court's finding above that "it is self-evident" that

18    public safety is an important government interest, it is a matter of common sense that

19    tracing of firearms aid in solving crimes which enhances public safety. Since the Gun

20    Control Act of 1968 ("GCA") began to require licensed importers and manufacturers to

21    identify each firearm with a serial number, *see* Identification Markings Placed on

22    _____

23    965 (quotes omitted, emphasis added). Intermediate scrutiny is not a strict test, and the
     Ninth Circuit has said that "intermediate scrutiny does not require the least restrictive

24    means of furthering a given end." *Silvester*, 843 F.3d at 827 (quoting *Jackson*, 746 F.3d
     at 966); *see also Altman v. Cnty. of Santa Clara*, 464 F. Supp. 3d 1106, 1129 (N.D. Cal.

25    2020 ("The Ninth Circuit, however, does not require narrow tailoring for firearm
     regulations subject to intermediate scrutiny.").) Accordingly, A.B. 286 need not be

26    narrowly tailored to the government's stated interest.

27        Additionally, Plaintiffs further argue that less burdensome means of regulating
     self-manufacture firearms, such as background checks, are available and that there are

28    less restrictive means of requiring serialization. (ECF No. 40 at 8, 11.) But "intermediate
     scrutiny does not require the least restrictive means of furthering a given end." *Jackson*,
     746 at 969.

9

ER-89

1   Firearms, 66 Fed. Reg. 40,596, 40,597 (Aug. 3, 2001) (codified at 27 C.F.R. pt. 178.92),

2   firearms tracing has become a critical tool for modern firearms investigations and

3   prosecution. In addition to the serial number, GCA's requirement that records be kept of

4   the acquisition and dispositions of the firearm, along with its description, enables

5   firearms to be uniquely identifiable and traceable. *Id.*; *see also* GCA, § 101, Pub. L. No.

6   90-618, 82 Stat. 1223 (codified as amended at 18 U.S.C. § 923(i)) (adding a

7   recordkeeping requirement to existing regulatory scheme). When a firearm is stolen, the

8   lawful owner files a police report that includes a serial number and description of the

9   firearm. When the firearm reappears at a crime scene, investigators can accurately

10   trace the firearm's history thereby determining if the firearm was stolen. These

11   protections aid law enforcement in prosecuting persons who are in possession of a

12   stolen firearm and countless other crimes.[9] Serialization and identification of firearms

13   are therefore crucial to public safety. As such, the Court finds that State Defendants

14   need not offer more specific evidence to show that tracing firearms reduces crime or

15   increases public safety as common sense dictates otherwise.

16        In sum, Plaintiffs have not met their burden to show a likelihood of success on

17   the merits of their Second Amendment claim to warrant a preliminary injunction.

18        **B.      Fifth Amendment's Takings Clause**

19        The Takings Clause of the Fifth Amendment provides: [N]or shall private property

20   be taken for public use, without just compensation." U.S. Const. amend. V. The Clause

21   is made applicable to states through the Fourteenth Amendment. *See Chi., B. & Q.R.*

22   *Co. v. Chicago*, 166 U.S. 226, 239 (1897). A physical taking of property occurs "[w]hen

23   the government physically takes possession of an interest in the property for some

24   public purpose." *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535

25   U.S. 302, 322 (2002). When a government regulation of private property becomes so

26

27        [9]*See* Andrew W. Eichner, *Crime in the Age of Printable Guns: Methodologies and Obstacles to Prosecuting Federal Offenses Involving 3D-Printed Firearms*, 45 Vt. L.

28   Rev. 189, 212-15 (2020) (discussing firearm tracing as a solution to deterring gun violence).

1   onerous and thus "goes too far[,] it will be recognized as a taking." *See Pa. Coal Co. v.*
2   *Mahon*, 260 U.S. 393, 415-16 (1922).

3         The Supreme Court has articulated two guidelines relevant to determining
4   whether a government regulation is onerous. *See Murr v. Wisconsin*, 137 S. Ct. 1933,
5   1942-43 (2017). "First, with certain qualifications . . . a regulation which denies all
6   economically beneficial or productive use of [property] will require compensation under
7   the Takings Clause. Second, when regulation impedes the use of property without
8   depriving the owner of all economically beneficial use, a taking still may be found based
9   on *a complex of factors*, including (1) the economic impact of the regulation on the
10  claimant; (2) the extent to which the regulation has interfered with distinct investment-
11  backed expectations; and (2) the character of the governmental action." *Id.* (emphasis
12  added and quotation marks omitted) (citing *Penn Central Transp. Co. v. New York City*,
13  438 U.S. 104, 124 (1978)).

14                    **1.    Regulatory Taking**

15        Plaintiffs argue that enforcement of A.B. 286 would regulate the firearms and
16  parts to such an extent that it would deprive persons of its use and economic benefits in
17  violation of the Takings Clause. (ECF No. 6 at 16.) State Defendants counter that the
18  government need not provide a just compensation when A.B. 286 is a valid law
19  prohibiting possession of unserialized firearms and constituent parts. (ECF No. 31 at
20  13.) The Court finds State Defendants' argument more persuasive.

21        A.B. 286 prohibits possession of firearms and its constituent parts not imprinted
22  with serial numbers. A.B. 286 requires that persons in Nevada sell the disputed items to
23  a firearms importer, manufacturer, or a license dealer before January 1, 2022. It does
24  not, however, prohibit persons from the use or benefit of those items outside of Nevada
25  before or after January 1, 2022. Nor does A.B. 286 prohibit unserialized firearm
26  possession if it falls within § 5(1)(a)-(b) exceptions. As such, the Court finds that A.B.
27  286 does not deny all economically beneficial or productive use of unserialized firearms
28  ///

1   and constituent parts as Plaintiffs contend. The Court therefore must turn to the
2   "complex factors" as originally set forth in *Penn Cent. Transp. Co.*, 438 U.S. at 124.

3       In their Motion, Plaintiffs state that A.B. 286 "has destroyed or significantly
4   diminished the value of the property to any would-be purchasers and has thus
5   destroyed the very market to which it has relegated the affected citizens." (ECF No. 6 at
6   17.) Moxley—a seller of firearms and constituent parts—declares that he had made
7   arrangements to attend six gun shows by the end of the year whereby he would have
8   "made available for sale and sold firearm components now prohibited from commercial
9   sale under [A.B. 286]." (ECF Nos. 1 at 23; 6-2 at 3.)

10      While the Court is sympathetic to the economic loss Plaintiffs assert, it is not
11  clear based on the record the extent or certainty of that economic loss. Because A.B.
12  286 provides an approximate 10-month period for persons to sell unserialized firearms
13  and constituent parts to firearms importers, manufacturers, or licensed dealers
14  beginning June 7, 2021, the possibility of recouping a potential economic loss was—and
15  remains as of the date of this order—possible. In the same vein, nothing in A.B. 286
16  prohibits Moxley and others similarly situated from selling unserialized firearms and
17  constituent parts at gun shows or to individuals outside of Nevada where the value will
18  likely not be impacted by A.B. 286 to recoup any alleged economic loss. Therefore, the
19  economic impact of A.B. 286 and the extent to which A.B. 286 interferes with distinct
20  investment-backed expectations remains undetermined. The Court will next turn to "the
21  character of the governmental action."

22      As stated previously, A.B. 286 was enacted to ensure public safety and preserve
23  the ability of law enforcement to investigate crimes through firearm tracing. Without
24  serial numbers, firearms and constituent parts circumvent and bypass background
25  checks. Inherent in State Defendants' "valid law" counterargument is that A.B. 286 is an
26  appropriate exercise of the government's police power.

27      The Court agrees with State Defendants that A.B. 286 is a valid exercise of the
28  government's police power. The police power exception to the Takings Clause provides

1    that "[a] prohibition simply upon the use of property for purposes that are declared, by

2    valid legislation, to be injurious to the health, morals, or safety of the community,

3    cannot, in any just sense, be deemed a taking." *Mugler v. Kansas*, 123 U.S. 623, 668

4    (1887). "If [an] ordinance is otherwise a valid exercise of the [government's] police

5    powers, the fact that it deprives the property of its most beneficial uses does not render

6    it unconstitutional." *Goldblatt v. Hempstead,* 369 U.S. 590, 592 (1962) (collecting

7    cases). Public safety and the importance of firearm tracing necessitates the prohibition

8    of Individual Plaintiffs' unserialized firearms and constituent parts at issue, and thus not

9    a taking.

10    Moreover, the Court is unaware of—and the parties have not pointed to—any

11    binding Ninth Circuit case explicitly discussing police power exception to the Takings

12    Clause where government regulates firearms.[10] However, several other courts have

13    applied this principle in finding that firearm regulations do not constitute a taking. *See*

14    *Adkins v. United States*, 82 Fed. Cl. 619, 623-24 (2008) (holding that prohibition on the

15    sale of machine guns to anyone other than law enforcement agencies did not constitute

16    a physical or regulatory taking); *Fesjian v. Jefferson*, 399 A.2d 861 (D.C. 1979) (holding

17    that a statue requiring machine guns denied registration be sold, surrendered, or

18    disposed, was a valid exercise of police power thereby not a taking); *Rupp v. Becerra*,

19    Case No. 8:17-cv-00746-JLS-JDE, 2018 WL 2138451, *8-*9 (C.D. Cal. May 9, 2018)

20    (dismissing a Takings claim on the grounds that a California prohibition on certain

21    weapons represented an exercise of police power and not a taking). Accordingly, and in

22    consideration of the previous complex factors discussed herein, the Court finds that

23    A.B. 286 does not constitute a regulatory taking.

24    ///

25    ///

26

27        [10]The Court notes that the Ninth Circuit was presented with a similar Takings claim in *Duncan v. Becerra*, 742 F. App'x 218 (9th Cir. 2018). That case, however, is not

28    binding precedent on this Court. Moreover, the Ninth Circuit affirmed the district court's findings on a deferential abuse of discretion standard. The Court finds the guidance from *Duncan* inconclusive as applied to the facts of this case.

13

ER-93

1          **2.      Physical Taking**

2          Plaintiffs also argue that A.B. 286 is "an unconstitutional deprivation of their

3   property interest" in violation of the Fifth Amendment's Takings Clause by requiring

4   unserialized firearms and constituent parts to be sold or transferred. (ECF No. 6 at 16.)

5   Plaintiffs further argue that the government has a duty to provide just compensation and

6   that just compensation is impossible through "any government-compelled sale." (*Id.*)

7   State Defendants counter that the government is not taking title to the property at issue.

8   (ECF No. 31 at 13.) The Court is not persuaded that A.B. 286 is a physical taking that

9   would require the government to provide just compensation.

10         The Takings Clause expressly prohibits the taking of "private property . . . *for*

11  *public use, without just compensation*." U.S. Const. amend. V (emphasis added). Here,

12  §§ 3 and 5 of A.B. 286—prohibiting the possession of unserialized firearms and

13  constituent parts—will become effective on January 1, 2022. Nowhere in A.B. 286 does

14  it expressly state, nor can it be implied, that the government is compelling the

15  conveyance of the disputed property for public use. Nor are persons denied possession

16  or use of unserialized firearms, if they or the disputed property, fall within an exception

17  as set forth in § 5(1)(a)-(b). Additionally, pursuant to § 5.5, persons in Nevada can sell

18  the disputed property to a firearms importer, manufacturer, or a license dealer prior to

19  January 1, 2022, but the value for the property is paid by the buyers and not the

20  government. As such, the Court does not find that the government is physically

21  appropriating Individual Plaintiffs' property, or property of persons similarly situated, to

22  constitute a physical taking.

23         The Court's analysis would not change even if A.B. 286 did authorize a physical

24  taking. In contrast to situations where a taking is for a public use under the

25  government's eminent domain power, just compensation is not required when the

26  government uses its police power to prevent a perceived public harm. *See, e.g., Lucas*

27  *v. S.C. Coastal Council*, 505 U.S. 1003, 1014 (1992) (discussing eminent domain);

28  *Mugler*, 123 U.S. at 668-669 (discussing police power exception). To their own

1    detriment, Plaintiffs point out that the government is not providing a just compensation
2    and a government-compelled sale cannot fulfill this requirement. (ECF No. 6 at 16-17.)
3    This further suggests that A.B. 286 is more appropriately analyzed under a regulatory
4    rather than a physical taking, and, as the Court discussed above, that argument is
5    legally infirm.

6        Accordingly, the government cannot be said to be engaging in a physical or
7    regulatory taking of Plaintiffs' property in violation of the Takings Clause by virtue of
8    enacting and enforcing A.B. 286. Because Plaintiffs have not shown a likelihood of
9    success on the merits with respect to their Fifth Amendment Takings Clause claim,
10   Plaintiffs are not entitled to a preliminary injunction.

11 **V.    CONCLUSION**

12        The Court notes that the parties made several arguments and cited to several
13   cases not discussed above. The Court has reviewed these arguments and cases and
14   determines that they do not warrant discussion as they do not affect the outcome of the
15   Motion and the issues before the Court.

16        It is therefore ordered that Plaintiffs' motion for a preliminary injunction (ECF No.
17   6) is denied.

18        DATED THIS 26th Day of July 2021.

19

20

21    MIRANDA M. DU
22    CHIEF UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF NEVADA
 2   BEFORE THE HONORABLE MIRANDA M. DU, CHIEF DISTRICT JUDGE
                      ---o0o---
 3

 4   Roger Palmer, Chad          :
     Moxley, Firearms Policy     :
 5   Coalition,                  :
                                 : No. 3:21-cv-268-MMD-CSD
 6            Plaintiffs,        :
                                 :
 7       -vs-                    : July 16, 2021
                                 :
 8   Stephen Sisolak, Aaron      :
     Ford, George Togliatti,     : United States District Court
 9   Mindy McKay, Joseph         : 400 S. Virginia Street
     Lombardo, et al.,           : Reno, Nevada  89501
10                               :
              Defendants.        :
11   _____       :

12
                TRANSCRIPT OF MOTION HEARING
13

14   A P P E A R A N C E S :

15   FOR THE PLAINTIFF:           Raymond DiGuiseppe
                                   David O'Mara
16                                 Adam Kraut
                                   William Sack
17                                 Attorneys at Law

18   FOR STATE DEFENDANT:          Jeffrey Conner
                                   Attorney at Law
19
     FOR CLARK COUNTY DEFENDANT:   Nicholas Crosby
20                                 Attorney at Law

21   FOR DOUGLAS COUNTY DEFENDANT: Zachary Wadle

22
     Proceedings recorded by mechanical stenography produced
23   by computer-aided transcript

24
     Reported by:              KATHRYN M. FRENCH, RPR, CCR
25                             NEVADA LICENSE NO. 392
                               CALIFORNIA LICENSE NO. 8536
```

1          Reno, Nevada, Friday, July 16, 2021, 1:30 p.m.

2                           ---oOo---

3

4     ****ZOOM CONFERENCE EXPERIENCING AUDIO INTERRUPTIONS

5               THROUGHOUT THE PROCEEDINGS***

6

7               THE CLERK:  3:21-civil-268-MMD-WGC,

8     Roger Palmer, et al. versus Stephen Sisolak, et al.

9               Present by video conference for plaintiff

10    are David O'Mara, Raymond DiGuiseppe, Adam Kraut, and

11    William Sack.

12               Present for the State defendants,

13    Jeffrey Conner.

14               Present for the Clark County defendants,

15    Nicholas Crosby.

16               Present for Douglas County defendants,

17    Zachary Wadle.

18               THE COURT:  All right.  Good afternoon,

19    counsel.

20               For the record, I have reviewed the Motion

21    For Preliminary Injunction, which is ECF number 6; and,

22    really, the main substantive Response from the State

23    defendants, ECF number 31; and the Reply brief, ECF

24    number 40.  I also skimmed through the brief Response

25    from the County defendants, basically deferring to the

1  State defendants.

2          I don't have any questions on the arguments

3  relating to the Takings Clause Claim, so I want counsel

4  to focus on the Second Amendment Claim.  And with

5  that, I'll hear arguments, first, from counsel for the

6  plaintiff.

7          MR. DIGUISEPPE:  Good afternoon, Your Honor.

8  This is Ray DiGuiseppe on behalf of the plaintiffs.

9          First of all, thank you for accommodating

10  us with the Zoom feeds, that makes it much more

11  convenient.  We appreciate that.

12          And just to start off, and to be clear,

13  as indicated in the briefing, this isn't a case about

14  firearms (audio interruption) and background checks.

15  No one asked any of the tens of thousands of law

16  abiding, responsible gun owners in Nevada to submit

17  to a background check or apply for a serial number for

18  (audio interruption) --

19          THE COURT:  I'm sorry.  The court reporter

20  is saying that you are dropping out periodically, so

21  you need to make sure you speak into your speaker

22  and slow down.  If you're reading, you need to slow

23  down because the court reporter will not be able to

24  transcribe if you're reading too fast.

25          MR. DIGUISEPPE:  Sure.  No problem.

1   I just was saying that there was not an

2   opportunity for anyone to submit to a background check

3   or apply for a serial number -- can you hear me better?

4   Just to be sure.

5   THE COURT:  Yes.

6   MR. DIGUISEPPE:  Okay.  Great.

7   -- which would have actually achieved the

8   interests the State is indicating that it is advancing

9   through AB-286.  The State just banned the full spectrum

10  of activity and protected property interests associated

11  with the process of self-manufacturing firearms; while,

12  on the other hand, affirmatively precluding the ability

13  of law abiding Nevadans to comply with the various

14  systems the State says are being evaded through this

15  process.

16  THE COURT:  But AB-286 does not ban

17  the possession of all firearms, right?  It leaves

18  alternative channels for possession of firearms,

19  legally, for self-defense purposes.  For example,

20  serialized firearms, am I right?

21  MR. DIGUISEPPE:  A person could acquire a

22  serialized firearm from a licensed seller of firearms,

23  that's correct, but what we have here is an entire class

24  of arms which have already been recognized as lawful

25  under State law, and constructed and possessed and

```
 1    used as such (audio interruption) in unlawful, and not
 2    allowing anyone to continue with manufacturing of such
 3    arms in the future, all tied to a statutory scheme,
 4    which is based upon a requirement that any such further
 5    self-manufacturing or possession of parts has to be in
 6    compliance with a serialization process that does not
 7    exist and may never exist until, effectively --
 8              THE COURT:  But does --
 9              MR. DIGUISEPPE:  Sorry?
10              THE COURT:  -- the State have to include a
11    mechanism for serialization with the ban?
12              MR. DIGUISEPPE:  I think if it's a ban -- I
13    don't think that a ban is permissible in this sense.
14    This reaches far, far greater -- has a far greater
15    reach than any other type of restriction of this (audio
16    interruption) and there aren't very many.
17              As far as whether there has to be an avenue,
18    I think there, absolutely, does because otherwise you're
19    talking about a situation where the activity itself of
20    manufacturing firearms and being able to possess and
21    use those arms -- which is all protected by the Second
22    Amendment -- is absolutely forbidden.  And that is not
23    permissible unless there's some means by which people
24    are able to comply with the stated interest.  If the
25    stated interest is we want to ensure that everything
```

ER-100

```
 1   is serialized, either through tracing, so we can have
 2   background checks and know who has all guns, they can do
 3   that.  There are ways in which they can achieve that,
 4   like other states who impose such regulations and are
 5   put in place to allow people to continue with this
 6   protected process (audio interruption) manufacturer
 7   without --
 8           THE COURT:  I'm sorry.  The court reporter
 9   is saying that she is not able to understand you again.
10   Would you repeat your last statement.  And maybe,
11   perhaps, you're moving around somewhat, if you could
12   just try to get closer to your microphone.
13           I haven't had any issue like this in other
14   video conferencing hearings.  So, let's try this.  It
15   may be that I have to get you on  the phone instead.
16           MR. DIGUISEPPE:  All right.  I'll try to
17   just to speak louder, if I can.
18               Is that better?
19           THE COURT:  I'm sorry.  Give me just one
20   moment.
21               What is it, Kathy.
22           THE COURT REPORTER:  It's not that he needs
23   to be louder.  He just needs to slow down because he
24   drops off and he is mumbling and I can't understand what
25   he is saying.
```

           THE COURT:  So, you also -- she is asking
you to slow down slightly because you tend to drop
off at the end of your sentence, too, which makes it
more difficult to hear.

           MR. DIGUISEPPE:  Okay.  All right.  I will
do so.

           So, I think as far as whether there needs
to be some avenue through which to allow people to
continue with the process of self-manufacturing arms,
I think that there must be.  A State cannot just simply
ban all of the protected conduct that's associated with,
with manufacturing firearms for lawful purposes, and
allow for no means to comply with the stated interests.
I think it's really important to pay attention
and notice that the stated interest is, in fact,
serialization for traceability purposes and background
checks to identify and know who has what firearms.
And to the extent that that is the only stated interest,
the State has to be able to show that they can't achieve
that through some other reasonably (indecipherable)
tailoring means.  And an absolute ban is simply not
constitutionally permissible.  Whichever test that
we happen to apply, I mean there's no tailoring,
essentially, at all, when  you have a situation like
that.

1        THE COURT:  Well, if I agree, and I think

2    that the -- assuming that the AB-286 burden conduct

3    protected under the Second Amendment, I think that

4    intermediate scrutiny applies, and under that test the

5    State just has to articulate a significant interest

6    that -- and a reasonable fit between the challenged law

7    and the asserted objective.  I mean, the case law in the

8    Ninth Circuit is clear that the State does not have to

9    adopt the least restrictive means, and so that's why I

10   asked, under that framework, is the State required to

11   have a means for serialization?  Within that framework,

12   is what I'm looking for.

13        MR. DIGUISEPPE:  I understand.

14        Within the framework of the intervening

15   scrutiny test as recognized by the Ninth Circuit itself,

16   and the Supreme Court, clearly, the difference between

17   strict scrutiny and intermediate scrutiny is the nature

18   of the State's interest, whether it has to be compelling

19   or important.  And the major difference, then, is

20   just that.  Beyond that, they both have to be narrowly

21   tailored.  And in a situation like this, there's not

22   any form of tailoring when the conduct and the property

23   is just outright banned.  That is not going to survive

24   even under the most lenient form of intermediate

25   scrutiny, which, as the Supreme Court has repeatedly

1  said, requires that there be a narrow -- a narrow

2  tailoring.  It's got to be in reasonable proportion with

3  the interests being served.  There's closely drawn

4  without an unnecessary abridgement.  And if the focus,

5  again, of the State interest is "want to ensure

6  serialization or traceability purposes," and we want

7  to ensure that we know who is getting these through

8  background checks, there's no reason why it could not

9  have allowed for some mechanism through which to

10  permit people to do so.  Because the alternative is,

11  essentially, a ban, as Your Honor previously made

12  reference to.  That's absolutely right.  It is a ban.

13  And a ban of these rights is simply not permissible.

14  And that is just considering things under the

15  intermediate scrutiny test, which I understand Your

16  Honor feels may be applicable.  And of course we have

17  other tests that we could look to.  In the context of a

18  total ban situation, we would say that the first place

19  to look is the "common use" test that is articulated

20  through and supported by Heller.  And that, alone,

21  wouldn't allow anything like this to stand because

22  of the -- it's not even just a severe burden.  It's a

23  ban on the protected conduct.

24       The alternative of being able to acquire, as

25  Your Honor referred to previously, a serialized firearm

1　through another means, again, that is making the other

2　options type argument that Heller itself rejected.  The

3　ability to be able to acquire the arm through another

4　means, is not an answer.  It's not an answer to a ban.

5　　　　　　And so just under Heller alone, you would

6　have a categorical problem, in that it would have to be

7　considered something that is just impermissible under

8　any test.  Ninth Circuit law would confirm that as well,

9　in being that anything that severely burdens a right is

10　going to be subject to scrutiny.  Although, again, even

11　if we're not in strict scrutiny territory and we're

12　just looking at immediate scrutiny, the difference only

13　is the nature of the interest.  Whether it's legitimate

14　or whether it's important or compelling, it still has

15　to be narrowly tailored.  And a ban, along with full

16　spectrum of the activity, is in all other property

17　interests associated with it, it's simply not anything

18　that could be ever considered tailored.

19　　　　　　THE COURT:  Thank you.

20　　　　　　Let me hear from the State defendants

21　counsel.

22　　　　　　MR. CONNER:  Good afternoon, Your Honor.

23　Jeffrey Conner on behalf of the State defendants.

24　　　　　　Can you hear me okay?

25　　　　　　THE COURT:  For now I can.

1     MR. CONNER: Okay. If there's any problems,

2  let me know. I'll try to speak slow and clear so that

3  you can hear me.

4     To begin with, where I depart from my

5  opponent's position is that he begins by just assuming

6  that the conduct at issue in this case is protected by

7  the Second Amendment. What we know from looking at

8  the Ninth Circuit's case law, as well as case law from

9  various other circuits throughout the country, courts

10  have imposed a two-step framework for addressing Second

11  Amendment challenges to State laws, like the law that's

12  at issue in this case.

13     The first step is looking at whether or not

14  the regulation is a burden on protected Second Amendment

15  conduct. And in _Heller_, the Supreme Court was very

16  clear that the protected con -- or the protected rights

17  under the Second Amendment is the right to self-defense,

18  and the right to defense of hearth and home. There is

19  no showing here, whatsoever, that these regulations have

20  any substantial burden or substantial impact on the

21  plaintiff's ability to own a handgun, or any other

22  weapon that they can lawfully own, for purposes of

23  self-defense within the home. And so I don't --

24     THE COURT: Well, they cannot own a firearm

25  that's not serialized, under AB-286, for self-defense in

1  the home.

2          MR. CONNER:  Correct, Your Honor, but

3  that is -- I disagree with the sense that that is a

4  categorical ban that prevents them from exercising their

5  Second Amendment rights.

6          The argument, here, is simply that they

7  have a right to self-manufacture a firearm.  And that's

8  really the right that they're trying to enforce here,

9  but there's no recognition under the Second Amendment,

10  historically, that there's a right to self-manufacture

11  a firearm.

12          THE COURT:  So is the argument under the

13  first step that the historical records here support a

14  ban on unserialized firearms?

15          And the reason I ask is it seems like the

16  State defendants may be collapsing two analysis under

17  Heller.  Because if the argument is the Court looks to

18  historical records, I think that the Young decision,

19  the en banc Young decision by the Ninth Circuit that

20  was issued this year, is really instructive on the types

21  of historical records that the Court is required to

22  review under that analysis.  And I don't think the

23  State offers anything close to that.

24          MR. CONNER:  So I would note, Your Honor,

25  that at page 10 of the opposition, we do cite the Fifth

 1    Circuit case, the NRA case out of the Fifth Circuit, for
 2    acknowledging -- that case acknowledged longstanding,
 3    legitimate limitations going back to the colonial era,
 4    addressing limitations on -- or recordkeeping on who
 5    possessed firearms, and having bans on certain persons
 6    that could own a fire -- or possess a firearm.  So,
 7    there is a link to longstanding, historical limitations
 8    of this nature that demonstrate that the right that
 9    they're really trying to protect here, which is the
10    right to self-manufacture a firearm, falls outside the
11    scope of the Second Amendment.
12         Now, even if the Court were to disagree with
13    me on that, though, I -- you -- moving on, if there is
14    Second Amendment conduct here, or a conduct here that is
15    protected by the Second Amendment, you move on to the
16    "means ends" test and identify the appropriate level
17    of strict scrutiny -- or not strict scrutiny.  The
18    appropriate level of "means ends" scrutiny here.  And
19    the default rule is intermediate scrutiny and, under
20    that test, as Your Honor noted, the State merely needs
21    to identify a significant substantial or important
22    interest, and that there is a reasonable fit between
23    the State law and that interest.  And as my opponent
24    acknowledged here, that these laws support two very
25    important State limitations on possession of firearms,

1    which is, on the front end of the transaction, is making

2    sure that prohibitive persons do not obtain a firearm;

3    and, on the back end, it helps in -- with prosecution of

4    crime and tracking guns for purposes of prosecuting gun

5    crime.

6            THE COURT:  So let me try to dissect that.

7            In the front end, why doesn't the State just

8    adopt background check requirements as the plaintiff

9    advanced here?

10           MR. CONNER:  Well, Your Honor, I think that

11    that is a -- that would potentially get into a strict

12    scrutiny analysis.  I don't think we even get to the

13    means end scrutiny.  But under the immediate scrutiny

14    test, there is not a requirement that we, uh, have a

15    least restrictive -- there's not a least restrictive

16    means test under the strict scrutiny.  It just has to

17    be a reasonable fit.  And so -- it looks like Your Honor

18    has a question so I'll --

19           THE COURT:  No, no.  Just finish.  Have you

20    finished your answer?

21           MR. CONNER:  Well, so there doesn't have

22    to be a perfect fit between the, you know, the most

23    restrictive way for the State to achieve this under

24    immediate scrutiny.

25           THE COURT:  What about the -- on the

1   back-end, as you described it, with respect to tracing

2   the firearm to a crime?  Do you want to respond to the

3   plaintiff's argument in their reply that that doesn't --

4   there's no explanation as to how that reduced threats

5   to public safety?

6           MR. CONNER:  It absolutely does, Your Honor.

7   It aids law enforcement in prosecuting crime and being

8   able to track ownership of guns.  And when where, when

9   guns that were used to commit a crime on the street,

10  where that gun came from.

11          THE COURT:  The State is not arguing that

12  the firearms here fall within the dangerous and unusual

13  category that is discussed under Heller, is it?  I don't

14  read the briefs to make that argument.

15          MR. CONNER:  Um, I don't --

16          THE COURT:  So I assume the answer is, no,

17  you're not making that argument?

18          MR. CONNER:  Well, I mean here's the thing,

19  is that whether they are or not, you know, I think that

20  our opponents rely pretty heavily on Justice Olita's

21  concurrence -- I don't know how to pronounce the name on

22  that case -- but they rely very heavily on that.  That,

23  of course, is just a concurrence and doesn't have any

24  real bearing here because you only had two justices

25  join that.  And so their argument in that regard relies

1   heavily on that case.  I don't think that that's
2   particularly instructive here.  But, again, I don't --
3   the -- I think the important point here is what we're
4   talking about in this case is not really about the right
5   to own a firearm.  This isn't a categorical ban on any
6   plaintiff's ability to own a firearm.  It is simply that
7   they cannot self-manufacture a firearm that doesn't have
8   a serialized receiver or frame.
9           THE COURT:  Thank you.
10          Anything else, Mr. Conner?
11          MR. CONNER:  I guess just the one thing I
12  would note, to make a record of it, is we do object to
13  the Court's consideration of Exhibits 4 and 5 that, one,
14  we have not received an expert report that would provide
15  us with the information that's required for expert
16  testimony under Rule 26; and, additionally, that they
17  were improperly attached to the reply brief without
18  giving the State an adequate opportunity to respond.
19          THE COURT:  All right.  Thank you.
20          I don't think that -- well, I'm assuming
21  the County defendant's counsel doesn't have anything
22  additional to add, am I right?
23          MR. WADLE:  That's correct, Your Honor.
24  Zach Wadle on behalf of Douglas County defendants.  I
25  have nothing further to say beyond what's in our brief

```
1    that we submitted to the Court.
2                THE COURT:  All right.
3                Let me hear a brief reply from plaintiff's
4    counsel.  And I think you should address the State's
5    argument that there is a historical regulation
6    supporting the argument that there's no right to
7    self-manufacture firearms under the Second Amendment
8    and, therefore, that's not conduct protected under
9    the Second Amendment.
10               MR. DIGUISEPPE:  Well, thank you, Your
11   Honor.
12               Our Complaint lays out, in a lot of detail,
13   a historical discussion that's apart from the discussion
14   that comes in through the Declarations -- which I can
15   respond to the objections to admissibility on those, if
16   you like -- we have an extensive discussion about the
17   historical background for self-manufacturing right.
18   There's been no -- absolutely no effort, whatsoever,
19   from the State, to try to say that any of that is
20   inaccurate.  Heller makes very clear that the nature
21   of the rights protected within the scope of the Second
22   Amendment are defined by the historical and traditional
23   understanding of firearm rights at the time of the
24   founding.  And that historical discussion in the
25   Complaint, and in the opening brief of the Motion For
```

1    Preliminary Injunction made quite clear that there

2    is a recognized right, and there has been.  It is not

3    sufficient to cite a -- one quote from the NRA case in

4    the Fifth Circuit, which the only thing in there that

5    related to restrictions on serialization of tracking

6    arms was a quote that said that there had been

7    regulations related to keeping track of who has guns

8    in the community.  That's all that it says.  It says

9    nothing to support the notion that you can just

10   take away all of the firearms that have already been

11   manufactured lawfully under the law that it was,

12   without any showing, whatsoever, that they pose any

13   danger with these arms.  There's nothing to refute any

14   of the evidence we submitted with respect to the

15   existence of such a right.  Plus, it has -- I can't

16   ignore that on the back-end of the construction process,

17   what you have is an end product that is protected

18   by the Second Amendment.  There's been no dispute that

19   the firearms which have been manufactured heretofore,

20   lawfully, are within protected classes.  That is very

21   well established in Ninth Circuit and Supreme Court

22   authority.  No dispute to that whatsoever.

23            So, these people have created arms of a

24   protected class.  They can't have their rights to build

25   those arms and then possess and use the arms -- which is

1   a natural outgrowth of the right to manufacture, just

2   as the right to possess them relates back to the

3   manufacture right -- as being recognized historically,

4   that cannot just be completely eliminated, and get

5   within even the most lenient form of intermediate

6   scrutiny, because there's no tailoring.

7           I understand the references to "reasonable

8   fit," but "reasonable fit," is defined as a narrowing

9   tailored restriction.  And I think it's really notable

10  that ATF's own proposed rule continues to include an

11  exception for personal, self-manufacture for personal

12  use.  That shows that it's obvious -- it is obvious,

13  even through the ATF, that even despite all the dangers

14  which may exist when those guns, quote, unquote, are

15  in the hands of the wrong people, that doesn't mean you

16  can just preclude all right and ability of law abiding

17  citizens to construct their own firearms, and then use

18  them for lawful purposes.  Why would ATF recognize that

19  if that wasn't just obvious?

20          It is obvious.  The other states that

21  have regulations, the few that do, California and

22  Connecticut, for example, they have a process for

23  State serialization.  All of the arguments that my

24  opposing counsel is making about the need for, or

25  importance of serialization and background check, just

1  gloss over the whole point that they could certainly

2  require that.  These -- these individuals are not

3  asking to have some kind of special treatment in that

4  way.  Nobody is asking to have preferential treatment

5  for themselves.  They haven't been given any opportunity

6  to comply with the very thing the State says that is so

7  important that they need to enact a ban.  That's totally

8  unacceptable under any view of the law.

9          And with respect to -- if I could respond

10 quickly -- to the inadmissibility to the declarations

11 at issue, I would point out that 26(2)(a)(2)(C) doesn't

12 apply to this situation for two reasons.  One, (b)

13 within that subdivision deals with the timing of the

14 need to disclose a report, and we're not nearly -- near

15 a trial that (C) says that you have to be within 90 days

16 before trial that you have to make such a disclosure.

17 We're at a preliminary phase of the process, so it

18 doesn't even apply.  But, these types of individuals

19 also are not experts of the sort who need to produce

20 such a report because they fall under (C), as employees

21 of FPC, who do not regularly testify.  But aside from

22 that, the subject matter to which they attest is all

23 already supported by independent evidence.  You know,

24 for example, even the conclusions they draw are not

25 disputed, that in the vast majority of the states

1   there's no regulation of this activity; that these types

2   of firearms and the Classes to which they belong; and

3   the activity itself are popular throughout the country

4   and, therefore, these are common use and not dangerous

5   and unusual, as they would have to be to be subject to

6   some kind of outright ban, potentially.  So they -- we

7   have independent evidence in that respect.

8              And I would ask for a moment to respond to

9   the -- to their evidence because we have objections of

10  our own to their statement that the Court should take

11  judicial notice of, quote, various citations to the

12  federal register and the federal legislative history

13  without any specification.  That's, obviously, quite

14  vague and unspecific as to what exactly they're asking

15  for.  And the material, as I point out in the briefing,

16  the material that's cited is full of hearsay and

17  unsubstantiated (indecipherable).  But even if we

18  take that that evidence at its face value, it just

19  undermines their position because it shows that the

20  ATF recognizes how popular these types of arms are;

21  and, most importantly, perhaps, that despite all the

22  dangers and dooms and glooms that they point to when

23  these things are in the hands of the wrong people, they

24  have an exception for personal use.  They retain that.

25  Nevertheless, I would point out, too, that the Homeland

1   Security assessment report that the State cites, there

2   was a supplement to that in which the committee itself

3   pointed out that this type -- even this (indecipherable)

4   assessment could potentially impugn the rights of

5   individuals by associating the improperly bringing

6   into the home of lawful gun owners who are pursuing

7   this activity lawfully.

8          So I mean, ultimately, their evidence just

9   undermines their position, particularly with the

10  exception that ATF provides for itself.

11         The other states, all of that, the law

12  from the other states, is obviously subject to judicial

13  notice.  You've got six other states, Connecticut and

14  California, D.C., New Jersey, and Hawaii, all of them

15  have some other means by which to exercise the right,

16  even if it's regulated.  So, nobody is standing here

17  saying that the State cannot impose reasonable

18  restrictions on self-manufacturing and then possession

19  and use for lawful purposes of those arms after self-

20  manufacturing.  What we're saying is it can't just

21  outright ban the whole spectrum of activity and the

22  products that are used to build them and the firearm

23  that's ultimately constructed of law abiding people

24  who have done nothing wrong and have no intention of

25  doing anything wrong.  And even as I pointed out, the

notion that you can just go and build your own firearm
from serialized receivers and frames isn't even true, as
one of their justifications.  That's not true because
the fire -- the parts have to be serialized as required
by federal law, under a system that doesn't even exist.
So, it's a false statement.

I think that the State's interests that
have been articulated are, essentially, pretextual.
A pretextual claim of interest can't support anything.
It has no weight in an interest balancing situation.
It shouldn't be afforded any weight at all.  But even
if it is, again, there's got to be narrow tailoring.
And we don't have narrow tailoring in a situation where
there's a total ban on the full spectrum of activity,
which has been protected and is protected based on the
evidence we submitted, to which there was no response,
no dispute, nothing in response besides a quote from a
case out of the Fifth Circuit that talked about keeping
track of who owns the arms.  That doesn't negate all
of the historical facts we've submitted that shows that
self-manufacture is a protected right.  Just as you
can't take away the implements that a person uses to
develop protected speech -- paper and pen and printers
and whatnot -- you can't just dispossess people of the
products they use to assemble arms, when, especially,

1   the end product is something they're going to use only
2   for lawful purposes.
3              This has gone way too far and it is an
4   extreme, extreme example of overreach by the State.
5   So, you know, it can have all these legitimate interests
6   that it articulates, and it very well may, and those
7   interests can stand with a regulation that permits
8   self-manufacturing, and use of self-manufacturing arms
9   for lawful purposes.  They're trying to eliminate
10  that spectrum of conduct in the product and the property
11  interests involved, and that can't be done.
12             THE COURT:  All right.  Thank you, counsel.
13             I hope to have a decision on the motion
14  within the next week, if not the next two weeks, so
15  you can expect a written order on the motion.
16             Thank you.
17             MR. DIGUISEPPE:  Thank you, Your Honor.
18
19             (Court Adjourned.)
20
21
22
23
24
25

-o0o-

I certify that the foregoing is a correct
transcript from the record of proceedings
in the above-entitled matter.

\s\ Kathryn M. French                    June 22, 2022
_____          _____

KATHRYN M. FRENCH, RPR, CCR                      DATE
Official Reporter

# EXHIBIT 2

Declaration of Joseph Ostini

# EXHIBIT 2

THE O'MARA LAW FIRM, P.C.
DAVID C. OMARA
(Nevada Bar No. 8599)
311 East Liberty Street
Reno, NV 89501
P: (775) 323-1321
F: (775) 323-4082
E: david@omaralaw.net

THE DIGUISEPPE LAW FIRM, P.C.
RAYMOND M. DIGUISEPPE*
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

FIREARMS POLICY COALITION
ADAM KRAUT*
WILLIAM SACK*
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 596-3492
E: akraut@fpclaw.org
E: wsack@fpclaw.org

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| ROGER PALMER, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>STEPHEN SISOLAK, in his official capacity as Governor of Nevada, *et al.*,<br><br>　　　　　Defendants. | Case No.: 3:21-cv-00268<br><br>**DECLARATION OF JOSEPH OSTINI IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Judge: Hon. Miranda Du**<br>**Date:　July 16, 2021**<br>**Time: 1:30 p.m.**<br>**Courtroom: 5** |

## DECLARATION OF JOSEPH OSTINI

I, Joseph Ostini, declare as follows:

1.　　I am not a party in the above-titled action. I am over the age of 18, have personal knowledge of the facts referred to in this declaration, and am competent to testify to the matters stated below.

2.　　I am a licensed attorney in the state of California.

1   3.      I have reviewed, and I am familiar with the various firearms definitions in the Nevada

2   Revised Statutes, including those enacted under AB 286 (2021).

3   4.      The self-manufacture of firearms has long been common practice throughout the

4   United States, and the growing popularity of the practice is well documented. The popularity of non-

5   firearm object items like "80%" AR-15 lower receivers and handgun receivers, including but not

6   limited to Polymer80-type, has been increasing steadily over the last several years. The number of

7   online merchants that I have documented selling these items illustrates this fact.

8

9   5.      The Bureau of Alcohol Tobacco, Firearms and Explosives website itself directly states

10  individuals may self-build their own firearms for personal use without any special license.[1]

11  6.      According to one policy paper, "Currently, there are roughly 80 dealers in the US

12  online market selling 80 percent lowers. Most of these websites are very straightforward and make

13  purchasing the pieces quick and easy. In the past year, ghost gun purchases have grown drastically in

14  popularity with over a dozen distributors reporting shipping delays since March 2020 because of

15  overwhelming demand. The growth coincided with the beginning of pandemic lockdowns in the US,

16  as well as a jump in firearm sales writ large."[2] These findings are consistent with my findings

17  documented below, which indicate that there are a significant number of sellers of firearm precursor

18  parts, and that that their popularity is at an all-time high.

19

20

21

22

23

---

24  [1] "Does an individual need a license to make a firearm for personal use?" 2020,
25  https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use.

26  [2] "Ghost Guns: A Haunting New Reality," Simmons, Nicholas, 2021, https://rockinst.org/wp-
27  content/uploads/2021/04/210413-Ghost-Guns-web.pdf.

28

2

7.      Everytown for Gun Safety, an organization that advocates for increased gun control, has reported having identified 80 online sellers of unfinished frames and/or receivers in its own assessment.[3]

8.      From July 2, 2021, to July 7, 2021, I undertook the research of new commercially available firearm precursor components for sale within the United States.

9.      This research was conducted by reviewing the websites of most readily identified major retailers of firearms components within the U.S. I identified 54 merchants in the U.S. that offered for sale unfinished AR-15 lower receivers, commonly referred to in the marketplace as "80%" lower receivers, and 25 merchants that offered for sale the Polymer80-type, or "80%", unfinished handgun receivers. The completed firearms that can be home-built using these components are the two most commonly self-manufactured firearms in the U.S. at present.

10.      Attached as **Exhibit 1** is a true and correct copy of a table I authored, which lists the numerous retailers that offer for commercial sale precursor components, including the unfinished non-firearm object "80%" receivers from which individuals can home-build rifles and handguns. These unfinished receivers are categorically prohibited by the Nevada Statutes, but are freely available for sale throughout the vast majority of the United States. Exhibit 1 is supported by the listed web addresses illustrating the products available for sale. Based on normal market conditions, it stands to reason that the widespread commercial retail availability of firearm precursor parts mirrors the demand for such parts for self-manufacturing of firearms.

11.      Individuals are also making their own firearm receivers and components from scratch utilizing a variety of manufacturing methods. Technological advances in equipment like CNC

---

[3] "Untraceable: The Rising Specter of Ghost Guns," 2020, https://everytownresearch.org/report/the-rising-specter-of-ghost-guns/.

3

ER-124

machines and 3D printers—and decreases in equipment costs—have lowered the barriers to entry of their widespread use in self-manufacturing firearms.

12.     In analyzing Nevada's self-manufacture prohibition, I have concluded that the statute effects a total, categorical ban on the possession all firearm precursor materials, as well as the self-building of all firearms for the average citizen, including those of types in widely popular, lawful common use. I have additionally concluded that, amongst the handful of outlier states that have elected to regulate related conduct, Nevada's statute represents the broadest and most far-reaching prohibition on the self-building of firearms and possession of their precursor parts.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed within the United States on July 9, 2021.

*Joseph Ostini*
Joseph Ostini

4

# EXHIBIT 1

| EXHIBIT 1 |||
| :---: | :---: | :---: |
| **NON-FIREARM OBJECT / PREDECESSOR ITEM SURVEY** |||
| **ITEM** | **MERCHANT** | **LINK TO PRODUCT** |
| AR-15 "80%" Lower Receiver NFO | Right to Bear | https://www.righttobear.com/Polymer80-308-80-Lower-Receiver-Jig-OD-Green-p/p80-308kit-odgreen.htm?Click=64422 |
| AR-15 "80%" Lower Receiver NFO | Omega Tactical Distribution | https://www.omegamanufacturinginc.com/Special-Buy--Polymer80-AR-15-Lower-Receiver-Phoenix-Gen-2-80-with-Jig-and-bits_p_19469.html |
| AR-15 "80%" Lower Receiver NFO | Primary Arms | https://www.primaryarms.com/p80-g150-80-percent-lower-receiver-with-jig-system-kit-black?avad=211021_b22a755c1 |
| AR-15 "80%" Lower Receiver NFO | Durkin Tactical | https://www.durkintactical.com/product/5-56-80-lower-receiver-raw/ |
| AR-15 "80%" Lower Receiver NFO | OutdoorSports-USA | https://outdoorsportsusa.com/Cerakote-Sniper-Gray-AR-15-80-percent-Billet-Lower |
| AR-15 "80%" Lower Receiver NFO | Locked Loaded | https://lockedloaded.com/product/640901515984?gundeals |
| AR-15 "80%" Lower Receiver NFO | 22Mods4All | https://www.22mods4all.com/zaviar-firearms-ar-15-black-cerakote-mil-spec-80-lower-receiver/ |
| AR-15 "80%" Lower Receiver NFO | Guns 80 | https://guns80.com/HYBRID-80-COSMETIC-BLEMS-AR15-80-lower-and-Jig-p262092355 |
| AR-15 "80%" Lower Receiver NFO | AR Junkies | https://www.arjunkies.com/am-15-80-lower-upper-combo--raw-aluminum.html |
| AR-15 "80%" Lower Receiver NFO | Joe Bob Outfitters | https://www.joeboboutfitters.com/New-Frontier-Armory-80-AR-15-Billet-Lower-Receive-p/nfa-80percentlower.htm |
| AR-15 "80%" Lower Receiver NFO | Brownells | https://www.brownells.com/rifle-parts/receiver-parts/receivers/lower-receivers/brn-180m-lower-receiver-prod134121.aspx |
| AR-15 "80%" Lower Receiver NFO | GunStuff TV | https://gunstuff.tv/product/polymer80-p80rl556v3bl-ar-15-80-lower-receiver-kit-polymer-black/ |
| AR-15 "80%" Lower Receiver NFO | John's Militia Gear | https://www.johnsmilitiagear.com/products/polymer80-850283007612-3364 |
| AR-15 "80%" Lower Receiver NFO | BattleHawk Armory | https://battlehawkarmory.com/product/polymer80-p80rl556v3bl-ar-15-80-lower-receiver-kit-polymer-black |
| AR-15 "80%" Lower Receiver NFO | DR Gun Supply | https://www.drgunsupply.com/products/rifles-polymer80-p80rl556v3bl-850283007612-688 |
| AR-15 "80%" Lower Receiver NFO | GrabAGun.com | https://grabagun.com/p80-rl556v3-fde-rl556v3-ar15-lower-recv-kit-80.html |
| AR-15 "80%" Lower Receiver NFO | Smokin' Guns | https://www.mysmokinguns.com/products/accessories-polymer80-p80rl556v3bl-850283007612-3449 |
| AR-15 "80%" Lower Receiver NFO | Diamond District Firearms | https://www.diamonddistrictfirearms.com/products/rifles-polymer80-p80rl556v3bl-850283007612-4779 |

| | EXHIBIT 1 | |
| --- | --- | --- |
| | **NON-FIREARM OBJECT / PREDECESSOR ITEM SURVEY** | |
| **ITEM** | **MERCHANT** | **LINK TO PRODUCT** |
| AR-15 "80%" Lower Receiver NFO | Keely Arms | https://shop.keelyarms.com/products/rifles-polymer80-p80rl556v3bl-850283007612-3791 |
| AR-15 "80%" Lower Receiver NFO | Liberty Sport & Pawn | https://www.libertysportandpawn.net/products/rifles-polymer80-p80rl556v3bl-850283007612-4109 |
| AR-15 "80%" Lower Receiver NFO | Keely Arms | https://shop.keelyarms.com/products/rifles-polymer80-p80rl556v3bl-850283007612-3791 |
| AR-15 "80%" Lower Receiver NFO | Tin Star Shooting Range | https://www.tinstarshootingrange.com/products/rifles-polymer80-p80rl556v3bl-850283007612-707 |
| AR-15 "80%" Lower Receiver NFO | Liberty Arms | https://www.libertyarmstn.net/products/rifles-polymer80-p80rl556v3bl-850283007612-5161 |
| AR-15 "80%" Lower Receiver NFO | Cornerstone Arms | https://store.cornerstonearms.com/products/accessories-polymer80-p80rl556v3bl-850283007612-2530 |
| AR-15 "80%" Lower Receiver NFO | Hoosier Armory | https://www.hoosierarmory.com/products/accessories-polymer80-p80rl556v3bl-850283007612-480 |
| AR-15 "80%" Lower Receiver NFO | Houston Gun Store | https://www.houstongunstore.com/products/glock-polymer80-rl556v3bl-850283007612-rl556v3bl-4740 |
| AR-15 "80%" Lower Receiver NFO | Palmetto State Armory | https://palmettostatearmory.com/polymer-80-rl556v3-lower-receiver-kit-black-rl556v3bl.html?avad=211021_f22a7148d |
| AR-15 "80%" Lower Receiver NFO | TheGunDock.com | https://store.thegundock.com/product/80-lower-billet-raw |
| AR-15 "80%" Lower Receiver NFO | Pew Pew Guru | https://shop.pewpewguru.com/products/hunting-alex-pro-firearms-lp721-787790167754-3860 |
| AR-15 "80%" Lower Receiver NFO | Tomkat Armory | https://tomkatarmory.com/80-lower-ar-15-marines-logo |
| AR-15 "80%" Lower Receiver NFO | Ceratac | https://www.ceratac.com/Lower-Receiver-Cerakote-Blemished-p/lr-556-80-c-b.htm |
| AR-15 "80%" Lower Receiver NFO | Limitless America | https://limitlessamerica.com/noreen-firearms-80-ar15-billet-lower-receiver-andodized-black/ |
| AR-15 "80%" Lower Receiver NFO | Durkin Tactical | https://www.durkintactical.com/product/am-15-80-lower-receiver-anodize/ |
| AR-15 "80%" Lower Receiver NFO | Delta Team Tactical | https://gun.deals/product/mercury-precision-thebe-billet-ar-15-80-aluminum-lower-receiver-thin-cutouts-magwell-made-us |
| AR-15 "80%" Lower Receiver NFO | 3CR Tactical | https://3crtactical.com/product/80-ar-15-un-anodized-lower-receiver/ |
| AR-15 "80%" Lower Receiver NFO | Davidson Defense | https://davidsondefense.com/Mercury-Precision-Thebe-Billet-AR-15-80-Aluminum-Lower-Receiver--Thin-Cutouts-On-Magwell--Made-In-The-USA_p_10569.html |

| **EXHIBIT 1** | | |
|---|---|---|
| **NON-FIREARM OBJECT / PREDECESSOR ITEM SURVEY** | | |
| **ITEM** | **MERCHANT** | **LINK TO PRODUCT** |
| AR-15 "80%" Lower Receiver NFO | Black Aura Tactical | https://blackauratactical.com/80-lower-receiver/ |
| AR-15 "80%" Lower Receiver NFO | Omega Tactical Distribution | https://www.omegamanufacturinginc.com/Mercury-Precision-Thebe-Billet-AR-15-80-Aluminum-Lower-Receiver--Thin-Cutouts-On-Magwell--Made-In-The-USA-Gun-Deal-Exclusive_p_18807.html |
| AR-15 "80%" Lower Receiver NFO | Always Armed | https://alwaysarmed.com/always-armed-80-lower-receiver-black-anodized/?showHidden=true&_ga=2.130675724.201161145.1619008269-1725590213.1616422493 |
| AR-15 "80%" Lower Receiver NFO | Ghost Firearms | https://www.ghostrifles.com/ghost-firearms-80-lower-receiver-10-pack-black-anodized/?showHidden=true&_ga=2.208461712.389625947.1618834407-1693479043.1592491656 |
| AR-15 "80%" Lower Receiver NFO | Midway USA | https://www.midwayusa.com/product/1092916295905?utm_source=gundeals&utm_medium=shopping&utm_campaign=moderatorservice&?gd |
| AR-15 "80%" Lower Receiver NFO | Tactical R&R | https://www.tactical2r.com/Anderson-80-LOWER-RECEIVER-ANODIZED-p/d2-k067-c000.htm |
| AR-15 "80%" Lower Receiver NFO | Hinterland Outfitters | https://www.hinterlandoutfitters.com/308kit-warrhog-recv-p-76802.html |
| AR-15 "80%" Lower Receiver NFO | Tin Star Shooting Range | https://www.tinstarshootingrange.com/products/accessories-polymer80-p80308kitfde-850283007117-707 |
| AR-15 "80%" Lower Receiver NFO | Cornerstone Arms | https://store.cornerstonearms.com/products/accessories-polymer80-p80308kitfde-850283007117-2530 |
| AR-15 "80%" Lower Receiver NFO | Rainier Arms | https://www.rainierarms.com/james-madison-tactical-jmt-carbon-50-ar-15-80-lower-receiver-with-jig-black/ |
| AR-15 "80%" Lower Receiver NFO | Moriarti Armaments | https://moriartiarmaments.com/ar-9/ar-9-lowers/ar-9-9mm-80-anodized-lower-receiver-anodized-black-glock-style-mag-ar9lower |
| AR-15 "80%" Lower Receiver NFO | Adventure Survivalist | https://adventuresurvivalist.com/shop/ar-15-lower-parts/ar-15-skeleton-80-lower-receiver/ |
| AR-15 "80%" Lower Receiver NFO | Venom Defense and Design | https://venom-defense.com/ar-15-billet-80-lower-receiver-backordered-3-weeks/ |
| AR-15 "80%" Lower Receiver NFO | Wise Arms | https://shop.wisearms.com/wise-arms-billet-80-ar-15-lower-receiver-uncoated/ |
| AR-15 "80%" Lower Receiver NFO | Mid State Firearms | https://www.midstatefirearms.com/80-Machined-Lower-No-FFL-required-anodized-black-80LOWERBLACK.htm?categoryId=-1 |
| AR-15 "80%" Lower Receiver NFO | Project Defense Co. | https://projectdefensecompany.com/LR80-BIL?keyword=80%20 |
| AR-15 "80%" Lower Receiver NFO | Noreen Firearms | https://onlylongrange.com/noreen-billet-80-223-lower-receiver/ |
| AR-15 "80%" Lower Receiver NFO | Tactical Machining | https://www.tacticalmachining.com/80-lower-10-pack.html |

| | | |
|---|---|---|
| **EXHIBIT 1** | | |
| **NON-FIREARM OBJECT / PREDECESSOR ITEM SURVEY** | | |
| **ITEM** | **MERCHANT** | **LINK TO PRODUCT** |
| AR-15 "80%" Lower Receiver NFO | Classic Firearms | https://www.classicfirearms.com/anderson-ar-15-80-percent-lower-anodized-no-ffl-required/ |
| Handgun "80%" Lower Receiver NFO | Omaha Outdoors | https://www.omahaoutdoors.com/polymer-80-pf940v2-frame-jig/?attribute_pa_color=black |
| Handgun "80%" Lower Receiver NFO | Brownells | https://www.brownells.com/handgun-parts/frame-parts/frames/80-pf940v2-frame-black-textured-sku100025335-113451-207512.aspx |
| Handgun "80%" Lower Receiver NFO | Primary Arms | https://www.primaryarms.com/polymer-80-pfc9-serialized-glock-19-compact-frame-fde?avad=211021_a22ab6ee1 |
| Handgun "80%" Lower Receiver NFO | Right To Bear | https://www.righttobear.com/Polymer80-308-80-Lower-Receiver-Jig-OD-Green-p/p80-308kit-odgreen.htm?Click=64422 |
| Handgun "80%" Lower Receiver NFO | Arm or Ally | https://www.armorally.com/shop/polymer80-pf45-pistol-frame-kit/ |
| Handgun "80%" Lower Receiver NFO | MMC Armory | https://mmcarmory.com/micro-conversion-kit-fde-for-poly80-poly80-80-frame-kit.html |
| Handgun "80%" Lower Receiver NFO | Delta Team Tactical | https://www.deltateamtactical.com/Polymer-80-PF940C-80-Compact-Pistol-Frame-Kit--Black--Fits-All-Gen-3-Glock-19-23-Newest-Gen-II-Better-Aggressive-Texture-ADD-TO-CART-DISCOUNT_p_26174.html |
| Handgun "80%" Lower Receiver NFO | Omega Tactical Distribution | https://www.omegamanufacturinginc.com/Special-Buy--Polymer-80-PF940C-80-Compact-Pistol-Frame-Kit--Black--Fits-All-Gen-3-Glock-19-23-Newest-Gen-II-Better-Aggressive-Texture_p_19051.html |
| Handgun "80%" Lower Receiver NFO | Botach | https://botach.com/polymer80-glock-compatible-frame-kit/?avad=211021_e22aa8415 |
| Handgun "80%" Lower Receiver NFO | Mid State Firearms | https://www.midwayusa.com/product/1018339425 |
| Handgun "80%" Lower Receiver NFO | Karri's Guns | https://karrisguns.com/polymer-80-pf940v2-fullsize-80-frame-and-lower-parts-kit-w-burnt-bronze-cerakote-control-parts.html |
| Handgun "80%" Lower Receiver NFO | Davidson Defense | https://davidsondefense.com/dd-diy-pistol-kits-g17-frame-glock-mount.html |
| Handgun "80%" Lower Receiver NFO | Durkin Tactical | https://www.durkintactical.com/product/pf320ptex-grip-module-black/ |
| Handgun "80%" Lower Receiver NFO | Arm or Ally | https://www.armorally.com/shop/polymer80-pf940v2-pistol-frame-kit/ |
| Handgun "80%" Lower Receiver NFO | Wholesale Hunter | https://www.wholesalehunter.com/Product/Details/11230928?fs=1 |
| Handgun "80%" Lower Receiver NFO | Locked Loaded | https://lockedloaded.com/product/polymer80-p80pfc9blk-g1923-gen3-compatible-80-pistol-frame-polymer-black-serialized#product_detail |
| Handgun "80%" Lower Receiver NFO | Always Armed | https://alwaysarmed.com/polymer80-pf940cl-compact-longslide-frame/ |

| EXHIBIT 1 NON-FIREARM OBJECT / PREDECESSOR ITEM SURVEY | | |
|---|---|---|
| **ITEM** | **MERCHANT** | **LINK TO PRODUCT** |
| Handgun "80%" Lower Receiver NFO | KM Tactical | https://kmtactical.net/product/polymer-80-80-black-pistol-frame-kit-pf940cv1/ |
| Handgun "80%" Lower Receiver NFO | Rockey Brass | https://www.rockeybrass.com/Polymer-80-Glock-43-PF9SS-80-Single-Stack-Pistol-Frame-Kit_p_7562.html |
| Handgun "80%" Lower Receiver NFO | 3CR Tactical | https://3crtactical.com/product/9mm-polymer80-full-size-glock-19-frame-slide-barrel-builders-kit/ |
| Handgun "80%" Lower Receiver NFO | Ghost Firearms | https://www.ghostrifles.com/polymer80-pf940c-80-compact-frame-black/ |
| Handgun "80%" Lower Receiver NFO | Rainier Arms | https://www.rainicrarms.com/polymer80-pf45-80-full-size-pistol-textured-frame-kit-for-glock-20-21-black/ |
| Handgun "80%" Lower Receiver NFO | Boogaloo Supply | https://www.boogaloosupply.com/product/polymer-80-pf940c-80-compact-pistol-frame-kit-fde/ |
| Handgun "80%" Lower Receiver NFO | 80% Arms | https://www.80percentarms.com/products/gst-9-pistol-frame/ |
| Handgun "80%" Lower Receiver NFO | KM Tactical | https://kmtactical.net/product/polymer-80-80-black-pistol-frame-kit-pf940cv1/ |
| Handgun "80%" Lower Receiver NFO | Mag Commander | https://magcommaander.com/polymer80-pf940cv1-80-compact-pistol-frame-kit-glock-19-23-32-compatible-black/ |
| 3D Printer | Creality | https://www.creality3dofficial.com/products/official-creality-ender-3-3d-printer |
| CNC Mill | Defense Distributed | https://ghostgunner.net/product/ghost-gunner-3-deposit/ |

# EXHIBIT 1

Declaration of Joseph G.S. Greenlee

# EXHIBIT 1

THE O'MARA LAW FIRM, P.C.
DAVID C. OMARA
(Nevada Bar No. 8599)
311 East Liberty Street
Reno, NV 89501
P: (775) 323-1321
F: (775) 323-4082
E: david@omaralaw.net

FIREARMS POLICY COALITION
ADAM KRAUT*
WILLIAM SACK*
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 596-3492
E: akraut@fpclaw.org
E: wsack@fpclaw.org

THE DIGUISEPPE LAW FIRM, P.C.
RAYMOND M. DIGUISEPPE*
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ROGER PALMER, *et al.*,<br><br>                Plaintiffs,<br><br>    v.<br><br>STEPHEN SISOLAK, in his official capacity as Governor of Nevada, *et al.*,<br><br>                Defendants. | Case No.:  3:21-cv-00268<br><br>**DECLARATION OF JOSEPH G.S. GREENLEE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Judge: Hon. Miranda Du**<br>**Date:   July 16, 2021**<br>**Time:  1:30 p.m.**<br>**Courtroom: 5** |

**DECLARATION OF JOSEPH G.S. GREENLEE**

I, Joseph G.S. Greenlee, declare as follows:

1.     I am not a party to the above-captioned action, I am over the age of 18, I have personal knowledge of the facts stated herein, and I am competent to testify as to the matters stated and the opinions rendered below.

2.     I earned my Juris Doctor degree in 2014 from the University of Denver Sturm College of Law, after earning a Bachelor of Science Degree from Park University in 2011.

1    3.    I have practiced law since 2014, and currently serve as the Director of

2    Constitutional Studies at the Firearms Policy Coalition and as a Policy Advisor for

3    Legal Affairs at the Heartland Institute.

4    4.    I have published ten scholarly research articles in the field of Second

5    Amendment law.

6    5.    My work has been cited in the dissenting opinion in *New York State Rifle*

7    *& Pistol Ass'n, Inc. v. City of New York, New York*, 140 S. Ct. 1525, 1541 (2020) (Alito,

8    J., joined by Gorsuch and Thomas, JJ., dissenting), as well as by justices of the Ohio

9    and Wisconsin Supreme Courts, judges of the Third and Ninth Circuit Courts of

10    Appeals, and the United States District Court for the Northern District of Florida.

11    6.    Attached hereto as **Exhibit 1** is a true and correct copy of my Curriculum

12    Vitae. It describes my education, employment background, career experience, and

13    publications.

14    7.    My opinions expressed here are formed in light of my scholarship and

15    study of the current legal landscape of the Second Amendment.

16    8.    Based on my education, work experience, research, publications, and

17    review of the research of others, in my opinion, the right of law-abiding citizens to

18    build their own firearms for personal use is protected by the Second Amendment.

19    Americans have been building their own arms since the early colonial days, and the

20    practice has been largely unregulated throughout American history. What is more, the

21    ability to build arms was critical to American success during the Revolution and also

22    important for western expansion.

23    9.    The Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008)

24    focused on the Second Amendment's text, as informed by history and tradition.

25    <div align="center">Text</div>

26    10.    The text of the Second Amendment provides: "A well regulated Militia,

27    being necessary to the security of a free State, the right of the people to keep and bear

28

<div align="center">1</div>

1   Arms, shall not be infringed."[1] The text does not make a distinction between the

2   different methods of acquiring the firearms Americans have a right to keep and bear. It

3   shows no preference for purchasing a firearm built by another individual over building

4   one's own firearm.

### History and Tradition

6       11.   The colonists in the first permanent English settlements in America had

7   the express right to import arms and the items necessary to make them. Binding his

8   "Heirs and Successors," King James I in 1606 granted the "Southern Colony"

9   (Virginia) the right to import from Great Britain "the Goods, Chattels, Armour,

10  Munition, and Furniture, needful to be used by them, for their said Apparel, Food,

11  Defence or otherwise."[2] The 1620 Charter of New England granted colonists the right

12  "to take, load, carry, and transport in . . . Shipping, Armour, Weapons, Ordinances,

13  Munition, Powder, Shott, Victuals, and all Manner of Cloathing, Implements,

14  Furniture, Beasts, Cattle, Horses, Mares, and all other Things necessary for the said

15  Plantation, and for their Use and Defense, and for Trade with the People there."[3]

16      12.   Because the colonists depended on firearms for food and survival, the

17  ability to build arms was a highly valued skill. Gunsmiths quickly appeared throughout

18  the colonies, and some people who specialized in other occupations learned to build

19  and repair arms as well. Blacksmiths, locksmiths, farmers, silversmiths, clock and

20  watchmakers, stonemasons, whitesmiths, tinsmiths, cabinet makers, lockmakers, and

---

[1] U.S. CONST. amend. II.

[2] 7 FEDERAL AND STATE CONSTITUTIONS: COLONIAL CHARTERS AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3787–88 (Francis Thorpe ed., 1909).

The definition of "armour," at the time, included all weapons as well defensive clothing. *See* 1 Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated) ("In English statutes, *armor* is used for the whole apparatus of war; including offensive as well as defensive arms.").

[3] 3 *id.* at 1834–35.

2

1   at least one lawyer were among the early Americans who have been documented as

2   also making firearms.[4]

3       13.    Historian M.L. Brown explained that "[t]he influence of the gunsmith and

4   the production of firearms on nearly every aspect of colonial endeavor in North

5   America cannot be overstated, and that pervasive influence continuously escalated

6   following the colonial era."[5] It has been reported that over 600 gunsmiths were

7   operating in America between 1775 and 1783 alone.[6]

8       14.    Both professional and amateur gunsmiths played an important role in the

9   American Revolution. There was a shortage of firearms and gunpowder during the

10  Revolutionary War, due in large part to British efforts to restrict or prohibit arms

11  manufacture in the colonies leading up to and during the war. States depended on the

12  American people to help meet the demand. For example, on February 15, 1775,

13  Massachusetts's Provincial Congress recommended that the towns and districts within

14  the colony "encourage such persons as are skilled in the manufacturing of firearms and

15  bayonets, diligently to apply themselves thereto, for supplying such of the inhabitants

16  as may still be deficient."[7] The Provincial Congress promised to purchase "so many

17  effective arms and bayonets as can be delivered in a reasonable time upon notice given

18  to this congress at its next session."[8]

19      15.    On April 2, 1776, Pennsylvania's Committee of Safety approved a

20  contract paying someone named Tomlinson fifty pounds "for making publick the art of

21  boring and grinding Gun-barrels, and instructing such persons as they shall require to

22

23          [4] James Whisker, THE GUNSMITH'S TRADE 145–63 (1992).

24          [5] M.L. Brown, FIREARMS IN COLONIAL AMERICA 149 (1980).

25          [6] Clayton Cramer, LOCK, STOCK, AND BARREL: THE ORIGINS OF AMERICAN GUN CULTURE 54
    & Appendix A (2018).

26          [7] THE JOURNALS OF EACH PROVINCIAL CONGRESS OF MASSACHUSETTS IN 1774 AND 1775, AND
27  OF THE COMMITTEE OF SAFETY 103 (1838).

            [8] Id.

28

1   be taught that art."[9] That same day, the Pittsburgh Press announced in its paper that

2   "The Pennsylvania Committee of Safety authorized three of its members 'to contract

3   for making public the art of boring and grinding gun-barrels.'"[10] Thus, Pennsylvania

4   did not only rely on those already familiar with building arms, it desired to spread that

5   knowledge throughout the colony.

6          16.    Similar efforts were made to increase domestic gunpowder production.

7   For example, Paul Revere—who built firearms and gunpowder although he was a brass

8   founder and silversmith by trade[11]—"engraved a plate diagramming how to refine

9   saltpeter, an essential component in the making of gunpowder."[12] Revere's instructions

10  were published in the Royal American Magazine in August 1774.[13]

11         17.    During this period in particular, many firearm makers intentionally

12  omitted any markings that would suggest who built the firearm, "for the gunsmiths of

13  that troubled time had no desire to invite British reprisals, as they would if it were

14  known that they were furnishing arms to the colonists."[14]

15         18.    Many inventions came from the making of arms from people outside of

16  the gunsmithing profession. Joseph Belton informed the Continental Congress on April

17  11, 1777 that he had invented "a common small arm" that could "discharge sixteen, or

18  twenty [rounds], in sixteen, ten, or five seconds of time."[15] That summer, Belton

19  demonstrated his rifle before leading military officers—including General Horatio

20  Gates and Major General Benedict Arnold—and scientists—including David

21

---

22         [9] 5 AMERICAN ARCHIVES, FOURTH SERIES, 734 (Peter Force ed. 1844).

23         [10] THE PITTSBURGH PRESS, Apr. 2, 1776.

24         [11] Whisker, THE GUNSMITH'S TRADE, at 153.

         [12] Stephen P. Halbrook, THE FOUNDERS' SECOND AMENDMENT 33 (2008).

25         [13] Id.

26         [14] Charles Edward Chapel, GUNS OF THE OLD WEST 23 (1961).

27         [15] Letter from Joseph Belton to the Continental Congress, Apr. 11, 1777, in PAPERS OF THE
CONTINENTAL CONGRESS, COMPILED 1774–1789, vol. 1 AB, at 123.

28

4

1   Rittenhouse—who verified that "[h]e discharged Sixteen Balls loaded at one time."[16]

2   The Congress ordered 100 of them,[17] but ultimately the deal fell through when Belton

3   demanded what the Congress deemed "an extraordinary allowance."[18]

4       19.    Charles Willson Peale, who had formerly worked in saddlery,

5   clockmaking, and silversmithing before becoming a world-renown portraitist, "prized

6   a firelock" throughout the Revolutionary War "with a telescopic sight that he had built

7   with help from the astronomer David Rittenhouse."[19]

8       20.    After the war, the ability to manufacture and repair arms was important to

9   western expansion. For example, Daniel Boone, whose father taught him to build

10   firearms, benefited from the skill in his explorations.[20] Meriwether Lewis was also

11   experienced in amateur gunsmithing. Indeed, the Journals from the Lewis and Clark

12   Expedition include many entries about the men repairing their arms.[21]

13       21.    The Girandoni rifle Meriwether Lewis carried on the expedition and relied

14   on heavily was made by Isaiah Lukens, a Philadelphia clockmaker. The rifle, capable

15   of firing 22 consecutive rounds without reloading,[22] was essential to the Expedition's

16   success.[23]

17

---

18     [16] *Id.* at 139.

19     [17] 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, at 324 (1907).

  [18] *Id.* at 361.

20     [19] Rick Atkinson, THE BRITISH ARE COMING 493 (2019).

21     [20] Robert Morgan, BOONE 14 (2007) (Squire Boone's "skill at making and repairing guns was

22   passed down to his fourth son," Daniel, for whom "[i]t would be an essential, lifesaving skill in later years, in the wilderness beyond the mountains.").

23     [21] Meriwether Lewis and William Clark, THE JOURNALS OF THE LEWIS & CLARK EXPEDITION

24   (Gary Moulton ed., 1983) (13 vols.).

  [22] James B. Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION 100–01 (2012).

25     [23] Lewis mentioned the rifle at least 22 times in the journals, nearly always demonstrating it

26   to impress various Native American tribes encountered on the expedition. *See e.g.*, 6 The Journals of the Lewis & Clark Expedition, at 233 (Jan. 24, 1806 entry) ("My Air-gun also astonishes them very

27   much, they cannot comprehend it's [sic] shooting so often and without powder; and think that it is great medicine which comprehends every thing that is to them incomprehensible.").

28

22.     The ability to manufacture firearms, for personal use or otherwise, was critical in early American history. It was also an activity the ordinary American could legally partake in. As Thomas Jefferson wrote in 1793, "[o]ur citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them."[24]

### Supreme Court Precedent

23.     The *Heller* Court specifically addressed "*what* types of weapons" the Second Amendment protects.[25] The Court concluded that the right protects arms that are "typically possessed by law-abiding citizens for lawful purposes."[26] In other words, as *United States v. Miller*, 307 U.S. 174 (1939) "said . . . the sorts of weapons protected were those 'in common use at the time.'"[27]

24.     Thus, according to the concurring opinion in *Caetano v. Massachusetts*, "the pertinent Second Amendment inquiry is whether [the arms] are commonly possessed by law-abiding citizens for lawful purposes today."[28]

25.     The Supreme Court has not expressly defined "common." It had no need to in *Heller* or *McDonald v. City of Chicago*, 561 U.S. 742 (2010), because both cases dealt with handgun bans, and handguns are "the most popular weapon chosen by Americans for self-defense in the home,"[29] so they were clearly common.

26.     But *Heller* did establish what matters is whether the arm is among "the

---

[24] Letter from Secretary of State Thomas Jefferson to British Ambassador to the United States George Hammond, May 15, 1793, in 7 THE WRITINGS OF THOMAS JEFFERSON 325, 326 (Paul Ford ed., 1904).

[25] 554 U.S. at 624 (emphasis in original).

[26] *Id.* at 625.

[27] *Heller*, 554 U.S. at 627 (quoting *Miller*, 307 U.S. at 179).

[28] *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1032 (2016) (Alito, J., concurring) (emphasis omitted).

[29] *Heller*, 554 U.S. at 629.

6

1   sorts of weapons" or "of the kind" that are in common use.[30] In other words, the specific
2   features, make, or model, of the arm in question need not be common. Nor does it
3   matter whether the arm is purchased, bequeathed, or self-built.

4         27.   *Caetano* summarily reversed and remanded an opinion of the
5   Massachusetts Supreme Judicial Court upholding a stun gun prohibition. While the
6   Court's per curiam opinion focused on the lower court's violations of the precedent set
7   in *Heller*, Justices Alito and Thomas's concurrence determined that stun guns are
8   common—and thus protected—arms.

9         28.   The concurrence clarified that in determining commonality for Second
10  Amendment protection, "[t]he more relevant statistic is that hundreds of thousands of
11  Tasers and stun guns have been sold to private citizens, who it appears may lawfully
12  possess them in 45 States."[31]

13        29.   In other words, the raw number of arms and the number of jurisdictions in
14  which those arms are lawful controls. This is the best indication yet from the Supreme
15  Court of what factors are relevant in determining commonality.

16        30.   Applying those factors here, Nevada's ban as it applies to self-built
17  handguns contradicts *Heller*'s holding that handguns cannot be banned. If rifles are
18  also protected by the Second Amendment, the ban on self-built rifles would contradict
19  *Heller* as well.

20        31.   Even limiting the analysis to self-built arms, rather than handguns
21  generally or rifles generally as *Heller* suggests,[32] the test from the *Caetano* concurrence
22  suggests that self-built firearms are protected.

                                    Jurisdictional Analysis

24        32.   It is lawful to build arms for personal use under federal law and in 44

---

[30] *Id.* at 624, 627.

[31] *Caetano*, 136 S. Ct. at 1032 (Alito, J., concurring) (quotation omitted).

[32] *See* 554 U.S. at 624, 627 (what matters is whether the banned arms are among "the sorts of weapons" or "of the kind" that are in common use).

1   states, with no special restrictions. Only six states (including Nevada) and the District

2   of Columbia regulate the manufacture of arms for personal use. This is almost identical

3   to the jurisdictional analysis that led the *Caetano* concurrence to conclude that stun

4   guns were protected arms.[33]

5          33.    The federal government has never required a license to build a firearm for

6   personal use.

7          34.    The federal restrictions that do exist on self-manufactured arms have

8   limited application and are aimed at firearms generally. For example, federal law

9   forbids any person to manufacture, import, sell, ship, deliver, possess, transfer, or

10   receive any firearm if "after removal of grips, stocks, and magazines, [it] is not as

11   detectable as the Security Exemplar, by walk-through metal detectors calibrated and

12   operated to detect the Security Exemplar,"[34] or if "any major component . . . when

13   subjected to inspection by the types of x-ray machines commonly used at airports, does

14   not generate an image that accurately depicts the shape of the component."[35]

15          35.    Federal law also forbids any person to "assemble from imported parts any

16   semiautomatic rifle or any shotgun which is identical to any rifle or shotgun prohibited

17   from importation under" 18 U.S.C. 925(d)(3).[36]

18          36.    The making of a firearm that falls within the scope of the National

19   Firearms Act requires advanced approval by the Bureau of Alcohol, Tobacco, Firearms

20   and Explosives, as well as a tax payment.[37]

21          37.    Just recently, California, New Jersey, Connecticut, Hawaii, Rhode Island,

22   and the District of Columbia have regulated self-built firearms.

23          38.    California's law became effective in 2018. It requires that prior to

24   ───────────────

   [33] *Caetano*, 136 S. Ct. at 1032 (Alito, J., concurring).

25   [34] 18 U.S.C. § 922(p)(1)(A).

26   [35] 18 U.S.C. § 922(p)(1)(B).

   [36] 18 U.S.C. § 922(r).

27   [37] 26 U.S.C. § 5822.

28                                          8

1   manufacturing or assembling a firearm, a person must apply to the California

2   Department of Justice for a unique serial number and permanently affix it to the

3   firearm.[38]

4         39.    New Jersey has regulated self-built arms since 2018. The State punishes

5   with a crime in the third degree, anyone "who, with the purpose to manufacture or

6   otherwise assemble a firearm and without being registered or licensed do so as provided

7   in chapter 58 of Title 2C of the New Jersey Statutes, purchases or otherwise obtains

8   separately or as part of a kit a firearm frame or firearm receiver which is not imprinted

9   with a serial number registered with a federally licensed manufacturer or any

10   combination of parts from which a firearm without a serial number may be readily

11   manufactured or otherwise assembled, but which does not have the capacity to function

12   as a firearm unless manufactured or otherwise assembled. . . ."[39]

13         40.    Connecticut's 2019 law prohibits anyone from completing the

14   manufacture of a firearm without subsequently "obtaining a unique serial number or

15   other mark of identification from the Department of Emergency Services and Public

16   Protection" and "engraving upon or permanently affixing to the firearm such serial

17   number or other mark in a manner that conforms with the requirements imposed on

18   licensed importers and licensed manufacturers of firearms."[40] Additionally, the transfer

19   of an unfinished frame or receiver must comply with regulations for transfers of pistols

20   or revolvers.[41]

21         41.    Under Hawaii's 2020 law:

22          A person who is not licensed to manufacture a firearm
         under section 134-31, or who is not a dealer licensed by

23          the United States Department of Justice, shall not, for the
         purpose of assembling a firearm, purchase, produce with a

24

---

25     [38] Cal. Penal Code § 29180(b).

26     [39] N.J. Stat. § 2C:39-9.

27     [40] Conn. Pub. Act No. 19-6 (2019).

    [41] Id.

28

three-dimensional printer, or otherwise obtain separately, or as part of a kit:

(1) A firearm receiver that is not imprinted with a serial number registered with a federally licensed manufacturer;

(2) A firearm receiver that has not been provided a serial number that may be registered in accordance with section 134-3(c); or

(3) Any combination of parts from which a firearm having no serial number may be readily assembled; provided that the parts do not have the capacity to function as a firearm unless assembled.[42]

42.     The District of Columbia since 2020 requires the registration of "ghost guns,"[43] which it defines as "an unfinished frame or receiver."[44]

43.     Rhode Island, since 2020, forbids anyone to "manufacture, sell, offer to sell, transfer, purchase, possess, or have under his or her control . . . any firearm produced by a 3D printing process," or any "firearm, including a frame or receiver, that lacks a unique serial number engraved or cased in metal alloy on the frame or receiver by a licensed manufacturer, maker, or importer under federal law or markings in accordance with 27 C.F.R. § 479.102."[45]

44.     There appear to be no special regulations for self-built arms for personal use in 44 states. This is similar to the facts in *Caetano*, in which the concurrence determined stun guns were protected arms based in part on their legality in 45 states.[46]

45.     Even in the few jurisdictions that regulate self-built arms, some still allow them as long as they are serialized or meet some similar requirement. Nevada, by contrast, provides no such path for people to build their own arms.

---

[42] 2019 Hi. HB 2744.

[43] D.C. Code § 7-2502.02(a)(8),

[44] D.C. Code § 7-2501.01(9B).

[45] 2020 R.I. HB 7102.

[46] *Caetano*, 136 S. Ct. at 1032 (Alito, J., concurring) (quotation omitted).

10

ER-143

**CONCLUSIONS**

46.     My research leads me to the following conclusions:

47.     The building of firearms for personal use is deeply rooted in American tradition.

48.     The building of firearms for personal use has been largely unregulated throughout American history.

49.     The building of firearms for personal use remains a lawful Second Amendment activity in a large majority of jurisdictions across the United States.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed within the United States on July 9, 2021.

          __/s/Joseph G.S. Greenlee_____
          Joseph G.S. Greenlee

11

1

# EXHIBITS

2

| **Exhibit** | **Description** |
| --- | --- |
| 1 | Joseph G.S. Greenlee Curriculum Vitae |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

# Joseph Greenlee

josephgreenlee@gmail.com ☐ 970-485-3303 ☐ PO Box 4061, McCall, ID 83638

### LEGAL EXPERIENCE

| | |
|---|---|
| Attorney at Law: Constitutional and Appellate Law | 2014 – Present |
| Firearms Policy Coalition: Director of Constitutional Studies | 2019 – Present |
| Firearms Policy Foundation: Director of Constitutional Studies | 2021 – Present |
| Heartland Institute: Policy Advisor for Legal Affairs | 2019 – Present |
| Millennial Policy Center: Fellow in Constitutional Studies | 2017 – 2021 |
| Steamboat Institute: Emerging Leaders Advisory Council | 2016 – 2019 |

### EDUCATION

Juris Doctor – University of Denver Sturm College of Law (2014)
Bachelor of Science – Park University (2011)

### ADMISSIONS

Colorado
Idaho
Colorado District Court
Maryland District Court (pro hac vice)
First Circuit Court of Appeals
Second Circuit Court of Appeals
Third Circuit Court of Appeals
Fifth Circuit Court of Appeals
Seventh Circuit Court of Appeals
Ninth Circuit Court of Appeals
Tenth Circuit Court of Appeals
Eleventh Circuit Court of Appeals
United States Supreme Court

### PUBLICATIONS

David B. Kopel & Joseph G.S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 ST. LOUIS L.J. 193 (2017)

Jonathan S. Goldstein & Joseph G.S. Greenlee, *Pennsylvania's Expanded Castle Doctrine: An Annotated Tour of the First Five Years*, 88 PA. B.A. Q. 170 (2017)

David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Court Cases on the Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J 119 (2018)

ER-147

David B. Kopel & Joseph G.S. Greenlee, *Federal Circuit Second Amendment Doctrines 2017–2018*, Tx. B. J. ch.7 (2018)

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J 495 (2019)

David B. Kopel & Joseph G.S. Greenlee, *Federal Circuit Second Amendment Developments 2018*, 7 L.M.U. L. REV. 105 (2019)

Joseph G.S. Greenlee, *Concealed Carry and the Right to Bear Arms*, FED. SOC. REVIEW, Vol. 20 (2019)

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205 (2018)

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249 (2020)

Joseph G.S. Greenlee & Matthew Larosiere, *Red Flag Laws Raise Red Flags of Their Own*, 45 ALABAMA LAW & PSYCHOL. REV. (Forthcoming 2021)

### AMICUS BRIEFS IN FIREARMS LAW CASES

*Virginia Duncan, et al. v. Xavier Becerra*
Ninth Circuit Court of Appeals

*Michael Cargill v. Merrick B. Garland, et al.*
Fifth Circuit Court of Appeals

*Joshua Wade v. The Board of Regents of the University of Michigan*
Supreme Court of Michigan

*United States v. Antonio Francisco Gutierrez*
Supreme Court of Idaho

*Kenneth E. Flick v. Robert M. Wilkinson*
Supreme Court of the United States

*Maryland Shall Issue, Inc., et al. v. Lawrence Hogan*
Supreme Court of the United States

*New York State Rifle & Pistol Association, Inc., et al. v. Keith M. Corlett*
Supreme Court of the United States

*United States of America v. Israel Torres*
Supreme Court of the United States

*Association of New Jersey Rifle & Pistol Clubs, Inc., et al. v. Attorney General New Jersey, et al.*
Third Circuit Court of Appeals

*Kim Rhode, et al. v. Xavier Becerra*
Ninth Circuit Court of Appeals

*Zoie H. v. State of Nebraska*
Supreme Court of the United States

*William Drummond, et al. v. Township of Robinson, et al.*
Third Circuit Court of Appeals

*George K. Young, Jr. v. State of Hawaii, et al.*
Ninth Circuit Court of Appeals

*State of Vermont v. Max Misch*
Supreme Court of Vermont

*Raymond Holloway, Jr. v. William P. Barr, et al.*
Third Circuit Court of Appeals

*United States of America v. Israel Torres*
Ninth Circuit Court of Appeals

*Association of New Jersey Rifle & Pistol Clubs, Inc., et al. v. Attorney General New Jersey, et al.*
Third Circuit Court of Appeals

*Steven Rupp, et al. v. Xavier Becerra*
Ninth Circuit Court of Appeals

*Brian Kirk Malpasso, et al. v. William M. Pallozzi, et al.*
Supreme Court of the United States

*David Seth Worman, et al. v. Maura T. Healey, et al.*
Supreme Court of the United States

*Damien Guedes, et al. v. Bureau of Alcohol, Tobacco, Firearms and Explosives, et al.*
Supreme Court of the United States

*Jorge L. Medina v. William P. Barr*
Supreme Court of the United States

*Virginia Duncan, et al. v. Xavier Becerra*
Ninth Circuit Court of Appeals

3

ER-149

*Remington Arms Co., LLC, et al. v. Donna L. Soto, et al.*
Supreme Court of the United States

*Mark Cheeseman v. John Polillo, et al.*
Supreme Court of the United States

*United States of America v. Raphael Hunt-Irving*
Third Circuit Court of Appeals

*Raymond Holloway, Jr. v. William P. Barr, et al.*
Third Circuit Court of Appeals

*Lisa M. Folajtar v. William P. Barr, et al.*
Third Circuit Court of Appeals

*National Association for Gun Rights, Inc., et al. v. Jared S. Polis*
Colorado Supreme Court

*The People of the State of Illinois v. Vivian Claudine Brown*
Supreme Court of Illinois

*New York State Rifle & Pistol Association, Inc., et al. v. City of New York, New York, et al.*
Supreme Court of the United States

*Ivan Pena, et al. v. Martin Horan, Director, California Department of Justice Bureau of Firearms*
Supreme Court of the United States

*Fredric Russell Mance, Jr., et al. v. Matthew G. Whitaker, Acting U.S. Attorney General, et al.*
Supreme Court of the United States

*Maryland Shall Issue, Inc., et al. v. Lawrence Hogan, et al.*
Maryland District Court

*David Seth Worman, et al. v. Charles D. Baker, et al.*
First Circuit Court of Appeals

*Lori Rodriguez, et al. v. City of San Jose, et al.*
Ninth Circuit Court of Appeals

*John Teixeira, et al. v. County of Alameda, et al.*
Supreme Court of the United States

*Rocky Mountain Gun Owners, et al. v. John W. Hickenlooper*
Colorado Court of Appeals

ER-150

*Virginia Duncan, et al. v. Xavier Becerra*
Ninth Circuit Court of Appeals

*Stephen V. Kolbe, et al. v. Lawrence J. Hogan, Jr., et al.*
Supreme Court of the United States

*John Teixeira, et al. v. County of Alameda, et al.*
Ninth Circuit Court of Appeals (en banc)

### COURT CITATIONS

*Pena v. Lindley*, 898 F.3d 969, 1004 n.17 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part)

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York, New York*, 140 S. Ct. 1525, 1541 (2020) (Alito, J., joined by Gorsuch and Thomas, JJ., dissenting)

*Chiafalo v. Washington*, 140 S. Ct. 2316, 2325 (2020)

*Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Attorney Gen. New Jersey*, 974 F.3d 237, 270, 274 & n.18 (3d Cir. 2020) (Matey, J., dissenting)

*State v. Weber*, 2020-Ohio-6832, ¶ 89, 163 Ohio St. 3d 125, 151, 168 N.E.3d 468, 490

*State v. Roundtree*, 2021 WI 1, ¶130, 395 Wis. 2d 94, 156, 952 N.W.2d 765, 795

*Young v. Hawaii*, 992 F.3d 765, 796 (9th Cir. 2021) (en banc)

*NRA of Am., Inc. v. Swearingen*, No. 4:18cv137-MW/MAF, 2021 U.S. Dist. LEXIS 117837 (N.D. Fla. June 24, 2021).

### CONTINUING LEGAL EDUCATION PRESENTATIONS

1. Annual National Firearms Law Seminar
   05/20/2016

2. Regulating Arms Under the Second Amendment and Colorado Constitution
   Colorado Bar Association
   03/21/2017

3. TexasBarCLE - Firearms Law: What Every Texas Lawyer Needs to Know
   Texas Bar Association
   09/20/2018

ER-151

1   THE O'MARA LAW FIRM, P.C.
    DAVID C. OMARA
2   (Nevada Bar No. 8599)
    311 East Liberty Street
3   Reno, NV 89501
    P: (775) 323-1321
4   F: (775) 323-4082
    E: david@omaralaw.net
5
    THE DIGUISEPPE LAW FIRM, P.C.
6   RAYMOND M. DIGUISEPPE*
    4320 Southport-Supply Road, Suite 300
7   Southport, NC 28461
    P: 910-713-8804
8   E: law.rmd@gmail.com

FIREARMS POLICY COALITION
ADAM KRAUT*
WILLIAM SACK*
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 596-3492
E: akraut@fpclaw.org
E: wsack@fpclaw.org

*Admitted PHV

9   *Attorneys for Plaintiffs*

10          UNITED STATES DISTRICT COURT
                 DISTRICT OF NEVADA
11

ROGER PALMER, *et al.*,                    Case No.: 3:21-cv-00268
12
                          Plaintiffs,      **PLAINTIFF'S    REPLY    IN**
13      v.                                 **SUPPORT  OF  MOTION  FOR**
                                           **PRELIMINARY INJUNCTION**
14  STEPHEN SISOLAK, in his official
    capacity as Governor of Nevada, *et al.*,   **Judge: Hon. Miranda Du**
15                                              **Date:  July 16, 2021**
                                                **Time:  1:30 p.m.**
16                       Defendants.            **Courtroom: 5**

17

18       **REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

19                   **I.     INTRODUCTION**

20          Ultimately, this case is not about serial numbers or background checks at all. It is about a

21   state that blew past less-restrictive means of advancing its purported interests, instead completely

22   banning law-abiding individuals from self-manufacturing their own firearms for lawful purposes,

23   and worse, criminalizing the possession of constitutionally protected items that Nevada previously

24   allowed people to have and construct. The false narrative that the State Defendants push about

25   "ghost guns" and background checks simply does not align—or fit—with the total ban enacted. [1]

26   _____

27   [1]     Clark County Defendants "defer the defense of AB 286 to the Attorney General," Clark
28   Cnty. Def. Resp. at 2. For their part, Douglas County Defendants "do not offer any arguments"
     regarding the injunctive relief being sought. Douglas Cnty. Def. Resp. at 2.

                                    – 1 –

1    Indeed, the State Defendants' purported concern with unserialized weapons and background

2 checks is completely at odds with the laws being challenged, which—rather than providing a

3 mechanism by which individuals could submit to a background check or mark their self-built firearm

4 with a State-issued number, do the opposite—make it impossible for an individual to comply other

5 than through complete forced dispossession of property and termination of all proscribed conduct.

6 The State of California—widely regarded as having strict firearms regulations—itself has chosen to

7 provide background checks and State-issued serial numbers rather than enact a complete,

8 confiscatory ban. In fact, a lawfully self-manufactured gun in California that *does* bear a State-issued

9 serial number obtained *after* an applicant completes a State-provided background check is *still* illegal

10 to possess under Nevada's Ban, even though, as a marked gun, it is not any kind of "ghost." The

11 only plausible conclusion is that, rather than enacting a tailored law to directly further its purported

12 interests in background checks and serialization for tracing, Nevada chose to completely ban an

13 entire category of firearms and related conduct despite readily available less-restrictive alternatives.[2]

14    In the First Amendment context, for example, even if the government has a strong interest in

15 ensuring that the text of the Constitution is accurately reflected in publicly available works, it could

16 not—especially under pain of criminal sanction—require that all individuals dispossess themselves

17 of all self-printed copies of the Constitution, and then be limited to acquiring a copy of the

18 Constitution solely from government-licensed retailers selling copies produced by government-

19 licensed Constitution printers *when and if* those licensees choose to make copies available. As the

20 Supreme Court has made clear, "the enshrinement of constitutional rights necessarily takes certain

21 policy choices"—including Nevada's here—"off the table." That is essentially what Nevada is trying

22 to do here through AB 286 in targeting homemade firearms lawfully built for lawful purposes.

23    First, there is no factual support in the legislative record that "ghost guns" pose any

24 widespread or substantial risk to the public safety in Nevada. State Defendants cite only nationwide

25 data that ultimately devolves into speculation about possible connections to crime. Some percentage

26

27 [2] Of course, the fact that criminals might ignore such requirements doesn't justify a complete ban on the possession and making of arms by non-criminals, especially with zero evidence that this ban is

28 more effective in *preventing* crime than other less-restrictive means, let alone a reasonable fit.

1   of any class of arms will always be used illegally and found at crime scenes, and there is no evidence

2   of a disproportionate risk from law-abiding self-manufacturers. And, wherever and to whatever

3   extent such risks may be prevalent, it is certain that Nevada's Ban directly impacts Plaintiffs and

4   numerous other entirely *law-abiding* Nevadans. These good citizens of Nevada have only ever

5   sought to possess and use firearms components to build guns for lawful purposes. But rather than

6   provide them with options to comply with a regulatory scheme that requires serialization and

7   background checks, Nevada never gives them the opportunity to do so. Instead, it lumps them in

8   with criminals who, if they prefer unserialized weapons, can and do file the serial number off a

9   commercially produced firearm more easily than they can manufacture their own firearm.

10   Second, contrary to the claim that Plaintiffs and others like them seek to "exploit" the system,

11   "avoid" background checks, or evade serialization, the reality is that State never previously required,

12   or even provided, serialization and background check mechanisms, and now affirmatively *precludes*

13   them from being able to satisfy these asserted aims of the law. State Defendants, having no real legal

14   argument, simply mischaracterize Plaintiffs' *compliance* with the applicable laws as 'exploitation' of

15   a 'loophole' because their lawful conduct resulted in outcomes the State now dislikes. To be sure,

16   AB 286 has now erected an absolute ban on self-manufacturing *all* modern, operable firearms for *all*

17   lawful purposes by mandating that all "unfinished frames or receivers" be serialized through a *non-*

18   *existent* serialization process under *non-existent* federal law, and then declaring it illegal to possess

19   or use any such part in manufacturing *or* assembling a firearm unless and until it so serialized.

20   Rather than provide an opportunity to serialize the firearms and submit to a background check—the

21   purported interests animating the State—everyone is just forced to dispossess themselves of it all.

22   Third, the State cannot extinguish the existing property rights of law-abiding individuals by

23   merely labeling their current arms and parts "dangerous private property" subject to destruction, or

24   by saying they can instead *purchase* new arms or component parts from licensed dealers. The

25   building of one's own arms for lawful purposes has been recognized since the nation's founding as a

26   time-honored constitutionally protected activity, long popular among many Americans—far longer

27   than any of the few regulations on self-manufacturing arms have ever existed. And the end products

28   of this protected activity fall squarely within the protected class of firearms that cannot themselves

1  be banned because they are in common use for lawful purposes throughout the country. The
2  *purchase* alternative is no answer, just as it was no answer to say in *Heller* that people in
3  Washington, D.C. could still purchase and possess long guns despite the (doomed) ban on handguns.

4      The State's attempt to absolutely ban self-manufacturing firearms, and the products involved
5  with the process, constitutes a flagrant violation of the Second Amendment that is categorically
6  unconstitutional under *Heller* and necessarily fails even intermediate scrutiny.

7                    **II.    The Extreme Prohibitions of Nevada's Ban**

8      As of January 1, 2022, AB 286 makes it a crime for any ordinary citizen to "possess,
9  purchase, transport or receive an unfinished frame or receiver" unless the unfinished frame or
10 receiver "*is required by federal law* to be imprinted with a serial number issued by a firearms
11 importer or manufacturer and the unfinished frame or receiver *has been imprinted with the serial*
12 *number*." AB 286, § 3(1)(a)-(b) (italics added). Currently, it is literally impossible to comply with
13 such requirement, either retrospectively as to existing components, or prospectively as to new
14 components. As State Defendants' themselves detail, while there is a *proposal* to change the
15 regulatory definitions of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") to
16 require serialization of such "unfinished frames or receivers," neither those rules nor the underlying
17 federal statutes *require* such serialization. Resp. at 5-6 (citing Proposed Rules, Dept. of Justice,
18 Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27720, 27722-27; 18
19 U.S.C. § 923(i); 27 C.F.R. § 487.92(a)). And even this proposed regulatory process would not cover
20 all of the parts prohibited under AB 286. That is, unless and until *this regulation* is changed—*if* it
21 ever is—no possession of any such components *could* be lawful under Nevada law.

22     Similarly, section 3.5 *immediately* bans the sale or transfer of any such "unfinished frame or
23 receiver" to any ordinary law-abiding citizen unless it "*is required by federal law* to be imprinted
24 with a serial number issued by a firearms importer or manufacturer and the unfinished frame or
25 receiver *has been imprinted with the serial number*." AB 286, § 3.5(1)(a)-(b) (italics added). So,
26 unless and until—*if* ever—the federal regime *requires* such serialization, none of these people may
27 even lawfully *purchase* these components for purposes of self-manufacturing or assembling firearm.

28     Further, Section 4 of the Ban expressly criminalizes—also *immediately*—the very act of

1   "manufactur[ing] or caus[ing] to be manufactured" or "assembl[ing] or caus[ing] to be assembled"

2   any modern operable firearm "that is not imprinted with a serial number issued by a firearms

3   importer or manufacturer *in accordance with federal law and regulations.*" AB 286, § 4(1)(a)-(c)

4   (italics added). Again, no means exist for law-abiding citizens to satisfy the supposed concerns of the

5   State in a manner that would allow them to build their own firearms for lawful purposes.

6         Section 5 then separately criminalizes as of January 1, 2022, any possession of modern

7   operable firearms not "imprinted with a serial number issued by a firearms importer or manufacturer

8   *in accordance with federal law and regulations* adopted thereunder." AB 286, § 5(1)(a)-(b) (italics

9   added). Thus, for the average Nevadan, the Ban prohibits the acquisition, possession, and use of

10   "unfinished frames or receivers" and the firearms otherwise lawfully manufactured or assembled

11   with the same for entirely lawful purposes, thereby criminalizing the entire spectrum of conduct and

12   property interests involved in the exercise of the rights secured by the Second Amendment. And, it

13   provides no compensation for the dispossession mandate that takes effect January 1, 2022.

14         **III.    The Constitutional Framework that Must be Applied to This Ban**

15         In defense of their Ban, State Defendants run straight to intermediate scrutiny and try to shift

16   all the burdens to Plaintiffs, arguing that the Ban does not implicate "core" Second Amendment

17   rights or at least does not seriously burden any such rights because "no proper evidence" shows

18   unserialized firearms and their precursor parts are "commonly possessed by law-abiding citizens"

19   and, even if they are, "no evidence" shows they lack other means for self-defense. Resp. at 2, 4, 11.

20   They blow past Plaintiffs' discussion of the true test under the *Heller-McDonald* framework as if it

21   were just a bad riff on the test by a lone district court judge. Resp. at 9 (claiming Plaintiffs rely

22   solely on the opinion in *Miller v. Bonta*, __ F.Supp.3d __, WL 2284132 (S.D. Cal. 2021)). The

23   "hardware test" distilled in the *Miller* opinion is firmly rooted in Supreme Court authority.

24         The Supreme Court has made clear that the Second Amendment guarantees the right to keep

25   and bear all "weapons 'typically possessed by law-abiding citizens for lawful purposes,'" *Caetano v.*

26   *Massachusetts*, 577 U.S. 411, 416 (2016) (Alito, J., concurring) (quoting *District of Columbia v.*

27   *Heller*, 554 U.S. 570, 625 (2008)), which includes all "typically possessed" firearms that are not

28   *both* "dangerous *per se* and unusual," *Caetano* at 417. To be "dangerous" in this sense requires

1  substantially more than a firearm's mere potential to cause injury, and a firearm is not "unusual" so
2  long as it is "commonly possessed by law-abiding citizens for lawful purposes *today*." *Id.* at 420
3  (italics original). Thus, the Supreme Court struck down the District of Columbia's ban on handguns
4  because they are in common use for lawful purposes and "citizens must be permitted to use
5  handguns for the core lawful purposes of self-defense"—despite the evidence that such arms are *also*
6  used in the commission of crime. *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010). It
7  reversed the Massachusetts Supreme Judicial Court's decision on stun guns for the same reason—
8  they "are widely owned and accepted as legitimate means of self-defense across the county," and
9  thus a "categorical ban of such weapons violates the Second Amendment." *Caetano* at 420. (Alito,
10  J., concurring). In both cases, the availability of alternative arms for self-defense was irrelevant.

11        This right to possess and use firearms typically possessed for lawful purposes has always
12  included the right to build one's own firearms, as illustrated by the discussion and evidence Plaintiffs
13  have already cited—none of which State Defendants attempt to dispute. *See also* Exh. 1, Dec. of J.
14  Greenlee, ¶¶ 11-22 (further detailing the historical foundation of the constitutionally recognized right
15  to build and possess one's own firearms for lawful purposes). Moreover, constitutional rights
16  "implicitly protect those closely related acts necessary to their exercise." *Jackson v. City and County*
17  *of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). The Ninth Circuit "and other federal circuit
18  courts of appeals have held that the Second Amendment protects ancillary rights necessary to the
19  realization of the core right to possess a firearm for self-defense." *Teixeira v. County of Alameda*,
20  873 F.3d 670, 677 (9th Cir. 2016). This includes "important corollary" rights, such as the right to
21  acquire ammunition, *id.* at 958, and the right to maintain proficiency with those arms, *Ezell*, 651
22  F.3d at 708. Much as the right to keep and bear arms "wouldn't mean much without the training and
23  practice that make it effective," *Ezell* at 704, the right to self-manufacture arms "wouldn't mean
24  much" without the corresponding right to own, possess, and use them for lawful purposes.

25        The Ninth Circuit has also recognized that complete bans against the exercise of core Second
26  Amendment rights are categorically unconstitutional: "If a regulation 'amounts to a destruction of
27  the Second Amendment right,' it is unconstitutional under any level of scrutiny." *Young v. Hawaii*,
28  992 F.3d 765, 784 (9th Cir. 2021) (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)). It

1   has further instructed that strict scrutiny must be applied to any "'law that implicates the core of the

2   Second Amendment right and severely burdens that right.'" *Pena v. Lindley*, 898 F.3d 969, 977 (9th

3   Cir. 2018) (quoting *Silvester*, 843 F.3d at 821). Thus, when it comes to a ban on the exercise of core

4   rights, at the least the government must prove the law "is narrowly tailored to serve compelling state

5   interests." *In re National Security Letter*, 863 F.3d 1110, 1121 (9th Cir. 2017). Even under

6   intermediate scrutiny, the government bears the burden of proving the law is "narrowly tailored to

7   serve a significant governmental interest," *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736

8   (2017), which is an exceedingly tall order in any instance of a *total ban*.

9   <center>**IV.    The Ban is Categorically Unconstitutional**</center>

10   State Defendants make no attempt to dispute that the classes of arms to which the Plaintiffs'

11   firearms and component parts belong—e.g., handguns and AR-15 rifles—are in common use for

12   lawful purposes. That is already well established. *See Heller*, 554 U.S. at 628-29 (handguns are "the

13   quintessential self-defense weapon" "overwhelmingly chosen by American society" for lawful self-

14   defense; *Staples v. United States*, 511 U.S. 600, 603 (1994) ("The AR-15 is the civilian version of

15   the military's M-16 rifle . . ."). State Defendants jab about a supposed lack of "proper evidence" that

16   homemade firearms and component parts are in common use among law-abiding citizens, without

17   acknowledging that this is *their* burden to carry. Anyway, their own evidence alone proves this. The

18   same sections of the Federal Register that State Defendants cite to paint their picture of perils

19   concerning "ghost guns" repeatedly emphasize the *general* popularity and widespread possession of

20   homemade firearms and component parts—not just among criminals, but the public at large. *See*

21   Resp. at 6-7 (citing 86 Fed. Reg. at 27722-27, where arms and parts are variously described as

22   "popular," "widely available," and "proliferat[ing] throughout the marketplace").

23   Indeed, the many statements of concerned residents and organizations who opposed AB 286

24   included large groups speaking for the "tens of thousands" of law-abiding Nevadans seeking to

25   retain the right to peaceably build their own firearms for lawful purposes. *See*

26   https://www.leg.state.nv.us/App/NELIS/REL/81st2021/Bill/7778/Exhibits. Moreover, a jurisdiction

27   survey confirms that numerous retailers around the country sell precursor firearm parts now banned

28   by Nevada to people across many States, as the possession, use, and manufacturing with such parts

1  remains entirely legal in most all states. Exh. 2, Dec. of J. Ostini ¶¶ 8-10. In fact, restraints on the

2  self-manufacturing of firearms and possession of the component parts for such purposes exist only in

3  a small handful of states, and none rises to the level of Nevada's Ban on the full spectrum of

4  protected activities and property interests involved. Exh. 1, Dec. of J. Greenlee. ¶¶ 32, 37-45.

5        Notably too, *even with* the enactment of the proposed new ATF rule, which would

6  *prospectively* extend serialization requirements to "unfinished frames or receivers," the federal

7  regime would *continue* to permit self-manufacturing of firearms for personal use. The rule expressly

8  declares that "nothing in this rule would restrict persons not otherwise prohibited from possessing

9  firearms from making their own firearms at home *without markings* solely for personal use (not for

10  sale or distribution)." 86 Fed. Reg. at 27725, 22732 (italics added). That is, people would retain the

11  means to lawfully own, possess, use, manufacture and/or assemble firearms for personal use,

12  regardless of serialization. In fact, because the federal regulatory regime would *purposefully*

13  continue to permit self-building for personal use—what State Defendants falsely label a

14  "loophole"—all the barriers that Nevada has erected against the exercise of this right through AB

15  286 would remain fixed in place because serialization would still not be "*required* by federal law."

16        The categorical test of *Heller*, as recognized by the Ninth Circuit, thus applies to the Ban's

17  sweeping prohibitions against the constitutionally protected activities and property that it targets for

18  elimination, and compels that the Ban be declared categorically unconstitutional and enjoined.

19        **V.     The Ban is Unconstitutional Under Intermediate Scrutiny**

20        At the least, it must be said that a ban of this magnitude "'implicates the core of the Second

21  Amendment right and severely burdens that right,'" which triggers strict scrutiny, *Pena*, 898 F.3d at

22  977 (quoting *Silvester*, 843 F.3d at 821). And the Ban fails even under intermediate scrutiny because

23  the State cannot prove the Ban is "narrowly tailored to serve a significant governmental interest,"

24  *Packingham*, 137 S.Ct. at 1736, any more than it can prove that the Ban "is narrowly tailored to

25  serve compelling state interests," *In re National Security Letter*, 863 F.3d at 1121 (9th Cir. 2017),

26  because there has been *no tailoring at all*—it is total ban. California itself demonstrates the obvious

27  availability of less restrictive means to address the State's concern with background checks and

28  serialization. Indeed, Nevada *already* regulates the entire gamut of prohibited persons with its

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION (3:21-CV-00268-MMD-EGC)

1   existing laws that criminalize possession by every class of individual whose use of a firearm could

2   conceivably pose a danger to themselves or others. Nev. Rev. Stat. Ann. §§ 202.300, 202.360. Even

3   engaging in "interest-balancing" under intermediate scrutiny, the State must prove "each activity

4   targeted within the proscription's scope is an appropriately targeted evil," *Ward v. Rock Against*

5   *Racism*, 491 U.S. 781, 799–800 (1989), in demonstrating a "reasonable fit," *Board of Trustees of the*

6   *University of New York v. Fox*, 492 U.S. 469, 480 (1989). This the State has not and cannot do.

7   　　　First, State Defendants claim that "ghost guns" and their components pose a general "threat

8   to public safety" because they can fall into the hands of prohibited persons and be used in criminal

9   activities that cannot be adequately investigated or "traced" due to the lack of a serial number. The

10   State does not explain, let alone show with evidence, how tracing prevents crimes. In any event, the

11   data on which State Defendants rely to support their claimed interest is speculative, at best. The sole

12   support for this claim consists of references to two pages of the Federal Register where the ATF has

13   compiled some information about this supposed "ghost gun" phenomenon, which State Defendants

14   portray as establishing "[l]aw enforcement agencies recovered nearly 24,000 ghost guns at crime

15   scenes between 2016 and 2020," and "that number has been increasing every year." Resp. at 7

16   (citing 86 Fed. Reg. at 27722-23). But the sources cited for ATF's information are limited to

17   publications of newspaper and media outlets, like the Baltimore Sun, the Wall Street Journal, NPR,

18   and CBS News, concerning a supposed rise in crimes involving "ghost guns" in a handful of other

19   states. 86 Fed. Reg. 27722 n. 17. Not one report or publication from any law enforcement agency is

20   included among these hearsay sources. *If* should records existed, State Defendants, in particular,

21   would have access to them, yet none were provided, or even aggregated and summarized.

22   　　　In fact, while State Defendants portray the locations where these "ghost guns" were

23   recovered as clearly established "crimes scenes," ATF's data compilation includes a notable

24   disclaimer: the ATF referred to them only as "*potential* crime scenes," acknowledging that "*ATF*

25   *does not know if the firearm being traced by the law enforcement agency was found at a crime scene*

26   *as opposed to one recovered by them that was stolen or otherwise not from at the scene of a crime.*"

27   *Id.* at n. 18 (italics added). Whatever limited evidentiary value this information might have, *none* of

28   it concerns the situation within *Nevada* where this Ban has been imposed. Thus, the sole basis for the

1  governmental interest that the State has asserted in support of the Ban is staked around information

2  that reduces to nothing more than speculative hearsay, as the ATF itself essentially concedes.

3      Second, State Defendants cannot avoid responsibility for this unwarranted and unjustified

4  Ban by couching it as "a longstanding, presumptively lawful regulation" insulated from review.

5  Resp. at 10 (citing *Heller*, 554 U.S. at 626-27). Indeed, what they claim is "presumptively lawful" is

6  "a *serialization* requirement." Resp. at 10 (italics added). But the Ban affirmatively *precludes* people

7  from obtaining serialization (or even a background investigation) as means to lawfully self-build.

8  The refusal to provide any mechanism to comply with the very procedure the State claims is

9  essential to protect the public safety certainly can have *no historic pedigree at all*. A mandate

10  without available means of compliance is not and cannot be presumptively lawful—it is

11  presumptively *un*lawful and a disingenuous means of banning the underlying activity in toto. Any

12  such regulation is necessarily stripped of any "presumptive" lawfulness it might otherwise hold at

13  the outset. *See Pena*, 898 F.3d at 1009-1010 (quoting *Heller II*, 670 F.3d 1244, 1253 (D.C. Cir.

14  2011)) (observing that, like all legal presumptions, this presumption is rebutted upon a showing that

15  '"the regulation does have more than a de minimis effect on [plaintiff's] right"').

16      Further, this Ban, as a whole, is simply far afield from any of the types of regulations that the

17  *Heller* court recognized as "presumptively lawful," which were "prohibitions on the possession of

18  firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places

19  such as schools and government buildings, or laws imposing conditions and qualifications on the

20  commercial sale of arms." *Heller* at 626-27. The only remotely related concern that State Defendants

21  have articulated is "the possession of firearms by felons and the mentally ill." Yet, they cite no

22  evidence and articulate no reason for believing that, if and when such individuals engage in gun-

23  related crime, they use "ghost guns" any more than they use commercially manufactured firearms.

24  Additionally, as a general matter, governmental regulations on the exercise of the right to self-

25  manufacture firearms are simply not "longstanding." They are instead of very recent advent among

26  the small handful of states that do impose such restrictions. Dec. of J. Greenlee, ¶¶ 37-45.

27      Third, State Defendants also cannot insulate the Ban from Plaintiffs' requested judicial relief

28  by pointing to the supposed alternatives that still exist for the exercise of the rights it otherwise

1  stamps out. The Supreme Court has already flatly rejected such arguments, in both *Heller* and

2  *Caetano*. *Heller*, 554 U.S. at 629; *Caetano*, 577 U.S. 416-420. Moreover, as already noted, the State

3  has left its law-abiding citizens *no* viable channels for the exercise of the extinguished rights, by

4  tying all the *potential* alternative channels to a non-existent serialization process.

5      Lastly, the non-binding opinion of the Third Circuit in *United States v. Marzzarella*, 614 F.3d

6  85 (3d Cir. 2010) on which State Defendants heavily rely, Resp. 11-13, does not change things. That

7  case involved a challenge to federal prohibition of possessing firearms with required serial numbers

8  *defaced*, under 18 U.S.C. § 922(k), not a ban on the full spectrum of constitutionally protected

9  predecessor conduct involved in the building of a firearm for lawful purposes with precursor firearm

10  components that do not now—and may not ever—themselves require any serialization under the

11  federal regime. And even if a serialization requirement in general is permissible, there are far less

12  restrictive means of requiring serialization of firearm precursors and self-manufactured firearms by

13  providing an actual mechanism of compliance. Further, what State Defendants seek to portray as a

14  "loophole" in the federal law has been the status quo for more than 50 years now—prior to that,

15  there were no such regulations at all—and the proposed new ATF rule continues to preserve an

16  express exception for the building of homemade firearms for personal use. That is also why the *Pena*

17  case, upholding California's handgun microstamping requirement, is inapposite. Resp. at 12 (citing

18  *Pena*, 898 F. 3d at 982). As heavily regulated as the California regime is, the Ban still stands in stark

19  contrast, because even California has established a process for residents to make their own firearms

20  so long as they obtain a state-issued serial number. Cal. Penal Code §§ 29180(b)(1), 29182(b)(1).

21      **VI.    Any Taking of This Valuable Property Requires Just Compensation**

22      The entire thesis of State Defendants' claim that *no* compensation at all is required for the

23  forced dispossession of the countless homemade firearms and components targeted by the Ban rests

24  on the notion that the State can treat all such objects as "dangerous private property" subject to

25  complete destruction under the government's "police powers." Resp. 13-14 (citing *Guedes v. ATF*,

26  __ F.Supp.3d __ (D.C. Cir. 2021), 2021 WL 663183). Yet, their position here stands in stark contrast

27  to its position concerning the Second Amendment claim, in which context it has not even attempted

28  to claim, much less show, the homemade firearms and components at issue are *either* "dangerous" *or*

1   "unusual"—let alone both—so as to be stripped of constitutional protection. That the State provides

2   no viable means of making the existing property "safe," i.e., having it serialized so as to remove the

3   supposed nuisance, illustrates that the problem is not with the property itself, but with the restrictive

4   regulatory regime that literally makes compliance impossible. That is not even a remote basis for

5   invoking a public safety exception to the Takings Clause. It is equivalent to forbidding a homeowner

6   from installing noise abatement technology on his or her vehicle and then claiming that the noisy car

7   is now a nuisance. And it is surely no answer to say that compensation can be denied because the

8   property at issue is personal, as opposed to real, property. Resp. at 14. Property is property. *See*

9   *Horne v. Dept. of Agriculture*, 576 U.S. 352, 358 (2015) ("The Government has a categorical duty to

10  pay just compensation when it takes your car, just as when it takes your home."). Thus,

11  compensation is due for any taking of this constitutionally protected property and injunctive relief is

12  appropriate in the Takings context unless and until such time that just compensation is provided.

13                                   **VII.   Conclusion**

14          Even the most lenient form of scrutiny cannot save the Ban because it flatly fails every test.

15  With the deprivation of constitutional rights so abundantly clear, it necessarily follows that (1)

16  Plaintiffs stand to "prevail on the merits with a reasonable certainty," *South Bay United Pentecostal*

17  *Church v. Newsom*, __ F.Supp.3d __, 2020 WL 7488974 (S.D. 2020), *6, (2) they and all similarly

18  situated Nevadans face "irreparable injury," *Melendres* v. *Arpaio*, 695 F.3d 990, 1002 (9th Cir.

19  2012), (3) the State by contrast "cannot suffer harm from an injunction that merely ends an unlawful

20  practice," *Rodriguez v. Robbins*, 715 F.3d 1006, 1029 (9th Cir. 2013), and (4) inevitably the "public

21  interest … tip[s] sharply in favor of enjoining" the law, *Klein v. City of San Clemente*, 584 F.3d

22  1196, 1208 (9th Cir. 2009). Thus, all relevant factors weigh heavily in favor of issuing injunctive

23  relief against the Ban under all variations of the essential test for granting such relief.

24          And the injunctive relief is necessary against all the Douglas County Defendants just the

25  same, *see* Resp. of Douglas Cnty. Def. at 1-2 (summarily asserting without argument or authority

26  that no "justiciable controversy" exists as between them and Plaintiffs), because they are charged

27  with enforcement of the Ban against all Douglas County residents for long as it is in effect.

28  Dated: July 9, 2021                            Dated: July 9, 2021

THE O'MARA LAW FIRM, P.C.                    THE DIGUISEPPE LAW FIRM, P.C.

_/s/ David C. O'Mara_                         _/s/ Raymond M. DiGuiseppe_
DAVID C. O'MARA. ESQ.                          RAYMOND M. DIGUISEPPE
311 E. Liberty Street                        4320 Southport-Supply Road, Ste 300
Reno, NV 89501                               Southport, NC 28461
Tel: 775.323.1321                            910.713.8804
david@omaralaw.net                           Law.rmd@gmail.com


FIREARMS POLICY COALITION                    FIREARMS POLICY COALITION

_/s/ Adam Kraut_                              _/s/ William Sack_
ADAM KRAUT. ESQ.                              WILLIAM SACK, ESQ
1215 K Street 17th Floor
Sacramento, CA 95814
916.596.3492
akraut@fpclaw.org

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that I am an employee of The O'Mara Law Firm, P.C. and on this date, the

3 foregoing document was filed electronically *via* the Court's ECF system which provided notification

4 of such filing to counsel of record for all parties.

5

Dated: July 9, 2021             _____/s/ Bryan Snyder_____

6                                           BRYAN SNYDER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION (3:21-CV-00268-MMD-EGC)

1

**INDEX OF EXHIBITS**

2

| Exh No. | Description | Pages |
|---------|-------------|-------|
| 1 | Declaration of Joseph Greenlee | 18 |
| 2 | Declaration of Joseph Ostini | 9 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION (3:21-CV-00268-MMD-EGC)

1  AARON D. FORD
       Attorney General
2  Steve Shevorski (Bar No. 8256)
       Chief Litigation Counsel
3  Jeffrey M. Conner (Bar No. 11543)
       Deputy Solicitor General
4  Kiel B. Ireland (Bar No. 15368C)
       Deputy Attorney General
5  Office of the Attorney General
   555 E. Washington Ave, Ste. 3900
6  Las Vegas, NV 89101
   (702) 486-3420 (phone)
7  (702) 486-3773 (fax)
   sshevorski@ag.nv.gov
8  jconner@ag.nv.gov
   kireland@ag.nv.gov
9
   *Attorneys for State Defendants*
10

11              **UNITED STATES DISTRICT COURT**

12                   **DISTRICT OF NEVADA**

13  ROGER PALMER; CHAD MOXLEY; and          Case No.  3:21-cv-00268-MMD-WGC
    FIREARMS POLICY COALITION,
14
                        Plaintiffs,
15          vs.
                                            **STATE DEFENDANTS' MOTION TO**
16  STEPHEN SISOLAK, Governor of Nevada;    **DISMISS UNDER FRCP 12(B)(6)**
    AARON FORD, Attorney General of Nevada;
17  GEORGE TOGLIATTI, Director of the
    Nevada Department of Public Safety;
18  MINDY MCKAY, Administrator of the
    Records, Communications, and Compliance,
19  Division of the Nevada, Department of Public
    Safety; JOSEPH LOMBARDO, Sheriff of
20  Clark County, Nevada; STEVEN WOLFSON,
    District Attorney of Clark County, Nevada;
21  DANIEL COVERLEY, Sheriff of Douglas
    County, Nevada; and, MARK JACKSON,
22  District Attorney of Douglas County, Nevada,

23                        Defendants.

24

25        Defendants Stephen Sisolak, Aaron D. Ford, George Togliatti and Mindy McKay

26  (collectively, the "State Defendants"), by and through counsel, move to dismiss Plaintiffs'

27  complaint under FRCP 12(b)(6).

28  . . .

## I.     Introduction

This Court should dismiss Plaintiffs' complaint.  Assembly Bill 286 ("AB 286") prohibits the possession of firearms that lack serial numbers – commonly called "ghost guns" – and the kits that are used to assemble these virtually untraceable firearms. Plaintiffs contend that AB 286 violates the Second Amendment's right "to keep and bear Arms" and Fifth Amendment's takings clause.  No authority supports their view.

AB 286 is constitutional.  The Second Amendment does not insulate ghost guns from reasonable public safety legislation such as AB 286.  The Fifth Amendment's takings clause also does not hamstring state government's traditional power to regulate, and indeed prohibit, dangerous private property.  Dismissal is warranted.

## II.    Background

### A.     Plaintiffs and their claims

Plaintiffs are Robert Palmer ("Palmer"), Chad Moxley ("Moxley"), and Firearms Policy Coalition ("FPC").  ECF No. 1, ¶¶ 17-19.  Defendants are Governor Stephen Sisolak, Attorney General Aaron Ford, Director of Public Safety George Togliatti, and Division Administrator of Public Safety Mindy McKay.  *Id.* ¶¶ 20-24.

Plaintiffs allege two federal constitutional theories.  They allege Nevada Assembly Bill 286 violates the Second Amendment's right to keep and bear arms clause and the Fifth Amendment's takings clause.  *Id.* ¶¶ 123-160.  They only seek extraordinary relief.  *Id.* at 36-37 (prayer for relief).

### B.     Legal background

#### 1.     Serial numbers are the heart of the current regulatory regime

The Gun Control Act of 1968, Pub. L. 90-351, 82 Stat. 197, establishes numerous requirements for the manufacture, transfer and possession of firearms.  Its "twin goals" are "to keep guns out of the hands of criminals and others who should not have them, and to assist law enforcement authorities in investigating serious crimes." *Abramski v. United States*, 573 U.S. 169, 180 (2014).  To keep weapons out of the hands of persons who should not have them, the Gun Control Act criminalizes the possession of firearms by, among

others, those who "ha[ve] been adjudicated as a mental defective or who ha[ve] been committed to a mental institution," felons and domestic violence misdemeanants.   18 U.S.C. § 922(g).  It also prohibits federal firearm licensees from selling firearms to minors.  *Id.* § 922(b)(1).

To assist law enforcement in investigating crimes, the Gun Control Act requires that each firearm built by a licensed manufacturer contain a serial number unique to that firearm.  18 U.S.C. § 923(i).  It is a crime to possess a firearm that has had its serial number obliterated.  *Id.* § 922(k).  The statute also imposes recordkeeping requirements on federal firearm licensees so that a gun found on the street can be traced, through its serial number, to its point of sale.  *Abramski*, 573 U.S. at 173.

The Gun Control Act's provisions do not apply to every gun component.  With some exceptions not relevant here, only a gun's "frame or receiver" is considered a "firearm" subject to the Gun Control Act's prescriptions and proscriptions.  18 U.S.C. § 921(a)(3).

The "[f]rame or receiver" – which the rest of this brief will refer to simply as the "receiver" – is the part of the gun that receives the other essential components of the gun, like the barrel and the firing pin.  *See* 27 C.F.R. 478.11, 479.11.  That is, other gun components are attached to the receiver to create the complete gun.  The graphic below shows receivers in three types of guns:



. . .

. . .

. . .

1   *Firearms Verification*, ATF, https://bit.ly/2UJeryz (last visited June 26, 2021).[1]  Because

2   the receiver is the statutory "firearm," it must contain the serial number.  Definition of

3   "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. at 27721.

> **2.    Unfinished receiver kits allow buyers to easily build firearms without serial numbers**

4

5

6   Unfinished receiver kits exploit a loophole in that regulatory system.  H.R. Rep. No.

7   116-88, at 2 (2019); *Hearing on AB 286 Before the Senate Judiciary Committee on May 11,*

8   *2021*, 81st Sess., at 1 at 1:16:06 to 1:16:15 (Nev. 2021), https://bit.ly/2SupquV [hereinafter

9   "*May 11 Senate Hearing*"].[2]  An unfinished receiver still requires some work before it can

10  be used in a working gun.  AB 286, § 6(9); Definition of "Frame or Receiver" and

11  Identification of Firearms, 86 Fed. Reg. at 27726.  Under current federal law, an unfinished

12  receiver is not considered a firearm.  Definition of "Frame or Receiver" and Identification

13  of Firearms, 86 Fed. Reg. at 27726.

14  Several companies make and sell unfinished receiver kits.  Definition of "Frame or

15  Receiver" and Identification of Firearms, 86 Fed. Reg. at 27726.  These kits contain all the

16  parts the buyer needs to "complete a functional weapon in a short period of time."  *Id.*  A

17  supporter of AB 286 testified that a ghost gun can be built from an unfinished receiver kit

18  in "20 to 40 minutes."  *May 11 Senate Hearing*, *supra*, at 1:25-24 to 1:26:29.

19  Since they lack anything that qualifies as a firearm, unfinished receiver kits can be

20  sold without a background check.  H.R. Rep. No. 116-88, at 2.  That means that minors,

21  people who have been convicted of a domestic violence crime and other prohibited persons

22  can easily obtain unfinished receiver kits.  *Id.*  And unfinished receiver sales are not subject

23  . . .

24

---

25  [1] This Court can take judicial notice of the depiction of a "framer or receiver" as described on the government website of the Bureau of Alcohol, Tobacco, Firearms and

26  Explosives.  *See* Fed. R. Evid. 201; *see Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 866 n.1 (9th Cir. 2004) (explaining that a court may take judicial notice

27  of a government agency's records and other undisputed matters of public record under Fed. R. Evid. 201).

28  [2] Because minutes for the 2021 legislative sessions are not yet available, *May 11 Senate Hearing* citations will contain a pincite to the hearing recording's timestamp.

1  to the Gun Control Act's recordkeeping provisions. Definition of "Frame or Receiver" and
2  Identification of Firearms, 86 Fed. Reg. at 27726.

3        By that same token, unfinished receiver kits do not contain any serialized
4  components. *May 11 Senate Hearing, supra*, at 1:17:14 to 1:17:26. And, of course, that
5  means that the gun assembled from the kit does not have a serial number. Guns made
6  that way are virtually untraceable if used in a crime, which is why they're commonly called
7  ghost guns. Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg.
8  at 27722-23.

9        **3.**    **Ghost guns are a present and increasing threat to public safety**
10        The U.S. House Committee on Homeland Security has concluded that "[g]host guns"
11  present a "homeland security challenge." H.R. Rep. No. 116-88, at 2. They "enabl[e]
12  prohibited buyers to purchase deadly weapons with just a few clicks online." *Id.* And on
13  the backend, they "hamstring[ ] law enforcement's ability to investigate crimes committed
14  with untraceable weapons." *Id.*

15        The ATF likewise identified ghost guns as a threat to public safety. Definition of
16  "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. at 27722. Law
17  enforcement agencies recovered nearly 24,000 ghost guns at crime scenes between 2016
18  and 2020. *Id.* That number has been increasing each year. *Id.* at 27722-23. The ATF also
19  pointed out that the lack of sales controls and serial numbers make it much more difficult
20  to identify and break up firearms trafficking rings. *Id.* at 27725.

21        The ATF has issued a notice of proposed rulemaking to address those concerns. If
22  promulgated, the new rule will expand the definition of "firearm" to include unfinished
23  receivers that are "designed to or may readily be converted to" fire projectiles. Definition
24  of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. at 27726. That means
25  the sale of unfinished receiver kits will be subject to background checks and unfinished
26  receivers will be serialized. *Id.*

27  . . .
28  . . .

1

2

### 4.   AB 286 responds to the threat posed by unfinished receiver kits and ghost guns

3      During the Legislature's consideration of AB 286, its sponsor explained that ghost

4  guns are a public safety threat for two reasons: they circumvent background checks, and

5  they are virtually impossible to trace if used in a crime. *May 11 Senate Hearing*, *supra*, at

6  1:14:07 to 1:14:36 (statement of Assemb. Jauregui).  She explained that ghost guns are an

7  especially acute threat in Nevada because one of the largest unfinished receiver kit

8  companies in the nation, Polymer80, Inc. is based here.  *Id.* at 1:14:37 to 1:14:55.

9      AB 286 addresses the threat posed by unserialized firearms and firearm

10  components.  First, the law bans the possession and sale of unfinished receivers that lack

11  serial numbers.  AB 286, §§ 3, 3.5.  Next, it bans the act of assembling an unserialized

12  firearm – that is, the act of using an unfinished receiver kit to create a ghost gun.  *Id.* § 4.

13  There are exceptions for building firearms that are inoperable or that are antiques or

14  collector's items, as defined by federal law.  *Id.* § 4(1)(a)-(c).  Finally, it bans possession of

15  unserialized firearms (i.e. ghost guns).  *Id.* § 5.  Guns manufactured before serial numbers

16  became required in 1969, as well as inoperable guns, antiques and collector's items, are

17  exempt from the ban on unserialized firearms.  *Id.* § 5(1)(b).

18      The ban on assembling ghost guns is effective immediately.  AB 286, § 10(1).  But

19  the ban on possessing and selling unserialized unfinished receivers and ghost guns does

20  not take effect until January 1, 2022.  *Id.* § 10(2).  That way those who legally obtained

21  ghost guns can sell or otherwise dispose of them before they become unlawful.  Nev.

22  Legislative   Counsel   Bureau,   *AB   286   Work   Session   Document*   9   (2021),

23  https://bit.ly/3A3i02O.

24  **III.   Legal standard**

25      This Court should dismiss plaintiff's complaint with prejudice.  A court may dismiss

26  a complaint for "failure to state a claim upon which relief may be granted."  FRCP 12(b)(6).

27  To survive dismissal under FRCP 12(b)(6), a plaintiff's complaint must contain "a short

28  and plain statement of the claim showing that the pleader is entitled to relief."  FRCP

1  8(a)(2).   Although a complaint need not contain detailed allegations, it must allege

2  sufficient facts to "raise a right to relief above the speculative level." *Bell Atl. v. Twombly,*

3  550 U.S. 544, 555 (2007).  This obligation "requires more than labels and conclusions, and

4  a formulaic recitation of the elements of a cause of action will not do." *Id.*

5  **IV.   Argument**

6           **A.   AB 286 does not violate the Second Amendment**

7           The Second Amendment reads: "A well regulated Militia, being necessary to the

8  security of a free State, the right of the people to keep and bear Arms, shall not be

9  infringed." U.S. Const. amend. II. "[T]he core of the Second Amendment is 'the right of law-

10 abiding, responsible citizens to use arms in defense of hearth and home.'" *United States v.*

11 *Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013) (quoting *Heller v. District of Columbia*, 554

12 U.S. 570, 635 (2008)).

13          To succeed on their Second Amendment claim, Plaintiffs must meet a two-part test.

14 *See United States v. Torres*, 911 F.3d 1253, 1258 (9th Cir. 2019).  First, they must show

15 that AB 286 "burdens conduct protected by the Second Amendment." *Id.*  If it does not,

16 this Court must affirm it "without further analysis." *Young v. Hawaii*, 992 F.3d 765, 826

17 (9th Cir. 2021) (en banc), *cert. pet. docketed*, No. 20-1639 (U.S. filed May 11, 2021).  If

18 Plaintiffs can show that AB 286 does burden Second Amendment-protected conduct, then

19 they move onto the second step. *Torres*, 911 F.3d at 1258.  They must show that AB 286

20 fails the applicable level of means-end scrutiny. *Id.*

21                **1.   AB 286 does not burden constitutionally protected conduct**

22          AB 286 does not burden Second Amendment-protected conduct, so there is no need

23 to proceed past step one. The Supreme Court's *Heller* decision set out a non-exhaustive list

24 of "longstanding" gun-control measures that are "presumptively lawful." 554 U.S. at 626-

25 27, 627 n.26.  Those longstanding, presumptively lawful measures are constitutional

26 because they do not burden Second Amendment-protected conduct. *Torres,* 911 F.3d at

27 1258.   In other words, if the challenged gun control measure is a longstanding,

28 presumptively lawful regulation, the challenge fails at step one.

1    AB 286's basic requirement is that functioning firearms be serialized.  AB 286, §§ 4-

2  5.  That requirement is a longstanding, presumptively lawful regulation.  Many of the

3  "longstanding" regulations identified in *Heller* were established by the exact same law that

4  established the federal serialization requirement.  Gun Control Act of 1968, Pub. L. 90-618,

5  § 102, 82 Stat. 1213, 1220-21, 1223; *see NRA, Inc. v. Bureau of Alcohol, Tobacco, Firearms,*

6  *& Explosives*, 700 F.3d 185, 196-97 (5th Cir. 2012) (collecting cases).  If those other

7  measures are longstanding and presumptively valid, so is a serialization requirement.

8    AB 286 keeps faith with longstanding, presumptively valid laws.  The historical

9  record is replete with examples of colonial gun control laws tracking and restricting the

10  possession of firearms.  *NRA*, 700 F.3d at 200.  Like those laws, AB 286 is intended to

11  ensure that firearm ownership can be traced and to help prevent those who are barred from

12  possessing a firearm from buying one.  *May 11 Senate Hearing, supra*, at 1:14:07 to 1:14:36

13  (statement of Assemb. Jauregui).

14    AB 286 does not burden Second Amendment-protected conduct.  That is because it

15  does not interfere with the right to "defense of hearth and home."  *Chovan*, 735 F.3d at

16  1138 (quoting *Heller*, 554 U.S. at 635).  Neither of the individual Plaintiffs contend that

17  they will lack firearms to defend his home.  *See* ECF No. 1 at ¶¶85-87 and 99-101.  Plaintiffs

18  also do not contend that ghost guns have advantages over serialized firearms – for example,

19  that they are easier to use or more accurate – in terms of home defense.  *Id.*

20    Plaintiffs allege that AB 286 burdens their right to either "self-manufacture"

21  firearms or sell kits to allow others to "self-manufacture" firearms.  *Id.* at ¶¶ 83 and 99-

22  100.  But they never allege that self-assembling unserialized firearms is necessary to home

23  defense.  *See id.*  In any event, AB 286 does not bar self-assembling firearms.  It bars only

24  self-assembling a firearm that does not have a serial number.  AB 286, § 4(1).

25    Because AB 286 does not burden Second Amendment-protected conduct, this Court

26  need not reach step two.  But if it does, it should apply intermediate scrutiny and uphold

27  AB 286.

28  . . .

## 2.   **AB 286 passes the applicable level of scrutiny**

1

2    Intermediate scrutiny is the default level of scrutiny for Second Amendment cases.

3   *See Silvester v. Harris*, 843 F.3d 816, 822-823 (9th Cir. 2016) (collecting cases).   Strict

4   scrutiny applies only in the rare case where a measure "implicates the core of the Second

5   Amendment right and severely burdens that right." *Id.* at 821.

6    As the State Defendants have already explained, AB 286 does not implicate the core

7   Second Amendment right of home defense.  That is why the Third Circuit applied

8   intermediate scrutiny in a challenge to the federal law that criminalized possessing a

9   firearm with an obliterated serial number. *Marzzarella*, 614 F.3d at 97.  That federal law

10  is like AB 286 because it is also intended to ensure that guns used in crimes are traceable

11  by way of serial number. *Id.* at 98.

12    Intermediate scrutiny: A statute is constitutional under intermediate scrutiny as

13  long as (1) the State's stated goal is "significant, substantial, or important" and (2) there is

14  a "reasonable fit" between the statute and the State's goal. *Silvester*, 843 F.3d at 821-22.

15  Intermediate scrutiny is not a strict test, and it does not require that the State choose "the

16  least restrictive means of furthering a given end." *Silvester*, 843 F.3d at 827.

17    The Ninth Circuit has already held that "preserving the ability of law enforcement

18  to conduct serial number tracing – effectuated by limiting the availability of untraceable

19  firearms – constitutes a substantial or important interest." *Pena v. Lindley*, 898 F.3d 969,

20  982 (9th Cir. 2018).  Thus, AB 286 satisfies the first requirement of intermediate scrutiny.

21    AB 286 is a reasonable fit with that important goal. *Marzzarella*, 614 F.3d at 98

22  (holding that "[r]egulating the possession of un[serialized] firearms" fits "closely with the

23  interest in ensuring the traceability of weapons").  It "reaches only conduct creating a

24  substantial risk of rendering a firearm untraceable." *Id.*  It does not prevent any Nevadan

25  who is legally permitted to obtain a firearm to buy a serialized firearm (or assemble one

26  starting with a serialized receiver) for home defense.

27    Strict scrutiny: Even if this Court applied strict scrutiny to AB 286, it would still

28  pass constitutional muster.  A firearms law passes strict scrutiny if it is "narrowly tailored

to serve a compelling state interest." *Marzzarella*, 614 F.3d at 99.  Crime prevention and investigating gun violence are compelling interests.  *Id.* (citing *United States v. Salerno*, 481 U.S. 739, 749 (2010)).

By banning untraceable firearms and their components, AB 286 is narrowly tailored to accomplishing those compelling interests.  AB 286 applies at both ends – by making it more difficult for prohibited persons to obtain firearms, and by proscribing possession of a firearm that would be untraceable if used in a crime.  And it does so in a strikingly narrow way, leaving the gamut of lawful serialized firearms available to Nevadans for home defense.  *Marzzarella*, 614 F.3d at 100.

### B.   Plaintiffs' takings claim deserves dismissal

#### 1.   Injunctive relief is not available for takings claims in Nevada because damages are available

Plaintiffs seeks injunctive relief for the purported violation of the Fifth Amendment's takings clause.  ECF No. 1, ¶ 160.  But the takings clause cannot be the basis for injunctive relief where damages are available to compensate the taking.  *Knick v. Township of Scott*, 139 S. Ct. 2162, 2176 (2019).  Damages are available in Nevada because a plaintiff can bring an inverse condemnation action.  *See, e.g.*, *McCarran Int'l Airport v. Sisolak*, 137 P.3d 1110, 1118, 1130 (Nev. 2006).

#### 2.   No compensation is due for restrictions on personal property

Plaintiffs' takings claim also fails on the merits.  A government does not need to compensate owners when it prohibits a type of personal property through a valid law.  *Md. Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 366-67 (4th Cir. 2020), *cert. denied*, No. 20-855, 2021 WL 1725174 (U.S. May 3, 2021).  For example, in *Hamilton v. Kentucky Distilleries & Warehouse Co.*, 251 U.S. 146 (1919), the Supreme Court held that no compensation was due to distillers and jobbers after alcohol was prohibited.  *Id.* at 157-58.  The plaintiffs there had sufficient time to dispose of their alcohol inventory, so there was no taking.  *Id.*  A raft of federal courts have likewise concluded that the ATF did not effect a taking when they banned a previously legal firearm component called bump stocks.  *Guedes v. Bureau of*

1 | *Alcohol, Tobacco, Firearms, & Explosives*, __ F. Supp. 3d __, No. 18-cv-2988, 2021 WL

2 | 663183, at \*10 (D.D.C. Feb. 19, 2021) (collecting cases), *appeal filed*, No. 21-5045 (D.C. Cir.

3 | filed Feb. 23, 2021).

4 |   That rule applies here.  AB 286 is a valid law prohibiting two types of personal

5 | property – ghost guns and unserialized receivers.  Just as no compensation was due when

6 | alcohol and bump stocks were prohibited, no compensation is due here.

7 |   Alleging to the contrary, Plaintiffs liken AB 286 to government actions that effect a

8 | physical appropriation, deprivations of all economically beneficial use of property, and/or a

9 | permanent physical invasion of property.  ECF No. 1 at ¶150.  Plaintiffs' comparisons are

10 | off-base and not supported by legal authority.

11 |   AB 286 is not a "physical appropriation" because Nevada is not taking title to the

12 | prohibited items.  That is why federal courts have rejected that exact argument in

13 | connection with bump-stock bans.  *Md. Shall Issue*, 963 F.3d at 366; *McCutchen v. United*

14 | *States*, 145 Fed. Cl. 42, 54 (2019), *appeal filed*, No. 20-1188 (Fed. Cir. filed Nov. 27, 2019).

15 |   And while permanent physical invasions and complete deprivations of economically

16 | beneficial use can be categorical takings of *real* property, they are not categorical takings

17 | of *personal* property.  *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027-28 (1992);

18 | *Md. Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 413 (D. Md. 2018), *aff'd*, 963 F.3d 356.  AB

19 | 286 affects only personal property, so those principles are irrelevant here.

20 | **V.**  **Conclusion**

21 |   For these reasons, this Court should dismiss Plaintiffs' complaint.

22 |   DATED this 6th day of July, 2021.

23 |
24 |

AARON D. FORD
Attorney General

25 | By: */s/ Steve Shevorski*
  Steve Shevorski (Bar No. 8256)
  Chief Litigation Counsel

26 |   Jeffrey M. Conner (Bar No. 11543)
  Deputy Solicitor General

27 |   Kiel B. Ireland (Bar No. 15368C)
  Deputy Attorney General

28 |   *Attorneys for State Defendants*

1 | AARON D. FORD
    Attorney General
2 | Steve Shevorski (Bar No. 8256)
    Chief Litigation Counsel
3 | Jeffrey M. Conner (Bar No. 11543)
    Deputy Solicitor General
4 | Kiel B. Ireland (Bar No. 15368C)
    Deputy Attorney General
5 | Office of the Attorney General
   555 E. Washington Ave, Ste. 3900
6 | Las Vegas, NV 89101
   (702) 486-3420 (phone)
7 | (702) 486-3773 (fax)
   sshevorski@ag.nv.gov
8 | jconner@ag.nv.gov
   kireland@ag.nv.gov
9 |
   *Attorneys for State Defendants*
10 |

11 | **UNITED STATES DISTRICT COURT**

12 | **DISTRICT OF NEVADA**

13 | ROGER PALMER; CHAD MOXLEY; and          Case No.  3:21-cv-00268-MMD-WGC
    FIREARMS POLICY COALITION,
14 |
                    Plaintiffs,
15 |        vs.
                                            **STATE DEFENDANTS' RESPONSE TO**
16 | STEPHEN SISOLAK, Governor of Nevada;    **MOTION FOR PRELIMINARY**
    AARON FORD, Attorney General of Nevada; **INJUNCTION**
17 | GEORGE TOGLIATTI, Director of the
    Nevada Department of Public Safety;
18 | MINDY MCKAY, Administrator of the
    Records, Communications, and Compliance,
19 | Division of the Nevada, Department of Public
    Safety; JOSEPH LOMBARDO, Sheriff of
20 | Clark County, Nevada; STEVEN WOLFSON,
    District Attorney of Clark County, Nevada;
21 | DANIEL COVERLEY, Sheriff of Douglas
    County, Nevada; and, MARK JACKSON,
22 | District Attorney of Douglas County, Nevada,

23 |                Defendants.

24 |

25 |        Defendants Stephen Sisolak, Aaron D. Ford, George Togliatti and Mindy McKay

26 | (collectively, the "State Defendants"), by and through counsel, oppose Plaintiffs Roger

27 | Palmer, Chad Moxley and Firearms Policy Coalition's motion for a preliminary injunction,

28 | ECF No. 6.

Page **1** of **15**

ER-178

1  **I.      Introduction**

2          This Court should deny Plaintiffs' motion for a preliminary injunction. Assembly

3  Bill 286 ("AB 286") prohibits the possession of firearms that lack serial numbers –

4  commonly called "ghost guns" – and the kits that are used to assemble these virtually

5  untraceable firearms. No Plaintiff disputes the State or federal government's power to

6  require serial numbers on manufactured firearms. Plaintiffs' contention is that ghost gun

7  kits and the ghost guns that result from self-manufacture occupy a privileged place in

8  federal constitutional law. No precedent supports their view. AB 286 is constitutional.

9          The Second Amendment does not insulate ghost guns from reasonable public safety

10  legislation such as AB 286. The Second Amendment's core right is the possession of

11  firearms for defense of hearth and home. AB 286 does not violate the Second Amendment

12  because it does not interfere with that core right. Any Nevadan who could legally purchase

13  a firearm for home defense before AB 286 passed can still do so today, provided that the

14  firearm has a serial number. There is no evidence that AB 286 will impede lawful access

15  to firearms or that ghost guns have any advantage for home defense over firearms with

16  serial numbers.

17          The Fifth Amendment's takings clause does not hamstring state government's

18  traditional power to regulate, and indeed prohibit, dangerous private property. That is

19  why federal courts have consistently found that other bans of firearm components did not

20  implicate the Takings Clause.

21          Because Plaintiffs cannot mount any serious argument countering the State's valid

22  public interest goal in passing important public safety legislation on ghost guns, Plaintiffs

23  collapse the remaining 3 preliminary injunctive relief elements into one. Plaintiffs'

24  irreparable harm and public interest arguments are based solely on the purported violation

25  of their constitutional rights. However, because there was no constitutional violation, it

26  follows that they have failed to carry their burden as to irreparable harm and the public

27  interest. Injunctive relief is not appropriate here.

28  . . .

## II.    Background

### A.    Plaintiffs' claims and their motion for extraordinary relief

#### 1.    Plaintiffs' claims

Plaintiffs are Robert Palmer (**Palmer**), Chad Moxley (**Moxley**), and Firearms Policy Coalition (**FPC**). ECF No. 1, ¶¶ 17-19. Defendants are Governor Stephen Sisolak, Attorney General Aaron Ford, Director of Public Safety George Togliatti, and Division Administrator Mindy McKay. *Id.* ¶¶ 20-24.

Plaintiffs allege two federal constitutional theories. They allege Nevada Assembly Bill 286 violates the Second Amendment's Keep and Bear Arms Clause and the Fifth Amendment's Takings Clause. *Id.* ¶¶ 123-160. They only seek extraordinary relief. *Id.* at 36-37 (prayer for relief).

#### 2.    Plaintiffs' declarations

FPC is an advocacy organization. ECF No. 6-1. FPC describes what it advocates:

> The purposes of Plaintiff FPC include defending and promoting the People's rights – especially the fundamental, individual Second Amendment right to keep and bear arms – advancing individual liberty, and restoring freedom.

*Id.* ¶ 5. Relevant here, FPC wants its members to have the freedom to have unserialized (i.e. lacking a serial number) firearm components and firearm construction materials. *Id.* ¶ 10. They further desire to use unserialized firearm components to "self-manufacture" unserialized firearms for "self defense and other lawful purposes." *Id.* ¶ 13.

Moxley is a firearms dealer. ECF No. 6-2, ¶¶ 5-6. He attends about two gun shows per month and sells up to 40 "unfinished receiver" kits at each show. *Id.* ¶ 7. Moxley also "self-manufactured" handguns and rifles that are finished without any serial numbers. *Id.* at ¶11.

Palmer is a private investigator. ECF No. 6-3, ¶ 5. He owns unserialized handguns and rifles. *Id.* ¶ 8. They are unserialized because he "self-manufactured" them from unserialized component parts. *Id.*

. . .

### B.    At issue – avoidance of background checks

After reviewing Plaintiffs' declarations, it is important to state what is not at issue. First, Plaintiffs have not identified any advantage that ghost guns have for self-defense over firearms with serial numbers.  Second, neither of the individual Plaintiffs declared that he will lack firearms for self-defense if he disposes of his ghost guns.  Third, neither has declared that he will be unable to obtain serialized firearms if AB 286 is upheld. Fourth, there is no evidence that AB 286 will affect Moxley and Palmer's ability to visit Douglas and Clark County gun stores to purchase serialized firearms. *See* State Federal Firearms Listings, ATF, https://bit.ly/35UfmOZ (last visited June 26, 2021).  Fifth, there is no proper evidence supporting Plaintiffs' assertion that ghost guns and unfinished receiver kits are commonly possessed by law-abiding citizens.  ECF No. 6-1, ¶ 10; ECF No. 6-2, ¶ 12; ECF No. 6-3, ¶ 10.  Sixth, nowhere do Plaintiffs mount any challenge to the right of government to require serial numbers on manufactured firearms.

The issue for this case is therefore narrow.  The putative right to own, possess, sell, unfinished receiver kits and the ability to use them to self-manufacture unserialized firearms.  What is unmentioned by Plaintiffs, but is not subject to serious dispute, is that those unfinished receiver kits are sold without any background checks.  *See* Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27720, 27726 (proposed May 21, 2021) (to be codified at CFR pts. 447, 478-79); *Hearing on AB 286 Before the Senate Judiciary Committee on May 11, 2021*, 81st Sess., at 1:14:06 to 1:14:21 (Nev. 2021) (statement of Assemb. Jauregui), https://bit.ly/2SupquV [hereinafter "*May 11 Senate Hearing*"].[1]

### C.    Legal background

#### 1.    Serial numbers are the heart of the current regulatory regime

The Gun Control Act of 1968, Pub. L. 90-351, 82 Stat. 197, establishes numerous requirements for the manufacture, transfer and possession of firearms.  Its "twin goals" are

---

[1] Because minutes for the 2021 legislative sessions are not yet available, *May 11 Senate Hearing* citations will contain a pincite to the hearing recording's timestamp.

1   "to keep guns out of the hands of criminals and others who should not have them, and to

2   assist law enforcement authorities in investigating serious crimes." *Abramski v. United*

3   *States*, 573 U.S. 169, 180 (2014).  To keep weapons out of the hands of persons who should

4   not have them, the Gun Control Act criminalizes the possession of firearms by, among

5   others, those who "ha[ve] been adjudicated as a mental defective or who ha[ve] been

6   committed to a mental institution," felons and domestic violence misdemeanants.   18

7   U.S.C. § 922(g).  It also prohibits federal firearm licensees from selling firearms to minors.

8   *Id.* § 922(b)(1).

9        To assist law enforcement in investigating crimes, the Gun Control Act requires that

10  each firearm built by a licensed manufacturer contain a serial number unique to that

11  firearm.  18 U.S.C. § 923(i); 27 C.F.R. § 478.92(a).  It is a crime to possess a firearm that

12  has had its serial number obliterated.  *Id.* § 922(k).  The statute also imposes recordkeeping

13  requirements on federal firearm licensees so that a gun found on the street can be traced,

14  through its serial number, to its point of sale.  *Abramski*, 573 U.S. at 173.

15       The Gun Control Act's provisions do not apply to every gun component.  With some

16  exceptions not relevant here, only a gun's "frame or receiver" is considered a "firearm"

17  subject to the Gun Control Act's prescriptions and proscriptions.  18 U.S.C. § 921(a)(3).

18       The "[f]rame or receiver" – which the rest of this brief will refer to simply as the

19  "receiver" – is the part of the gun that receives the other essential components of the gun,

20  like the barrel and the firing pin.  *See* 27 C.F.R. 478.11, 479.11.  That is, other gun

21  components are attached to the receiver to create the complete gun.  The graphic below

22  shows receivers in three types of guns:



1    *Firearms Verification*, ATF, https://bit.ly/2UJeryz (last visited June 26, 2021). Because the

2    receiver is the statutory "firearm," it must contain the serial number. Definition of "Frame

3    or Receiver" and Identification of Firearms, 86 Fed. Reg. at 27721.

<div align="center">

**2.**    **Unfinished receiver kits allow buyers to easily build firearms without serial numbers**

</div>

6        Unfinished receiver kits exploit a loophole in that regulatory system. H.R. Rep. No.

7    116-88, at 2 (2019); *May 11 Senate Hearing*, *supra*, at 1:16:06 to 1:16:15. An unfinished

8    receiver still requires some work before it can be used in a working gun. AB 286, § 6(9);

9    Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. at 27726.

10    Under current federal law, an unfinished receiver is not considered a firearm. Definition

11    of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. at 27726.

12        Several companies make and sell unfinished receiver kits. Definition of "Frame or

13    Receiver" and Identification of Firearms, 86 Fed. Reg. at 27726. These kits contain all the

14    parts the buyer needs to "complete a functional weapon in a short period of time." *Id.* A

15    supporter of AB 286 testified that a ghost gun can be built from an unfinished receiver kit

16    in "20 to 40 minutes." *May 11 Senate Hearing*, *supra*, at 1:25-24 to 1:26:29.

17        Since they lack anything that qualifies as a firearm, unfinished receiver kits can be

18    sold without a background check. H.R. Rep. No. 116-88, at 2. That means that minors,

19    people who have been convicted of a domestic violence crime and other prohibited persons

20    can easily obtain unfinished receiver kits. *Id.* And unfinished receiver sales are not subject

21    to the Gun Control Act's recordkeeping provisions. Definition of "Frame or Receiver" and

22    Identification of Firearms, 86 Fed. Reg. at 27726.

23        By that same token, unfinished receiver kits do not contain any serialized

24    components. *May 11 Senate Hearing*, *supra*, at 1:17:14 to 1:17:26. And, of course, that

25    means that the gun assembled from the kit does not have a serial number. Guns made

26    that way are virtually untraceable if used in a crime, which is why they're commonly called

27    ghost guns. Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg.

28    at 27722-23.

### 3. Ghost guns are a present and increasing threat to public safety

The U.S. House Committee on Homeland Security has concluded that "[g]host guns" present a "homeland security challenge." H.R. Rep. No. 116-88, at 2. They "enabl[e] prohibited buyers to purchase deadly weapons with just a few clicks online." *Id.* And on the backend, they "hamstring[ ] law enforcement's ability to investigate crimes committed with untraceable weapons." *Id.*

The ATF likewise identified ghost guns as a threat to public safety. Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. at 27722. Law enforcement agencies recovered nearly 24,000 ghost guns at crime scenes between 2016 and 2020. *Id.* That number has been increasing each year. *Id.* at 27722-23. The ATF also pointed out that the lack of sales controls and serial numbers make it much more difficult to identify and break up firearms trafficking rings involving ghost guns. *Id.* at 27725.

The ATF has issued a notice of proposed rulemaking to address those concerns. If promulgated, the new rule will expand the definition of "firearm" to include unfinished receivers that are "designed to or may readily be converted to" fire projectiles. Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. at 27726. That means the sale of unfinished receiver kits will be subject to background checks and unfinished receivers will be serialized. *Id.*

### 4. AB 286 responds to the threat posed by unfinished receiver kits and ghost guns

During the Legislature's consideration of AB 286, its sponsor explained that ghost guns are a public safety threat for two reasons: they circumvent background checks and they are virtually impossible to trace if used in a crime. *May 11 Senate Hearing*, *supra*, at 1:14:07 to 1:14:36 (statement of Assemb. Jauregui). She explained that ghost guns are an especially acute threat in Nevada because one of the largest unfinished receiver kit companies in the nation, Polymer80, Inc. is based here. *Id.* at 1:14:37 to 1:14:55.

AB 286 addresses the threat posed by unserialized firearms and firearm components. First, the law bans the possession and sale of unfinished receivers that lack

1  serial numbers.  AB 286, §§ 3, 3.5.  Next, it bans the act of assembling an unserialized

2  firearm – that is, the act of using an unfinished receiver kit to create a ghost gun.  *Id.* § 4.

3  There are exceptions for building firearms that are inoperable or that are antiques or

4  collector's items, as defined by federal law.  *Id.* § 4(1)(a)-(c).  Finally, it bans possession of

5  unserialized firearms (i.e. ghost guns).  *Id.* § 5.  Guns manufactured before serial numbers

6  became required in 1969, as well as inoperable guns, antiques and collector's items, are

7  exempt from the ban on unserialized firearms.  *Id.* § 5(1)(b).

8       The ban on assembling ghost guns is effective immediately.  AB 286, § 10(1).  But

9  the ban on possessing and selling unserialized unfinished receivers and ghost guns does

10  not take effect until January 1, 2022.  *Id.* § 10(2).  That way those who legally obtained

11  ghost guns can sell or otherwise dispose of them before they become unlawful.  Nev.

12  Legislative  Counsel  Bureau,  *AB  286  Work  Session  Document*  9  (2021),

13  https://bit.ly/3A3i02O.

14  **III.   Legal standard**

15       Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear

16  showing that the plaintiff is entitled to such relief."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 22

17  (2008).  The plaintiff must make four separate showings:

18       (1)   He is likely to succeed on the merits,

19       (2)   He will suffer irreparable harm without preliminary relief,

20       (3)   The balance of equities tips in his favor and

21       (4)   The injunction is in the public interest.

22  *Id.* at 20.  When the party opposing injunctive relief is the government – as is the case here

23  – the third and fourth prerequisites merge.  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d

24  640, 668 (9th Cir. 2021).

25  **IV.   Argument**

26       Plaintiffs have not met their burden.  They are not likely to succeed on the merits –

27  under  established  Second  Amendment  and  Takings  Clause  doctrine,  AB  286  is

28  . . .

1  constitutional.  Because their irreparable harm and public interest arguments turn solely

2  on their mistaken view of the merits, those arguments fail as well.

3      **A.**  **Plaintiffs are unlikely to succeed on the merits**

4      Plaintiffs assert a claim based the Second Amendment and a claim based on the

5  federal Takings Clause.  ECF No. 1, ¶¶ 142, 152, 159.  Plaintiffs are not likely to succeed

6  on either claim.

7      **1.**  **AB 286 does not violate the Second Amendment**

8        **a.**  **Plaintiffs set out the wrong legal standard by failing to**

9            **apply the two-step analysis required by the Ninth Circuit**

10      The Second Amendment reads: "A well regulated Militia, being necessary to the

11  security of a free State, the right of the people to keep and bear Arms, shall not be

12  infringed." U.S. Const. amend. II.  "[T]he core of the Second Amendment is 'the right of

13  law-abiding, responsible citizens to use arms in defense of hearth and home.'" *United*

14  *States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013) (quoting *Heller v. District of*

15  *Columbia*, 554 U.S. 570, 635 (2008)).

16      To succeed on their Second Amendment claim, Plaintiffs must overcome a two-step

17  inquiry.  *See United States v. Torres*, 911 F.3d 1253, 1258 (9th Cir. 2019).  First, they must

18  show that AB 286 "burdens conduct protected by the Second Amendment." *Id.*  If it does

19  not, this Court must affirm it "without further analysis." *Young v. Hawaii*, 992 F.3d 765,

20  826 (9th Cir. 2021) (en banc), *cert. pet. docketed*, No. 20-1639 (U.S. filed May 11, 2021).

21      If Plaintiffs can show that AB 286 does burden Second Amendment-protected

22  conduct, then they move onto the second step. *Torres*, 911 F.3d at 1258.  They must show

23  that AB 286 fails the applicable level of means-end scrutiny. *Id.*

24      Plaintiffs do not even attempt to make the showing required by the binding Ninth

25  Circuit caselaw cited above. *See* ECF No. 6, at 12-13.  They instead rely on a district court

26  case that is contrary to U.S. court of appeals decisions and has been stayed by the Ninth

27  Circuit. *See* ECF No. 6, at 9-10, 12-14 (citing *Miller v. Bonta*, __ F. Supp. 3d __, No. 19-cv-

28  . . .

1537, 2021 WL 2284132 (S.D. Cal. June 4, 2021), *stayed pending appeal*, No. 21-55608 (9th Cir. June 21, 2021)).

While Plaintiffs would undoubtedly prefer that that standard apply here, we must apply the Ninth Circuit's precedent, not a stayed district court order.  Applying the Second Amendment analysis mandated by the Ninth Circuit shows that AB 286 is constitutional.

> **b.    AB 286 does not burden protected conduct because it is a longstanding, presumptively valid regulation and it does not interfere with Nevadans' right to defend "hearth and home"**

AB 286 does not burden Second Amendment-protected conduct, so there is no need to proceed past step one.  The Supreme Court's *Heller* decision set out a nonexhaustive list of "longstanding" gun-control measures that are "presumptively lawful."  554 U.S. at 626-27, 627 n.26.  Those longstanding, presumptively lawful measures are constitutional because they don't burden Second Amendment-protected conduct.  *Torres,* 911 F.3d at 1258. In other words, if the challenged gun control measure is a longstanding, presumptively lawful regulation, the challenge fails at step one.

AB 286's basic requirement is that functioning firearms be serialized.  AB 286, §§ 4-5.  That requirement is a longstanding, presumptively lawful regulation.  Many of the "longstanding" regulations identified in *Heller* were established by the exact same law that established the federal serialization requirement.  Gun Control Act of 1968, Pub. L. 90-618, § 102, 82 Stat. 1213, 1220-21, 1223; *see NRA, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196-97 (5th Cir. 2012) (collecting cases).  If those other measures are longstanding and presumptively valid, so is a serialization requirement.

AB 286's historical pedigree also shows that it is a longstanding, presumptively valid regulation.  The historical record is replete with examples of colonial gun control laws tracking and restricting the possession of firearms.  *NRA*, 700 F.3d at 200.  Like those laws, AB 286 is intended to ensure that firearm ownership can be traced and to help prevent those who are barred from possessing a firearm from buying one.  *May 11 Senate Hearing*, *supra*, at 1:14:07 to 1:14:36 (statement of Assemb. Jauregui).

1    Putting aside the historical record, as a practical matter AB 286 does not burden
2  Second Amendment-protected conduct. That is because it does not interfere with the right
3  to "defense of hearth and home." *Chovan*, 735 F.3d at 1138 (quoting *Heller*, 554 U.S. at
4  635). Neither of the individual declarants has testified that if he disposes of his ghost guns,
5  he will lack any firearms to defend his home. See ECF No. 6-2, ¶¶ 11-16; ECF No. 6-3, ¶¶
6  8-14. And neither individual Plaintiff points to any advantage ghost guns have over
7  serialized firearms – for example, that they are easier to use or more accurate – in terms
8  of home defense.

9    Plaintiffs argue that AB 286 burdens their right to "self-manufacture" firearms.
10  ECF No. 6, at 10-11. But they present no evidence that self-assembling unserialized
11  firearms is necessary to home defense. *See id.* And they cite no caselaw finding that the
12  Second Amendment extends to assembling – as opposed to keeping and bearing – firearms.
13  *See id.* Both individual Plaintiffs have access to gun stores that can sell serialized firearms
14  for home defense. In any event, AB 286 does not bar self-assembling firearms. It bars only
15  self-assembling a firearm that does not have a serial number. AB 286, § 4(1).

16           **c.    In the alternative, AB 286 passes heightened scrutiny**

17    Because AB 286 does not burden Second Amendment-protected conduct, this Court
18  need not reach step two. But if it does, it should apply intermediate scrutiny and uphold
19  AB 286.

20    Intermediate scrutiny is the default level of scrutiny for Second Amendment cases.
21  *See Silvester v. Harris*, 843 F.3d 816, 822-823 (9th Cir. 2016) (collecting cases), *cert. denied*
22  *sub nom. Silvester v. Becerra*, 138 S. Ct. 945 (2018). Strict scrutiny applies only in the rare
23  case where a measure "implicates the core of the Second Amendment right and severely
24  burdens that right." *Id.* at 821.

25    As the State Defendants have already explained, AB 286 does not implicate the core
26  Second Amendment right of home defense. *See supra* Part IV.A.1.a. That is why the Third
27  Circuit applied intermediate scrutiny in a challenge to the federal law that criminalized
28  possessing a firearm with an obliterated serial number. *Marzzarella*, 614 F.3d at 97. That

1  federal law is similar to AB 286 because it is also intended to ensure that guns used in
2  crimes are traceable by way of serial number. *Id.* at 98.

3      <u>Intermediate scrutiny</u>: A statute is constitutional under intermediate scrutiny as
4  long as (1) the State's stated goal is "significant, substantial, or important" and (2) there is
5  a "reasonable fit" between the statute and the State's goal. *Silvester*, 843 F.3d at 821-22.
6  Intermediate scrutiny is not a strict test, and it does not require that the State choose "the
7  least restrictive means of furthering a given end." *Silvester*, 843 F.3d at 827.

8      The Ninth Circuit has already held that "preserving the ability of law enforcement
9  to conduct serial number tracing – effectuated by limiting the availability of untraceable
10  firearms – constitutes a substantial or important interest." *Pena v. Lindley*, 898 F.3d 969,
11  982 (9th Cir. 2018), *cert. denied sub nom. Pena v. Horan*, 141 S. Ct. 108 (2020). Thus, AB
12  286 satisfies the first requirement of intermediate scrutiny.

13      AB 286 is a reasonable fit with that important goal. *Marzzarella*, 614 F.3d at 98
14  (holding that "[r]egulating the possession of un[serialized] firearms" fits "closely with the
15  interest in ensuring the traceability of weapons"). It "reaches only conduct creating a
16  substantial risk of rendering a firearm untraceable." *Id.* It does not prevent any Nevadan
17  who is legally permitted to obtain a firearm to buy a serialized firearm (or assemble one
18  starting with a serialized receiver) for home defense.

19      <u>Strict scrutiny</u>: Even if this Court applied strict scrutiny to AB 286, it would still
20  pass constitutional muster. A firearms law passes strict scrutiny if it is "narrowly tailored
21  to serve a compelling state interest." *Marzzarella*, 614 F.3d at 99. Crime prevention and
22  investigating gun violence are compelling interests. *Id.* (citing *United States v. Salerno*,
23  481 U.S. 739, 749 (2010)).

24      By banning untraceable firearms and their components, AB 286 is narrowly tailored
25  to accomplishing those compelling interests. AB 286 applies at both ends – by making it
26  more difficult for prohibited persons to obtain firearms, and by proscribing possession of a
27  firearm that would be untraceable if used in a crime. And it does so in a strikingly narrow
28  . . .

1  way, leaving the gamut of lawful serialized firearms available to Nevadans for home

2  defense. *Marzzarella*, 614 F.3d at 100.

3        **2.    Plaintiffs' takings claim cannot support injunctive relief and is meritless**

4        **a.    Injunctive relief is not available for takings claims in Nevada because damages are available**

5

6        As long as damages are available to compensate a taking, the Takings Clause cannot

7  be the basis for injunctive relief. *Knick v. Township of Scott*, 139 S. Ct. 2162, 2176 (2019).

8  Damages are available in Nevada because a plaintiff can bring an inverse condemnation

9  action. *See, e.g.*, *McCarran Int'l Airport v. Sisolak*, 137 P.3d 1110, 1118, 1130 (Nev. 2006).

10  As such, injunctive relief is not available here and Plaintiffs' motion for a preliminary

11  injunction must be denied.

12        **b.    No compensation is due for restrictions on personal property**

13

14        Injunctive relief is inappropriate here for the independent reason that Plaintiffs'

15  takings claim fails on the merits. A government does not need to compensate owners when

16  it prohibits a type of personal property through a valid law. *Md. Shall Issue, Inc. v. Hogan*,

17  963 F.3d 356, 366-67 (4th Cir. 2020), *cert. denied*, No. 20-855, 2021 WL 1725174 (U.S. May

18  3, 2021). For example, in *Hamilton v. Kentucky Distilleries & Warehouse Co.*, 251 U.S. 146

19  (1919), the Supreme Court held that no compensation was due to distillers and jobbers

20  after alcohol was prohibited. *Id.* at 157-58. The plaintiffs there had sufficient time to

21  dispose of their alcohol inventory, so there was no taking. *Id.* A raft of federal courts have

22  likewise concluded that the ATF did not effect a taking when they banned a previously

23  legal firearm component called bump stocks. *Guedes v. Bureau of Alcohol, Tobacco,*

24  *Firearms, & Explosives*, __ F. Supp. 3d __, No. 18-cv-2988, 2021 WL 663183, at *10 (D.D.C.

25  Feb. 19, 2021) (collecting cases), *appeal filed*, No. 21-5045 (D.C. Cir. filed Feb. 23, 2021).

26        That rule applies here. AB 286 is a valid law prohibiting two types of personal

27  property – ghost guns and unserialized receivers. *See supra* Part IV.A.1. Just as no

28  . . .

1  compensation was due when alcohol and bump stocks were prohibited, no compensation is

2  due here.

3        Arguing to the contrary, Plaintiffs liken AB 286 to government actions that "effect[

4  ] a physical appropriation, a permanent physical invasion," or a "complete deprivation of

5  all economically beneficial use."   ECF No. 6, at 17 (quotation marks omitted).   Those

6  comparisons are off-base.

7        AB 286 is not a "physical appropriation" because Nevada is not taking title to the

8  prohibited items.  That is why federal courts have rejected that exact argument in

9  connection with bump-stock bans.  *Md. Shall Issue*, 963 F.3d at 366; *McCutchen v. United*

10  *States*, 145 Fed. Cl. 42, 54 (2019), *appeal filed*, No. 20-1188 (Fed. Cir. filed Nov. 27, 2019).

11        And while permanent physical invasions and complete deprivations of economically

12  beneficial use can be categorical takings of *real* property, they are not categorical takings

13  of *personal* property.  *Md. Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 413 (D. Md. 2018),

14  *aff'd*, 963 F.3d 356; *see Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027-28 (1992).  AB

15  286 affects only personal property, so those principles are irrelevant here.

16      **B.    Plaintiffs' constitutional claims fail, so they have made no showing of**
          **irreparable harm**

17

18         Plaintiffs don't point to any form of irreparable harm besides the purported violation

19  of their constitutional rights.  *See* ECF No. 6, at 17-18.  As explained above, AB 286 does

20  not violate the Constitution.  This Court should therefore find that Plaintiffs have not

21  shown that they are likely to suffer irreparable harm.

22      **C.    The public's interest in preventing and prosecuting gun crime**
          **outweighs Plaintiffs' asserted hardship**

23

24         Just like their irreparable harm argument, Plaintiffs' public interest argument relies

25  solely on their erroneous claim that AB 286 is unconstitutional.  ECF No. 6, at 18-19.  And

26  just like their irreparable harm argument, their public interest argument fails.

27         Notably, Plaintiffs do not even attempt to balance their purported interest in this

28  litigation with the public's interest in preventing and prosecuting gun crime.  They ignore

that Nevada enacted AB 286 in response to what one witness called "the fastest rising threat to gun safety in the country, and in Nevada particularly." *May 11 Senate Hearing*, *supra*, at 1:15:42 to 1:16:05. A threat that Congress and the ATF have also recognized. H.R. Rep. No. 116-88, at 2 (2019); Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27720, 27726 (proposed May 21, 2021) (to be codified at CFR pts. 447, 478-79). Nevada was reacting to specific crimes committed by ghost guns, including recent attacks on law enforcement. *May 11 Senate Hearing*, *supra*, at 1:14:55 to 1:15:05.

**V.   Conclusion**

The Second Amendment does not protect the right to possess an untraceable firearm. AB 286 will not interfere with Nevadans' right to defend their homes. This Court should deny the motion for a preliminary injunction.

DATED this 2nd day of July, 2021.

> AARON D. FORD
> Attorney General
>
> By: _/s/ Steve Shevorski_
>     Steve Shevorski (Bar No. 8256)
>     Chief Litigation Counsel
>     Jeffrey M. Conner (Bar No. 11543)
>     Deputy Solicitor General
>     Kiel B. Ireland (Bar No. 15368C)
>     Deputy Attorney General
>     *Attorneys for State Defendants*

1 | THE O'MARA LAW FIRM, P.C.
DAVID C. OMARA
2 | (Nevada Bar No. 8599)
311 East Liberty Street
3 | Reno, NV 89501
P: (775) 323-1321
4 | F: (775) 323-4082
E: david@omaralaw.net
5
FIREARMS POLICY COALITION
6 | ADAM KRAUT*
WILLIAM SACK*
7 | 1215 K Street, 17th Floor
Sacramento, CA 95814
8 | P: (916) 596-3492
E: akraut@fpclaw.org
9 | E: wsack@fpclaw.org

THE DIGUISEPPE LAW FIRM, P.C.
RAYMOND M. DIGUISEPPE*
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

10 | Attorneys for Plaintiff

11 | **UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

12

ROGER PALMER, *et al.*,                    Case No.: 3:21-cv-00268

13
                          Plaintiffs,

14      v.
                                           **PLAINTIFF'S MOTION FOR EXPEDITED**
15 | STEPHEN SISOLAK, in his official        **BRIEFING SCHEDULE AND**
capacity as Governor of Nevada, *et al.*,  **CONSIDERATION OF THEIR MOTION**
16                                          **FOR PRELIMINARY INJUNCTION**
                          Defendants.
17

18

19       The provisions of Nevada's Ban enacted in AB 286 individually and collectively work to

20 completely prohibit Plaintiffs', Plaintiff FPC's Nevada resident members', and indeed all ordinary

21 law-abiding Nevadans' fundamental constitutional right to possess and self-manufacture arms in

22 common use for lawful purposes including self-defense in the home, and predecessor materials

23 necessary to the construction of self-manufactured arms. Moreover, the confiscatory Ban scheme

24 requires complete dispossession of currently possessed arms and predecessor materials.

25       AB 286 was signed into law on June 7, 2021, with some provisions causing Plaintiffs to

26 cease constitutionally protected conduct under pain of criminal sanction taking effect immediately,

27 and all other provisions adding further restrictions and criminal liability effective on January 1,

28 2022, leaving Plaintiffs and others like them mere months to seek relief or be forced to dispossess

1  themselves of their constitutionally protected property. Plaintiffs filed their Complaint [ECF No. 1]

2  on June 10, 2021, and Motion for Preliminary Injunction on June 18, 2021.  ECF No. 6.

3      At the present time, Defendant Joseph Lombardo, through his attorney, has accepted service

4  [ECF No. 5], and Defendant Steven Wolfson, through his counsel, will accept service and will sign

5  the Acceptance of Service upon counsel's return to her office on Monday, June 21, 2021. Counsel

6  also emailed these Defendants' attorneys on June 18, 2021, and requested they agree to the proposed

7  briefing schedule.

8      Additionally, save and except for Defendant Mindy McKay, counsel has been advised by the

9  process server that all other Defendants, Stephen Sisolak, Aaron Ford, George Togliatti, Daniel

10  Coverley, and Mark Jackson have been personally served on Thursday, June 17, 2021. It is expected

11  that Mindy McKay would be served today or early next week.  Counsel anticipates obtaining the

12  signed Affidavits of Service by Wednesday and will file them accordingly. Moreover, Plaintiffs have

13  also emailed copies of the complaint to the Nevada Attorney General's Office, through Deputy

14  Solicitor General Greg Zunino, on June 14, 2021, and again to Deputy Solicitor General Craig

15  Newby on June 18, 2021.  Upon the Court rendering a decision on this request, Plaintiffs will

16  provide a copy of the Order to Defendants.

17      Because this lawsuit involves an expansive, confiscatory ban on the exercise of Plaintiffs'

18  fundamental, individual Second Amendment right to keep and bear arms, the potential forced

19  dispossession of lawfully possessed and constitutionally protected property, and the right to due

20  process of the law and just compensation guaranteed by the Fifth and Fourteenth Amendments to the

21  United States Constitution, Plaintiffs respectfully request this Court order expedited briefing and

22  consideration of this motion pursuant to Federal Rule of Civil Procedure 57. While Plaintiffs would

23  prefer an even shorter briefing schedule, Plaintiffs recognize that the filing of this motion will cause

24  the briefing of this motion to occur over the Independence Day holiday, and Plaintiffs wish to be

25  respectful of Defendants' counsels' and the Court's time and attention.  Moreover, the proposed

26  schedule will also allow for all personal service to be completed such that all Defendants could file

27  an opposition, should they choose.

28

1    Thus, Plaintiffs move this Court for an order that requires Defendants to file an Opposition

2  Memorandum no later than Friday, July 2, 2021, and allow Plaintiffs to file their Reply

3  Memorandum no later than Friday, July 9, 2021. Thereafter, if the Court is available, Plaintiffs seek

4  to hold oral argument on the motion during the week of July 12, 2021.

5    This Motion for Expedited Briefing Schedule and Determination is necessary so this Court

6  can determine the matter and issue an injunction with enough time to prevent enforcement of the

7  challenged laws and the dispossession of Plaintiffs' property, or, alternatively, should the Court deny

8  Plaintiffs' Motion for Preliminary Injunction, allow Plaintiffs sufficient time to seek relief from the

9  Court of Appeals, and should it be necessary, seek relief from the Supreme Court. Without the

10  expedited briefing and decision, Plaintiff will be irreparably harmed because they will have no

11  remedy at law.

12  DATED:  June 18, 2021                    THE O'MARA LAW FIRM, P.C.

13

14                                              /s/ David C. O'Mara
                                          DAVID C. O'MARA, ESQ.

15
                                          311 E. Liberty Street
16                                          Reno, NV 89501
                                          Tel: 775.323.1321
17

18

19

20

21

22

23

24

25

26

27

28

1  **CERTIFICATE OF SERVICE**

2   I hereby certify that I am an employee of The O'Mara Law Firm, P.C. and on this date, the

3  foregoing document was filed electronically *via* the Court's ECF system which provided notification

4  of such filing to counsel of record for all parties.

5  Dated: June 18, 2021 _____ /s/ Bryan Snyder _____

6                                    BRYAN SNYDER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 3

# EXHIBIT 3

1 | THE O'MARA LAW FIRM, P.C.          THE DIGUISEPPE LAW FIRM, P.C.
   | DAVID C. OMARA                    RAYMOND M. DIGUISEPPE*
2 | (Nevada Bar No. 8599)             4320 Southport-Supply Road
   | 311 East Liberty Street           Suite 300
3 | Reno, NV 89501                     Southport, NC 28461
   | P: (775) 323-1321                 P: 910-713-8804
4 | F: (775) 323-4082                  E: law.rmd@gmail.com
   | E: david@omaralaw.net
5 |
   | FIREARMS POLICY COALITION
6 | ADAM KRAUT*
   | WILLIAM SACK*
7 | 1215 K Street, 17th Floor
   | Sacramento, CA 95814
8 | P: (916) 596-3492
   | E: akraut@fpclaw.org
9 | E: wsack@fpclaw.org

10 | Attorneys for Plaintiff

11 | **UNITED STATES DISTRICT COURT**
    | **DISTRICT OF NEVADA**
12 |

ROGER PALMER, *et al.*,                    Case No.: 3:21-cv-00268

                        Plaintiffs,

        v.

STEPHEN SISOLAK, in his official
capacity as Governor of Nevada, *et al.*,

                        Defendants.

18 | **DECLARATION OF ROGER PALMER**

19 | I, Roger Palmer, am competent to state and declare the following based on my personal

20 | knowledge:

21 | 1.   I am a resident of Clark County, Nevada.

22 | 2.   I am a responsible, peaceable citizen not disqualified from exercising my right to

23 | possess firearms and ammunition.

24 | 3.   I hold a Nevada Concealed Carry Permit.

25 | 4.   I am a retired law enforcement officer who has also served as a firearms instructor,

26 | concealed carry instructor, and a state security guard instructor.

27 | 5.   I am currently a full-time private investigator.

28 | 6.   I am not a licensed firearms manufacturer, importer, or dealer.

- 1 -

**ER-198**

1          7.      I am a member of Plaintiff FPC.

2          8.      I own and possess multiple unserialized firearms, both handguns and rifles, that I

3    previously self-manufactured lawfully with unserialized component parts, including Polymer80

4    NFOs.

5          9.      I also own and possesses multiple uncompleted NFOs and firearm building kits,

6    which I lawfully acquired before enactment of the Ban.

7          10.     My lawfully self-manufactured, unserialized firearms are of a type commonly

8    possessed by law-abiding citizens for lawful purposes today; specifically, handguns manufactured

9    with Polymer80 kits and AR-15 rifles manufactured with precursor NFOs. The unserialized NFOs

10   are also commonly possessed by law-abiding citizens in the exercise of their right to self-

11   manufacture such firearms for self-defense and other lawful purposes.

12         11.     It is my understanding that I am mandated to dispossess myself of the unserialized

13   NFOs, and to dispossess myself of the unserialized firearms I self-built (or render them

14   "permanently inoperable") by January 1, 2022, or face criminal prosecution under Sections 3 and 5

15   of AB 286.

16         12.     I desire to continue to own and possess my lawfully self-manufactured unserialized

17   firearms and NFOs for self-defense and other lawful purposes, and not sell or otherwise dispose of

18   them, but I fear criminal sanction in light of the statutorily mandated dispossession and general bans

19   established under Nevada's Ban.

20         13.     I also desire to acquire additional NFOs commonly used in the self-manufacturing of

21   firearms for self-defense and other lawful purposes, including those that fall within the definition of

22   "unfinished frames or receivers" under Nevada's Ban, and I desire to self-manufacture additional

23   operable firearms for self-defense and other lawful purposes. However, I am currently prohibited

24   from purchasing or otherwise acquiring any such NFOs under the Ban, I am currently prohibited

25   from self-manufacturing any operable unserialized firearms under Section 4, and I am prohibited

26   from ever again possessing, purchasing, transporting, or receiving any such firearms or NFOs any

27   time on or after January 1, 2022.

28         14.     Based on the threat of criminal prosecution by and through Nevada's Ban that

1   Defendants are actively enforcing and will continue to enforce, I am and have been prevented from

2   acquiring, possessing, transporting, or receiving NFOs, and from self-manufacturing any additional

3   operable firearms from NFOs, for self-defense and other lawful purposes.

4        I, Roger Palmer, verify that I am a Plaintiff named in this action and declare under penalty of

5   perjury, all the information herein is true and correct to the best of my information, knowledge, and

6   belief.

7   Dated:    6/17/2021

By: _____

8                                       ROGER PALMER
                                        *Plaintiff*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -

# EXHIBIT 2

# EXHIBIT 2

1 | THE O'MARA LAW FIRM, P.C.
DAVID C. OMARA
2 | (Nevada Bar No. 8599)
311 East Liberty Street
3 | Reno, NV 89501
P: (775) 323-1321
4 | F: (775) 323-4082
E: david@omaralaw.net
5
FIREARMS POLICY COALITION
6 | ADAM KRAUT*
WILLIAM SACK*
7 | 1215 K Street, 17th Floor
Sacramento, CA 95814
8 | P: (916) 596-3492
E: akraut@fpclaw.org
9 | E: wsack@fpclaw.org

THE DIGUISEPPE LAW FIRM, P.C.
RAYMOND M. DIGUISEPPE*
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

10 | Attorneys for Plaintiff

11 | **UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

12

ROGER PALMER, *et al.*,

13

Plaintiffs,

14 | v.

15 | STEPHEN SISOLAK, in his official
capacity as Governor of Nevada, *et al.*,

16

17 | Defendants.

Case No.: 3:21-cv-00268

18 | **DECLARATION OF CHAD MOXLEY**

19 | I, Chad Moxley, am competent to state and declare the following based on my personal

20 | knowledge:

21 | 1. I am is a resident of Douglas County, Nevada.

22 | 2. I am a responsible, peaceable citizen not disqualified from exercising my right to

23 | possess firearms and ammunition.

24 | 3. I am a retired firefighter.

25 | 4. I am a member of Plaintiff FPC.

26 | 5. I currently hold a valid Federal Firearms License ("FFL") and a Nevada Concealed

27 | Carry Permit.

28 | 6. I conduct sales of firearms and constituent firearm parts at local gun shows through my

- 1 -
ER-202

1  sole proprietorship, Strategic Supplies, in compliance with all applicable state and federal laws and
2  regulations.

3      7.      On average, I attend two gun shows per month and sell between five and forty
4  unfinished receiver kits that would fall within the new definition of and prohibition against the sale of
5  unserialized "unfinished receivers" under Sections 3 and 3.5 of the new Nevada's Ban.

6      8.      Before the enactment of Nevada's Ban, I had already planned and made arrangements
7  to attend at least six more gun shows before the end of the year, at which I would have otherwise
8  made available for sale and sold firearm components now prohibited from commercial sale under the
9  Ban.

10     9.      I desire to continue making available for sale and would make available for sale to
11  ordinary law-abiding citizens the unserialized firearms component parts and other NFOs targeted by
12  Nevada's Ban, but I am now prohibited from doing so under Section 3.5's ban against any such sales
13  or transfers.

14     10.      Based on this threat of criminal prosecution by and through the Nevada Ban that
15  Defendants are actively enforcing, I am now abstaining from and must continue to abstain from any
16  attempt to sell or transfer any "unfinished frames or receivers" (and all other NFOs that fall within
17  this broad definition) to any ordinary, law-abiding citizen. Consequently, I am forced to suffer lost
18  sales, revenue, and goodwill in my business, and my would-be consumers are concomitantly denied
19  the ability to acquire from me such constituent firearms components in the exercise of their right to
20  self-manufacture firearms for self-defense and other lawful purposes.

21     11.      Further, I lawfully own and possess multiple firearms, both handguns and rifles, that I
22  previously self-manufactured lawfully with unserialized component parts, including Polymer80 kits,
23  precursor AR-15 lower receivers, and/or other NFOs, one or more of which would fall within the new
24  definition of and prohibition against unserialized "unfinished frames or receivers" under Section 3 of
25  Nevada's Ban. Because these firearms were self-manufactured, the completed firearms themselves
26  lack necessarily lack "a serial number issued by a firearms importer or manufacturer," thus falling
27  within the Ban's prohibition against all modern, operable unserialized firearms under Section 5 of AB
28  286.

1    12.   My lawfully self-manufactured unserialized firearms are of a type commonly

2  possessed by law-abiding citizens for self-defense and other lawful purposes today, including

3  handguns.

4    13.   It is my understanding that I am mandated to dispossess myself of all unserialized

5  firearms I have self-built (or render them "permanently inoperable") by January 1, 2022, or face

6  criminal prosecution under Sections 3 and 5 of AB 286.

7    14.   I desire to continue to own and possess my lawfully self-manufactured unserialized

8  firearm for self-defense and other lawful purposes, and not sell or otherwise dispose of them, but I

9  fear criminal sanction in light of the statutorily mandated dispossession established under Section 5 of

10  Nevada's Ban.

11    15.   I also desire to self-manufacture additional operable firearms for self-defense and other

12  lawful purposes. However, I am currently prohibited from self-manufacturing any operable

13  unserialized firearms under Section 4, and I am prohibited from ever again possessing, purchasing,

14  transporting, or receiving any such firearms under Section 5 any time on or after January 1, 2022.

15    16.   Based on this threat of criminal prosecution by and through Nevada's Ban that

16  Defendants are actively enforcing and will continue to enforce, I am and has been prevented from

17  acquiring, possessing, transporting, or receiving NFOs, and from self-manufacturing any additional

18  operable firearms from NFOs, for personal self-defense and other lawful purposes.

19    I, Chad Moxley, sole proprietor of Strategic Supplies, verify that I am a Plaintiff named in this

20  action and declare, under penalty of perjury, all the information contained herein is true and correct to

21  the best of my information, knowledge, and belief.

22  Dated:   6/17/2021

                              By: _____

23                                           CHAD MOXLEY

                                        *Plaintiff*

24

25

26

27

28

# EXHIBIT 1

# EXHIBIT 1

1  THE O'MARA LAW FIRM, P.C.
   DAVID C. OMARA
2  (Nevada Bar No. 8599)
   311 East Liberty Street
3  Reno, NV 89501
   P: (775) 323-1321
4  F: (775) 323-4082
   E: david@omaralaw.net
5
   FIREARMS POLICY COALITION
6  ADAM KRAUT*
   WILLIAM SACK*
7  1215 K Street, 17th Floor
   Sacramento, CA 95814
8  P: (916) 596-3492
   E: akraut@fpclaw.org
9  E: wsack@fpclaw.org

10  Attorneys for Plaintiff

THE DIGUISEPPE LAW FIRM, P.C.
RAYMOND M. DIGUISEPPE*
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

11  **UNITED STATES DISTRICT COURT**
    **DISTRICT OF NEVADA**
12

13  ROGER PALMER, *et al.*,                Case No.: 3:21-cv-00268

                        Plaintiffs,
14
        v.
15
    STEPHEN SISOLAK, in his official
16  capacity as Governor of Nevada, *et al.*,

17                      Defendants.

18            **DECLARATION OF BRANDON COMBS**

19       I, Brandon Combs, am competent to state and declare the following based on my personal

20  knowledge:

21       1.    I am the President of Firearms Policy Coalition, Inc. ("FPC"), a Plaintiff in this

22  action. I am authorized to testify on behalf of FPC as to matters set forth in this Declaration.

23       2.    I have personal knowledge of the facts stated herein, have reviewed the Complaint,

24  Motion for Preliminary Injunction, and Memorandum in Support of the Motion for Preliminary

25  Injunction, and if called as a witness, could competently testify thereto.

26       3.    I have held the elected position of president of FPC since the organization was founded

27  in 2014. As its president, I am duly authorized to act on behalf of the organization.

28       4.    FPC is a non-profit organization incorporated under the laws of Delaware, with a

                              - 1 -

1  place of business in Nevada, as well as other states.

2      5.      The purposes of Plaintiff FPC include defending and promoting the People's rights—
3  especially the fundamental, individual Second Amendment right to keep and bear arms—advancing
4  individual liberty, and restoring freedom.

5      6.      Plaintiff FPC serves its members and the public through legislative advocacy,
6  grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

7      7.      Plaintiff FPC has members within and outside of Nevada.

8      8.      Plaintiff FPC represents its Nevada resident members—who include gun owners,
9  prospective gun owners, and gun self-manufacturers, as well as retailers of NFOs, parts, and
10  firearms, and others—and brings this action on behalf of its Nevada resident members, including the
11  named Plaintiffs herein.

12      9.      Plaintiff FPC's Nevada resident members, including the individual Plaintiffs in this
13  case, have been and will continue to be adversely and directly harmed by Defendants'
14  administration, implementation, and enforcement of the laws, and related regulations, policies,
15  practices, and customs challenged herein and will otherwise remain so adversely and directly
16  affected under the Nevada Ban.

17      10.     Many of Plaintiff FPC's Nevada resident members lawfully acquired unserialized
18  firearm components and firearm construction materials that are commonly possessed by law-abiding
19  citizens in the exercise of their right to self-manufacture firearms for their own self-defense and
20  other lawful purposes.

21      11.     However, FPC's Nevada resident members are mandated to dispossess themselves of
22  all unserialized firearm components, by January 1, 2022, or face criminal prosecution under Section
23  3 of Nevada's Ban.

24      12.     Many of Plaintiff FPC's Nevada resident members desire to continue to own and
25  possess the now-banned firearm components for lawful purposes, and to not sell or otherwise
26  dispose of them, but they reasonably fear criminal sanction in light of the statutorily mandated
27  dispossession established under Section 3 of Nevada's Ban.

28      13.     Many of Plaintiff FPC's Nevada resident members also desire to acquire additional

1    NFOs and firearm construction materials otherwise commonly available for purchase and used in the

2    self-manufacturing of firearms for self-defense and other lawful purposes, including those that fall

3    within the definition of "unfinished frames or receivers" under Nevada's Ban, and further desire to

4    self-manufacture additional operable firearms for self-defense and other lawful purposes. However,

5    they are currently prohibited from purchasing or otherwise acquiring any such unfinished receivers

6    or frames under Section 3.5 of the Ban, they are currently prohibited from self-manufacturing any

7    operable unserialized firearms under Section 4, and they are prohibited from ever again possessing,

8    purchasing, transporting, or receiving any such firearms or NFOs under Sections 3 and 5 any time on

9    or after January 1, 2022.

10         14.    Based on this threat of criminal prosecution by and through the Nevada Ban that

11   Defendants are actively enforcing, Plaintiff FPC's Nevada resident members have been prevented

12   from acquiring, possessing, transporting, or receiving NFOs, and from self-manufacturing any

13   additional operable firearms from NFOs, for self-defense and other lawful purposes.

14         15.    Plaintiff FPC reasonably fears the prosecution of its Nevada resident members by and

15   through Defendants' administration, implementation, and enforcement of the laws, regulations,

16   policies, practices, and customs challenged herein.

17         16.    As to all claims made in a representative capacity herein, there are common questions

18   of law and fact that substantially affect the rights, duties, and liabilities of numerous FPC Nevada

19   resident members who knowingly or unknowingly are subject to the Nevada Ban.

20         I, Brandon Combs, verify that FPC is a Plaintiff named in this action and declare, under

21   penalty of perjury under the law of the State of Nevada, that all the information contained herein is

22   true and correct to the best of my information, knowledge, and belief.

23   Dated: June 17, 2021

                                    By:    _____

24                                                BRANDON COMBS

25

26

27

28

1    THE O'MARA LAW FIRM, P.C.         THE DIGUISEPPE LAW FIRM, P.C.
     DAVID C. OMARA                 RAYMOND M. DIGUISEPPE*
2    (Nevada Bar No. 8599)            4320 Southport-Supply Road
     311 East Liberty Street           Suite 300
3    Reno, NV 89501                  Southport, NC 28461
     P: (775) 323-1321              P: 910-713-8804
4    F: (775) 323-4082              E: law.rmd@gmail.com
     E: david@omaralaw.net
5

     FIREARMS POLICY COALITION          * PHV Forthcoming
6    ADAM KRAUT*
     WILLIAM SACK*
7    1215 K Street, 17th Floor
     Sacramento, CA 95814
8    P: (916) 596-3492
     E: akraut@fpclaw.org
9    E: wsack@fpclaw.org

10    Attorneys for Plaintiff

11            **UNITED STATES DISTRICT COURT**
                 **DISTRICT OF NEVADA**
12

     ROGER PALMER, *et al.*,          Case No.: 3:21-cv-00268
13

                Plaintiffs,     **PLAINTIFF'S MOTION PRELIMINARY**
14      v.                        **INJUNCTION AND SUPPORTING**
                                       **MEMORANDUM OF POINTS AND**
15    STEPHEN SISOLAK, in his official     **AUTHORITIES**
     capacity as Governor of Nevada, *et al.*,
16                                   **Judge: Hon. Miranda Du**
                Defendants.      **Date:**
17                                       **Time**
                                      **Courtroom:**
18

19         **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

20        Plaintiffs Roger Palmer, Chad Moxley, and Firearms Policy Coalition, Inc. (collectively,

21    "Plaintiffs") move for a Preliminary Injunction enjoining Defendants Stephen Sisolak, Aaron Ford,

22    George Togliatti, Mindy McKay, Joseph Lombardo, Stephen Wolfson, Daniel Coverley, and Mark

23    Jackson (collectively, "Defendants") from enforcing the statutes enacted in AB 286 and Defendants'

24    derivative laws, regulations, policies, procedures, enforcement practices, and customs as being in

25    violation of the right to keep and bear arms as guaranteed by the Second and Fourteenth

26    Amendments to the United States Constitution and as being in violation of the right to due process

27    and just compensation for the destruction of or damage to property interests.

28        This Motion is made pursuant to Rule 65 of the Federal Rules of Civil Procedure on the

1  grounds that immediate and irreparable injury will result unless and until such relief is obtained. The

2  Motion is based on this Supporting Memorandum of Points and Authorities, the Declarations of

3  Plaintiff Palmer, Plaintiff Moxley, and Plaintiff Firearms Policy Coalition's President, Brandon

4  Combs, including any exhibits concurrently filed, the pleadings and papers on file in this action, and

5  such other evidence and argument as may be permitted at the hearing.

6  DATED:  June 18, 2021                         THE O'MARA LAW FIRM, P.C.

7

8                                                        */s/ David C. O'Mara*
                                                        DAVID C. O'MARA, ESQ.
9                                                        311 E. Liberty Street
                                                        Reno, NV 89501
10                                                       775.323.1321
                                                        david@omaralaw.net
11
                                                        *Attorney for Plaintiff*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

# SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES
## I.  INTRODUCTION

3    Rather than enact tailored laws to address the State's interests in reducing crime, such as
4  increased enforcement of laws prohibiting the possession of firearms by convicted violent criminals,
5  or law enforcement recovery of illegally possessed weapons by such violent convicts, or even
6  addressing root causes of violent crime and social ills, Nevada instead enacted Assembly Bill 286
7  ("AB 286"), a radically expansive, confiscatory ban on constitutionally protected property and
8  conduct that runs roughshod over the rights of its many thousands of law-abiding citizens who have
9  only ever self-manufactured and used firearms for entirely lawful, indeed constitutionally protected
10  purposes ("Nevada's Ban" and the "Ban").

11    The regulatory scheme enacted under AB 286, enforced by Defendants, imposes an
12  immediate and total ban on the self-manufacturing of all modern operable firearms, most or a great
13  many of which are of a type in common use for lawful purposes throughout Nevada and much of the
14  rest of the country, and it criminalizes the mere possession of such arms by ordinary law-abiding
15  Nevadans as of January 1, 2022. What is more, this date marks a deadline by which all such people
16  are forced to dispossess themselves of all these arms, in addition to their constituent parts, without
17  any compensation. All this, without a hint of evidence that any of the numerous law-abiding citizens
18  targeted by this ban has ever been involved any instance of gun violence or misuse, that any of them
19  poses any risk to public safety in possessing such arms, or even that violence involving "ghost guns"
20  exists as a significant or prevalent problem generally in Nevada.

21    By all measures, Nevada's Ban is an unconstitutional infringement of the fundamental rights
22  guaranteed under the Second Amendment to all ordinary law-abiding citizens, including Plaintiffs in
23  this case and all the similarly situated Nevadans that they represent. And by all measures, the Ban's
24  forced dispossession of constitutionally protected, valuable property interests without any
25  compensation constitutes an unconstitutional taking in violation of fundamental due process. The
26  strength of Plaintiffs' claims, the balance of the equities, and the public interest all weigh heavily in
27  favor of granting preliminary injunctive relief against the significant, irreparable harm they have
28  suffered and will continue to suffer on account of these blatant, unjustified constitutional injuries.

## II. RELAVENT BACKGROUND

### A.   The Nevada Ban

The provisions of the Ban, enacted under AB 286, individually and collectively work to cut off the fundamental constitutional right of numerous ordinary law-abiding Nevadans to keep, bear, and self-manufacture protected arms commonly used by them and countless others around the country for self-defense and other lawful purposes. The Ban does this by (1) forcing the dispossession of all "unfinished" frames and receivers—amorphously defined to include virtually all non-firearm components and parts that could conceivably be used to construct a firearm ("Non-Firearm Objects" or "NFOs")—as well as all fully assembled firearms that lack "a serial number issued by a firearms importer or manufacturer," (2) eliminating all lawful means of acquiring these so-called "ghost guns" and their component parts, (3) prohibiting any self-manufacturing of such arms, and (4) otherwise outlawing their possession and use by ordinary law-abiding Nevadans.

### 1.   The Forced Dispossession of All Existing "Unfinished Frames or Recievers" by January 1, 2022 (Section 3)

Under Section 3 of AB 286, effective January 1, 2022, it is a crime for anyone in Nevada to "possess, purchase, transport or receive an unfinished frame or receiver," unless "[t]he person is a firearms importer or manufacturer" or "[t]he unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by a firearms importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number." AB 286, § 3(1)(a)-(b); *id.* at §10(2). Only those "licensed to import or manufacture firearms pursuant to 18 U.S.C. Chapter 4" fit within the classification of a "firearms importer or manufacturer." AB 286, § 6(5). And the term "unfinished frame or receiver" is sweepingly defined to include all Non-Firearm Objects potentially serving as precursor components in the construction of a firearm, as follows:

> a blank, a casting or a machined body that is intended to be turned into the frame or lower receiver of a firearm with additional machining and which has been formed or machined to the point at which most of the major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm even if the fire-control cavity area of the blank, casting or machined body is still completely solid and unmachined.

AB 286 § 6(9).

1   Obtaining serialization of such components after the fact is not an option, as federal law only

2   requires that any necessary serialization of be completed *before* the firearm reaches the consumer

3   and that the final product is indeed a *firearm*. *See* 27 C.F.R. § 478.92(a)(1) & (a)(2) (firearms

4   importers and manufacturers "must legibly identify each firearm manufactured or imported" and

5   identify "as required by this section" any "firearm frame or receiver that is not a component part of a

6   complete weapon at the time it is sold, shipped, or otherwise disposed"); *see also* 18 U.S.C. §

7   921(a)(3) (defining "firearm"). Consequently, all ordinary law-abiding Nevadans (i.e., everyone

8   except licensed firearms importers and manufacturers) must dispossess themselves of all unfinished

9   frames and receivers, i.e., all NFOs, by no later than January 1, 2022.

10   Dispossession is the only option the State ever intended. The sponsor of AB 286 herself

11   declared that the effective date of section 3 was set for January 1, 2022, just to permit those in

12   possession of such firearm components "to sell or dispose of them" before the total ban kicks in.

13   Notes   of   Assemblywoman   Jauregui   to   amendments   of   AB   286   on   5/11/21.

14   (https://www.leg.state.nv.us/App/NELIS/REL/81st2021/ExhibitDocument/OpenExhibitDocument?e

15   xhibitId=53667&fileDownloadName=AB%20286_Work%20Session%20Document_Patrick%20Gui

16   nan_Policy%20Analyst_Research%20Division_LCB.pdf). Then, once the ban takes effect, no

17   ordinary law-abiding citizen of Nevada may ever again lawfully possess, purchase, transport, or

18   receive any unserialized frame, receiver, or other NFO. This blanket prohibition effectively bans any

19   manufacture or assembly of any firearm using any such object unless and until some unknown date

20   in the future (if ever) when (1) federal law or regulations require serialization of components, (2) the

21   components are in fact serialized, and (3) they are transferred in accordance with those laws or

22   regulations, all before being incorporated into any self-built firearm.

23   **2.   *The Immediate Ban on the Sale and Transfer of All Unserialized "Unfinished Frames or Receivers" (Section 3.5)***

24

25   Section 3.5 of AB 286 shuts the door on any future sale or transfer of any unserialized frame,

26   receiver, or other NFO to or by any ordinary law-abiding citizen, by immediately criminalizing all

27   such sales or transfers, except for sales conducted to comply with the mandatory dispossession of

28   such frames and receivers by the dispossession deadline of January 1, 2022, § 3.5(1)(a)-(b); *id.* at

1 §10(1), after which the permanent and total ban in Section 3 takes hold.

2        **3.**     **The Immediate Ban on Self-Manufacturing of All Modern Operable**
3               **Firearms(Section 4)**

4       Section 4 immediately makes it a crime for anyone in Nevada to "manufacture or cause to be

5 manufactured or assemble or cause to be assembled a firearm that is not imprinted with a serial

6 number issued by a firearms importer or manufacturer in accordance with federal law and any

7 regulations adopted thereunder," unless the firearm "[h]as been rendered permanently inoperable,"

8 "[i]s an antique firearm," or "[h]as been determined to be a collector's item pursuant to 26 U.S.C.

9 Chapter 53 or a curio or relic pursuant to 18 U.S.C. Chapter 44." AB 286, § 4(1)(a)-(c); *id.* at §10(1).

10 This prohibition effectively bans all self-manufacturing of modern operable firearms since the

11 mandated form of serialization must be "*issued by* a firearms importer or manufacturer."

12        **4.**     **The Forced Dispossession of All Unserialized Operable Modern Firearms by January**
13               **1, 2022, and Total Ban Against All Such Firearms (Section 5)**

14       Section 5 targets existing unserialized firearms of ordinary law-abiding Nevadans, banning as

15 of January 1, 2022 the possession, sale, transfer, transport, or receipt of all such modern and operable

16 firearms manufactured after 1969. As noted, federal law requires any necessary serialization of

17 firearms and related components be completed *before* they reach the consumer, so that obtaining

18 serialization after the fact for pre-existing unserialized firearms is no option. *See* 27 C.F.R. §

19 478.92(a)(1) & (a)(2). Consequently, all ordinary law-abiding citizens must dispossess themselves of

20 all such firearms no later than January 1, 2022, in order not to be in violation of this prohibition. *See*

21 Notes of Assemblywoman Jauregui to the amendments of AB 286 on 5/11/21. And, as of January 1,

22 2022, no ordinary law-abiding citizen may ever again lawfully possess, sell, transfer, purchase,

23 transport, or receive any unserialized modern and operable firearm, further nailing the coffin shut on

24 any future self-manufacturing of firearms by these individuals.

25        **5.**     **The Penalties**

26       The penalties for any violation of these prohibitions are severe. The first offense subjects the

27 alleged violator to conviction of a gross misdemeanor punishable by incarceration for up to 364

28 days, a fine up to $2,000, or both. AB 286 §§ 3(2), 3.5(2), 4(2), 5(2); NRS § 193.140. Any additional

1  offense calls for conviction of a category D felony, punishable by incarceration for at least a year

2  and up to four years, in addition to a $5,000 fine, *id.*, and which would result in a lifetime ban on the

3  right to keep and bear arms under federal law, *see* 18 U.S.C. § 922(g)(1).

4  **B.   Impact on Plaintiffs**

5  　　　The individual Plaintiffs and all similarly situated Nevada resident FPC members are directly

6  and significantly impacted by the prohibitions of the Ban. Plaintiff Palmer owns and possesses

7  firearms of a type commonly used for lawful purposes, including handguns and AR-15 rifles, which

8  he previously self-manufactured lawfully. Complaint ("Compl.") ¶ 84; Decl. of R. Palmer ¶¶ 8, 10.

9  He also owns and possesses firearm building kits and other NFOs of a type commonly possessed for

10 lawful purposes which fall within the Ban's definition of "unfinished frames and receivers," but

11 which he lawfully acquired before the Ban. Compl. ¶¶ 83-84; Decl. of R. Palmer ¶ 9. Plaintiff

12 Palmer desires to continue possessing and using for lawful purposes the self-built firearms and NFOs

13 he currently owns, and he also desires to acquire additional NFOs to self-manufacture additional

14 firearms in common use for lawful purposes. Compl. at ¶¶ 86-87; Decl. of R. Palmer ¶¶ 12-13. But

15 he is subject to the immediate bans against the acquisition of "unfinished frames and receivers" and

16 self-manufacturing of firearms, the mandates requiring dispossession of existing self-manufactured

17 firearms and related NFOs by January 1, 2022, without compensation, and the permanent ban against

18 any ownership or possession of any such firearms or components after that date. Decl. of R. Palmer

19 ¶¶ 11-12, 14. Plaintiff Palmer thus has been prevented and will continue to be prevented from

20 acquiring, possessing, transporting, or receiving NFOs, and from self-manufacturing any additional

21 operable firearms in common use, for self-defense and other lawful purposes. *Id.* ¶¶ 12, 14.

22 　　　Plaintiff Moxley also owns and possesses handguns and rifles of a type commonly used for

23 lawful purposes, which he previously self-manufactured lawfully, which he desires to keep for such

24 purposes, and of which he desires to build more for lawful purposes. Compl. ¶¶ 84, 101; Decl. of C.

25 Moxley ¶¶ 11-12. Thus, he is left to face the same peril that Plaintiff Palmer faces should this Ban

26 continue to be enforced. Decl. of C. Moxley ¶¶ 13-16. Additionally, Plaintiff Moxley lawfully

27 conducts sales of firearms and firearm precursor parts to law-abiding people at gun shows in

28 Nevada, including NFOs that fall within the definition of "unfinished frames and receivers." Compl.

1   ¶¶ 87, 95-97; Decl. of C. Moxley ¶¶ 5-7. He desires to continue doing so and would do so but for the

2   Ban. Compl. ¶ 99-100; Decl. of C. Moxley ¶¶ 9-10. Before the Ban, Plaintiff Moxley had arranged

3   to attend several more shows this year where he would have sold additional NFOs to law-abiding

4   citizens for lawful purposes, but which he is now immediately banned from doing. Compl. at ¶ 99;

5   Decl. of C. Moxley ¶ 8. Consequently, he has lost and will continue to lose sales, revenue, and

6   goodwill, while his would-be consumers have been concomitantly denied and will continue to be

7   denied the ability to acquire NFOs in the lawful exercise of their self-manufacture rights, as he has

8   been and will remain restrained from conducting any further such sales based on the threat of

9   criminal prosecution. Compl. at ¶ 99; Decl. of C. Moxley ¶ 10.

10       Plaintiff FPC brings this action on behalf of its Nevada resident members, including Palmer

11   and Moxley, who are subject to the immediate bans against the acquisition of "unfinished frames and

12   receivers" and self-manufacturing, the mandates requiring dispossession of existing self-

13   manufactured firearms and related NFOs by January 1, 2022, without compensation, and the

14   permanent ban against any ownership or possession of any such firearms or components. Compl. ¶¶

15   107, 113; Decl. of B. Combs ¶¶ 8-16. Plaintiff Moxley is also asserting the rights of his customers

16   whose Second Amendment rights are being violated by the Ban's prohibition against their acquiring

17   NFOs for lawful purposes, including for the self-manufacture of arms. *Id.* at ¶ 107.

18                              **III. GENERAL LEGAL STANDARDS**

19       To obtain preliminary relief, a plaintiff "'must establish that he is likely to succeed on the

20   merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

21   balance of equities tips in his favor, and that an injunction is in the public interest.'" *Am. Trucking*

22   *Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Natural*

23   *Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). Alternatively, injunctive relief "is appropriate

24   when a plaintiff demonstrates that serious questions going to the merits [are] raised and the balance

25   of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d

26   1127, 1134-35 (9th Cir. 2011).

27

28

1
<div align="center">

**IV. ARGUMENT**
</div>

2 **A.    Plaintiffs Hold a Strong Likelihood of Success on Their Claims**

3          "[A] party seeking preliminary injunction must establish that it will prevail on the merits with

4 a 'reasonable certainty.'" *South Bay United Pentecostal Church v. Newsom*, __ F.Supp.3d __, 2020

5 WL 7488974 (S.D. Cal. 2020) *6 (quoting *Sierra Club v. Hickel*, 433 F.2d 24, 33 (9th Cir. 1970)).

6 "In this circuit, the burden is lessened to a fair chance of success on the merits in cases in which the

7 harm that may occur to the plaintiff is sufficiently serious." *Id.* (citing *William Inglis & Sons Baking*

8 *Co. v. ITT Continental Baking Co., Inc.*, 526 F.2d 86, 88 (9th Cir. 1975)).

9          **1.    The Second Amendment Rights Directly Infringed by the Ban**

10          Incorporated against the states through the due process clause of the Fourteenth Amendment,

11 *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010), the Second Amendment confers "an

12 individual right to keep and bear arms," *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). It

13 is "a fundamental constitutional right guaranteed to the people," *id.*, which is and always has been

14 key to "our scheme of ordered liberty," *McDonald* at 767-68. The Second Amendment guarantees an

15 individual, personal right "to keep and bear arms for lawful purposes, most notably for self-defense

16 within the home," *McDonald* at 780, and "to possess and carry weapons in case of confrontation,"

17 *Heller* at 592. This is a "fundamental constitutional right guaranteed to the people," *Heller* at 592,

18 which is and always has been key to "our scheme of ordered liberty," *McDonald* at 767-68.

19 Ultimately, "[t]he Second Amendment is about America's freedom: the freedom to protect oneself,

20 family, home, and homeland." *Miller v. Bonta*, __ F.Supp.3d __, 2021 WL 2284132 (S.D. Cal.

21 2021), *44.

22          "Government is not free to impose its own new policy choices on American citizens where

23 Constitutional rights are concerned. As *Heller* explains, the Second Amendment takes certain policy

24 choices and removes them beyond the realm of permissible state action." *Miller*, 2021 WL 2284132,

25 *45. "The very enumeration of the right takes out of the hands of government—even the Third

26 Branch of Government—the power to decide on a case-by-case basis whether the right is really

27 worth insisting upon." *Heller*, 554 U.S. at 634. The Second Amendment "elevates above all other

28 interests"—including any interest in targeting the self-manufacturing of so-called "ghost guns"—

<div align="center">

- 9 –
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (CASE NO. 3:21-CV-00268-MMD-WGC)

**ER-217**
</div>

1  "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id* at 635.

2  "Fortunately, no legislature has the constitutional authority to dictate to a good citizen that he or she

3  may not acquire a modern and popular gun for self-defense." *Miller* at *45.

4  "There is only one policy enshrined in the Bill of Rights. Guns and ammunition in the hands

5  of criminals, tyrants and terrorists are dangerous; guns in the hands of law-abiding responsible

6  citizens are better." *Miller*, 2021 WL 2284132, *45. "To give full life to the core right of self-

7  defense, every law-abiding responsible individual citizen has a constitutionally protected right to

8  keep and bear firearms *commonly owned and kept for lawful purposes.*" *Id.* (italics added). The

9  Second Amendment "guarantees the right to carry weapons '*typically possessed* by law-abiding

10  citizens for lawful purposes,'" *Caetano v. Massachusetts*, 577 U.S. 411, 416 (2016) (Alito, J.,

11  concurring) (quoting *Heller*, 554 U.S. at 625) (italics added), so its protection extends to all firearms

12  in common use that are not both "dangerous per se" and "unusual," *id.* at 417. "*Heller* defined the

13  'Arms' *covered by* the Second Amendment to include ""any thing that a man wears for his defence,

14  or takes into his hands, or useth in wrath to cast at or strike another."" *Id.* (quoting *Heller* at 581)

15  (quoting 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)).

16  This right to keep and bear all arms commonly possessed for lawful purposes includes—and

17  has always included—the right to self-manufacture such arms. The Supreme Court made clear in

18  *Heller* that the rights secured under the Second Amendment are, and always must be, defined by the

19  history and tradition of citizens' firearm rights as recognized during the founding era. *See Heller*,

20  554 U.S. 623-24 (rejecting any reliance on the opinion in *United States v. Miller*, 307 U.S. 174

21  (1939) to define the nature and scope of the Second Amendment rights, because the *Miller* opinion

22  "discusses *none* of the history of the Second Amendment" and the government's briefing in that case

23  also "provided scant discussion of the history of the Second Amendment"); *id.* at 598 (observing that

24  "once one knows the history that the founding generation knew," the text of the Second Amendment

25  "fits perfectly" with an interpretation that it "confers an individual right to keep and bear arms"); *id.*

26  at 595 ("There seems to us no doubt, on the basis of both text and history, that the Second

27  Amendment conferred an individual right to keep and bear arms.").

28  As detailed in the historical analysis of the Complaint, Americans' freedom to self-

1    manufacture firearms has been recognized since the earliest days of this country's founding. As

2    Thomas Jefferson observed more than two centuries ago, "[o]ur citizens have always been free to

3    make, vend, and export arms." Secretary of State Thomas Jefferson, letter to George Hammond,

4    British Ambassador to the U.S., May 15, 1793, in 7 The Writings Of Thomas Jefferson 325, 326

5    (Paul Ford ed., 1904). And this historical right to self-manufacture arms in common use for lawful

6    purposes necessarily secures the related right to *own, possess, and use* these arms constructed for

7    lawful purposes. *Luis v. United States*, __ U.S. __, 136 S.Ct. 1083, 1097 (2016) (Thomas, J.,

8    concurring) (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir.

9    2014) ("Constitutional rights thus implicitly protect those closely related acts necessary to their

10   exercise ... The right to keep and bear arms, for example 'implies a corresponding right to obtain the

11   bullets necessary to use them.' ").

12          Indeed, the rights secured under the Second Amendment would be rendered meaningless if

13   the states could force the dispossession or permanent disabling of such arms once they are assembled

14   for lawful purposes. That would undermine the Second Amendment's essential protection against

15   government tyranny. *Heller*, 554 U.S. at 598 (the Second Amendment secures an individual right to

16   keep and bear arms because tyrants have historically succeeded in oppressing their subjects "simply

17   by taking away the people's arms, enabling a select militia or standing army to suppress political

18   opponents") *id.* at 608-09 (quoting A Familiar Exposition of the Constitution of the United States §

19   450 (reprinted 1986)) ("One of the ordinary modes, by which tyrants accomplish their purposes

20   without resistance, is, by disarming the people, and making it an offence to keep arms, and by

21   substituting a regular army in the stead of a resort to the militia.").

22          The existence of alternative channels for the lawful acquisition of firearms, such as through

23   lawful purchases or other transfers, in no way negates this long recognized and revered right of

24   individuals to self-manufacture firearms in common use for lawful purposes in the exercise of their

25   fundamental right to keep and bear arms under the Second Amendment. A government regulation

26   eliminating one of the rights secured by the Second Amendment cannot be excused or overlooked on

27   the basis that it does not eliminate one or more *additional* rights secured thereunder. The *Heller*

28   court already made this clear in flatly rejecting the District of Columbia's attempt to justify its

1   handgun ban with the argument that the District had not *also* banned residents from possessing long

2   guns. *Heller*, 554 U.S. at 629 ("It is no answer to say … that it is permissible to ban the possession

3   of handguns so long as the possession of other firearms (i.e., long guns) is allowed.").

4       **2.    The Proper Rest for the Constitutional Analysis**

5       Just as "there is only one policy enshrined in the Bill of Rights," *Miller*, 2021 WL 2284132,

6   *45, there is only one true test for measuring the constitutionality of restrictions upon the rights that

7   the Second Amendment secures for ordinary law-abiding people. Simply put, "*Heller* asks whether a

8   law bans a firearm that is commonly owned by law-abiding citizens for lawful purposes." *Id.* If so, it

9   cannot stand and "judicial review can end right here." *Id.* The *Heller* opinion does not prescribe any

10  tiers of scrutiny for analyzing the constitutionality of such restrictions. It expressly rejects any use of

11  "rational basis" scrutiny, *Heller*, 554 U.S. at 628, n. 27, and emphasizes that any "judge-empowering

12  interest-balancing inquiry" is inappropriate because the Second Amendment is "the very *product* of

13  an interest balancing by the people" already solidified at the time of the founding, which is not

14  subject to second-guessing based on "future judges' assessments of its usefulness." *Id.* at 634. And,

15  in any event, "[i]f a regulation 'amounts to a destruction of the Second Amendment right,' it is

16  unconstitutional under any level of scrutiny." *Young v. Hawaii*, 992 F.3d 765, 784 (9th Cir. 2021)

17  (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)).

18      Further, because the high court has expressly rejected any "rational basis" testing of restraints

19  on the rights secured under the Second Amendment, only the most stringent forms of scrutiny could

20  ever be appropriate in any "interest balancing." *Teter v. Connors*, 460 F.Supp.3d 989, 1001 (D.

21  Hawaii 2020) (*Heller* makes clear that "rational basis is not appropriate" and "some degree of

22  heightened scrutiny applies" to such restraints). Courts must "strictly scrutinize any "'law that

23  implicates the core of the Second Amendment right and severely burdens that right.'" *Pena v.*

24  *Lindley*, 898 F.3d 969, 977 (9th Cir. 2018) (quoting *Silvester*, 843 F.3d at 821). "Under strict

25  scrutiny, restrictions 'may be justified only if the government proves that they are narrowly tailored

26  to serve compelling state interests.'" *In re National Security Letter*, 863 F.3d 1110, 1121 (9th Cir.

27  2017) (quoting *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)).

28      Intermediate scrutiny is also "not a free pass," even under the "watered down" and "overly

1   relaxed" iterations of the test prevalent in some courts. *Miller*, 2021 WL 2284132, *11. The State

2   bears the burden of affirmatively proving with "substantial evidence" that the restriction at issue is

3   "narrowly tailored to serve a significant governmental interest," *Packingham v. North Carolina*, 137

4   S. Ct. 1730, 1736 (2017), i.e., that it reasonably fits the claimed interest "to a material degree,"

5   *Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996). And the "narrowly tailored"

6   requirement essential to this test can be met "only if each activity within the proscription's scope is

7   an appropriately targeted evil." *Ward v. Rock Against Racism*, 491 U.S. 781, 799–800 (1989).

8           **3.      The Ban is Unconstitutional Under Any Standard**

9           By all measures, AB 286 is a total ban against the manufacture, ownership, possession, use,

10  transport, purchase, and sale by all ordinary law-abiding Nevadans of all self-manufactured modern,

11  operable arms otherwise in common use for lawful purposes—including the core purpose of self-

12  defense—*in addition* to all "unfinished frames," "unfinished receivers," and other NFOs that fall

13  within the sweepingly broad definition of "unfinished frames or receivers." All such self-

14  manufacturing is *immediately* banned, AB 286 § 4, all sales and transfers of NFOs to and by

15  ordinary citizens are *immediately* banned (except to effect a *dispossession* in compliance with

16  sections 3 and 5), *id.* at § 3.5, all such arms and components must be dispossessed or rendered

17  "permanently in operable" by January 1, 2022, *id.* at §§ 3 & 5, and all ownership, possession, use,

18  transport, purchases, and sales of all such arms and components are completely banned thereafter, *id.*

19  On top of that, the dispossession mandate destroys the valuable property interests in these protected

20  arms and products without even any thought of compensation for the concrete injury.

21          Unquestionably, this Ban and the destruction of significant protected interests it entails flunks

22  the simple, yet fundamental *Heller* test because it blatantly violates the Second Amendment's

23  guarantee to ordinary law-abiding citizens of the right to self-manufacture, possess, and use for

24  lawful purposes all "weapons '*typically possessed* by law-abiding citizens for lawful purposes,'"

25  *Caetano*, 577 U.S. at 416 (quoting *Heller*, 554 U.S. at 625). Many, if not, most of the firearms

26  targeted by the Ban are just like those that Plaintiffs Palmer and Moxley previously self-

27  manufactured and desire to continue self-manufacturing for lawful purposes—handguns built with

28  the popular and widely sold Polymer80 component materials and AR-15 rifles built with the popular

1    and widely sold precursor AR-15 lower receivers. Handguns are indisputably in common use

2    throughout the country, as the Supreme Court itself confirmed in declaring such arms "the

3    quintessential self-defense weapon" "overwhelmingly chosen by American society" for lawful self-

4    defense. *Heller*, 554 U.S. at 628-29. Judicial findings in recent case law also confirm the same is true

5    of AR-15 rifles: such rifles are "commonly owned by law-abiding citizens" and "the overwhelming

6    majority of citizens who own and keep the popular AR-15 rifle and its many variants do so for

7    lawful purposes, including self-defense at home." *Miller*, 2021 WL 2284132, *6.

8        Thus, the Ban's blanket prohibitions against the self-manufacture, possession, and use of

9    such protected arms "'amounts to a destruction of the Second Amendment right'" so as to be

10    "unconstitutional under any level of scrutiny," *Young*, 992 F.3d at 784 (quoting *Silvester*, 843 at

11    821), and at the least constitutes a "'law that implicates the core of the Second Amendment right and

12    severely burdens that right'" such that strict scrutiny must set the minimum constitutional floor for

13    any "interest-balancing inquiry," *Pena*, 898 F.3d at 977 (quoting *Silvester*, 843 F.3d at 821). The

14    State cannot prove these prohibitions are "*narrowly tailored* to serve compelling state interests"

15    because, whatever the claimed interest may be and however "compelling" the interest might be,

16    there has been *no tailoring at all. In re National Security Letter*, 863 F.3d at 1121. The very nature

17    of *the Ban* is just that—a *ban* against the full spectrum of protected arms and activities associated

18    with these otherwise widely available firearms in common use for self-defense and other lawful

19    purposes.

20        For the same essential reasons, the Ban must fail intermediate scrutiny, because a total

21    absence of any tailoring necessarily cannot meet any test requiring that the law be "narrowly tailored

22    to serve a significant governmental interest," *Packingham*, 137 S. Ct. at 1736 (2017)

23    —much less tailored "to a material degree," *Liquormart, Inc.*, 517 U.S. at 505—as this test requires.

24        Even continuing to look through the overly-lenient lens of intermediate scrutiny, beyond the

25    clear lack of "the reasonable fit" required to satisfy this test, *Board of Trustees of the University of*

26    *New York v. Fox*, 492 U.S. 469, 480 (1989), the State has no chance of carrying its related burden of

27    showing that "each activity within the proscription's scope is an appropriately targeted evil," *Ward*,

28    491 U.S. at 799–800. The only discernable "evil" being targeted here is "ghost guns" and the

1  unserialized parts used in self-manufacturing such guns—a menacing label attached to unserialized
2  firearms through sensationalism of instances of gun violence and misuse, conduct worlds apart from
3  the constitutionally protected purposes for which law-abiding Nevadans and countless others across
4  the country build and use such arms in the exercise of their Second Amendment rights. The State
5  cannot show, and has made no attempt to show, that *any* of the countless law-abiding Nevadans
6  targeted under this Ban—much less any significant number of these individuals—has had any
7  involvement in any crime associated with any unserialized firearm or any unserialized firearm
8  component so as to somehow justify dispossessing them of all such firearms and firearm parts and
9  prohibiting them from exercising their fundamental right to possess, use, and self-manufacture these
10  arms in common use for self-defense and other lawful purposes.

11  In fact, the State has cited no evidence of *any* pervasive gun violence or misuse of "ghost
12  guns" or their constituent parts within Nevada which could reasonably warrant their eradication
13  through a ban so all-encompassing that it captures the protected arms and entirely lawful conduct of
14  countless law-abiding Nevadans simply seeking to exercise their constitutional rights. To the extent
15  the State may claim a legitimate interest in ensuring firearms are "traceable" for law enforcement
16  purposes, no such interest could justify its blanket prohibition against the self-manufacture,
17  possession, and use of all modern operable unserialized firearms. Even California apparently
18  recognizes that is a bridge too far; as oppressive as its regulatory scheme is, California residents who
19  apply for and obtain a serial number from the State, and pass its background check, "shall" be
20  authorized to construct their own firearm. Cal. Penal Code §§ 29180(b)(1), 29182(b)(1).

21  Even under intermediate scrutiny, the restraint must be "in reasonable proportion to the
22  interests served," *Edenfield v. Fane*, 507 U.S. 761, 767 (1993), and however strong the interests
23  served may be, the government must prove its chosen means are "'closely drawn'" to achieve that
24  end without "'unnecessary abridgment'" of constitutionally protected conduct, *McCutcheon v. FEC*,
25  134 S. Ct. 1434, 1456-57 (2014) (quoting *Buckley v. Valeo*, 424 U.S. 1, 25 (1976)). Given the
26  blanket outlawing of all unserialized arms and their constituent components under Nevada's Ban,
27  stripping all ordinary law-abiding people of their constitutional rights to harness all such protected
28  arms for any purpose including for the "core" right to self defense, the State has no hope of even

1   coming close to satisfying the most lenient test conceivably applicable here.

2          Success on the merits of Plaintiffs' Second Amendment claim is thus inevitable, but they

3   need only show a "reasonable certainty" of prevailing on the merits. *South Bay United Pentecostal*

4   *Church*, 2020 WL 7488974, *6. This they have done, especially in light of the seriousness of the

5   harm inflicted by the Ban (as discussed more fully below), which further reduces the required degree

6   of certainty here. *See id.* ("In this circuit, the burden is lessened to a fair chance of success on the

7   merits in cases in which the harm that may occur to the plaintiff is sufficiently serious.").

8          **4.      The Ban Also Unquestionably Effects an Unconstitutional Taking**

9          A similarly high likelihood of success exists for Plaintiffs' claim that they and all similarly

10  situated Nevada resident FPC members face an unconstitutional deprivation of their property

11  interests in the absence of relief from this Court. "[W]here government requires an owner to suffer a

12  permanent physical invasion of her property—however minor—it *must* provide just compensation."

13  *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005) (italics added); *Horne v. Dep't of Agric.*,

14  576 U.S. 350, 359 (2015) ("a physical appropriation of property, giv[es] rise to a per se taking"). The

15  same is true for government regulations that "completely deprive an owner of '*all* economically

16  beneficial us[e] of her property,'" even without a physical invasion or appropriation. *Id.* (quoting

17  *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1009 (1992)).

18          The Nevada Ban forces ordinary law-abiding citizens to rid themselves of all modern

19  operable self-manufactured firearms and all NFOs that fall within the definition of "unfinished

20  frames or receivers." All the NFOs must be sold or transferred away by no later than January 1,

21  2022, and all the firearms must be sold, transferred away, or rendered "permanently inoperable" (i.e.,

22  totally useless) by then. The purported option of selling these arms and constituent parts is illusory.

23  First, and fundamentally, it is the *State's* duty to provide just compensation; it cannot shift to the

24  citizen the burden of remedying or meditating the loss suffered on account of the taking. *Horne v.*

25  *Dept. of Agriculture*, 576 U.S. 352, 358 (2015) ("The Government has a categorical duty to pay just

26  compensation when it takes your car, just as when it takes your home.") Moreover, "just

27  compensation" is "normally measured by fair market value" in a sale on the open market. *U.S. v. 50*

28  *Acres of Land*, 469 U.S. 24, 26 (1984). "A 'sale' implies willing consent to the bargain. A

1   transaction although in the form of a sale, but under compulsion or duress, is not a sale." *Dore v.*

2   *U.S.*, 97 F.Supp. 239, 224 (Ct. Cl. 1951). The Ban has destroyed or significantly diminished the

3   value of the property to any would-be purchasers and has thus destroyed the very market to which it

4   has relegated the affected citizens. *See Amen v. City of Dearborn*, 718 F.2d 789, 797 (6th Cir. 1983)

5   ("the City chose not to invoke its condemnation powers, but, rather, elected to engage in a deliberate

6   course of conduct to force the sale of private property at reduced value").

7         Thus, no "*just* compensation" could be obtained through any government-compelled sale of

8   the condemned property. Indeed, because all arms and parts of the same type are now banned, any

9   substitute for the property would almost invariably require the purchase of other *legal* reasonably

10  equivalent arms and component parts at their *full* fair market value. Realistically then, the vast

11  majority of Nevadans will ultimately be forced to just surrender their valuable arms and constituent

12  parts to law enforcement before the deadline, suffering a total loss of their property interests.

13        Despite having undeniably effected a "physical appropriation," a "permanent physical

14  invasion," or at the very least a complete deprivation of "all economically beneficial use" of their

15  property through the Nevada Ban, the State never even contemplated providing compensation for the

16  taking of this personal property. It just assumed it could condemn the property out of existence with

17  the stroke of the Governor's pen. *See* Notes of Assemblywoman Jauregui (AB 286's sponsor) to the

18  amendments of AB 286 on 5/11/21 (reflecting the intent for "those in possession of an unserialized

19  firearm or frame/receiver" to just "sell or dispose of them" by the deadline).

20        Such a taking is plainly unconstitutional and cannot be permitted, compelling the relief

21  Plaintiffs seek. At the very least, it must be said that Plaintiffs hold a "reasonable certainty" of

22  prevailing on the merits so as to warrant preliminary relief pending ultimate resolution of the merits.

23  *South Bay United Pentecostal Church*, 2020 WL 7488974, *6.

24  **B.**   **Likelihood of irreparable harm absent preliminary relief**

25        "It is well established that the deprivation of constitutional rights 'unquestionably constitutes

26  irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v.*

27  *Burns*, 427 U.S. 347, 373 (1976)); 11A Charles Alan Wright et al., Federal Practice and Procedure §

28  2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts

1 | hold that no further showing of irreparable injury is necessary."). The Ninth Circuit has applied the

2 | First Amendment's "irreparable if-only-for-a-minute" rule to cases involving other rights and, in

3 | doing so, has held a deprivation of these rights represents irreparable harm. *Monterey Mech. Co. v.*

4 | *Wilson*, 125 F.3d 702, 715 (9th Cir. 1997); *Ezell v. Chicago*, 651 F.3d 684, 700 (7th Cir. 2011) (a

5 | deprivation of the right to arms is "irreparable," with "no adequate remedy at law"). As the court has

6 | also recognized, we are generally "guided by First Amendment principles" in resolving challenges to

7 | Second Amendment restrictions. *Jackson*, 746 F.3d at 961.

8 |       Here, the deprivation is indisputable, and so is the irreparability of the harm should this Ban

9 | be permitted to remain in effect without any injunctive relief. The deprivation of protected rights

10 | exacted by the prohibitions against any further self-manufacturing of unserialized firearms and any

11 | further sales or transfers of "unfinished frames or receivers," under sections 3.5 and 4 of AB 286,

12 | became *immediately* effective on June 7, 2021. Much more than "a minute" is at stake, as these

13 | prohibitions have already been in effect for more than ten days and they will remain in effect

14 | indefinitely because they are *permanent*. The dispossession mandates under sections 3 and 5 of AB

15 | 286 force the *permanent* dispossession of the targeted arms and constituent parts by no later than

16 | January 1, 2022, and without any compensation, and thereafter *permanently* ban any future

17 | ownership, possession, use, transport, purchases, and sales of all such arms and components.

18 |       Irreparable harm is not just likely, it is certain, it has already occurred, and will persist

19 | *indefinitely* unless and until injunctive relief is obtained against the operation of the Ban.

20 | **C.**    **The Balance of Equities Tips Sharply in Plaintiffs' Favor**

21 |       When it comes to "the balance of hardships between the parties" in this context,

22 | fundamentally, the State "cannot suffer harm from an injunction that merely ends an unlawful

23 | practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715

24 | F.3d 1127, 1145 (9th Cir. 2013); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir.

25 | 2013) ("[I]t is clear that it would not be equitable ... to allow the state ... to violate the requirements

26 | of federal law.") (citations omitted). The illegality of the Ban and the significant, irreparable harm it

27 | forces upon countless law-abiding Nevadans are clear, and any potential harm to the State is

28 | comparatively minimal, if any exists at all. Again, the apparent interest behind the Ban devolves into

1  nothing more than a claim to be regulating in favor of the general public welfare and safety by

2  eradicating the potential dangers of untraceable "ghost guns" when in the hands of wrongdoers. This

3  claim is staked without evidence of *any* pervasive or significant violence or misuse of such firearms,

4  *much less* any instances of misuse by any of the numerous law-abiding citizens like Plaintiffs and

5  those similarly situated Nevadans they represent, who have only used and only ever intended to use

6  these arms for lawful, constitutionally protected purposes. When the State cannot show any

7  prevalence of "ghost gun" violence within its borders and cannot point to even one instance of

8  misuse involving the *law-abiding* people whose constitutional rights are being directly targeted by

9  the Ban, it cannot reasonably claim *any* meaningful degree of "harm" in being required to suspend

10  enforcement of the Ban pending resolution of the merits in this case and, whatever theoretical harm

11  it may be able to conjure would necessarily be of miniscule significance in comparison to the

12  undeniably significant, and concrete, deprivation of constitutional rights.

13  **D.    A Preliminary Injunction is in the Public's Interest**

14         When the challenged government action substantially impacts the exercise of constitutional

15  rights, necessarily, "[t]he public interest … tip[s] sharply in favor of enjoining the" law. *Klein v. City*

16  *of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (emphasis added). Thus, simply put, for all

17  the same reasons already discussed, this factor also weighs in Plaintiffs' favor and further compels

18  preliminary injunctive relief pending resolution of the merits.

19  **E.    The Alternative Test for Preliminary Relief is Also Fully Satisfied**

20         While the likelihood of success is strong, even assuming it is not, preliminary relief remains

21  appropriate and necessary regardless. Again, "serious questions going to the merits and a balance of

22  hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so

23  long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction

24  is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d at 1135. The "[s]erious

25  questions need not promise a certainty of success, nor even present a probability of success," as they

26  need only "involve a 'fair chance of success on the merits.'" *National Association of Manufacturers*

27  *v. United States Department of Homeland Security*, 491 F.Supp.3d 549, 550 (N.D. Cal. 2020)

28  (quoting *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)). The strength of

1  Plaintiffs' claims easily meets this "fair chance" standard of success, the irreparable injury is

2  undeniable, the balance of hardships indeed tip sharply in their favor, and preliminary injunctive

3  relief against this severe, unjustified deprivation of fundamental rights is strongly in the public

4  interest. Thus, this alternative test for a preliminary injunction is also fully satisfied.

5  **F.     Waiver of Bond is Proper and Appropriate Under These Circumstances**

6         "Notwithstanding its seemingly mandatory language," stating that the movant must provide

7  "security in an amount that the court considers proper to pay the costs and damages sustained by any

8  party found to have been wrongfully enjoined or restrained," "'Rule 65(c) invests the district court

9  with discretion as to the amount of security required, if any.'" *Weaver v. City of Montebello*, 370

10  F.Supp.3d 1130, 1139 (C.D. Cal. 2109) (quoting *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th

11  Cir. 2009)). The court may properly dispense with any such bond requirement when "'the balance of

12  ... equities weighs overwhelmingly in favor of the party seeking the injunction,'" *East Bay Sanctuary*

13  *Covenant v. Trump*, 349 F.Supp.3d 838, 869 (N.D. Cal. 2018) (quoting *Elliott v. Kiesewetter*, 98

14  F.3d 47, 60 (3d Cir. 1996)), when "there is no realistic likelihood of harm to the defendant from

15  enjoining his or her conduct," *Johnson* at 1086 (internal quotations omitted), and where the plaintiffs

16  have a "likelihood of success on the merits," *People of the State of Cal. ex rel. Van De Kamp v.*

17  *Tahoe Regency Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985). All these factors are true

18  here, as illustrated above, thus rendering a waiver both proper and appropriate.

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28                              [*signatures on following page*]

| | |
|---|---|
| 1 | **CONCLUSION** |
| 2 | For these reasons, Plaintiffs respectfully request preliminary injunctive relief enjoining |
| 3 | Defendants, their officers, agents, servants, employees, all persons in active concert or participation |
| 4 | with them, and all persons who have notice of the injunction, from enforcing the statutes enacted in |
| 5 | AB 286 and Defendants' derivative laws, regulations, policies, procedures, enforcement practices, |
| 6 | and customs, as being in violation of the right to keep and bear arms as guaranteed by the Second |
| 7 | and Fourteenth Amendments to the United States Constitution and the right to due process and just |
| 8 | compensation for the destruction of or damage to property interests. |

Dated: June 18, 2021

THE O'MARA LAW FIRM, P.C.

_____/s/ David C. O'Mara_____
DAVID C. O'MARA, ESQ.
311 E. Liberty Street
Reno, NV 89501
Tel: 775.323.1321
david@omaralaw.net

Dated: June 18, 2021

THE DIGUISEPPE LAW FIRM, P.C.

_____/s/ Raymond M. DiGuiseppe_____
RAYMOND M. DIGUISEPPE
4320 Southport-Supply Road, Ste 300
Southport, NC 28461
910.713.8804
Law.rmd@gmail.com

FIREARMS POLICY COALITION

_____/s/ Adam Kraut_____
ADAM KRAUT, ESQ.
1215 K Street 17th Floor
Sacramento, CA 95814
916.596.3492
akraut@fpclaw.org

FIREARMS POLICY COALITION

_____/s/ William Sack_____
WILLIAM SACK, ESQ
1215 K Street 17th Floor
Sacramento, CA 95814
916.596.3492
wsack@fpclaw.org

1

**CERTIFICATE OF SERVICE**

2        I hereby certify that I am an employee of The O'Mara Law Firm, P.C. and on this date, the

3    foregoing document was filed electronically *via* the Court's ECF system which provided notification

4    of such filing to counsel of record for all parties.

5

Dated: June 18, 2021                                    /s/ Bryan Snyder
6                                                       BRYAN SNYDER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INDEX OF EXHIBITS

| Exh No. | Description | Pages |
|---|---|---|
| 1 | Declaration of Brandon Combs | 3 |
| 2 | Declaration of Chad Mosley | 3 |
| 3 | Declaration of Roger Palmer | 3 |

THE O'MARA LAW FIRM, P.C.
DAVID C. OMARA
(Nevada Bar No. 8599)
311 East Liberty Street
Reno, NV 89501
P: (775) 323-1321
F: (775) 323-4082
E: david@omaralaw.net

THE DIGUISEPPE LAW FIRM, P.C.
RAYMOND M. DIGUISEPPE*
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

FIREARMS POLICY COALITION
ADAM KRAUT*
WILLIAM SACK*
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 596-3492
E: akraut@fpclaw.org
E: wsack@fpclaw.org

* Will comply with LR IA 11-2 within 14 days

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ROGER PALMER; CHAD MOXLEY; and, FIREARMS POLICY COALITION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> STEPHEN SISOLAK, <br> Governor of Nevada; <br> AARON FORD, <br> Attorney General of Nevada; <br> GEORGE TOGLIATTI, <br> Director of the Nevada Department of Public Safety; <br> MINDY MCKAY, <br> Administrator of the Records, Communications, and Compliance, Division of the Nevada, Department of Public Safety; | Case No.: <br><br> **COMPLAINT FOR DECLARATORY, INJUNCTIVE, OR OTHER RELIEF** <br><br> **42 U.S.C. § 1983** |

1  JOSEPH LOMBARDO,
     Sheriff of Clark County, Nevada;
2  STEVEN WOLFSON,
     District Attorney of Clark County,
3     Nevada;
   DANIEL COVERLEY,
4     Sheriff of Douglas County, Nevada;
   and, MARK JACKSON,
5     District Attorney of Douglas County,
     Nevada,
6
7                    Defendants.

8

9          COME NOW Plaintiffs Roger Palmer, Chad Moxley, and Firearms Policy Coalition,

10  Inc., by and through their attorneys, and complain of Defendants and alleges:

11                              **INTRODUCTION**

12         1.      The Supreme Court "has held that the Second Amendment extends, prima

13  facie, to all instruments that constitute bearable arms, even those that were not in existence

14  at the time of the founding," *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016), quoting

15  *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008), and that this "Second Amendment

16  right is fully applicable to the States," *id.* (quoting *McDonald v. City of Chicago*, 561 U.S.

17  742, 750 (2010)).

18         2.      In spite of the text of the Constitution and binding Supreme Court

19  precedents, on June 7, 2021, Defendant Governor Stephen Sisolak signed into law

20  Assembly Bill 286 ("AB 286").

21         3.      AB 286 radically expands the State of Nevada's statutes to

22  unconstitutionally and categorically ban, under pain of severe criminal sanctions, the

23  possession, receipt, manufacturing, and sales of Non-Firearm Objects ("NFOs"), and further

24  bans both the possession of previously self-manufactured firearms as well as, prospectively,

25  any further self-manufacturing of firearms (hereinafter referred to as the "Ban" and

26  "Nevada's Ban").

27         4.      Indeed, under the new statutes established by AB 286, the Defendants are

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
- 2 -

ER-233

charged with and are enforcing laws that:

      a.     Completely prohibit a person from possessing, purchasing, transporting, or receiving NFOs that some use to machine, print, or otherwise self-manufacture firearms (Sec. 3);

      b.     Completely prohibit a person from selling, offering to sell, or transferring NFOs (Sec. 3.5);

      c.     Completely prohibit a person from manufacturing, causing to be manufactured, assembling, or causing to be assembled a firearm that is not imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law (Sec. 4);

      d.     Completely prohibit a person from possessing, selling, offering to sell, transferring, purchasing, transporting, or receiving a firearm that is not imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law (Sec. 5); and,

      e.     Establish an expansive, inherently vague definition of an "[u]finished frame or receiver," encompassing virtually all conceivable forms and types of NFOs and non-firearm predecessor materials.

5.     The Ban's restrictions are nothing less than a broad and unconstitutional ban on constitutionally protected conduct and instruments in direct violation of the fundamental individual right to keep and bear arms.

6.     The Ban generally took effect immediately when Defendant Sisolak signed AB 286 into law, and Sections 3 and 5 of the Act become effective on January 1, 2022—leaving thousands of individuals and countless local businesses mere months to dispossess themselves of all lawfully owned property in the State affected by the Ban and putting all residents at risk of enforcement and prosecution for proscribed conduct on and after January 1.

7.     And the State has not even attempted to show any of the numerous law-

1  abiding citizens directly targeted by this law has ever misused, much less committed any

2  crime of violence with, any unserialized firearm or firearm component, so as to justify this

3  dispossession and ban being imposed against them.

4        8.     Rather than tailor its laws as the Constitution requires, the State elected to

5  take an overbroad, categorical approach that unquestionably infringes on the rights of

6  Nevada residents, businesses, and visitors, and empowers Defendants to use criminal

7  sanctions and force to impose the State's policy preferences on Nevada's law-abiding

8  residents, denying them access to and the exercise of their right to keep and bear protected

9  arms.

10        9.     "But the enshrinement of constitutional rights necessarily takes certain

11  policy choices"—including these—"off the table." *Heller*, 554 U.S. at 636.

12        10.    Throughout American history and our nation's traditions of robustly

13  exercising the right to keep and bear arms, people have been free to personally manufacture,

14  construct, and/or assemble arms for lawful purposes, including self-defense in the home.

15        11.    "The *Heller* test is a test that any citizen can understand. *Heller* asks whether

16  a law bans a firearm that is commonly owned by law-abiding citizens for lawful purposes.

17  It is a hardware test." *Miller v. Bonta*, No. 19-cv-1537-BEN (JLB), 2021 U.S. Dist. LEXIS

18  105640, at \*16 (S.D. Cal. June 4, 2021). If the arm is commonly owned by law-abiding

19  citizens for lawful purposes, then it is protected by the Constitution, full stop.

20        12.    But Nevada's Ban completely and categorically prohibits individuals not

21  prohibited from exercising their Second Amendment rights from possessing, acquiring, and

22  self-manufacturing firearms that are of types, functions, and designs, and are themselves,

23  commonly owned and possessed firearms—self-made firearms that do not bear a

24  manufacturer's serial number—by law-abiding citizens for lawful purposes.

25        13.    Plaintiffs therefore bring this challenge because they unquestionably face "a

26  realistic danger of sustaining a direct injury as a result of the law's operation or

27  enforcement," *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

- 4 -

738, 747 (9th Cir. 2020), seek to vindicate their rights, and to immediately and permanently enjoin enforcement of Nevada's Ban as required to conform the law to the Constitution's text, our Nation's history and tradition, and the Supreme Court's binding *Heller*, *McDonald*, and *Caetano* decisions.

## JURISDICTION AND VENUE

14. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges under the United States Constitution. To the extent that the court determines that Plaintiffs are asserting state law claims, this court has supplemental jurisdiction under 28 U.S.C. § 1367(a).

15. This action, based on a violation of Plaintiffs' constitutional rights, is brought under 42 U.S.C. § 1983 and seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

16. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the District of Nevada.

## PARTIES

17. Plaintiff Palmer is a natural person and a citizen of the State of Nevada, residing in Clark County, Nevada.

18. Plaintiff Moxley is a natural person and a citizen of the State of Nevada, residing in Douglas County, Nevada.

19. Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a 501(c)(4) non-profit organization incorporated under the laws of Delaware with a place of business in Clark County, Nevada.

20. Defendant Stephen Sisolak is vested with the "supreme executive power" of the State. As the Governor of Nevada, Nev. Const., Art. 5, Sec. 1, Defendant Sisolak is required under the State Constitution to "see that the laws are faithfully executed," *id*. Sec.

1   7, and is thus wholly or partially responsible for overseeing, implementing, and enforcing

2   Nevada's Ban, regulatory programs, and related policies, practices, and customs designed

3   to propagate the same. Defendant Sisolak is sued in his official capacity.

4        21.    Defendant Aaron Ford is the Attorney General of the Nevada and is wholly

5   or partially responsible in such capacity for overseeing, implementing, and enforcing

6   Nevada's Ban, including the State's statutes, regulations, and related policies, practices, and

7   customs designed to propagate the same. Defendant Ford oversees "[s]pecial investigators"

8   who "have the powers of a peace officer." NRS 289.170. Defendant Ford is sued in his

9   official capacity.

10       22.    Defendant George Togliatti is the Director of Public Safety ("DPS"), based

11  in Carson City, Nevada. Defendant Togliatti has the powers of a peace officer, NRS

12  289.270. 1.(a), and oversees "[t]he sworn personnel of the Department of Public Safety,"

13  who also have the powers of a peace officer, NRS 289.270.1.(d). Defendant Togliatti is

14  wholly or partially responsible for overseeing, implementing, and enforcing Nevada's Ban,

15  regulatory programs, and related policies, practices, and customs designed to propagate the

16  same. Defendant Togliatti is sued in his official capacity.

17       23.    Defendant Mindy McKay is the Division Administrator for the DPS

18  Records, Communications and Compliance Division. Defendant McKay has the powers of

19  a peace officer. NRS 289.170. 1.(b). She is wholly or partially responsible for overseeing,

20  implementing, and enforcing Nevada's Ban, regulatory programs, and related policies,

21  practices, and customs designed to propagate the same.[1] Defendant McKay is sued in her

22  official capacity.

23       24.    Defendant Joseph Lombardo is sued in his official capacity as Sheriff of

24  

25  [1] See, e.g., "Governor's Recommended Budget" for "Budget Accounts 4702, 4709 2022/2023," (Department of Public Safety, Records, Communications and Compliance Division), dated March 9, 2021, online at

26  https://www.leg.state.nv.us/App/NELIS/REL/81st2021/ExhibitDocument/OpenExhibitDo

27  cument?exhibitId=48182&fileDownloadName=BA 4709 and BA 4702_Department of Public Safety_Presentation.pdf (last accessed June 10, 2021).

28  

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
- 6 -

Clark County, Nevada. As Sheriff of that county, he has the duty to "keep and preserve the peace" in his county and "apprehend[] or secur[e] any person for felony, or breach of the peace …" in the county. NRS § 248.090. Defendant Lombardo's ongoing enforcement of the Nevada Ban against Clark County residents places Plaintiff Palmer under imminent threat of arrest should he violate any of its restrictions, thereby depriving him of his fundamental constitutional right to keep, bear, and self-manufacture protected arms under the Second Amendment to the United States Constitution, as alleged herein.

25.   Defendant Steven Wolfson is sued in his official capacity as District Attorney of Clark County, Nevada. As District Attorney of that county, he is the "public prosecutor," NRS § 252.090, with the duty to "[a]ttend the district courts in his … county, for the transaction of criminal business," *id.* at 252.90(1), "[a]ttend justice courts in his … county, when required by justices of the peace, and conduct all prosecutions on behalf of the people for public offenses," *id.* at 252.90(2). Defendant Wolfson's ongoing enforcement of the Nevada Ban against Clark County residents, through the discharge of his duty to prosecute alleged violations of the Ban, places Plaintiff Palmer under imminent threat of prosecution and criminal sanction should he violate any of its restrictions, thereby depriving him of his fundamental constitutional right to keep, bear, and self-manufacture arms under the Second Amendment to the United States Constitution, as alleged herein.

26.   Defendant Daniel Coverly is sued in his official capacity as Sheriff of Douglas County, Nevada. As Sheriff of that county, he has the duty to "keep and preserve the peace" in his county and "apprehend[] or secur[e] any person for felony, or breach of the peace …" in the county. NRS § 248.090. Defendant Coverly's ongoing enforcement of the Nevada Ban against Douglas County residents places Plaintiff Moxley under imminent threat of arrest should he violate any of its restrictions, thereby depriving him of his fundamental constitutional right to keep, bear, and self-manufacture arms under the Second Amendment to the United States Constitution, as alleged herein.

27.   Defendant Mark Jackson is sued in his official capacity as District Attorney

of Douglas County, Nevada. As District Attorney of that county, he is the "public prosecutor," NRS § 252.090, with the duty to "[a]ttend the district courts in his … county, for the transaction of criminal business," *id.* at 252.90(1), "[a]ttend justice courts in his … county, when required by justices of the peace, and conduct all prosecutions on behalf of the people for public offenses," *id.* at 252.90(2). Defendant Jackson's ongoing enforcement of the Nevada Ban against Douglas County residents, through the discharge of his duty to prosecute alleged violations of the Ban, places Plaintiff Moxley under imminent threat of prosecution and criminal sanction should he violate any of its restrictions, thereby depriving him of his fundamental constitutional right to keep, bear, and self-manufacture arms under the Second Amendment to the United States Constitution, as alleged herein.

## THE RIGHTS AT STAKE

### *The Right to Keep and Bear Arms*

28.     The Second Amendment to the United States Constitution provides (italics added): "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms *shall not* be infringed."

29.     Incorporated against the states through the due process clause of the Fourteenth Amendment, *McDonald*, 561 U.S. at 767, the Second Amendment guarantees "an individual right to keep and bear arms," *Heller*, 554 U.S. at 595. It is "a fundamental constitutional right guaranteed to the people," *id.*, which is and always has been key to "our scheme of ordered liberty," *McDonald* at 767-68.

30.     The "central" holding of the Supreme Court in *Heller* is "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald*, 561 U.S. at 780. It "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592.

31.     "The very enumeration of the right takes out of the hands of government— even the Third Branch of Government—the power to decide on a case-by-case basis

1    whether the right is really worth insisting upon." *Heller*, 554 U.S. at 634. The Second

2    Amendment "elevates above all other interests"—including any interest in targeting the so-

3    called "ghost guns" commonly available and used for lawful purposes—"the right of law-

4    abiding, responsible citizens to use arms in defense of hearth and home." *Id* at 635.

5          32.    The Second Amendment is not a "second-class right, subject to an entirely

6    different body of rules than the other Bill of Rights guarantees," *McDonald*, 561 U.S. at

7    780, and it cannot "be singled out for special—and specially unfavorable—treatment," *id.*

8    at 778–79. Even purported "[c]ommercial regulations on the sale of firearms do not fall

9    outside the scope of the Second Amendment[.]" *United States v. Marzzarella*, 614 F.3d 85,

10    92, n. 8 (3d Cir. 2010). Indeed, "prohibiting the commercial sale of firearms . . . would be

11    untenable under *Heller*." *Id.*

12          33.    Instead, "[j]ust as the First Amendment protects modern forms of

13    communications, … and the Fourth Amendment applies to modern forms of search, … the

14    Second Amendment extends, prima facie, to all instruments that constitute bearable arms,

15    even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582

16    (internal citations omitted); *accord Caetano*, 577 U.S. at 416 (Alito, J., concurring).

17          34.    Thus, the Second Amendment "guarantees the right to carry weapons

18    '*typically possessed* by law-abiding citizens for lawful purposes,'" *Caetano*, 577 U.S. at

19    416 (quoting *Heller*, 554 U.S. at 625) (italics added), and its protection extends to all

20    firearms currently in common use that are not both "dangerous per se" and "unusual," *id.* at

21    417 ("A weapon may not be banned unless it is both dangerous *and* unusual.").

22          35.    "Dangerous *per se*" does not mean the mere inherent propensity of a firearm

23    to cause injury. *Caetano*, 577 U.S. at 418 ("firearms cannot be categorically prohibited just

24    because they are dangerous"). In fact, "the relative dangerousness of a weapon is irrelevant

25    when the weapon belongs to a class of arms commonly used for lawful purposes." *Id.*

26    "*Heller* defined the 'Arms' *covered by* the Second Amendment to include " 'any thing that

27    a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike

28

1    another.' " *Id.* (quoting *Heller*, 554 U.S. at 581) (quoting 1 Dictionary of the English
2    Language 106 (4th ed.) (reprinted 1978)) (italics original in *Caetano*).

3         36.    An arm is not "unusual" so as to fall outside the ambit of this protection so
4    long as it is "commonly possessed by law-abiding citizens for lawful purposes *today.*"
5    *Caetano*, 577 U.S. at 420 (italics original). For example, modern handguns, including many
6    of the popular makes and models targeted by the Nevada ban, are not only not "unusual" in
7    this country but are recognized as "the quintessential self-defense weapon"
8    "overwhelmingly chosen by American society" for lawful self-defense. *Heller*, 554 U.S. at
9    628-29; *see also Miller v. Bonta*, __ F.Supp.3d __, 2021 WL 2284132 * 45 ("To give full
10   life to the core right of self-defense, every law-abiding responsible individual citizen has a
11   constitutionally protected right to keep and bear firearms commonly owned and kept for
12   lawful purposes.").

13        37.    Indeed, Nevada's ban does not merely prohibit dangerous convicted felons
14   from the conduct of keeping and making firearms, nor does it impose a pre-possession or
15   pre-construction requirement that persons seeking to acquire NFOs and materials, or self-
16   manufacture firearms, must pass a background check. Rather than attempt to regulate the
17   channel in a targeted manner, the State simply bans all conduct and possession *in toto*,
18   forcing all law-abiding people to purchase pre-manufactured commercial firearms, often
19   more expensive than what can be constructed with a 3D printer or small CNC machine at
20   home.

21        38.    In the First Amendment context, individuals have a right that includes the
22   ability to build one's own printing and communications devices, print one's own fliers, and
23   utilize largely unregulated channels of speech. In that context, the government cannot
24   narrow the channels for exercising the right to freely speak by having limited, government-
25   approved gatekeepers who create or provide speech and its means of distribution for a
26   beholden populace.

27        39.    Likewise, in the Second Amendment context, the government cannot narrow

28

1   the channels for exercising the right to keep and bear arms by limiting one's access to the

2   essential instruments of that right to limited, government-approved manufacturers of

3   firearms and firearm predecessor materials.

4       40.    The Second Amendment right necessarily includes and thus guarantees the

5   ability of ordinary law-abiding citizens to self-manufacture firearms commonly owned,

6   possessed, and used for self-defense and other lawful purposes.

7       41.    Perhaps, understanding that a ban such as Nevada's would be

8   unconstitutional, the State of California—hardly reticent when it comes to regulating

9   firearms—took a different approach. In that state, a person can (and is required to) "[a]pply

10   to the Department of Justice for a unique serial number or other mark of identification" prior

11   to constructing a firearm, Cal. Penal Code § 29180(b)(1). Before the Department issues the

12   serial number to an applicant, it conducts a background check. Cal. Penal Code §

13   29182(b)(1). And if the applicant is not disqualified, the Department "shall grant" such an

14   application "in the form of serial numbers pursuant to Section 23910 to, persons who wish

15   to manufacture or assemble firearms pursuant to subdivision (b) of Section 29180." Cal.

16   Penal Code § 29182(a)(1).

17       42.    The ability to self-manufacture arms has always been part of the Second

18   Amendment right, as well as American history and tradition.

19       43.    The colonists in the first permanent English settlements had the express right

20   to import arms and the items necessary to make them. Binding his "Heirs and Successors,"

21   King James I in 1606 granted the "Southern Colony" (Virginia) the right to import from

22   Great Britain "the Goods, Chattels, Armour, Munition, and Furniture, needful to be used by

23   them, for their said Apparel, Food, Defence or otherwise." 7 FEDERAL AND STATE

24   CONSTITUTIONS: COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES,

25   TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF

26   AMERICA 3787–88 (Francis Thorpe ed., 1909). And the 1620 Charter of New England

27   granted colonists the right "to take, load, carry, and transports in . . . Shipping, Armour,

28

1   Weapons, Ordinances, Munition, Powder, Shott, Victuals, and all Manner of Cloathing,

2   Implements, Furniture, Beasts, Cattle, Horses, Mares, and all other Things necessary for the

3   said Plantation, and for their Use and Defense, and for Trade with the People there." 3

4   FEDERAL AND STATE CONSTITUTIONS: COLONIAL CHARTERS, AND OTHER ORGANIC LAWS

5   OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED

6   STATES OF AMERICA 1834–35 (Francis Thorpe ed., 1909). And "[f]rom the earliest periods

7   American gunsmiths had made and repaired military firearms." Harold L. Peterson, ARMS

8   AND ARMOR IN COLONIAL AMERICA 178 (1956).

9        44.    "The influence of the gunsmith and the production of firearms on nearly

10  every aspect of colonial endeavor in North America cannot be overstated, and that pervasive

11  influence continuously escalated following the colonial era." M.L. Brown, FIREARMS IN

12  COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792, at 149

13  (1980).

14       45.    As historian Charles Winthrop Sawyer explained, "in the smaller shops

15  which formed the great majority—mere cabins on the outskirts of the wilderness—one man

16  with or without an apprentice did every part of the work." 1 Charles Winthrop Sawyer,

17  FIREARMS IN AMERICAN HISTORY 145 (1910). Moreover, many gunsmiths worked primarily

18  in other trades and built or repaired firearms as a hobby. See James Whisker, THE

19  GUNSMITH'S TRADE 145–63 (1992).

20       46.    During the Revolutionary War, many colonies relied on and incentivized

21  people outside of the firearms industry to produce firearms. For example, on August 2, 1775,

22  a Committee appointed by Maryland's Provincial Convention "to enquire into the

23  practicability of establishing a manufactory of Arms within this Province" determined that

24  "Arms may be furnished sooner, and at less expense by engaging immediately all Gun

25  Smiths, *and others concerned in carrying on that business*." Journal of the Maryland

26  Convention July 26 – August 14, 1775, at 64–65 (William Hand Browne ed. 1892) (italics

27  added).

28

47.    In January 1776, the New Hampshire House of Representatives passed a resolution to pay each person who "made" a firearm to certain specifications. "[E]very good firearm Manufactured in this Colony" was rewarded with "three pounds for each." *8 Documents and Records Relating to the State of New-Hampshire During the Period of the American Revolution, From 1776 to 1783*, at 15–16 (Nathaniel Bouton ed., 1874).

48.    In March 1776, a committee of New York's Provincial Congress published notice "in all the publick Newspapers in this Colony" that "this Committee are ready to receive proposals from & treat with any Person or Persons who are willing to engage in manufacturing good Muskets, or the Locks, Barrels, or any necessary parts thereof." *5 American Archives, Fourth Series*, 1418 (Peter Force ed. 1844). The Provincial Congress offered rewards for the manufacturers who could produce the greatest number of arms for the colony, but excluded "any person with whom the Congress or Committee of Safety have already contracted"—thus incentivizing those capable of manufacturing arms but not necessarily in the firearms business.

49.    A month later, the North Carolina Provincial Congress called for "all Gunsmiths, and other mechanicks, who have been accustomed to make, or assist in making Muskets" to be recruited to manufacture arms for the colony. *5 American Archives, Fourth Series*, 1338 (Peter Force ed. 1844). And further, "that they be furnished, at the expense of this Colony, with tools, implements and utensils, and materials for carrying on the said work." *Id.*

50.    Certainly, the ratifiers of the Bill of Rights remembered that the young country depended on the manufacture of firearms by those outside of the firearms industry for survival and intended to protect such activity through the Second Amendment. Indeed, building firearms was entirely unregulated during the colonial and founding eras in America. And there were no restrictions on who could be a gunsmith or make guns.

51.    "Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Secretary of State Thomas Jefferson,

1   letter to George Hammond, British Ambassador to the U.S., May 15, 1793, in 7 THE

2   WRITINGS OF THOMAS JEFFERSON 325, 326 (Paul Ford ed., 1904).

3       52.     Thus, no history or precedent exists for extinguishing citizens' ability to self-

4   manufacture firearms for self-defense or other lawful purposes—and rightly so, since the

5   Second Amendment, through its text and as it is informed by history and tradition, is

6   intended to guarantee this right as part of the fundamental liberty it secures.

7                   ***The Right to Due Process of Law and Just Compensation***

8       53.     The fundamental right to due process of law is also at stake in this case in

9   light of the mandate that all ordinary law-abiding Nevadans dispossess themselves of all

10  unserialized "unfinished frames or receivers" (and the many other NFOs that fall within the

11  Ban's sweepingly broad definition of this term) as well as all unserialized firearms, without

12  any compensation for the destruction of their valuable property rights.

13      54.     The Fifth Amendment to the United States Constitution states, in pertinent

14  part, "No person shall . . . be deprived of life, liberty, or property, without due process of

15  law; nor shall private property be taken for public use, without just compensation."

16      55.     The Fourteenth Amendment to United States Constitution states, in pertinent

17  part, ". . . nor shall any State deprive any person of life, liberty, or property, without due

18  process of law."

19      56.     The Nevada Constitution similarly provides: "No person shall be deprived

20  of life, liberty, or property, without due process of law," and "[p]rivate property shall not

21  be taken for public use without just compensation having been first made, or secured, except

22  in cases of war, riot, fire, or great public peril, in which case compensation shall be afterward

23  made." Nev. Const., art. I, § 8.

24      57.     "[W]here government requires an owner to suffer a permanent physical

25  invasion of her property—however minor—it must provide just compensation." *Lingle v.*

26  *Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005). "A second categorical rule applies to

27  regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her

28

1   property." *Id.* (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019
2   (1992)).

3       58.   Beyond these recognized categories of "takings *per se*," any other
4   "regulatory actions that are functionally equivalent to the classic taking in which
5   government directly appropriates private property or ousts the owner from his domain"
6   require compensation to the property owner. *Lingle*, 544 U.S. at 539. This is measured by
7   "the magnitude of a regulation's economic impact and the degree to which it interferes with
8   legitimate property interests," where "the complete elimination of a property's value" or
9   other "permanent physical invasion" of the property is a "determinative factor." *Id.*

10   **THE CHALLENGED BAN**

11       59.   Through AB 286, the Nevada Legislature amended Chapter 202 of the
12   Nevada Revised Statutes (NRS) by adding the following provisions, categorized as Sections
13   3, 4, 5, and 5.5 of the Bill, which force ordinary law-abiding citizens to dispossess
14   themselves of all unserialized "unfinished frames or receivers" (and the many other NFOs
15   that fall within this sweepingly broad definition) as well as unserialized, self-manufactured
16   firearms by no later than January 1, 2022, and thereafter ban the same as criminal objects
17   whenever in the hands of such individuals.

18       60.   Effective immediately, Section 6 of AB 286 amended NRS 202.253 to add
19   the term "[u]nfinished frame or receiver," defining it to mean:

> a blank, a casting or a machined body that is intended to be
> turned into the frame or lower receiver of a firearm with
> additional machining and which has been formed or
> machined to the point at which most of the major machining
> operations have been completed to turn the blank, casting or
> machined body into a frame or lower receiver of a firearm
> even if the fire-control cavity area of the blank, casting or
> machined body is still completely solid and unmachined.

**Section 3 of AB 286**
*The Forced Dispossession of All Existing "Unfinished Frames or Receivers" by*
*January 1, 2022, and Total Ban Thereafter*

61.     Effective January 1, 2022, it is a crime for anyone in Nevada to "possess, purchase, transport or receive an unfinished frame or receiver," unless "[t]he person is a firearms importer or manufacturer" or "[t]he unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by a firearms importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number." AB 286, § 3(1)(a)-(b); *id.* at §10(2) (establishing January 1, 2022 as the effective date of this section); *id.* at §5.5 (providing that "[n]othing in the provisions of sections 3 to 5, inclusive, of this act shall be deemed to prohibit the sale of an unfinished frame or receiver or firearm that is not imprinted with a serial number to a firearms importer or manufacturer or a licensed dealer before January 1, 2022").

62.     "Firearms importer or manufacturer" is defined as "a person licensed to import or manufacture firearms pursuant to 18 U.S.C. Chapter 44." AB 286, § 6(5). "Unfinished frame or receiver" is broadly and vaguely defined as follows, so as to sweep into its net virtually all conceivable forms and types of NFOs and non-firearm predecessor materials: "a blank, a casting or a machined body that is intended to be turned into the frame or lower receiver of a firearm with additional machining and which has been formed or machined to the point at which most of the major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm even if the fire-control cavity area of the blank, casting or machined body is still completely solid and unmachined." *Id.* at § 6(9). "Firearm" is defined as: "any device designed to be used as a weapon from which a projectile may be expelled through the barrel by the force of any explosion or other form of combustion." *Id.* at § 6(3).

63.     Obtaining serialization of such components after the fact is not an option, as federal law only requires that any necessary serialization be completed *before* the firearm reaches the consumer and that the final product is indeed a *firearm*. *See* 27 C.F.R. §

1  478.92(a)(1) & (a)(2) (firearms importers and manufacturers "must legibly identify each

2  firearm manufactured or imported" and identify "as required by this section" any "firearm

3  frame or receiver that is not a component part of a complete weapon at the time it is sold,

4  shipped, or otherwise disposed"); *see also* 18 U.S.C. § 921(a)(3) (defining "firearm").

5      64.    Indeed, it is clear that the Nevada lawmakers fully anticipate and intend

6  dispossession as the sole means of complying with this law. *See* Notes of Assemblywoman

7  Jauregui (AB 286's sponsor) to the amendments of AB 286 on May 11, 2021 (stating that

8  the limited sales exception is designed "to ensure that those in possession of an unserialized

9  firearm or frame/receiver have time and ablity [*sic*] to sell their parts to federally licensed

10  firearms dealers" and that the later effective date "will allow those possession of an

11  unserialized firearm or frame/receiver have [*sic*] until January 1, 2022 to sell or dispose of

12  them").[2]

13      65.    Consequently, all ordinary law-abiding citizens (i.e., everyone except

14  firearms importers and manufacturers) must dispossess themselves of all unserialized

15  "unfinished frames or receivers" and other NFOs that fall within this definition by no later

16  than January 1, 2022.

17      66.    Further, no ordinary law-abiding citizen may ever again lawfully possess,

18  purchase, transport, or receive any such unserialized frames, receivers, or NFOs on or after

19  January 1, 2022, which effectively means no ordinary law-abiding Nevadan may thereafter

20  lawfully manufacturer or assemble a firearm of any type using just about any NFO; no

21  firearms can be lawfully self-built with any such products in the State unless and until (1)

22  federal law or regulations require serialization of such component parts separately from

23  serialization of fully assembled firearms and (2) the components are in fact serialized and

24

25  ---

[2] The document is publicly available online at
26  https://www.leg.state.nv.us/App/NELIS/REL/81st2021/ExhibitDocument/OpenExhibitDo
cument?exhibitId=53667&fileDownloadName=AB%20286_Work%20Session%20Docu
27  ment_Patrick%20Guinan_Policy%20Analyst_Research%20Division_LCB.pdf (last
accessed June 10, 2021).

28

1   then transferred in accordance with those laws or regulations before being incorporated into
2   any firearm self-built by the ordinary person.

### Section 3.5 of AB 286
### The Immediate Ban on the Sale and Transfer of
### All Unserialized "Unfinished Frames or Receivers"

67.   Effective immediately, it is a crime for anyone in Nevada to "sell, offer to sell or transfer an unfinished frame or receiver," unless (1) the person is (a) a firearms importer or manufacturer *and* (b) "the recipient of the unfinished frame or receiver is a firearms importer or manufacturer," or (2) "[t]he unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by an importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number"—subject to the limited exception for sales permitted under section 5.5. AB 286, § 3.5(1)(a)-(b); *id.* at §10(1) (this section "becomes effective upon passage and approval").

68.   Thus, this section shuts the door on any future sale or transfer of any unserialized "unfinished frame or receiver" to or by any ordinary law-abiding citizen, by immediately criminalizing all such sales or transfers, except for sales conducted for purposes of complying with the mandatory dispossession of frames, receivers, and other NFOs falling within this definition by the dispossession deadline of January 1, 2022.

### Section 4 of AB 286
### The Immediate Ban on Self-Manufacturing of All Modern Operable Firearms

69.   Effective immediately, it is a crime for anyone in Nevada to "manufacture or cause to be manufactured or assemble or cause to be assembled a firearm that is not imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law and any regulations adopted thereunder," unless the firearm "[h]as been rendered permanently inoperable," "[i]s an antique firearm," or "[h]as been determined to be a collector's item pursuant to 26 U.S.C. Chapter 53 or a curio or relic pursuant to 18 U.S.C. Chapter 44." AB 286, § 4(1)(a)-(c); *id.* at §10(1) (establishing this section "becomes effective upon passage and approval"). "Assemble" means "to fit together component

1  parts," and "manufacture" means "to fabricate, make, form, produce or construct by manual

2  labor or machinery." *Id.* at § 4(3)(a)-(b).

3      70.    Because the serialization requirement of this manufacturing prohibition

4  mandates that the firearm's serial number be "*issued by* a firearms importer or

5  manufacturer," the prohibition effectively bans all self-manufacturing by ordinary law-

6  abiding citizens of any modern operable firearms.

7
### Section 5 of AB 286
*The Forced Dispossession of All Unserialized, Operable, Modern Firearms by January*
8  *1, 2022, and Total Ban Against All Such Firearms Thereafter*

9      71.    Effective January 1, 2022, it is a crime for anyone in Nevada to "possess,

10 sell, offer to sell, transfer, purchase, transport or receive a firearm that is not imprinted with

11 a serial number issued by a firearms importer or manufacturer in accordance with federal

12 law and any regulations adopted thereunder," unless (1) the person is a law enforcement

13 agency or a firearms importer or manufacturer, or (2) the firearm has been rendered

14 permanently inoperable, was manufactured before 1969, is an antique firearm, or has been

15 determined to be a collector's item pursuant to 26 U.S.C. Chapter 53 or a curio or relic

16 pursuant to 18 U.S.C. Chapter 44. AB 286, § 5(1)(b)-(b); *id.* at §10(2) (establishing an

17 effective date of January 1, 2022); *id.* at §5.5 (providing the sales exception for purposes of

18 complying with the mandated dispossession of such frames and receivers by January 1,

19 2022).

20     72.    This section targets existing unserialized firearms of ordinary law-abiding

21 Nevadans, banning as of January 1, 2022 the possession, sale, transfer, transport, or receipt

22 of all such modern and operable firearms manufactured after 1969. As noted, federal law

23 requires that any necessary serialization of firearms and related components be completed

24 *before* they reach the consumer, such that obtaining serialization after the fact for pre-

25 existing unserialized firearms is no option. *See* 27 C.F.R. § 478.92(a)(1) & (a)(2).

26 Consequently, all ordinary law-abiding citizens must dispossess themselves of all such

27 firearms no later than January 1, 2022, in order not to be in violation of this prohibition. *See*

28

1    Notes of Assemblywoman Jauregui to the amendments of AB 286 on May 11, 2021. And,

2    as of January 1, 2022, no ordinary law-abiding citizen may ever again lawfully possess, sell,

3    transfer, purchase, transport, or receive any unserialized modern and operable firearm,

4    further nailing the coffin on any future self-manufacturing of firearms by such ordinary law-

5    abiding people.

6                    **The Criminal Sanctions for Violating Nevada's Ban**

7            73.     Nevada's Ban scheme imposes significant criminal sanctions for a violation

8    of any of the new regulatory provisions enacted in AB 286: The first offense constitutes a

9    gross misdemeanor, punishable by imprisonment in county jail for up to 364 days, a fine up

10   to $2,000, or both. AB 286, §§ 3(2), 3.5(2), 4(2), 5(2); NRS § 193.140. Any second or

11   subsequent violation constitutes a category D felony, punishable by imprisonment in state

12   prison for at least one year and up to four years, in addition to a fine of up to $5,000. *Id.*;

13   NRS § 193.130(d). Any second or subsequent violation would also result in a lifetime ban

14   on an individual's right to keep and bear arms. *See* 18 U.S.C. § 922(g)(1).

15              **FACTS AS TO THE PLAINTIFFS AND THE BAN'S IMPACTS ON THEM**

16                          *Facts Relating to Roger Palmer*

17           74.     The foregoing paragraphs are incorporated herein as if set forth in full.

18           75.     Plaintiff Palmer is a resident of Clark County, Nevada.

19           76.     Plaintiff Palmer is a responsible, peaceable citizen not disqualified from

20   exercising his right to possess firearms and ammunition.

21           77.     Plaintiff Palmer holds a Nevada Concealed Carry Permit.

22           78.     Plaintiff Palmer is a retired law enforcement officer who has also served as

23   a firearms instructor, concealed carry instructor, and a state security guard instructor.

24           79.     Plaintiff Palmer is currently a full-time private investigator.

25           80.     Plaintiff Palmer is not a licensed firearms manufacturer, importer, or dealer.

26           81.     Plaintiff Palmer is a member of Plaintiff FPC.

27           82.     Plaintiff Palmer lawfully owns and possesses multiple unserialized firearms,

28

1   both handguns and rifles, that he previously self-manufactured lawfully with unserialized

2   component parts, including Polymer80[3] NFOs, one or more of which would fall within the

3   new definition of and prohibition against unserialized "unfinished frames or receivers"

4   under Nevada's Ban. Because these firearms were self-manufactured, the completed

5   firearms themselves necessarily lack "a serial number issued by a firearms importer or

6   manufacturer," thus falling within the Ban's prohibition against all modern, operable

7   unserialized firearms under Section 5 of AB 286.

8       83.    Plaintiff Palmer also owns and possesses multiple uncompleted NFOs and

9   firearm building kits, which he lawfully acquired before enactment of the Ban. One or more

10  of these components would fall within the new definition of and prohibition against

11  unserialized "unfinished frames or receivers" under Nevada's Ban, which now mandates

12  dispossession of such firearms components by January 1, 2022, and thereafter outlaws

13  possession of any such components and any unserialized firearms assembled with such

14  components under Sections 3 and 5, and immediately bans any further self-manufacturing

15  of such firearms under Section 4 of AB 286.

16      84.    Plaintiff Palmer's lawfully self-manufactured, unserialized firearms are of a

17  type commonly possessed by law-abiding citizens for lawful purposes today; specifically,

18  handguns manufactured with Polymer80 kits and AR-15 rifles manufactured with precursor

19  NFOs. Indeed, handguns are recognized as "the most popular weapon chosen by Americans

20  for self-defense in the home." *Heller*, 554 U.S. at 629. The unserialized NFOs are also

21  commonly possessed by law-abiding citizens in the exercise of their right to self-

22  manufacture such firearms for self-defense and other lawful purposes.

23

24  [3] "About Polymer80," online at https://www.polymer80.com/about-us: "Polymer80, Inc.
    designs and develops innovative firearms and after-market accessories that provide ways

25  for our customer to participate in the build process, while expressing their right to bear arms.
    This provides a fun learning experience and a greater sense of pride in their completed

26  firearm, strengthening our brand loyalty. We summarize this with our motto of 'Engage
    Your Freedom.'" (last accessed June 10, 2021). Polymer80, Inc., is presently located in

27  Dayton, Nevada.

28

85.     However, Plaintiff Palmer is mandated to dispossess himself of the unserialized NFOs, and to dispossess himself of the unserialized firearms he self-built (or render them "permanently inoperable") by January 1, 2022, or face criminal prosecution under Sections 3 and 5 of AB 286.

86.     Plaintiff Palmer desires to continue to own and possess his lawfully self-manufactured unserialized firearms and NFOs for self-defense and other lawful purposes, and not sell or otherwise dispose of them, but he reasonably fears criminal sanction in light of the statutorily mandated dispossession established under Nevada's Ban.

87.     Plaintiff Palmer also desires to acquire additional NFOs commonly used in the self-manufacturing of firearms for self-defense and other lawful purposes, including those that fall within the definition of "unfinished frames or receivers" under Nevada's Ban, and he desires to self-manufacture additional operable firearms for self-defense and other lawful purposes. However, he is currently prohibited from purchasing or otherwise acquiring any such NFOs under the Ban, he is currently prohibited from self-manufacturing any operable unserialized firearms under Section 4, and he is prohibited from ever again possessing, purchasing, transporting, or receiving any such firearms or NFOs any time on or after January 1, 2022.

88.     Based on the threat of criminal prosecution by and through Nevada's Ban that Defendants are actively enforcing and will continue to enforce, Plaintiff Palmer is and has been prevented from acquiring, possessing, transporting, or receiving NFOs, and from self-manufacturing any additional operable firearms from NFOs, for self-defense and other lawful purposes.

89.     Defendants' active administration, implementation, and enforcement of the Ban, and the related regulations, policies, practices, and customs designed to implement and enforce the same, has violated and will continue to violate unless and until enjoined, the fundamental individual right to keep and bear arms guaranteed under the Second and Fourteenth Amendments to Plaintiff Palmer and all similarly situated Nevada resident FPC

members, in addition to the right of Plaintiff Palmer and all such similarly situated individuals to receive just compensation of under the due process clauses of the Fifth and Fourteenth Amendments for the destruction of their property interests being exacted by the dispossession mandate.

### *Facts Relating to Plaintiff Moxley*

90.    The foregoing paragraphs are incorporated herein as if set forth in full.

91.    Plaintiff Moxley is a resident of Douglas County, Nevada.

92.    Plaintiff Moxley is a responsible, peaceable citizen not disqualified from exercising his right to possess firearms and ammunition.

93.    Plaintiff Moxley is a retired firefighter.

94.    Plaintiff Moxley is a member of Plaintiff FPC.

95.    Plaintiff Moxley currently holds a valid Federal Firearms License ("FFL") and a Nevada Concealed Carry Permit.

96.    Plaintiff Moxley conducts sales of firearms and constituent firearm parts at local gun shows through his sole proprietorship, Strategic Supplies, in compliance with all applicable state and federal laws and regulations.

97.    On average, Plaintiff Moxley attends two gun shows per month and sells between five and forty unfinished receiver kits that would fall within the new definition of and prohibition against the sale of unserialized "unfinished receivers" under Sections 3 and 3.5 of the new Nevada's Ban.

98.    Before the enactment of Nevada's Ban, Plaintiff Moxley had already planned and made arrangements to attend at least six more gun shows before the end of the year, at which he would have otherwise made available for sale and sold firearm components now prohibited from commercial sale under the Ban.

99.    Plaintiff Moxley desires to continue making available for sale and would make available for sale to ordinary law-abiding citizens the unserialized firearms

1    component parts and other NFOs targeted by Nevada's Ban, but he is now prohibited from

2    doing so under Section 3.5's ban against any such sales or transfers.

3       100. Based on this threat of criminal prosecution by and through the Nevada Ban

4    that Defendants are actively enforcing, Plaintiff Moxley is now abstaining from and must

5    continue to abstain from any attempt to sell or transfer any "unfinished frames or receivers"

6    (and all other NFOs that fall within this broad definition) to any ordinary, law-abiding

7    citizen. Consequently, he is forced to suffer lost sales, revenue, and goodwill in his business,

8    and his would-be consumers, who include individuals just like the other individual plaintiffs

9    in this case, are concomitantly denied the ability to acquire from him such constituent

10   firearms components in the exercise of their right to self-manufacture firearms for self-

11   defense and other lawful purposes.

12      101. Further, Plaintiff Moxley lawfully owns and possesses multiple firearms,

13   both handguns and rifles, that he previously self-manufactured lawfully with unserialized

14   component parts, including Polymer80 kits, precursor AR-15 lower receivers, and/or other

15   NFOs, one or more of which would fall within the new definition of and prohibition against

16   unserialized "unfinished frames or receivers" under Section 3 of Nevada's Ban. Because

17   these firearms were self-manufactured, the completed firearms themselves lack necessarily

18   lack "a serial number issued by a firearms importer or manufacturer," thus falling within

19   the Ban's prohibition against all modern, operable unserialized firearms under Section 5 of

20   AB 286.

21      102. Plaintiff Moxley's lawfully self-manufactured unserialized firearms are of a

22   type commonly possessed by law-abiding citizens for self-defense and other lawful

23   purposes today. As with Plaintiff Palmer, these self-manufactured firearms include

24   handguns, "the most popular weapon chosen by Americans for self-defense in the home."

25   *Heller*, 554 U.S. at 629.

26      103. However, Plaintiff Moxley is mandated to dispossess himself of all

27   unserialized firearms he has self-built (or render them "permanently inoperable") by

28

1    January 1, 2022, or face criminal prosecution under Sections 3 and 5 of AB 286.

2        104.    Plaintiff Moxley desires to continue to own and possess his lawfully self-

3    manufactured unserialized firearm for self-defense and other lawful purposes, and not sell

4    or otherwise dispose of them, but he reasonably fears criminal sanction in light of the

5    statutorily mandated dispossession established under Section 5 of Nevada's Ban.

6        105.    Plaintiff Moxley also desires to self-manufacture additional operable

7    firearms for self-defense and other lawful purposes. However, he is currently prohibited

8    from self-manufacturing any operable unserialized firearms under Section 4, and he is

9    prohibited from ever again possessing, purchasing, transporting, or receiving any such

10   firearms under Section 5 any time on or after January 1, 2022.

11       106.    Based on this threat of criminal prosecution by and through Nevada's Ban

12   that Defendants are actively enforcing and will continue to enforce, Plaintiff Moxley is and

13   has been prevented from acquiring, possessing, transporting, or receiving NFOs, and from

14   self-manufacturing any additional operable firearms from NFOs, for personal self-defense

15   and other lawful purposes.

16       107.    Individual Plaintiffs Palmer and Moxley are bringing this action on behalf

17   of themselves, and as representatives of the class of similarly situated Nevada resident FPC

18   members who are being forced to dispossess themselves of the firearms and constituent

19   firearm parts prohibited by the Nevada Ban, who are banned from lawfully possessing or

20   using any other such firearms and constituent parts, and who are banned from self-

21   manufacturing any such firearms. Further, as a seller of now-banned NFOs, Plaintiff

22   Moxley is bringing this action on behalf of his customers who seek to purchase NFOs for

23   lawful purposes and whose Second Amendment rights are being violated by the Ban.

24       108.    Defendants' active administration, implementation, and enforcement the

25   Nevada Ban, and the related regulations, policies, practices, and customs designed to

26   implement and enforce the same, has violated and will continue to violate unless and until

27   enjoined, the fundamental individual right to keep and bear arms under the Second

28

1   Amendment guaranteed to the Plaintiffs and all similarly situated Nevada resident FPC

2   members, in addition to the right of Plaintiffs and all such similarly situated individuals to

3   receive just compensation under the due process clauses of the Fifth and Fourteenth

4   Amendments for the destruction of their property interests being exacted by the

5   dispossession mandate.

### Facts Relating to
### Plaintiff Firearms Policy Coalition

109.   The foregoing paragraphs are incorporated herein as if set forth in full.

110.   The purposes of Plaintiff FPC include defending and promoting the People's rights—especially the fundamental, individual Second Amendment right to keep and bear arms—advancing individual liberty, and restoring freedom.

111.   Plaintiff FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

112.   Plaintiff FPC's members reside both within and outside Nevada.

113.   Plaintiff FPC represents its Nevada resident members—who include gun owners, prospective gun owners and self-manufacturers, retailers of NFOs, parts, and firearms, and others—and brings this action on behalf of its Nevada resident members, including the named Plaintiffs herein.

114.   Plaintiff FPC's Nevada resident members, including the individual Plaintiffs in this case, have been and will continue to be adversely and directly harmed by Defendants' administration, implementation, and enforcement of the laws, and related regulations, policies, practices, and customs challenged herein and will otherwise remain so adversely and directly affected under the Nevada Ban.

115.   Many of Plaintiff FPC's Nevada resident members lawfully acquired unserialized firearm components are commonly possessed by law-abiding citizens in the exercise of their right to self-manufacture such firearms for self-defense and other lawful

purposes.

116.   However, those Nevada resident members are mandated to dispossess themselves of the unserialized firearm components, by January 1, 2022, or face criminal prosecution under Section 3 of Nevada's Ban.

117.   Many of Plaintiff FPC's Nevada resident members desire to continue to own and possess its firearm components for lawful purposes, and to not sell or otherwise dispose of them, but they reasonably fear criminal sanction in light of the statutorily mandated dispossession established under Section 3 of Nevada's Ban.

118.   Many of Plaintiff FPC's Nevada resident members also desire to acquire additional NFOs otherwise commonly available for purchase and commonly used in the self-manufacturing of firearms for self-defense and other lawful purposes, including those that fall within the definition of "unfinished frames or receivers" under Nevada's Ban, and further desire to self-manufacture additional operable firearms for self-defense or other lawful purposes. However, they are currently prohibited from purchasing or otherwise acquiring any such unfinished receivers or frames under Section 3.5 of the Ban, currently prohibited from self-manufacturing any operable unserialized firearms under Section 4, and prohibited from ever again possessing, purchasing, transporting, or receiving any such firearms or NFOs parts under Sections 3 and 5 any time on or after January 1, 2022.

119.   Based on this threat of criminal prosecution by and through the Nevada Ban that Defendants are actively enforcing, Plaintiff FPC's Nevada resident members have been prevented from acquiring, possessing, transporting, or receiving NFOs, and from self-manufacturing any additional operable firearms from NFOs, for self-defense and other lawful purposes.

120.   Plaintiff FPC reasonably fears the prosecution of its Nevada resident members by and through Defendants' administration, implementation, and enforcement of the laws, regulations, policies, practices, and customs challenged herein.

121.   As to all claims made in a representative capacity herein, there are common

questions of law and fact that substantially affect the rights, duties, and liabilities of numerous FPC Nevada resident members who knowingly or unknowingly are subject to the Nevada Ban. The relief sought in this action is declaratory and injunctive in nature, and is a matter of substantial public interest.

122.   Defendants' active administration, implementation, and enforcement the Nevada Ban, and the related regulations, policies, practices, and customs designed to implement and enforce the same, has violated and will continue to violate unless and until enjoined, the fundamental individual right to keep and bear arms under the Second Amendment guaranteed to the Nevada resident members of FPC, including the Plaintiffs in this case, in addition to the right of such individuals to receive just compensation of under the due process clauses of the Fifth and Fourteenth Amendments for the destruction of their property interests being exacted by the Ban's dispossession mandate.

## COUNT I: VIOLATION OF THE SECOND AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
### Facial and As-Applied to Plaintiffs
### (All Plaintiffs v. All Defendants)

123.   The foregoing paragraphs are hereby incorporated herein as if set forth in full.

124.   Under federal law, "a license is not required to make a firearm solely for personal use." https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use. And that is true if the firearm is based on an NFO, a 3D printed unserialized frame or receiver, machined from a block of raw materials, or stamped from a piece of sheet metal.

125.   And under federal law, it is "unlawful for any person to manufacture, import, sell, ship, deliver, possess, transfer, or receive any firearm—[¶] (A) that, after removal of grips, stocks, and magazines, is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar; or [¶] (B) any major component of which, when subjected to inspection by the types of x-ray machines

1   commonly used at airports, does not generate an image that accurately depicts the shape of
2   the component. Barium sulfate or other compounds may be used in the fabrication of the
3   component." 18 U.S.C. § 922(p).

4       126.   Thus, law already requires that self-manufactured firearms are not
5   "undetectable." Nor would they be, since pressure-bearing and mechanically reciprocating
6   parts are made of detectable metals.

7       127.   Nevada's Ban imposes a blanket prohibition against a broad class of
8   protected arms in common use for self-defense and other lawful purposes by ordinary law-
9   abiding citizens like the Plaintiffs in this case: all modern operable firearms of any type (all
10  handguns and all long guns) *in addition* to component parts integral to their manufacture
11  which lack "a serial number issued by a firearms importer or manufacturer." The Ban
12  mandates that all ordinary law-abiding citizens *dispossess* themselves of all such firearms,
13  related components, and NFOs on or before January 1, 2022, totally bans all such
14  individuals from possessing or using them on and after that date, *immediately* bans any
15  further sales or transfers of "unfinished frames or receivers" involving these individuals,
16  and *immediately* bans them from any further self-manufacturing of firearms.

17      128.   The Second Amendment guarantees ordinary law-abiding citizens the right
18  to acquire, possess, use, and self-manufacture *all* firearms in common use for self-defense
19  and other lawful purposes. *Caetano*, 577 U.S. at 420. Because the Nevada Ban outlaws
20  numerous such arms by deeming their possession and use, and their manufacture, to be
21  crime for any ordinary law-abiding person, the Ban is categorically unconstitutional and
22  must be enjoined as such. *Young v. Hawaii*, 992 F.3d 765, 784 (9th Cir. 2021) (quoting
23  *Silvester v. Harris*, 843 F.3d 816, 824 (9th Cir. 2016) ("If a regulation 'amounts to a
24  destruction of the Second Amendment right,' it is unconstitutional under any level of
25  scrutiny.").

26      129.   If any tiers-of-scrutiny analysis were to apply, only the highest level, strict
27  scrutiny, could be applied since the Ban unquestionably "'implicates the core of the Second

28

1  Amendment right and severely burdens that right.'" *Young*, 992 F.3d at 784 (quoting

2  *Silvester*, 843 F.3d at 824). And whatever public safety interest the State may claim in

3  enacting this ban, there has been no effort to tailor it so as to minimize imposing unnecessary

4  or overly broad restraints—much less to establish "the least restrictive means" of achieving

5  any "compelling" interests—which is the essence of the strict scrutiny test. *Miller v.*

6  *Johnson*, 515 U.S. 900, 920 (1995).

7        130.    There has been no showing that *any* of the countless law-abiding Nevadans

8  targeted under this Ban has had any involvement in any crime associated with any

9  unserialized firearm or any unserialized firearm component, much less any significant

10  number of these individuals, so as to somehow justify dispossessing them of all such

11  firearms and firearm parts and prohibiting them from exercising their fundamental right to

12  possess, use, and self-manufacture protected arms in common use for self-defense and

13  lawful purposes.

14        131.    The lack of meaningful tailoring in this broad prohibition renders the Ban

15  unconstitutional even under intermediate scrutiny, because that test requires at least "a

16  means narrowly tailored to achieve the desired objective." *Bd. of Trustees of State Univ. of*

17  *New York*, 492 U.S. 468, 480 (1989).

18        132.    The answers to the questions of law in this case require a textual and

19  historical inquiry into original meaning of the Second Amendment, *Heller*, 554 U.S. at 634-

20  35, because "[c]onstitutional rights are enshrined with the scope they were understood to

21  have when the people adopted them, whether or not future legislatures or (yes) even future

22  judges think that scope too broad."

23        133.    The Ninth Circuit "and other federal courts of appeals have held that the

24  Second Amendment protects ancillary rights necessary to the realization of the core right to

25  possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th

26  Cir. 2017).

27        134.    Plaintiffs have a right to self-manufacture arms for protection and all lawful

28

1    purposes, including those arms and precursor materials, including but not limited to NFOs,

2    prohibited under Nevada's Ban.

3        135.    Nevada's Ban prohibits law-abiding citizens from acquiring materials and

4    supplies necessary to self-manufacture, construct, and/or assemble constitutionally

5    protected arms of designs and functions—including but not limited to AR-15[4] semi-

6    automatic rifles, and Glock-compatible designs[5] and other common semi-automatic

7    handguns—that are commonly possessed and used for self-defense and other lawful

8    purposes in the vast majority of states.

9        136.    Nevada's Ban prohibits law-abiding citizens from self-manufacturing,

10   constructing, and/or assembling constitutionally protected arms of designs and functions,

11   including but not limited to AR-15 semi-automatic rifles and Glock-platform based designs

12   and other common semi-automatic handguns, that are commonly possessed and used for

13   self-defense and other lawful purposes in the vast majority of states.

14       137.    Nevada's Ban prohibits law-abiding citizens from possessing self-

15   manufactured constitutionally protected arms of designs and functions, including but not

16   limited to AR-15-platform semi-automatic rifles and Glock-platform based designs and

17   other common semi-automatic handguns, that are commonly possessed and used for self-

18   defense and other lawful purposes in the vast majority of states.

19       138.    The AR-15 is an incredibly common and constitutionally protected firearm.

20   And this fact isn't a recent development. Over 25 years ago, the Supreme Court recognized

21   _____

22   [4] See, e.g., https://www.polymer80.com/RL556v3-80-AR15-Lower-black (NFO is "Mil-
     spec," allowing self-manufacturers to parts compatible with the open source AR-15 design)

23   (last accessed June 10, 2021).

24   [5] *See, e.g.,* https://www.polymer80.com/PF940v2-80-Full-Size-Frame-Kit-   ("The
     PF940v2™ is compatible with components for 3-pin 9mm [Glock®] G17, 34, 17L;

25   .40S&W G22, 35, 24; and .357Sig G31.") (last accessed June 10, 2021);
     https://www.polymer80.com/PF940C-80-Compact-Pistol-Frame-Kit-Black          (has

26   "compatibility with Glock® 19/23 Gen3 components") (last accessed June 10, 2021). These
     Glock-platform handguns are some of the most common in the United States, and *Heller*'s

27   "hardware test" is not limited to the original designer or a specific manufacturer.

28

the AR-15 as a common firearm possessed by *regular individuals* (not military or law enforcement) when it held: "The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon." *Staples v. United States*, 511 U.S. 600, 603 (1994). Even in 1994, it was widely known that the common AR-15 was a firearm commonly possessed for lawful purposes by non-government "civilian" individuals.

139.    "The AR-15 platform in particular, is an 'open source' design … with countless variations and adaptations. In fact, the platform's ability to accept modifications with ready-made retail parts without the need for specialized tools or expertise, is part of what makes these rifles popular." *Miller,* 2021 U.S. Dist. LEXIS 105640, at *12-14. "Furthermore, the modularity and standardization of the AR-15, its ubiquity, commonality, and widespread ownership in common ammunition sizes such as .223 and 5.56 x 45mm, and the interchangeability of parts, including magazines, makes it ideal." *Id.*, at *108.

140.    Because it is "open source" in nature, has a large volume of [constitutionally protected] educational materials on manufacturing and construction dedicated to it and found on the Internet, is relatively easily constructed, has excellent availability of parts, and a modular design ready and able to be configured in countless lawful ways for many lawful purposes, "the popular AR-15 rifle is a perfect combination of home defense weapon and homeland defense equipment. Good for both home and battle, the AR-15 is the kind of versatile gun that lies at the intersection of the kinds of firearms protected under *District of Columbia v. Heller* and *United States v[.] Miller,*" *Id.*, at *2 (internal citations omitted).

141.    Nevada's Ban inflicts irreparable harm on Plaintiffs by prohibiting property and conduct protected under the Second Amendment individual right to keep and bear arms. Plaintiffs lack an adequate remedy at law for this burden on their Second Amendment right, and the harm Plaintiffs would suffer from denial of an injunction exceeds any legally cognizable harm an injunction may inflict upon Defendants. The public interest favors enjoining unconstitutional statutes such as Nevada's Ban.

142.    Therefore, as a direct and proximate result of the above infringement of and

1  impermissible burden on the rights of Plaintiffs protected under the Second and Fourteenth

2  Amendments, Plaintiffs and all similarly situated Nevada resident members of FPC have

3  suffered an unlawful deprivation of their fundamental constitutional right to keep and bear

4  arms, and they will continue to suffer such injury unless and until granted the relief they

5  seek herein.

6  **COUNT II: VIOLATION THE FIFTH AND FOURTEENTH AMENDMENTS TO**
7  **THE UNITED STATES CONSTITUTION**
   **Facial and As-Applied to Plaintiffs**
8  **(All Plaintiffs v. All Defendants)**

9       143.    The foregoing paragraphs are hereby incorporated herein as if set forth in

10  full.

11       144.    The numerous unserialized modern operable firearms, and the unserialized

12  unfinished frames, receivers, and NFOs possessed as constituent parts of the same, which

13  were previously owned, possessed, used, and manufactured for self-defense and other

14  lawful purposes, but which are now subject to dispossession or permanently disabling by

15  no later than January 1, 2022, under Nevada's Ban, have substantial value as property

16  interests to all the ordinary law-abiding forced to comply with this mandate, including

17  Plaintiffs and all similarly situated Nevada resident FPC members who have relied on them

18  for such constitutionally-protected purposes, including for defense of hearth and home.

19  Thus, the manner in which Plaintiffs and the represented class have kept, bore, and

20  possessed such property represents a substantial, constitutionally-protected liberty interest.

21       145.    Indeed, while Nevada has suspended the criminal sanctions for selling

22  unserialized firearms and "unfinished frames or receivers" until January 1, 2022, to permit

23  an opportunity for ordinary law-abiding citizens "to sell or dispose of them" before that

24  date, Notes of Assemblywoman Jauregui (AB 286's sponsor) to the amendments of AB 286

25  on May 11, 2021, a *sale* of unserialized firearms or their constituent unserialized parts is no

26  realistic option, particularly since such items are now *banned* from the hands of all ordinary

27  law-abiding citizens throughout the State of Nevada. On information and belief, many

28

1    licensed firearms dealers refuse or will refuse to purchase or otherwise accept for sale any

2    such products given the potential risks and uncertainties in dealing with legally banned

3    firearms and firearms products, and/or due to objections or concerns about participating in

4    an undertaking that amounts to a *de facto* taking of personal property. And, on information

5    and belief, banned unserialized firearms cannot be brought into compliance with Nevada's

6    Ban, even through licensed firearm retailers.

7    146.   Further, whatever limited market may exist for the sale of such outlawed

8    items, anyone *forced* to sell under such a legal compulsion surely will not garner the *fair*

9    market value of these otherwise valuable and popular firearms and constituent components.

10   147.   The lack of any realistic opportunity of obtaining fair compensation for the

11   property these law-abiding citizens are being forced to give up is significant. The only way

12   to potentially make themselves whole again would be to acquire a substitute for the

13   dispossessed firearms and/or firearm components, almost invariably requiring the purchase

14   of a substitute product at its fair market value, forcing these individuals to incur potentially

15   significant additional costs.

16   148.   Further, even if one could obtain a sale price commensurate with the fair

17   market value of these popular firearms products, the full value of such products is not

18   measured in just dollars. "The right to bear arms enables one to possess not only the means

19   to defend oneself but also the self-confidence—and psychic comfort—that comes with

20   knowing one could protect oneself if necessary." *Grace v. District of Columbia*, 187

21   F.Supp.3d 124, 150 (D.D.C. 2016). The value in terms of "psychic comfort" is

22   immeasurable when considering that the purpose of these products is to protect and preserve

23   life itself, and in particular, with the satisfaction of having manufactured the firearm oneself,

24   with one's own hands and tools.

25   149.   At the least, fair compensation from the State for this forced dispossession

26   of protected arms and their constituent parts is required to ensure the minimum that due

27   process requires. In fact, such compensation is absolutely required because, unquestionably,

28

1   the Nevada Ban completely deprives the property owners of "*all* economically beneficial

2   us[e]' of [their] property," and causes them to "suffer a permanent physical invasion of their

3   property interests." *Lingle*, 544 U.S. at 538 (quoting *Lucas*, 505 U.S. at 1019).

4   150.   Yet, the Nevada Ban provides no form of compensation whatsoever. Such

5   compensation was never even considered. Instead, it is clear that all ordinary law-abiding

6   citizens swept up into this Ban are expected to just give up the property in response to a

7   mandate of a government that not only pays them nothing for their property but threatens to

8   jail them for failing to comply. Notes of Assemblywoman Jauregui (AB 286's sponsor) to

9   the amendments of AB 286 on May 11, 2021 (reflecting the intent for "those in possession

10   of an unserialized firearm or frame/receiver" "to sell or dispose of them").

11   151.   Thus, the State has not created or established, nor has there even been any

12   established process, remedy, or administrative body through which one may seek

13   compensation for the forced dispossession this property. Accordingly, Plaintiffs are not

14   required to exhaust any administrative remedies, as no such administrative remedies even

15   exist.

16   152.   The Supreme Court has established two guides "for detecting when

17   government regulation is so burdensome that it constitutes a taking." *Duncan*, 366 F. Supp.

18   3d 1131, 1184.

19   153.   "First, with certain qualifications … a regulation which 'denies all

20   economically beneficial or productive use of land' will require compensation under the

21   Takings Clause." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942-43 (2017) (citing *Palazzolo v.*

22   *Rhode Island*, 533 U.S. 606, 617 (2001), quoting *Lucas v. South Carolina Coastal Council*,

23   505 U.S. at 1015).

24   154.   "Second, when a regulation impedes the use of property without depriving

25   the owner of all economically beneficial use, a taking still may be found based on a complex

26   of factors, including (1) the economic impact of the regulation on the claimant; (2) the extent

27   to which the regulation has interfered with distinct investment-backed expectations; and (3)

28

the character of the governmental action." *Murr*, 137 S.Ct. at 1938 (citations and quotation marks omitted).

155.   And "a physical *appropriation* of property g[ives] rise to a *per se* taking, without regard to other factors." *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2427 (2015).

156.   Here, Nevada "will deprive Plaintiffs not just of the use of their property, but of possession, one of the most essential sticks in the bundle of property rights. … Thus, whatever might be the State's authority to ban the sale or use of [unserialized NFOs and firearms], the Takings Clause prevents it from compelling the physical dispossession of such lawfully-acquired private property without just compensation." *Duncan*, 366 F. Supp. at 1185.

157.   And "[g]uns in general are not 'deleterious devices or products or obnoxious waste materials.' " *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1183 (S.D. Cal. 2019) (quoting *Staples*, 511 U.S. at 610). Nor could they be under *Heller*.

158.   The Ban's confiscatory process of mandating forfeiture to law enforcement, destruction, or forced dispossession of this constitutionally protected and previously lawfully acquired and possessed property, with no just compensation, inflicts irreparable harm on Plaintiffs.

159.   Therefore, as a direct and proximate result of the Ban's confiscatory process of mandating forfeiture to law enforcement, destruction, or forced dispossession of this property with no just compensation, in violation of the rights of Plaintiffs protected under the Fifth and Fourteenth Amendments, Plaintiffs and all similarly situated Nevada resident members of FPC have suffered and will continue to suffer injury unless and until granted the relief they seek herein.

160.   Thus, injunctive relief is appropriate to protect against the irreparable harm of compelled destruction of or damage to valuable property interests.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter

1  judgment in their favor and against Defendants, as follows:

2      a)      Declare that the statutes enacted in AB 286 and Defendants' derivative laws,

3  regulations, policies, procedures, enforcement practices, and customs violate the right of

4  Plaintiffs and all similarly situated Nevada resident FPC members, to keep and bear arms

5  as guaranteed by the Second and Fourteenth Amendments to the United States Constitution;

6      b)      Preliminarily, and thereafter permanently, enjoin Defendants, their officers,

7  agents, servants, employees, and all persons in active concert or participation with them,

8  and all persons who have notice of the injunction, from enforcing against Plaintiffs and all

9  similarly situated Nevada resident FPC members, the statutes enacted in AB 286 and

10  Defendants' derivative laws, regulations, policies, procedures, enforcement practices, and

11  customs that impede or would impede Plaintiffs and similarly situated Nevada resident FPC

12  members, from exercising their right to keep and bear arms guaranteed by the Second and

13  Fourteenth Amendments or sanction them for it;

14      c)      Declare that the statutes enacted in AB 286 and Defendants' derivative laws,

15  regulations, policies, procedures, enforcement practices, and customs violate the right of

16  Plaintiffs and all similarly situated Nevada resident FPC members, to due process of the law

17  as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution;

18      d)      Preliminarily, and thereafter permanently, enjoin Defendants, their officers,

19  agents, servants, employees, and all persons in active concert or participation with them,

20  and all persons who have notice of the injunction, from enforcing against Plaintiffs and all

21  similarly situated Nevada resident FPC members, the statutes enacted in AB 286 and

22  Defendants' derivative laws, regulations, policies, procedures, enforcement practices, and

23  customs that impede or would impede Plaintiffs and similarly situated Nevada resident FPC

24  members from obtaining due process under the law and just compensation for the resulting

25  destruction of or damage to their property interests;

26      e)      Award Plaintiffs' costs, attorney fees, and all other allowable expenses

27  pursuant to 42 U.S.C. § 1988 and all applicable laws; and,

28

1    f)  Grant any and all other equitable and/or legal remedies this Court may see

2 fit.

3

4 Dated: June 10, 2021      THE O'MARA LAW FIRM, P.C.

5             By _/s/ DAVID C. O'MARA_____
                DAVID C. O'MARA

6

7             Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Query    Reports ⌄    Utilities ⌄    Help    Log Out

CLOSED,APPEAL

United States District Court
District of Nevada (Reno)
CIVIL DOCKET FOR CASE #: 3:21–cv–00268–MMD–CSD

Palmer et al v. Sisolak et al                                          Date Filed: 06/10/2021
Assigned to: Chief Judge Miranda M. Du                                 Date Terminated: 03/29/2022
Referred to: Magistrate Judge Craig S. Denney                          Jury Demand: None
Case in other court: Ninth Circuit, 22-15645                           Nature of Suit: 440 Civil Rights: Other
Cause: 42:1983 Civil Rights Act                                        Jurisdiction: Federal Question

**Plaintiff**

**Roger Palmer**                                   represented by **Adam Kraut**
                                                                 Firearms Policy Coalition
                                                                 1215 K St Fl 17
                                                                 Sacramento, CA 95814
                                                                 916-596-3492
                                                                 Email: akraut@fpclaw.org
                                                                 *LEAD ATTORNEY*
                                                                 *PRO HAC VICE*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **David C OMara**
                                                                 The OMara Law Firm, P.C.
                                                                 311 E. Liberty Street
                                                                 Reno, NV 89501
                                                                 775-323-1321
                                                                 Fax: 775-323-4082
                                                                 Email: david@omaralaw.net
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Raymond DiGuiseppe**
                                                                 The DiGuiseppe Law Firm, P.C.
                                                                 4320 Southport-Supply Road

Suite 300
Southport, NC 28461
910-713-8804
Email: law.rmd@gmail.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Aaron Sack**
Firearms Policy Coalition
1215 K St Fl 17
Sacramento, CA 95814
916-596-3492
Email: Wsack@fpclaw.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Chad Moxley**                                  represented by  **Adam Kraut**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David C OMara**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Raymond DiGuiseppe**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Aaron Sack**
(See above for address)
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Firearms Policy Coalition, Inc.**                     represented by **Adam Kraut**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David C OMara**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Raymond DiGuiseppe**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Aaron Sack**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Stephen Sisolak**                                     represented by **Kiel Brunetti Ireland**
Attorney General's Office
555 East Washington Ave Suite 3900
Las Vegas, NV 89101
702-486-3795
Fax: 702-486-3773
Email: kireland@ag.nv.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Shevorski**
Nevada Office of the Attorney General
555 E. Washington Avenue
Suite 3900
Las Vegas, NV 89101
702-486-3825
Fax: 702-486-3773
Email: sshevorski@ag.nv.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey M Conner**
Nevada Attorney General
100 N Carson St.
Carson City, NV 89701
775-684-1200
Fax: 775-684-1108
Email: jconner@ag.nv.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**A.G. Aaron Ford**                        represented by **Kiel Brunetti Ireland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Shevorski**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey M Conner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**George Togliatti**                        represented by **Kiel Brunetti Ireland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Shevorski**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey M Conner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mindy McKay**                          represented by   **Kiel Brunetti Ireland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Shevorski**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey M Conner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Joseph Lombardo**                      represented by   **Nicholas Crosby**
*TERMINATED: 08/27/2021*                                 Marquis & Aurbach
10001 Park Run Drive
Las Vegas, NV 89145-
702-382-0711
Fax: 702-382-5816
Email: ncrosby@maclaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Steven Wolfson**                       represented by   **Nicholas Crosby**
*TERMINATED: 08/27/2021*                                 (See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Daniel J. Coverley**
*TERMINATED: 10/05/2021*

represented by **Zachary J. Wadle**
Douglas County District Attorneys Office
1038 Buckeye Road
PO Box 218
Minden, NV 89423
775-782-9803
Fax: 775-782-9807
Email: zwadle@douglas.nv.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mark Jackson**
*TERMINATED: 10/05/2021*

represented by **Zachary J. Wadle**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/10/2021 | 1 | COMPLAINT against All Defendants (Filing fee $402 receipt number 0978-6519051) by Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer. Proof of service due by 9/8/2021. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons) (OMara, David)<br><br>NOTICE of Certificate of Interested Parties requirement: Under Local Rule 7.1-1, a party must immediately file its disclosure statement with its first appearance, pleading, petition, motion, response, or other request addressed to the court. (Entered: 06/10/2021) |
| 06/10/2021 | 2 | CERTIFICATE of Interested Parties by Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer. There are no known interested parties other than those participating in the case (OMara, David) (Entered: 06/10/2021) |
| 06/10/2021 |  | Case randomly assigned to Chief Judge Miranda M. Du and Magistrate Judge William G. Cobb. (LE) (Entered: 06/10/2021) |
| 06/11/2021 | 3 | STANDING ORDER. This case has been assigned to the Honorable Miranda M. Du. Chief Judge Du's Civil Standing Order is posted on the U.S. District Court, District of Nevada public website and may be accessed directly via this hyperlink: www.nvd.uscourts.gov. (Copies have been distributed pursuant to the NEF - PAV) (Entered: 06/11/2021) |
| 06/11/2021 | 4 | SUMMONSES ISSUED re ECF No. 1 Complaint - Summons Stephen Sisolak. (Attachments: # 1 Summons Daniel Coverley, # 2 Summons Aaron Ford, # 3 Summons Mark Jackson, # 4 Summons Joseph Lombardo, # 5 Summons Mindy McKay, # 6 Summons George Togliatti, # 7 Summons Steven Wolfson) (KR) (Entered: 06/11/2021) |
| 06/18/2021 | 5 | ACCEPTANCE OF SERVICE by Joseph Lombardo on 6/16/2021 executed by Firearms Policy Coalition, Inc. re 1 Complaint,, 4 Summons Issued,. (OMara, David) (Entered: 06/18/2021) |

| 06/18/2021 | 6 | MOTION for Preliminary Injunction by Plaintiff Firearms Policy Coalition, Inc.. Responses due by 7/2/2021. (Attachments: # 1 Declaration, # 2 Declaration, # 3 Declaration) (OMara, David) (Entered: 06/18/2021) |
|---|---|---|
| 06/18/2021 | 7 | MOTION to Expedite *Briefing Schedule and Consideration of their Motion for Preliminary Injunction* re 6 Motion for Preliminary Injunction by Plaintiffs Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer. (OMara, David) (Entered: 06/18/2021) |
| 06/21/2021 | 8 | NOTICE of Appearance by attorney Nicholas Crosby on behalf of Defendant Joseph Lombardo. (Crosby, Nicholas) (Entered: 06/21/2021) |
| 06/21/2021 | 9 | PROPOSED SUMMONS to be issued by Plaintiffs Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer. (OMara, David) (Entered: 06/21/2021) |
| 06/21/2021 | 10 | MINUTE ORDER IN CHAMBERS of the Honorable Chief Judge Miranda M. Du on 6/21/2021. Plaintiffs filed a motion for an expedited briefing schedule (ECF No. 7) that accompanied their motion for a preliminary injunction (ECF No. 6). The Court, having reviewed the motion for an expedited briefing schedule, is unable to decipher if the motion is filed pursuant to LR IA 6-1(d) to shorten time or to LR 7-4 governing emergency motions. The Court construes the motion as a request to shorten time but given that the dates of service on Defendants vary, the Court will deny Plaintiffs' proposed briefing schedule. Alternatively, the Court directs that each Defendant files their response to Plaintiffs' motion for a preliminary injunction 14 days from service of the summons, complaint, and the preliminary injunction motion. Plaintiffs' reply is due on or before July 9, 2021. The Court will issue a separate order setting the hearing on the preliminary injunction motion. (Copies have been distributed pursuant to the NEF - KL) (Entered: 06/21/2021) |
| 06/22/2021 | 11 | Summons Issued as to Mindy McKay re ECF No. 1 Complaint. (SC) (Entered: 06/22/2021) |
| 06/22/2021 | 12 | MINUTE ORDER IN CHAMBERS of the Honorable Chief Judge Miranda M. Du on 6/22/2021. By Deputy Clerk: Peggie Vannozzi. <br><br> The hearing on Plaintiffs' motion for preliminary injunction (ECF No. 6 ) is set for 7/16/2021 at 1:30 p.m. in Courtroom 5 before Chief Judge Miranda M. Du. <br><br> To the extent the parties request to present evidence at the hearing on Plaintiff's motion for preliminary injunction (ECF No. 6 ), the parties are directed to coordinate exhibits and witnesses and file a status report with the Court no later than 7 days prior to the hearing. The exchanged witness lists must contain each witness's identity, contact information, and brief summaries of anticipated testimony to fairly afford the other party sufficient notice of the substance of the other party's expected testimony. In the status report to the Court, the parties must stipulate to any undisputed material facts and items of evidence. The parties must otherwise state with specificity the objections to any asserted material fact or item of evidence. The parties are directed to file their separate exhibit lists and witness lists no later than 5 days prior to the hearing. For exhibits, Plaintiffs are to use numerals 1-499 and Defendants are to use numerals 500 and above. Counsel is further to provide the Court with a courtesy copy of all exhibits to be used in the hearing by delivering a thumb drive or CD to the Clerks Office in Reno for the Courts use no later than 2 days prior to the hearing. <br><br> **(no image attached)** (Copies have been distributed pursuant to the NEF - PAV) (Entered: 06/22/2021) |

ER-276

| 06/22/2021 | 13 | SUMMONS Returned Executed by Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer re 1 Complaint,,. Stephen Sisolak served on 6/15/2021. (OMara, David) (Entered: 06/22/2021) |
|---|---|---|
| 06/22/2021 | 14 | SUMMONS Returned Executed by Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer re 1 Complaint,,. Aaron Ford served on 6/15/2021. (OMara, David) (Entered: 06/22/2021) |
| 06/22/2021 | 15 | SUMMONS Returned Executed by Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer re 1 Complaint,,. George Togliatti served on 6/15/2021. (OMara, David) (Entered: 06/22/2021) |
| 06/22/2021 | 16 | SUMMONS Returned Executed by Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer re 1 Complaint,,. Mark Jackson served on 6/16/2021. (OMara, David) (Entered: 06/22/2021) |
| 06/22/2021 | 17 | SUMMONS Returned Executed by Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer re 1 Complaint,,. Daniel J. Coverley served on 6/16/2021. (OMara, David) (Entered: 06/22/2021) |
| 06/22/2021 | 18 | CERTIFICATE OF SERVICE for 6 Motion for Preliminary Injunction, 7 Motion to Expedite by Plaintiffs Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer. (OMara, David) (Entered: 06/22/2021) |
| 06/22/2021 | 19 | MOTION/VERIFIED PETITION for Permission to Practice Pro Hac Vice by William Sack, Esq. and DESIGNATION of Local Counsel David C. O'Mara, Esq. (Filing fee $ 250 receipt number 0978-6532158) by Plaintiffs Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer. (OMara, David) (Entered: 06/22/2021) |
| 06/22/2021 | 20 | MOTION/VERIFIED PETITION for Permission to Practice Pro Hac Vice by Adam Kraut, Esq. and DESIGNATION of Local Counsel David C. O'Mara, Esq. (Filing fee $ 250 receipt number 0978-6532168) by Plaintiffs Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer. (OMara, David) (Entered: 06/22/2021) |
| 06/22/2021 | 21 | MOTION/VERIFIED PETITION for Permission to Practice Pro Hac Vice by Raymond M. DiGuiseppe, Esq. and DESIGNATION of Local Counsel David C. O'Mara, Esq. (Filing fee $ 250 receipt number 0978-6532174) by Plaintiffs Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer. (OMara, David) (Entered: 06/22/2021) |
| 06/22/2021 | 22 | ORDER **granting** ECF No. 19 Verified Petition for Permission to Practice Pro Hac Vice for William Sack representing Plaintiffs and approving Designation of Local Counsel, David O'Mara. Signed by Chief Judge Miranda M. Du on 6/22/2021. Any Attorney not yet registered with the Court's CM/ECF System shall submit a Registration Form on the Court's website www.nvd.uscourts.gov (Copies have been distributed pursuant to the NEF - SC) (Entered: 06/23/2021) |
| 06/22/2021 | 23 | ORDER **granting** ECF No. 20 Verified Petition for Permission to Practice Pro Hac Vice for Adam Kraut, representing Plaintiffs and approving Designation of Local Counsel, David O'Mara. Signed by Chief Judge Miranda M. Du on 6/22/2021. Any Attorney not yet registered with the Court's CM/ECF System shall submit a Registration Form on the Court's website www.nvd.uscourts.gov (Copies have been distributed pursuant to the NEF - SC) (Entered: 06/23/2021) |
| 06/22/2021 | 24 | ORDER **granting** ECF No. 21 Verified Petition for Permission to Practice Pro Hac Vice for Raymond M. DiGuiseppe, representing Plaintiffs and approving Designation of Local Counsel, David O'Mara. Signed by Chief Judge Miranda M. Du on 6/22/2021. |

| | | |
|---|---|---|
| | | Any Attorney not yet registered with the Court's CM/ECF System shall submit a Registration Form on the Court's website www.nvd.uscourts.gov (Copies have been distributed pursuant to the NEF - SC) (Entered: 06/23/2021) |
| 06/28/2021 | 25 | RESPONSE to 6 Motion for Preliminary Injunction by Defendant Joseph Lombardo. Replies due by 7/5/2021. (Crosby, Nicholas) (Entered: 06/28/2021) |
| 06/29/2021 | 26 | ACCEPTANCE OF SERVICE by Steven Wolfson on 6/25/2021 executed by Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer re 2 Certificate of Interested Parties, 10 Order on Motion to Expedite,,,,, Minute Order,,,, 1 Complaint,, 12 Minute Order,,,,,, 6 Motion for Preliminary Injunction, 7 Motion to Expedite. (OMara, David) (Entered: 06/29/2021) |
| 06/29/2021 | 27 | NOTICE of Appearance by attorney Nicholas Crosby on behalf of Defendant Steven Wolfson. (Crosby, Nicholas) (Entered: 06/29/2021) |
| 06/30/2021 | 28 | RESPONSE to 6 Motion for Preliminary Injunction by Defendant Steven Wolfson. Replies due by 7/7/2021. (Crosby, Nicholas) (Entered: 06/30/2021) |
| 07/01/2021 | 29 | First STIPULATION FOR EXTENSION OF TIME (First Request) *To File Response to Complaint* by Defendants Daniel J. Coverley, Mark Jackson. (Wadle, Zachary) (Entered: 07/01/2021) |
| 07/01/2021 | 30 | ORDER **granting** ECF No. 29 Stipulation to Extend Time : Douglas County Defendants to file their response to Plaintiffs' complaint within 14 days after this Court issues a final order on Plaintiffs' pending Motion for Preliminary Injunction (ECF No. 6 ). Signed by Magistrate Judge William G. Cobb on 7/1/2021. (Copies have been distributed pursuant to the NEF - DRM) (Entered: 07/01/2021) |
| 07/02/2021 | 31 | RESPONSE to 6 Motion for Preliminary Injunction by Defendants Aaron Ford, Mindy McKay, Stephen Sisolak, George Togliatti. Replies due by 7/9/2021. (Shevorski, Steven) (Entered: 07/02/2021) |
| 07/02/2021 | 32 | RESPONSE to 6 Motion for Preliminary Injunction by Defendants Daniel J. Coverley, Mark Jackson. Replies due by 7/9/2021. (Wadle, Zachary) (Entered: 07/02/2021) |
| 07/06/2021 | 33 | SUMMONS Returned Executed by Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer re 2 Certificate of Interested Parties, 1 Complaint,,. Mindy McKay served on 6/24/2021. (OMara, David) (Entered: 07/06/2021) |
| 07/06/2021 | 34 | MOTION to Dismiss 1 Complaint,, by Defendants Aaron Ford, Mindy McKay, Stephen Sisolak, George Togliatti. Responses due by 7/20/2021. (Shevorski, Steven) (Entered: 07/06/2021) |
| 07/08/2021 | 35 | STIPULATION FOR EXTENSION OF TIME (First Request) *to File Status Report* re 12 Minute Order,,,,,, by Plaintiff Firearms Policy Coalition, Inc.. (OMara, David) (Entered: 07/08/2021) |
| 07/08/2021 | 36 | ANSWER to 1 Complaint,, *Defendant Joseph Lombardo's Answer to Plaintiffs' Complaint* filed by Joseph Lombardo. Discovery Plan/Scheduling Order due by 8/22/2021.(Crosby, Nicholas)<br><br>NOTICE of Certificate of Interested Parties requirement: Under Local Rule 7.1-1, a party must _immediately_ file its disclosure statement with its first appearance, pleading, petition, motion, response, or other request addressed to the court. (Entered: |

| | | 07/08/2021) |
|---|---|---|
| 07/08/2021 | 37 | ANSWER to 1 Complaint,, *Defendant Steven Wolfson's Answer to Plaintiffs' Complaint* filed by Steven Wolfson.(Crosby, Nicholas) (Entered: 07/08/2021) |
| 07/08/2021 | 38 | ORDER **granting** ECF No. 35 Stipulation : Joint Status Report due by 7/13/2021. Signed by Chief Judge Miranda M. Du on 7/8/2021. (Copies have been distributed pursuant to the NEF - DRM) (Entered: 07/09/2021) |
| 07/09/2021 | 39 | MINUTE ORDER IN CHAMBERS of the Honorable Chief Judge Miranda M. Du on 7/9/2021. By Deputy Clerk: Peggie Vannozzi. IT IS ORDERED that the hearing set for 7/16/2021 at 1:30 PM in Reno Courtroom 5 before Chief Judge Miranda M. Du will be heard by Zoom Video Conference<br><br>Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court.<br><br>The Public may access and listen to the Sentencing Hearing as follows:<br>**Public telephonic participants shall call AT&T no later than five (5) minutes prior to the hearing at 1 (888) 251-2909, and provide Access Code 3803398 and Security Code 071621**<br><br>IT IS ORDERED that the following Video Conference Instructions be adhered to as follows:<br>INSTRUCTIONS FOR VIDEO CONFERENCE HEARING<br>Invitations to the scheduled hearings will be sent via email thirty (30) minutes prior to the hearing to the participants email provided to the Court.<br><br>* Ensure that the Zoom video conferencing application is updated prior to the time of the hearing.<br>*Log on to the call ten (10) minutes prior to the hearing time.<br>*Mute your sound prior to entering the hearing.<br>*Do not talk over one another.<br>*State your name prior to speaking for the record.<br>*Do not have others in the video screen or moving in the background.<br>*No recording of the hearing.<br>*No forwarding of any video conference invitations.<br>*Unauthorized users on the video conference will be removed.<br><br>**(no image attached)** (Copies have been distributed pursuant to the NEF - PAV) (Entered: 07/09/2021) |
| 07/09/2021 | 40 | REPLY to 31 Response, 6 Motion for Preliminary Injunction, 32 Response, 28 Response, 25 Response by Plaintiffs Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer. (Attachments: # 1 Exhibit Declaration of Joseph G.S. Greenlee, # 2 Exhibit Declaration of Joseph Ostini) (OMara, David) (Entered: 07/09/2021) |
| 07/12/2021 | 41 | EXHIBIT LIST *for Hearing on Motion for Preliminary Injunction* by Plaintiffs Firearms Policy Coalition, Inc., Chad Moxley, |

|  |  | Roger Palmer.. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(OMara, David) (Entered: 07/12/2021) |
|---|---|---|
| 07/13/2021 | 42 | EXHIBIT LIST *for Hearing on Motion for Preliminary Injunction* by Defendants Aaron Ford, Mindy McKay, Stephen Sisolak, George Togliatti. (Shevorski, Steven) (Entered: 07/13/2021) |
| 07/13/2021 | 43 | EXHIBIT LIST *Defendant Joseph Lombardo's Exhibit & Witness List Pursuant to Court's Order (ECF No. 12) Regarding Motion for Preliminary Injunction* by Defendant Joseph Lombardo. (Crosby, Nicholas) (Entered: 07/13/2021) |
| 07/13/2021 | 44 | EXHIBIT LIST *Defendant Steven Wolfson's Exhibit & Witness List Pursuant to Court's Order (ECF No. 12) Regarding Motion for Preliminary Injunction* by Defendant Steven Wolfson. (Crosby, Nicholas) (Entered: 07/13/2021) |
| 07/13/2021 | 45 | EXHIBIT LIST *Exhibit and Witness List Pursuant to Court's Minute Order (ECF No. 12) Regarding Motion for Preliminary Injunction* by Defendants Daniel J. Coverley, Mark Jackson. (Wadle, Zachary) (Entered: 07/13/2021) |
| 07/13/2021 | 46 | NOTICE of Appearance by attorney Jeffrey M Conner on behalf of Defendants Aaron Ford, Mindy McKay, Stephen Sisolak, George Togliatti. *Notice of Appearance* (Conner, Jeffrey) (Entered: 07/13/2021) |
| 07/13/2021 | 47 | Joint STATUS REPORT *Concerning Hearing on Plaintiffs' Motion for Preliminary Injunction* by Plaintiffs Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer. (OMara, David) (Entered: 07/13/2021) |
| 07/16/2021 | 48 | MINUTES OF PROCEEDINGS - Video Conference Motion Hearing held on 7/16/2021 before Chief Judge Miranda M. Du. Crtrm Administrator: *Peggie Vannozzi*; Pla Counsel: *Raymond DiGuiseppe, David O'Mara, Adam Kraut, William Sack*; Def Counsel: *Jeffrey Conner (for state defendants); Nicholas Crosby (for Clark County Defendants) and Zachary Wadle (for Douglas County Defendants)*; Court Reporter: *Kathy French*; Time of Hearing: *1:30 PM - 2:30 PM*; Courtroom: *5*.<br><br>The Court advises counsel that it has reviewed Plaintiff's motion for preliminary injunction (ECF No. 6 ), the responses (ECF Nos. 25 , 31 and 32 ) and the reply (ECF No. 40 .) Mr. DiGuiseppe and Mr. Conner present argument. The Court takes the matter under advisement.<br><br>**(no image attached)** (Copies have been distributed pursuant to the NEF - PAV) (Entered: 07/16/2021) |
| 07/19/2021 | 49 | First STIPULATION FOR EXTENSION OF TIME (First Request) re 34 Motion to Dismiss by Plaintiffs Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer. (OMara, David) (Entered: 07/19/2021) |
| 07/20/2021 | 50 | MINUTE ORDER IN CHAMBERS of the Honorable Chief Judge Miranda M. Du on 7/20/2021. The Court grants the stipulation (ECF No. 49 ) to extend time to file response to State Defendants' motion to dismiss (ECF No. 34 .) Responses are due 14 days after the Court issues its ruling on Plaintiff's motion for preliminary injunction (ECF No. 6 ) or by 8/31/2021. **(no image attached)** (Copies have been distributed pursuant to the NEF - PAV) (Entered: 07/20/2021) |
| 07/26/2021 | 51 | ORDER **denying** ECF No. 6 Motion for Preliminary Injunction. Signed by Chief Judge Miranda M. Du on 7/26/2021.(Copies have been distributed pursuant to the NEF - SC) (Entered: 07/26/2021) |
| 08/09/2021 | 52 | MOTION to Dismiss 1 Complaint,, by Defendants Daniel J. Coverley, Mark Jackson. Responses due by 8/23/2021. (Wadle, Zachary) (Entered: 08/09/2021) |

ER-280

| 08/09/2021 | 53 | RESPONSE to 34 Motion to Dismiss by Plaintiffs Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer. Replies due by 8/16/2021. (Attachments: # 1 Exhibit) (OMara, David) (Entered: 08/09/2021) |
| 08/10/2021 | 54 | NOTICE of Appearance by attorney Kiel Brunetti Ireland on behalf of Defendants Aaron Ford, Mindy McKay, Stephen Sisolak, George Togliatti. (Ireland, Kiel) (Entered: 08/10/2021) |
| 08/13/2021 | 55 | STIPULATION FOR EXTENSION OF TIME (First Request) *Stipulation and Order to Extend State Defendants' Deadline to File Reply to Response to Motion to Dismiss* re 34 Motion to Dismiss by Defendants Aaron Ford, Mindy McKay, Stephen Sisolak, George Togliatti. (Ireland, Kiel) (Entered: 08/13/2021) |
| 08/16/2021 | 56 | ORDER **granting** ECF No. 55 Stipulation. The State Defendants' time to file a reply to ECF No. 34 Motion to Dismiss is extended seven days to **August 23, 2021**. Signed by Chief Judge Miranda M. Du on 8/16/2021. (Copies have been distributed pursuant to the NEF - SC) (Entered: 08/17/2021) |
| 08/23/2021 | 57 | REPLY to Response to 34 Motion to Dismiss by Defendants Aaron Ford, Mindy McKay, Stephen Sisolak, George Togliatti. (Ireland, Kiel) (Entered: 08/23/2021) |
| 08/23/2021 | 58 | First STIPULATION FOR EXTENSION OF TIME (First Request) re 52 Motion to Dismiss by Plaintiffs Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer. (OMara, David) (Entered: 08/23/2021) |
| 08/24/2021 | 59 | Proposed Discovery Plan and Scheduling Order by Plaintiffs Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer. (OMara, David) (Entered: 08/24/2021) |
| 08/24/2021 | 60 | ORDER **granting** ECF No. 58 Stipulation : Response to ECF No. 52 Motion to Dismiss due by **8/30/2021**. Signed by Chief Judge Miranda M. Du on 8/24/2021. (Copies have been distributed pursuant to the NEF - DRM) (Entered: 08/25/2021) |
| 08/25/2021 | 61 | MINUTE ORDER IN CHAMBERS of the Honorable Magistrate Judge William G. Cobb on 8/25/2021. <br><br> Before the court is Plaintiffs' Discovery Plan and Scheduling Order (ECF No. 59). <br><br> In light of Chief District Judge Miranda M. Du's order denying Plaintiffs' Motion for Preliminary Injunction (ECF No. 51) and Defendants' Motions to Dismiss (ECF Nos. 34 and 52), the court declines to enter a Scheduling Order at this time. Once Chief District Judge Du issues a ruling on Defendants' Motions to Dismiss (ECF Nos. 34 and 52), and depending on the outcome of those motions, the court will order the parties to submit their proposed Discovery Plan and Scheduling Order, if necessary. <br><br> **IT IS SO ORDERED.** <br><br> (Copies have been distributed pursuant to the NEF - HJ) (Entered: 08/25/2021) |
| 08/27/2021 | 62 | STIPULATION of Dismissal *Stipulation and Order for Dismissal with Prejudice* by Defendants Joseph Lombardo, Steven Wolfson. (Crosby, Nicholas) (Entered: 08/27/2021) |
| 08/27/2021 | 63 | ORDER **granting** ECF No. 62 Stipulation of Dismissal With Prejudice : The Clark County Defendants and the Douglas County Defendants, Joseph Lombardo and Steven Wolfson, are dismissed with prejudice. Signed by Chief Judge Miranda M. Du on 8/27/2021. (Copies have been distributed pursuant to the NEF - DRM) (Entered: 08/30/2021) |

| 01/26/2022 | 64 | CLERK'S NOTICE due to Magistrate Judge William G. Cobb's retirement, this case is reassigned to Magistrate Judge Craig S. Denney for all further proceedings. All further documents must bear the correct case number **3:21-cv-00268-MMD-CSD**. **(no image attached)** (DRM) (Entered: 01/26/2022) |
| --- | --- | --- |
| 03/29/2022 | 65 | ORDER granting 34 Motion to Dismiss; Re: 34 Motion to Dismiss. Clerk shall enter judgment and close case. Signed by Chief Judge Miranda M. Du on 3/29/2022. (Copies have been distributed pursuant to the NEF - LG) (Entered: 03/30/2022) |
| 03/30/2022 | 66 | JUDGMENT Defendants' motion to dismiss the complaint is granted. Signed by Clerk of Court Debra K. Kempi on 3/30/2022. (Copies have been distributed pursuant to the NEF - LG) (Main Document 66 replaced and regenerated NEF on 3/30/2022) (LG). (Entered: 03/30/2022) |
| 04/28/2022 | 67 | NOTICE OF APPEAL as to 66 Judgment, 65 Order on Motion to Dismiss, by Plaintiffs Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer. Filing fee $ 505, receipt number ANVDC-6885139. E-mail notice (NEF) sent to the US Court of Appeals, Ninth Circuit. (Attachments: # 1 Exhibit, # 2 Exhibit) (OMara, David) (Entered: 04/28/2022) |
| 04/28/2022 | 68 | EXHIBIT *Representation Statement* to 67 Notice of Appeal, by Plaintiffs Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer. (OMara, David) (Entered: 04/28/2022) |
| 04/29/2022 | 69 | USCA ORDER for Time Schedule as to ECF No. 67 Notice of Appeal, filed by Roger Palmer, Chad Moxley, Firearms Policy Coalition, Inc. **USCA Case Number 22-15645** assigned. (Copies have been distributed pursuant to the NEF - CJD) (Entered: 04/29/2022) |
| 06/03/2022 | 70 | TRANSCRIPT DESIGNATION by Plaintiffs Firearms Policy Coalition, Inc., Chad Moxley, Roger Palmer re 67 Notice of Appeal, 48 Motion Hearing,,,, (OMara, David) (Entered: 06/03/2022) |
| 06/23/2022 | 71 | TRANSCRIPT of Proceedings, 48 Motion Hearing,,, held on 7-16-21, before Chief Judge Miranda M. Du. Court Reporter/Transcriber: Kathy French, KF@nvd.uscourts.gov. Any Redaction Request is due by 7/14/2022. Redacted Transcript Deadline is set for 7/24/2022. Release of the Transcript Restriction is set for 9/21/2022. Before release date, the transcript may be viewed at the court public terminal or purchased through the reporter/transcriber. Transcript Order form is available on court website. After that date it may be obtained through the court reporter or PACER. (KF) (Entered: 06/23/2022) |

| **PACER Service Center** | | | |
| --- | --- | --- | --- |
| **Transaction Receipt** | | | |
| 10/06/2022 07:17:57 | | | |
| **PACER Login:** | rmdllp1749 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:21-cv-00268-MMD-CSD |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

ER-282