# In the
# United States Court of Appeals
# for the Ninth Circuit

◆

ROGER PALMER, et al.,

*Plaintiffs–Appellants,*

v.

STEVE SISOLAK, et al.,

*Defendants–Appellees.*

◆

On Appeal from the United States District Court
for the District of Nevada
Case No. 3:21-cv-00268-MMD-CSD
The Honorable Miranda M. Du

◆

**APPELLANTS' REPLY BRIEF**

◆

DAVID C. O'MARA
THE O'MARA LAW FIRM, P.C.
311 East Liberty Street
Reno, NV 89501
(775) 323-1321
david@omaralaw.net

RAYMOND M. DIGUISEPPE
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
(910) 713-8804
law.rmd@gmail.com

*Counsel for Appellants*

# CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellants submit this corporate disclosure and financial interest statement pursuant to Federal Rule of Appellate Procedure 26.1.

Firearms Policy Coalition, Inc., has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

/s/ *Raymond M. DiGuiseppe*
*Counsel for Appellants*

# TABLE OF CONTENTS

**Page**

I. Introduction ...................................................................1

II. Defendants' claim that AB 286's ban is wholly exempt under *Bruen* illustrates the spurious nature of their defense. ........4

III. The Second Amendment's plain text unquestionably covers the protected arms and conduct targeted by AB 286's ban....8

IV. Defendants necessarily cannot carry their burden. ...........10

    A. AB 286 indisputably targets arms in common use. ......10

    B. Defendants cannot identify any relevantly similar historical analogue, because none exists. ..................13

    C. Defendants' purported analogies come nowhere close to the "how and why" of the ban imposed by AB 286. ..16

V. Defendants also wrongly rely on "permissible alternatives."..................................................................18

VI. No amount of further discovery can change the result already clear from the undisputed facts before the Court...20

VII. Defendants' self-destructive arguments against the Takings claim further spotlight the unconstitutionality of AB 286...23

VIII. Conclusion ..................................................................27

# TABLE OF CITED AUTHORITIES

**Page**

**Cases**

*Abramski v. United States*, 573 U.S. 169............................................2

*Andrews v. State*, 50 Tenn. 165 (1871)...............................................9

*Caetano v. Massachusetts*, 136 S.Ct. 1027 (2016)........................10, 21

# TABLE OF CITED AUTHORITIES (continued)

**Page**

## Cases

*Crow Tribe of Indians*, 87 F.3d 1039 (9th Cir. 1996)..........................22

*District of Columbia v. Heller*, 554 U.S. 570 (2008).....................*passim*

*Drummond v. Robinson Township*, 9 F.4th 217 (3d Cir. 2021)..............9

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)...........................9

*Horne v. Dept. of Agriculture*, 576 U.S. 350 (2015)...........................24

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012).................................21

*Nationwide Transport Finance v. Cass Information Systems, Inc.*,
523 F.3d 1051, 1058 (9th Cir. 2008)................................................22

*New York State Rifle & Pistol Ass'n v. Bruen*
152 S.Ct. 2111 (2022)................................................................*passim*

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)..............21

*People v. Yanna*, 297 Mich. App. 137 (2012)....................................22

*Range v. Attorney General U.S.*, 53 F.4th 262 (3d Cir. 2022)............4-5

*Rigby v. Jennings*, __ F.Supp.3d __, 2022 WL 4448220 (D. Del. 2022)......9

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017)............8, 9

*Teter v. Connors*, 460 F.Supp.3d 989 (D. Hawaii 2020).......................10

## United States Constitution

Second Amendment..................................................................*passim*

Fifth Amendment....................................................................1, 2, 3, 23

**Publications**

Advisory Committee Notes to rule 201 of the Federal Rules of Evidence…………………………………………………………………………21

Cramer, Clayton E., *Colonial Firearms Regulation* (April 6, 2016)……..18

Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652 et seq. (Apr. 26, 2022)…………………………15, 16, 19

5 American Archives, Fourth Series, 1418 (Peter Force ed., 1844)……...13

M. L. Brown*, Firearms in Colonial America: The Impact on History and Technology 1492-1792 (1980)……………………………………………………12

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004)……...17

Thayer, Preliminary Treatise on Evidence 279-280 (1898)………………21

**Other Sources**

https://dictionary.cambridge.org/us/dictionary/english/gunsmith………13

https://www.collinsdictionary.com/us/dictionary/english/gunsmith…….13

https://www.dictionary.com/browse/gunsmith……………………………13

## I. Introduction

Defendants concede the sweeping effects of AB 286: that it outright "bans unserialized firearms, no matter their provenance," "mak[ing] it illegal" for ordinary law-abiding Nevadans to do anything with them or with any "unfinished" frames and receivers—possess, transfer, transport, receive, manufacture, or assemble any such arm or constituent part— and mandating the dispossession of all such arms and parts by January 1, 2022. Ans. Br. at 8. They admit that, because of this "ghost gun" law, the *only* firearms and constituent parts now legal in Nevada are "*pre-serialized*" firearms and unfinished frames and receivers—i.e., those *already* "imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law"—absent narrow exceptions largely unavailable to the average person. Ans. Brf. at 18-19.

Yet, Defendants refuse to acknowledge or accept any responsibility for the impacts of this law under either the Second or the Fifth Amendment. Instead, they cast AB 286 as a righteous exercise of Nevada's broad "police powers" to regulate against "threats" to public safety, which imposes no cognizable injury on anyone because "serialized firearms are widely available in Nevada *without the need for* self-

manufacturing" and people can still "self-manufacture firearms as long as they start with a *serialized* receiver." Ans. Brf. at 18 & n. 9 (emphasis added). They even claim AB 286 must be accorded special status as a "permissible prophylactic measure" that exempts it from scrutiny under the Second Amendment because—as one could say about any firearm regulation at the highest level of generality—it is designed to ensure that only law-abiding citizens keep and bear arms. Ans. Brf. at 2, 11-12.

Defendants imbue their themes of a constitutionally bulletproof "public safety" law with an aura of credibility by painting AB 286 as a spearhead for the Bureau of Alcohol, Tobacco, Firearms, and Explosives, which champions ATF's mandates and policies concerning background checks and recordkeeping "'to prevent guns from falling into the wrong hands'"—i.e., "minors, felons and other prohibited persons." Ans. Brf. at 1, 3 (quoting *Abramski v. United States*, 573 U.S. 169, 172 (2014)).

And all this tees up Defendants' claim that AB 286 skates right past the Fifth Amendment's Takings Clause because it's a proper exercise of the State's "police powers," empowering it to compel all law-abiding Nevadans to forfeit all their offending arms and precursor parts with zero compensation under the "public safety exception." Ans. Brf. at 30-31.

Defendants' Answer seriously distorts both the facts and the law. In truth, AB 286 is an egregious violation of the Second Amendment, virtually unprecedented in its scope of prohibition and certainly finding no support anywhere within the relevant history or even anywhere within the policies or mandates of the modern federal government. In fact, the State's entire position is built on a false narrative: it touts a need for this "ghost gun" ban in order to ensure background checks and recordkeeping for all Nevadans who seek to keep and bear arms, while nevertheless providing no mechanism for its law-abiding citizens to satisfy such requirements as a condition to self-manufacturing, thereby completely depriving them of any path for lawful self-manufacturing.

The real story is that this is just a flat-out ban on constitutionally protected liberties, which is untenable under the Second and Fifth Amendments. The district court's judgment short-circuiting this case must be reversed. Particularly now in light of Defendants' Answer, it's clear that Plaintiffs' claims are not only "plausible," but ultimately meritorious, warranting entry of a preliminary injunction on remand.

**II. Defendants' claim that AB 286's ban is wholly exempt under *Bruen* illustrates the spurious nature of their defense.**

In building their house of cards here, Defendants place great emphasis on footnote 9 of the *Bruen* majority opinion, where the Court noted that "it appears" "shall-issue" carry regimes—unlike New York's fatally unconstitutional "may-issue" regime—"which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *New York State Rifle & Pistol Ass'n v. Bruen*, 152 S.Ct. 2111, 2138, n. 9 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)).

Defendants spin up this language into a wholesale exemption for any firearm regulation designed to ensure that "only law-abiding, responsible citizens keep and bear arms." Ans. Brf. at 16. So, the notion goes, "only 'law-abiding citizens' are part of 'the people' who may assert Second Amendment rights," and thus any regulation designed to advance this purpose falls "outside the Second Amendment's plain text," basically leaving it exempt from constitutional scrutiny. Ans. Brf. at 11-12, 15-16.[1]

---

[1]     Here, and at several other places in their brief, Defendants rely on *Range v. Attorney General U.S.*, 53 F.4th 262, 266, 268 n.5 (3d Cir. 2022)

Footnote 9 arises in the context of the Court's discussion of "*well-defined* restrictions governing the intent for which one could carry arms, the *manner* of carry, or the *exceptional circumstances* under which one could not carry arms," as distinguished from "may-issue" regimes that require a "special" need to exercise carry rights. *Bruen*, 142 S.Ct. at 2138 (emphasis added). The footnote extrapolates on this by noting that "shall-issue" regimes generally fall within this *well-defined* category of restrictions, involving "*narrow, objective, and definite* standards," "to which the right to keep and bear arms in public has traditionally been subject." *Id.* at 2138, n. 9 (emphasis added). *These* types of regulations are generally "designed to ensure *only* that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" *id.* (emphasis added)—that is, this the *only* purpose of such regulatory schemes and they are *tailored* to do so with "narrow, objective, and definite standards."

The Court was contrasting such regulations from may-issue schemes, which do not *just* ensure the applicant is a "law-abiding, responsible citizen" but impose *additional* restrictions and conditions

<hr />

(per curiam), which has since been vacated and ordered for rehearing. *Range v. Attorney General U.S.*, 2023 WL 118469 (Jan. 6, 2023).

that unduly burden the Second Amendment, like New York's "proper cause" showing. The Court was not, by any stretch, creating a wholesale exemption for any regulation designed to ensure that "only law-abiding, responsible citizens keep and bear arms." A notion like that would allow governments to nullify the Second Amendment rights of such individuals, since virtually all firearms regulations could be seen as ultimately designed "to prevent guns from falling into the wrong hands." Indeed, the Court rejected any such notion within Footnote 9 itself, something Defendants conspicuously ignore. *Bruen*, 142 S.Ct. at 2138, n. 9 ("That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes …").

And AB 286 is nothing like a shall-issue regime with "well-defined" restrictions bounded by "narrow, objective, and definite standards" designed only to establish "*exceptional* circumstances" under which law-abiding people may *not* acquire arms bearable arms in common use and ultimately to ensure only law-abiding people acquire such arms. Instead, as Defendants readily admit, it's a broad *ban* on the possession, transfer, transport, receipt, manufacture, and assembly of *all* firearms and their constituent parts not "imprinted with a serial number issued by a

firearms importer or manufacturer in accordance with federal law"—
*regardless* of whether a person is indisputably a "law-abiding, responsible citizen" and *regardless* of whether that person would willingly submit to and satisfy background-check and recordkeeping requirements.

Indeed, while Defendants repeatedly espouse concerns about people "circumvent[ing] background checks" and using "ghost guns" to perpetrate "untraceable" gun crimes, Ans. Brf. at 7, AB 286 provides no mechanism for Nevada's "law-abiding, responsible" citizens to *comply* with background-check and recordkeeping requirements as a condition to lawfully self-manufacturing a firearm or as a condition to keeping one that they already lawfully self-manufactured under the prior law. Rather, as Defendants themselves put it, AB 286 just flatly "bans unserialized firearms, no matter their provenance." Ans. Brf. at 8.

Defendants have created a false narrative around a non-existent exemption for their law. They cannot avoid scrutiny of this law.

**III. The Second Amendment's plain text unquestionably covers the protected arms and conduct targeted by AB 286's ban.**

After trying to avoid it, when they do get to the textual question, Defendants attempt to brush it off too with the argument that "self-manufacturing firearms has no basis in the Second Amendment's plain text" because it "does not refer to manufacturing" or to "items or materials (like unfinished receivers) that could, with further processing, become arms." Ans. Brf. at 17. The first problem with Defendants' textual argument is that it glosses over the full extent of AB 286's impact which, as they admit elsewhere, bans not *just* self-manufacturing firearms but also the possession, transfer, transport, and receipt of all arms and constituent parts that fall within the scope of the ban—i.e., all arms and parts except those already "imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law."

To repeat, as *Bruen* did, "the Second Amendment extends, prima facie, to *all instruments that constitute bearable arms*, even those that were not in existence at the time of the founding." *Bruen*, 142 S. Ct. at 2132 (citing *Heller*, 554 U.S. at 582) (emphasis added). And, again, "the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. County*

*of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). "As with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to *acquire* arms." *Id.* at 677–78 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) (quoting *Ezell* at 704 (italics added) (This "'implies a corresponding *right to acquire* and maintain proficiency' with common weapons.").

Certainly nothing within the plain text of the Second Amendment *limits* the manner of arms acquisition—i.e., limiting it to the purchase or acquisition from a third party, as Defendants suggest. Ans. Brf. at 12 (arguing the restriction falls outside the plain text because self-manufacturing "is not necessary to the exercise of the right to keep and bear arms in Nevada, where professionally made, serialized firearms are abundantly available"). It's clear that "the right to keep and bear arms implies a corresponding right to manufacture arms." *Rigby v. Jennings*, __ F.Supp.3d __, 2022 WL 4448220, *7 (D. Del. 2022); *see also Teixeira* 873 F.3d at 679 (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871) (where the Ninth Circuit recognized the right "to keep" arms "necessarily

involves" the right to "'keep them in a state of efficiency for use'" and "'to keep them in repair,'" which implies the right to *self*-repair). It follows that the right to self-manufacture "wouldn't mean much" without the right to own, possess, and use the constituent parts necessary to engage in such activity—and, of course, the firearms ultimately produced.

The conduct targeted by AB 286's ban is unquestionably "covered" by the Second Amendment, such that the only question is whether the law "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126. It most definitely is not.

## IV. Defendants necessarily cannot carry their burden.

### A. AB 286 indisputably targets arms in common use.

Again, as *Heller* explained and *Bruen* reaffirmed, the government may only ban weapons that are dangerous and unusual, i.e., those that are *not* in common use for lawful purposes. *Heller*, 554 U.S. at 626-27; *Caetano v. Massachusetts*, 136 S.Ct. 1027, 1031 (2016); *Teter v. Connors*, 460 F.Supp.3d 989, 999 (D. Hawaii 2020) ("The inquiry is conjunctive, so a weapon must be both dangerous <u>and</u> unusual."). This is "fairly supported by the historical tradition of prohibiting the carrying of

dangerous and unusual weapons." *Bruen*, 142 S.Ct. at 2128. Defendants do not even attempt to argue the arms and constituent parts targeted by the ban here are "dangerous and unusual," as they must prove in carrying their burden. Instead, they attempt to shift the burden Plaintiffs to prove the targeted arms are "in common use" for lawful purposes—even though they elsewhere admit it's *their* burden "to show that the regulation "is consistent with the Nation's historical tradition of firearm regulation." Ans. Brf. at 14. At any rate, it is indisputable that the ban targets a huge swath of popular handguns and long guns otherwise widely available and used across the country for self-defense and other lawful purposes.

A model-by-model evidentiary showing that the countless firearms targeted by the ban are in common use is plainly not required by *Heller* or *Bruen*. *Heller* and *Bruen* affirm that the textual analysis itself looks only at whether the *category* of weapons is protected as "arms." *Bruen*, 142 S.Ct. at 2128, 2134; *Heller*, 554 U.S. at 629 ("handguns are the most popular weapon chosen by Americans for self-defense in the home").

Indeed, with the sweeping scope of their law targeting not only completed firearms but the core precursor parts necessary to manufacture virtually *any* firearm—all "unfinished" frames and

receivers, including any "blank," "casting," or "machined body" intended for manufacturing or assembly— Defendants cannot credibly contest that AB 286 bans arms "in common use today" because it *necessarily* does. With that, the constitutional inquiry is complete since the historical record supports only restrictions on "dangerous and unusual arms."

The same goes for the activity of *self-manufacturing* such arms. That is woven into the fabric of the Nation's historical tradition. "The influence of the gunsmith and the production of firearms on nearly every aspect of colonial endeavor in North America cannot be overstated, and that pervasive influence continuously escalated following the colonial era." M. L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492-1792, at 149 (1980). ER-243 [Compl. ¶44]. Defendants' only comeback is to say that "[n]early all of Plaintiffs' sources discuss *professional* gun manufacturers and dealers," Ans. Brf. at 24, apparently based on the assumption that a "gunsmith" exclusively means a *commercial* manufacturer. However, "gunsmith" unquestionably includes ordinary, law-abiding citizens like Plaintiffs because it means, as it always has, "*a person* who makes or repairs firearms."

https://dictionary.cambridge.org/us/dictionary/english/gunsmith,

https://www.collinsdictionary.com/us/dictionary/english/gunsmith,

https://www.dictionary.com/browse/gunsmith (italics added).

### B. Defendants cannot identify any relevantly similar historical analogue, because none exists.

As Plaintiffs' sources illustrate, the early colonies incentivized "*any* Person or Persons" "willing to engage in manufacturing" of arms and "*any necessary parts thereof*." 5 American Archives, Fourth Series, 1418 (Peter Force ed., 1844). ER-244 [Compl. ¶48] (italics added). And those who engaged in such manufacturing were furnished "with tools, implements and utensils, and materials for carrying on the said work." *Id.* at 1338. ER-244 [Compl. ¶49]. Consistent with this venerable tradition of Americans freely engaging in the manufacture of arms in common use— with all the necessary parts, implements, and materials at their disposal—no regulations on this activity existed at all until just recently, and they exist only in a small handful of jurisdictions, including Nevada. Defendants don't deny this; instead, they say it "makes no difference" that such laws "are of a relatively recent vintage." Ans. Brf. at 24. But that makes all the difference. The basis for Defendants' outlandish claim otherwise is that modern regulations spurred by recent technological

advances are subject to a "more relaxed" historical inquiry. *Id.* Nowhere does *Bruen* establish "more relaxed" standards for newer laws. All the Court said about that was, "[w]hile the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 142 S.Ct. at 2132. More "nuanced" doesn't mean more "relaxed." The Court explained in no uncertain terms that "[w]hen confronting such present-day firearms regulations," the essential task is the same: "reasoning by analogy—a commonplace task for any lawyer or judge"—to determine if the proffered analogue is "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. And it circled back to the key principle that this reasoning "requires judges to apply faithfully the balance struck by the founding generation to modern circumstances" because "the Second Amendment is the 'product of an interest balancing *by the people*,' not the evolving product of federal judges." *Bruen* at 2133, n. 7 (quoting *Heller*, 554 U.S. at 635).

And the required "reasoning by analogy" is the death knell for AB 286, specifically because it is of such "recent vintage" with no historical

precedent as Defendants readily concede. Notably, while Defendants claim to be in good company with the federal government here, they can't even draw a true similarity there. They misleadingly portray the Nevada legislature as having "c[o]me to the same conclusion as the federal government about ghost guns' threat to public safety," Ans. Brf. at 7, and characterize AB 286 as a spearhead against this threat that "prevent[s] an easy end-run around" such background-check laws, Ans. Brf. at 3.

To the contrary, in its most recent rulemaking, ATF repeatedly emphasized that, regardless of any rule changes designed to bring certain "unfinished" frames or receivers within the general definition of its "firearm" regulations, it has not and will not regulate self-manufacturing for personal use—there are no serialization, recordkeeping, background checks, or other conditions imposed on law-abiding citizens engaged in doing so. Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652 et seq. (Apr. 26, 2022) (codified at 27 CFR 447-49); *id* at 24686 ("This rule does not restrict law-abiding citizens' ability to make their own firearms from parts for self-defense or other lawful purposes. … Neither the GCA nor this implementing rule requires unlicensed individuals to mark (non-NFA)

firearms they make for their personal use, or to transfer them to an FFL for marking."); *id.* at 24750 ("This rule does not require unlicensed PMF ["privately made firearm"] owners to do anything to their firearms maintained solely for personal use."); *id.* at 24653, 24665, 24699, 24676, 24690, 24706, 24719 (same). ATF has even defended the constitutionality of its rules under the Second Amendment on this ground. *Id.* at 24676.

## C. Defendants' purported analogies come nowhere close to the "how and why" of the ban imposed by AB 286.

Lacking anything "relatively similar" to point to in the annals of history, or even in the current federal regulatory regime, Defendants try to play the all-inclusive "prophylactic measure" card again, saying "AB 286 continues the historical tradition of laws preventing non-lawabiding individuals from obtaining firearms." Ans. Brf. at 23. If that were enough, governments could all too easily sail past this historical inquiry with "a regulatory blank check," *Bruen*, 142 S.Ct. at 2133, as virtually all such regulations could be characterized as serving such a purpose.

Rather, the "relevantly similar" inquiry requires that the government's current regulation be "*comparable*" to the historical regulation on which it relies, because the question is "whether modern and historical regulations impose a comparable burden on the right of

armed self-defense and whether that burden is comparably justified." *Bruen*, 142 S.Ct. at 2133. This requires an analysis of "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* Besides the generic category of "laws preventing non-lawabiding individuals from obtaining firearms," Defendants point to "the historical tradition of keeping track of the firearms present in the community" and "founding-era laws [that] monitored who in the community had guns." Ans. Brf. at 23. AB 286 doesn't "keep track" of or "monitor" firearms and who has them—it's a *ban* on all "unserialized" firearms and precursor parts. Nevada *could* have included recordkeeping and background-check requirements as a condition to the continued possession and ability to self-manufacture such arms, so as to meet Defendants' supposed concerns, but it simply outlawed the activity and the related products.

Further, according to Defendants' own resource, the laws "keep[ing] track of who had firearms" were *militia* laws intended to ensure all members of the militia timely reported for "muster." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 505 (2004); *see* Ans. Brf. at 23. That is, the purpose was to ensure preparedness to defend the community

17

*with arms*. *See also* Cramer, Clayton E., *Colonial Firearms Regulation* (April 6, 2016). Available at SSRN: https://ssrn.com/abstract=2759961 or http://dx.doi.org/10.2139/ssrn.2759961, at p. 6. That is hardly comparable to a law designed to ban the possession, use, and self-manufacture of huge swaths of arms in common use for lawful purposes. Neither the "how" nor the "why" of AB 286 bears any comparable or relevantly similar relation to any historical tradition of firearms regulation.

## V. Defendants also wrongly rely on "permissible alternatives."

Defendants' "permissible alternatives" argument not only directly contradicts *Heller*—554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.")—but smacks of the very rationale struck down in *Bruen*. They say, "serialized firearms are widely available in Nevada *without the need for* self-manufacturing," Ans. Brf. at 18 (italics added), as if an individual can and should be made to show a "special need," "distinguishable from that of the general community," before being permitted to engage in self-manufacturing. *See Bruen*, 142 S.Ct. at 2123 (striking down New York's "proper cause" carry

permitting scheme, under which New Yorkers had to "demonstrate a special need for self-protection distinguishable from that of the general community"). It doesn't work that way, with the Second Amendment or any other fundamental civil liberty. *See Bruen* at 2156 ("We know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need.").

So, Defendants are dodging the point in citing "the vast number of serialized firearms *for sale*" in Nevada. Ans. Brf. at 21 (italics added). And it's also no answer to say that Nevadans can still "self-manufacture firearms as long as they start with a *serialized* receiver." Ans. Brf. at 18-19, & n. 9 (italics added). This argument spotlights the whole problem: if the receiver or frame is already serialized, then it's *already* been manufactured because only licensed manufacturers and importers imprint such markings and only *finished* frames or receivers are subject to such requirements. *See* 87 Fed. Reg. at 24665 (the new rules do "not require FFLs to accept any PMFs, or to mark PMFs themselves, or to provide services to place identification marks on PMFs."). Thus, ordinary law-abiding citizens cannot lawfully manufacture receivers or frames, which are the most integral components of any self-made firearm.

Coupled with the broad definition of the "unfinished" frames or receivers banned under AB 286, Nevada has effectively shut down lawful self-manufacturing in the State. And that is unconstitutional.

## VI. No amount of further discovery can change the result already clear from the undisputed facts before the Court.

Defendants say, "the State has not had the opportunity to present its historical evidence, marshal expert testimony or interrogate the complaint's alleged historical evidence" and thus the Court "should remand so that the parties can develop the historical record in the district court." Ans. Brf. at 12. They propose that this evidence "will come from primary sources, as well as expert testimony." Ans. Brf. at 20. But no amount of discovery or "expert testimony" can alter the fundamental reality that (1) this is a *ban* of arms in common use, the constituent parts of those arms, and self-manufacturing of such arms with such parts and (2) *any* regulation of self-manufacturing is of "recent vintage." Defendants concede this. Necessarily then, they cannot carry their burden of proving the law "is consistent with this Nation's historical tradition of firearm regulation"—the tradition "that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127.

This claim presents a purely legal question—and one that ultimately must be resolved in Plaintiffs' favor given the undisputed facts before the Court. Courts routinely decide purely legal issues that depend only on the existence of "legislative facts" rather than "adjudicative facts" developed in discovery or "determined in trials." *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012).[2] *Heller* supported its conclusion that handguns are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family" by citing to a social science paper cited in another case for the same point. *Id.* at 628-29 (citing *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007)). Justice Alito, in his concurrence in *Caetano*, 577 U.S. 411, concluded that stun guns "are widely owned and accepted as a legitimate means of self-defense across

---

[2]     The Advisory Committee Notes to rule 201 of the Federal Rules of Evidence explain the basic difference between "adjudicative" and "legislative" facts as follows: "Adjudicative facts are simply the facts of the particular case. Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body." That is, legislative facts are not limited to information introduced through a formal evidentiary process or facts that are indisputable, but include "non-evidence facts" necessarily incidental to the reasoning process—matters that judges and juries reasonably believe and assume to be true "'with competent judgment and efficiency'" "'as part of their necessary mental outfit.'" *Id.* (quoting Thayer, Preliminary Treatise on Evidence 279-280 (1898)).

the country" by quoting a Michigan Court of Appeal's statement—supported in turn by citation to a law review article—that "hundreds of thousands" of stun guns had been sold to private citizens, *id*. at 420 (citing *People v. Yanna*, 297 Mich. App. 137, 144 (2012)).

Again, the inevitable outcome here is clear, and any further analysis that may pertain in resolving this purely legal question can be based solely on legislative facts without the need for any formal discovery, development of adjudicative facts, or expert testimony concerning the import of such facts. As the *Bruen* court emphasized, the necessary process of "reasoning by analogy" is "a commonplace task for any *lawyer or judge*." *Bruen*, 142 S.Ct. at 2132 (italics added). And, anyway, because the ultimate question of whether the law "is consistent with this Nation's historical tradition of firearm regulation" is a legal one, any "expert testimony" on the matter would constitute an "improper "legal conclusion, an opinion on an ultimate issue of law." *Nationwide Transport Finance v. Cass Information Systems, Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008); *Crow Tribe of Indians*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("Expert testimony is not proper for issues of law.").

## VII. Defendants' self-destructive arguments against the Takings claim further spotlight the unconstitutionality of AB 286.

Consistent with their continuing denial of any responsibility for AB 286's clear violation of the Second Amendment, Defendants continue to deny that the law's dispossession mandate effects any sort of cognizable taking under the Fifth Amendment. Their refusal to accept such responsibility on either front quickly defeats their attempt to shut the door on a takings claim by arguing Plaintiffs are relegated to state court in seeking relief because an inverse condemnation action is an "available" remedy. Ans. Brf. at 25. As Plaintiffs alleged in the Complaint, ER-266 [Compl. ¶¶150-151], any such state court action would clearly be a futile effort given the State's insistence that the dispossession mandate is a valid exercise of its police powers under the "public safety" exception. Defendants' brief in this Court underscores that reality as they double down on that claim in fending off this challenge. Ans. Brf. at 30-31.

On the merits, Defendants are flat wrong about multiple points foundational to their Answer. First, the record belies their claim that Plaintiffs "forfeited" the right to challenge the dispossession mandate as a "physical" taking because they did not oppose Defendants' motion to dismiss on this ground. Ans. Brf. at 26. Not only did Plaintiffs specifically

argue this point in their opposition to Defendants' motion, ER-76, but they also specifically asserted the physical taking dimension of this claim in the Complaint, ER-267 [Compl. ¶155]. Second, Defendants claim that Plaintiffs never argued the dispossession mandate entirely eliminated the economic value of their property, Ans. Brf. at 27-28, but that was in fact a key contention in their opposition to Defendants' motion, ER-78. Third, it's clearly not the case that Plaintiffs are foreclosed from pursuing a takings claim simply because the property at issue is personal property and not a piece of real estate, as Defendants claim. Ans. Brf. at 27; *see Horne v. Dept. of Agriculture*, 576 U.S. 350, 358 (2015) ("Nothing in the text or history of the Takings Clause, or our precedents, suggests that the rule is any different when it comes to appropriation of personal property. The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home.").

Fourth, Defendants' claim that Plaintiffs have asserted nothing more than "speculative" forms of injury to their property interests ignores the clear, essentially irrefutable allegations that the supposed "grace" period to sell the banned firearms and precursor parts was an illusory option because no viable market existed to dispose of the property

through a sale and certainly not a sale for *fair* market value. ER-264 [Compl. ¶ 145]; ER-77. Further, an obvious economic advantage of self-manufacturing arms is that it facilitates the acquisition of arms at substantially lesser expense. Thus, the forced dispossession had a doubly-injurious impact: *even if* a person was able to sell the property at some price compromised by Defendants' classification of it as "injurious to the public health," to substitute for the loss of that property, the person would be required to turn around and *purchase* a serialized firearm and/or serialized precursor parts on the open market at retail price.

Fifth, Defendants claim the dispossession mandate "did not interfere with Plaintiffs' investment-backed expectations" because law-abiding Nevadans should be assumed to have *expected* a new regulation like this might render their property "economically worthless," but all Defendants cite in support of this expectation is the existence of a *single* regulation on self-manufacturing from *2015*. Ans. Brf. at 30. That's hardly cause for holding law-abiding Nevadans accountable for assuming Nevada would wipe out their self-manufacturing rights and force a forfeiture of their homemade guns, especially when the federal government has consistently left this activity entirely unregulated.

Last, AB 286 is not a "valid law" so as to support any kind of exercise of police powers under the "public safety exception," Ans. Brf. at 31, given its direct and egregious contravention of the Second Amendment rights. In fact, while Defendants tout the district court's endorsement of their claim that this property can and should be outlawed as "dangerous private property," they have not argued and the district did not find that any of the targeted arms is "dangerous and unusual" as they must be in order to be *constitutionally* banned. Moreover, again, the ATF is fully aware of the same potential risks supposedly driving AB 286—"ghost guns" falling into the "wrong hands"—and yet it has not only *not* imposed a blanket ban but it has expressly permitted law-abiding people to continue self-manufacturing without regulation. This clearly further undermines Defendants' already tenuous claim that the property targeted by the ban is truly "injurious to the public health" when in the hands of all those *law-abiding* citizens compelled to give up the property.

## VIII. Conclusion

The outcome in this case is clear, and without any further process, especially after *Bruen*: Plaintiffs not only *state* plausible claims for relief but they ultimately prevail on their claims. Accordingly, the judgment should be reversed with directions that Plaintiffs may proceed on their claims and, in light of Defendants' Answer demonstrating the State necessarily cannot carry the burden required to sustain AB 286, with further directions that the district court enter a preliminary injunction.

Respectfully submitted,

/s/ *Raymond M. DiGuiseppe*
RAYMOND M. DIGUISEPPE
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
(910) 713-8804
law.rmd@gmail.com

# CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party.

This brief contains 5,376 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** _Raymond M. DiGuiseppe_      **Date:** February 10, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2023, I served the foregoing brief via the CM/ECF system for the United States Court of Appeals for the Ninth Circuit, which will distribute the brief to all attorneys of record in this case. No privacy redactions were necessary.

Dated this 10th day of February 2023.

/s/ *Raymond M. DiGuiseppe*
*Counsel for Appellants*